No. 24-1570

_____

_____

IN THE UNITED STATES COURT OF APPEALS
FOR THE NINTH CIRCUIT
_____

PHARMACEUTICAL RESEARCH AND MANUFACTURERS OF
AMERICA,

     Plaintiff-Appellee,

         v.

ANDREW STOLFI, in his official capacity as Director of the Oregon
Department of Consumer and Business Services,

     Defendant-Appellant.

_____

APPELLANT'S OPENING BRIEF
_____

Appeal from the United States District Court
for the District of Oregon
_____

ELLEN F. ROSENBLUM
Attorney General
BENJAMIN GUTMAN
Solicitor General
PEENESH SHAH
Assistant Attorney General
1162 Court St. NE
Salem, Oregon 97301-4096
Telephone: (503) 378-4402
peenesh.h.shah@doj.oregon.gov

Attorneys for Appellant

_____

_____

# TABLE OF CONTENTS

INTRODUCTION ......................................................................................1

STATEMENT OF JURISDICTION ..........................................................3

    A.    District Court Jurisdiction .................................................3

    B.    Finality of Judgment and Appellate Court Jurisdiction ..................3

    C.    Date of Entry of Judgment and Timeliness of Notice of Appeal ....................................................................................3

ISSUES PRESENTED FOR REVIEW .....................................................4

STATEMENT OF THE CASE ...................................................................4

    A.    Nature of the Case ..............................................................4

    B.    Course of Proceedings and Disposition Below ................................5

STATEMENT OF FACTS .........................................................................6

    A.    The Challenged Laws .........................................................6

        1.    The Reporting Requirement .................................. 7

        2.    The Public-Interest Exception. ......................... 10

    B.    Plaintiff's Challenges ......................................................10

        1.    The Reporting Requirement ............................... 11

        2.    The Public-Interest Exception .......................... 11

    C.    The District Court's Ruling...............................................12

        1.    The Reporting Requirement ............................... 12

        2.    The Public-Interest Exception .......................... 13

        3.    Entry of Final Judgment .................................... 13

SUMMARY OF ARGUMENT ................................................................14

STANDARD OF REVIEW ......................................................................16

ARGUMENT............................................................................................17

i

A.  The district court should have granted summary judgment for defendant rather than for plaintiff on the First Amendment claim. ..........................................................17

　1.  Whether it governs commercial speech or not, the reporting requirement is valid because it satisfies rational-basis scrutiny. .......................................... 17

　　a.  Compelled routine disclosures of factual information—commercial or otherwise—to the government is permissible if supported by a rational basis. ........................................... 18

　　b.  The reporting requirement survives rational-basis review. ........................................... 22

　　c.  The district court misunderstood the purpose of the reporting requirement when assessing whether that law advanced a legitimate government interest. ................................... 25

　2.  In the alternative, the reporting requirement should be upheld under either of the tests that apply to commercial speech. ........................................... 27

　　a.  The speech affected by the reporting requirement is commercial in nature. ...................... 28

　　b.  The reporting requirement should be upheld under the permissive standard applied in *Zauderer*. ................................................ 30

　　　i.  The reporting requirement concerns purely factual and uncontroversial information. .................................... 33

　　　ii.  The reporting requirement is reasonably related to a substantial government interest. ......................................... 37

　　　iii.  The reporting requirement is not unduly burdensome. ................................... 38

　　c.  If *Zauderer* is inapplicable, the reporting requirement should be upheld under the somewhat more exacting standard applied in *Central Hudson*. ...................................... 40

ii

3.    At most, plaintiff is entitled to a judgment severing any unconstitutional portion of the reporting requirement from the rest of the law .................................. 42

B.    The district court should have granted summary judgment for defendant rather than for plaintiff on the takings claim. ..........44

1.    Plaintiff lacks standing for its facial takings challenge. ..... 44

2.    Plaintiff's claim alleging a taking of trade secrets must be assessed as a regulatory-takings claim. ................ 47

3.    The public-interest exception is not an impermissible regulatory taking of trade secrets under the *Penn Central* factors. ................................. 49

a.    Assessed facially, the nature of the governmental action does not unfairly interfere with trade secrets. .................................... 50

b.    Assessed facially, the disclosure of trade secrets does not necessarily have a significant economic impact .................................... 52

c.    The disclosure of trade secrets under the public-interest exception does not upset any reasonable investment-backed expectations. .............................. 56

4.    Even if plaintiff were entitled to summary judgment, it is not entitled to prospective relief. ................................. 61

CONCLUSION .................................................................................65

## TABLE OF AUTHORITIES

### Cases Cited

*Am. Beverage Ass'n v. City & Cnty. of San Francisco*,
   916 F.3d 749 (9th Cir. 2019) ....................................................... 30, 31, 38

*Ariix, LLC v. NutriSearch Corp.*,
   985 F.3d 1107 (9th Cir. 2021) ...................................................................28

*Bolger v. Youngs Drug Prods. Corp.*,
   463 U.S. 60, 103 S. Ct. 2875 (1983) ................................................. 28, 29

*Branch Banking & Tr. Co. v. D.M.S.I., LLC*,
   871 F.3d 751 (9th Cir. 2017) ...................................................................17

iii

*California Chamber of Commerce v. Council for Education and
    Research on Toxics*, 29 F.4th 468 (9th Cir. 2022) ...................................36

*CCA Associates v. United States*,
    667 F.3d 1239 (Fed. Cir. 2011) ..............................................................52

*Central Hudson Gas & Electric Corp. v. Public Service Commission
    of New York*, 447 U.S. 557, 100 S. Ct. 2343 (1980) ....... 12, 27, 29, 30, 40

*Clear Channel Outdoor, Inc. v. City of Portland*,
    262 P.3d 782, 243 Or. App. 133 (2011) ...................................................43

*Comite de Jornaleros de Redondo Beach v. City of Redondo Beach*,
    657 F.3d 936 (9th Cir. 2011) ...................................................................43

*Corn Products Ref. Co. v. Eddy*,
    249 U.S. 427, 39 S. Ct. 325 (1919) .........................................................55

*CTIA - The Wireless Ass'n v. City of Berkeley, California*,
    928 F.3d 832 (9th Cir. 2019) ....................................................... 30, 31, 35

*Friends of the Earth, Inc. v. Laidlaw Envtl. Servs. (TOC), Inc.*,
    528 U.S. 167, 120 S. Ct. 693 (2000) .......................................................44

*Full Value Advisors, LLC v. S.E.C.*,
    633 F.3d 1101 (D.C. Cir. 2011) ................................ 18, 19, 20, 21, 24, 32

*Guggenheim v. City of Goleta*,
    638 F.3d 1111 (9th Cir. 2010) .................................................................45

*Kaiser Aetna v. U.S.*,
    444 U.S. 164, 100 S. Ct. 383 (1979) .......................................................49

*Keystone Bituminous Coal Ass'n v. DeBenedictis*,
    480 U.S. 470, 107 S. Ct. 1232 (1987) ............................................... 45, 50

*Knick v. Twp. of Scott, Pennsylvania*,
    588 U.S. 180, 139 S. Ct. 2162 (2019) ............................................... 62, 65

*Ladd v. Law & Tech. Press*,
    762 F.2d 809 (9th Cir. 1985) ...................................................................61

*Leavitt v. Jane L.*,
    518 U.S. 137, 116 S. Ct. 2068 (1996) .....................................................43

*Lorillard Tobacco Co. v. Reilly*,
    533 U.S. 525, 121 S. Ct. 2404 (2001) .....................................................26

*Montgomery v. Carr*,
    101 F.3d 1117 (6th Cir. 1996) .................................................................22

*Murr v. Wisconsin*,
    582 U.S. 383, 137 S. Ct. 1933 (2017) ....................................... 52, 53, 54

*Nat'l Ass'n for the Advancement of Psychoanalysis v. Cal. Bd.
    of Psychology*, 228 F.3d 1043 (9th Cir. 2000) .......................................25

iv

*Nat'l Ass'n of Manufacturers v. S.E.C.*,
   800 F.3d 518 (D.C. Cir. 2015) ........................................ 36, 37

*Nat'l Ass'n of Wheat Growers v. Bonta*,
   85 F.4th 1263 (9th Cir. 2023)........................ 30, 31, 34, 36, 40

*Nat'l Elec. Mfrs. Ass'n v. Sorrell*,
   272 F.3d 104 (2d Cir. 2011) ...................................................38

*Nat'l Inst. of Family & Life Advocates v. Becerra*,
   585 U.S. 755, 138 S. Ct. 2361 (2018) ....................................35

*Nationwide Biweekly Admin., Inc. v. Owen*,
   873 F.3d 716 (9th Cir. 2017)............................................ 33, 34

*Nevada Comm'n on Ethics v. Carrigan*,
   564 U.S. 117, 131 S. Ct. 2343 (2011) ....................................39

*New York State Rest. Ass'n v. New York City Bd. of Health*,
   556 F.3d 114 (2d Cir. 2009) ...................................................33

*Penn Cent. Transp. Co. v. City of New York*,
   438 U.S. 104, 98 S. Ct. 2646 (1978) ........................ 48–50, 52–53, 56, 63

*Pharm. Care Mgmt. Ass'n v. Rowe*,
   429 F.3d 294 (1st Cir. 2005) ................................... 18–21, 32–33, 57, 61

*Pharm. Research & Manufacturers of Am. v. Williams*,
   64 F.4th 932 (8th Cir. 2023)..................................... 62, 63, 64

*Philip Morris, Inc. v. Reilly*,
   312 F.3d 24 (1st Cir. 2002) ................................ 46–48, 51, 55, 57, 60–61

*PruneYard Shopping Ctr. v. Robins*,
   447 U.S. 74, 100 S. Ct. 2035 (1980) ......................................49

*Riley v. Nat'l Fed'n of the Blind of N. Carolina, Inc.*,
   487 U.S. 781, 108 S. Ct. 2667 (1988) ....................................21

*Ruckelshaus v. Monsanto Co.*,
   467 U.S. 986, 104 S. Ct. 2862 (1984) ............... 13, 46–49, 55–56, 58–60

*Spokeo, Inc. v. Robins*,
   578 U.S. 330, 136 S. Ct. 1540 (2016) ....................................47

*Tahoe–Sierra Pres. Council, Inc. v. Tahoe Reg'l Planning Agency*,
   535 U.S. 302, 122 S. Ct. 1465 (2002) ............................... 47, 54

*Thomas v. Anchorage Equal Rights Comm'n*,
   220 F.3d 1134 (9th Cir. 2000)................................................44

*Toguchi v. Chung*,
   391 F.3d 1051 (9th Cir. 2004)............................................... 17

*United States v. Liew*,
   856 F.3d 585 (9th Cir. 2017).......................................... 48, 57

*United States v. Navarro*,
  800 F.3d 1104 (9th Cir. 2015) ........................................................27

*United States v. Salerno*,
  481 U.S. 739, 107 S. Ct. 2095 (1987) ...........................................50

*United States v. Sindel*,
  53 F.3d 874 (8th Cir. 1995) ...........................................................20

*W. Virginia State Bd. of Educ. v. Barnette*,
  319 U.S. 624, 63 S. Ct. 1178 (1943) .............................................19

*Williamson v. Lee Optical of Okla., Inc.*,
  348 U.S. 483, 75 S. Ct. 461 (1955) ...............................................26

*Zauderer v. Office of Disciplinary Counsel*,
  471 U.S. 626, 105 S. Ct. 2265 (1985) ........................... 12, 27, 29–35, 40

## Constitutional and Statutory Provisions

28 U.S.C. § 1291 ...............................................................................3

28 U.S.C. § 1331 ...............................................................................3

28 U.S.C. § 2201 ...............................................................................3

42 U.S.C. § 1395w-3a(c)(6)(B) ........................................................7

42 U.S.C. § 1983 ...........................................................................3, 4

Or. Laws ch. 373, §§ 23c, 23d .......................................................59

Or. Rev. Stat. § 174.040 .................................................................43

Or. Rev. Stat. § 192.345(2) .............................................................59

Or. Rev. Stat. § 646A.689(1)(e) ........................................................7

Or. Rev. Stat. § 646A.689(1)(h) ........................................................7

Or. Rev. Stat. § 646A.689(1)(i) .........................................................7

Or. Rev. Stat. § 646A.689(10) .........................................................10

Or. Rev. Stat. § 646A.689(3) ........................................................8, 9

Or. Rev. Stat. § 646A.689(3)(c) ......................................................42

Or. Rev. Stat. § 646A.689(9) .................................................... 10, 29

Or. Rev. Stat. § 646A.689(13) ...........................................................9

U.S. Const. Amend. I ........................ 1, 11-14, 17-22, 25, 30, 38-39, 42, 44, 65

U.S. Const. Amend. V ...............................1, 11, 13-15, 22, 47-48, 61

## Administrative Rules

Or. Admin. Code 836-200-0530(2)(h) ........................................9, 42

**Other Authorities**

Fed. R. App. P. 4(a)(1)(A) ..................................................................3

Fed. R. Civ. Proc. 54(b) ..............................................................3, 14

H.B. 4005 ................................................................................ *passim*

H.B. 4005, ch. 7 .......................................................................9, 23

H.B. 4005, ch. 7, § (2)(1)(e) ............................................................7

H.B. 4005, ch. 7, § 2(1)(h) ...............................................................7

H.B. 4005, ch. 7, § 2(1)(i) ................................................................7

H.B. 4005, ch. 7, § 2(10) ................................................................10

H.B. 4005, ch. 7, § 2(10)(a) .............................................................7

H.B. 4005, ch. 7, § 2(12) ..................................................................9

H.B. 4005, ch. 7, § 2(3) ........................................................... 6, 8, 9

H.B. 4005, ch. 7, § 2(3)(c) ..............................................................42

H.B. 4005, ch. 7, § 2(9) .......................................................... 10, 29

Amy Kapczynski, *The Public History of Trade Secrets*,
    55 U.C. Davis L. Rev. 1367 (2022) ....................................................61

Robin Feldman & Charles Tait Graves, *Naked Price and Pharmaceutical
    Trade Secret Overreach*, 22 Yale J.L. & Tech. 61 (2020) ............... 23, 25

## APPELLANTS' BRIEF

_____

## INTRODUCTION

To introduce more transparency into a market where rising prices have burdened the state treasury and citizens' pocketbooks, the Oregon Legislature passed a law requiring prescription drug manufacturers to file reports with a state regulatory agency whenever they increased the price of a drug beyond a specific threshold. The questions in this case are whether those reports amount to compelled speech in violation of the First Amendment and whether the possible public disclosure of information contained in those reports makes the law facially invalid as a regulatory taking under the Fifth Amendment.

Although the district court agreed that those reports largely involved facts about costs, revenue, and market conditions, it concluded that a single part of the reporting law (requiring a narrative explanation of factors influencing the price increase) amounted to compelled speech that impermissibly forced manufacturers to express a particular view on a controversial topic. For that reason, it invalidated the _entire_ reporting law. But that law—especially its provision for reporting pure facts—is akin to countless well-accepted laws requiring routine disclosures in highly regulated markets and industries. For that reason, the law does not offend the First Amendment under the relevant

2

standard of scrutiny, whether that standard is rational-basis review, intermediate scrutiny, or something in between.

The district court also concluded that the law created a facial taking by providing that, when the public interest will be served by disclosure of trade secret information reported under that law, that information can be disclosed to the public. In so holding, the district court failed to correctly apply the relevant factors that the Supreme Court uses to identify an impermissible regulatory taking of the sort that might result from disclosure of trade secrets. In particular, the district court functionally treated the challenged law as a *per se* taking, focusing on the narrow property interest affected by the challenged law and ignoring the property-as-a-whole rule for assessing the economic impact of the regulation. The district court also ignored the Court's holding that a party can have no reasonable investment-backed expectation of confidentiality in information voluntarily submitted to a regulatory agency without an *express* promise of confidentiality, which was lacking here.

The district court's rulings were error, and it should have granted summary judgment for defendant rather than for plaintiff on the free-speech and takings claims in this case.

3

## STATEMENT OF JURISDICTION

### A.    District Court Jurisdiction

If plaintiff's claims are justiciable (which is disputed in part as explained below), the district court had federal-question jurisdiction under 28 U.S.C. § 1331 over this action filed under 42 U.S.C. § 1983, and it had jurisdiction to over the request for declaratory relief under 28 U.S.C. § 2201. (*See* ER-198 ¶¶ 14, 16).

### B.    Finality of Judgment and Appellate Court Jurisdiction

The district court entered a partial final judgment under Fed. R. Civ. Proc. 54(b), declaring that the laws challenged by plaintiff do violate or "would" violate the United States Constitution. (ER-40–41).

If plaintiff's claims are justiciable, this court has jurisdiction to review that final order under 28 U.S.C. § 1291.

### C.    Date of Entry of Judgment and Timeliness of Notice of Appeal

The order on appeal was entered on February 16, 2024. (ER-39–41). The state filed its notice of appeal on March 13, 2024, within 30 days of the entry of judgment. (ER-245). Accordingly, the notice of appeal is timely under Federal Rule of Appellate Procedure 4(a)(1)(A).

4

## ISSUES PRESENTED FOR REVIEW

A state law provides that, to participate in a highly regulated market, a manufacturer must report factual information about costs, revenue, and market conditions whenever it raises its prices beyond a specified threshold.

1.     Does that entire reporting requirement impermissibly compel speech—by making the manufacturer affirm a belief or take sides in a controversy—simply because it requires those reports to include a narrative explanation of the factors that influenced the price increase?

2.     Does that law work an impermissible facial taking by allowing public disclosure of trade secret information voluntarily reported under that law, only when the public interest requires it?

## STATEMENT OF THE CASE

### A.     Nature of the Case

In this action filed under 42 U.S.C. § 1983 and naming as defendant the director of the Oregon Department of Consumer and Business Services (DCBS) acting in his official capacity, plaintiff Pharmaceutical Research and Manufacturers of America (PhRMA) sought—on behalf of its member pharmaceutical and biotechnology companies—a declaration that two state laws are unconstitutional, and it sought to enjoin the implementation or enforcement of those laws.  (ER-233; *see also* ER-197 ¶¶ 12–13 (describing parties)).

5

**B.     Course of Proceedings and Disposition Below**

Plaintiff commenced this action by filing a complaint seeking declaratory and injunctive relief involving a state law described as the "Disclosure Law." (ER-192–233; C.R. 1).  The complaint also challenged another state law identified as the "Advance Notification Law," (ER-192 ¶ 1), but plaintiff ultimately dismissed without prejudice its claims against that law, (ER-134–36; *see also* ER-130–31).

After defendant filed an answer, (C.R. 21), the parties filed cross-motions for partial summary judgment on their claims against the disclosure law, along with supporting declarations, additional briefs, and supplemental authorities in support and opposition, (C.R. 25, 29–31, 34–35, 38–39, 43–44).  On the basis of those filings, the district court held a telephonic hearing on the motions and took them under advisement.  (C.R. 45).

While the motions were under advisement, the parties filed additional supplemental authorities and responses.  (C.R. 46–51, 56–58).  After complications resulting from the reopening of discovery on claims no longer in the case on appeal, (*see* ER-131–32; C.R. 55), the case was reassigned to a new judge and reset for further oral argument on the motions for partial summary judgment, (C.R. 61, 65).  The case was then reassigned once more before

6

further oral argument was held, (C.R. 70), and the district court issued oral rulings on the motions at that hearing. (C.R. 71; ER-119).

After receiving competing proposals from the parties as to the form and content of a written judgment memorializing its oral ruling, (C.R. 73, 75–76), the district court resolved any remaining disputes by entering a written judgment resolving the summary judgment motions. (C.R. 77; ER-39–41). Defendant filed a notice of appeal from that judgment. (C.R. 78; ER-245–46). Thereafter, the district court issued a written opinion explaining the grounds for its ruling. (C.R. 81; ER-3–38).

## STATEMENT OF FACTS

Because this appeal involves claims raising facial constitutional challenges to state statutes, the facts are largely undisputed and procedural, involving the specific terms of the challenged laws, the claimed constitutional violations, and the district court's rulings on those claims.

### A.    The Challenged Laws

Plaintiff's claims challenge statutes that they describe as the "Disclosure Law," as contained in 2018 Oregon House Bill 4005 (H.B. 4005). (ER-192–93 ¶¶ 1–2; ER-202–07 ¶¶ 27–40). Two particular provisions of H.B. 4005 are central to the claims on which the district court ruled for plaintiff: (1) H.B. 4005, ch. 7, § 2(3), which the district court identified as the "reporting

7

requirement"; and (2) H.B. 4005, ch. 7, § 2(10)(a), which the district court

identified as the "public interest exception."  (*See* ER-40).  The full text of H.B.

4005 is available in the record at ER-234–44.

### 1.    The Reporting Requirement

The first provision at issue requires a drug "manufacturer"[1] to report the

following information to DCBS for certain[2] prescription drugs:

> (a) The name and price of the prescription drug and the net
> increase, expressed as a percentage, in the price of the drug over
> the course of the previous calendar year;

> (b) The length of time the prescription drug has been on the
> market;

---

[1]    A "manufacturer" is defined, for the purposes of H.B. 4005, as "a
person that manufactures a prescription drug that is sold in this state."  H.B.
4005, ch. 7, § (2)(1)(e) (codified at Or. Rev. Stat. § 646A.689(1)(e)).

[2]    The reporting requirement applies only to "prescription drug[s]"
for which:

> (a) The price was $100 or more for a one-month supply or
> for a course of treatment lasting less than one month; and

> (b) There was a net increase of 10 percent or more in the
> price of the prescription drug described in paragraph (a) of this
> subsection over the course of the previous calendar year.

H.B. 4005, ch. 7, § 2(2) (codified at Or. Rev. Stat. § 646A.689(2)).

"Prescription drug" and "price" are further defined by reference to
federal law, including the "wholesale acquisition cost" defined in 42 U.S.C.
§ 1395w-3a(c)(6)(B).  H.B. 4005, ch. 7, § 2(1)(h), (i) (codified at Or. Rev. Stat.
§ 646A.689(1)(h), (i)).

8

    (c) The factors that contributed to the price increase;

    (d) The name of any generic version of the prescription drug available on the market;

    (e) The research and development costs associated with the prescription drug that were paid using public funds;

    (f) The direct costs incurred by the manufacturer:

        (A) To manufacture the prescription drug;

        (B) To market the prescription drug;

        (C) To distribute the prescription drug; and

        (D) For ongoing safety and effectiveness research associated with the prescription drug;

    (g) The total sales revenue for the prescription drug during the previous calendar year;

    (h) The manufacturer's profit attributable to the prescription drug during the previous calendar year;

    (i) The introductory price of the prescription drug when it was approved for marketing by the United States Food and Drug Administration and the net yearly increase, by calendar year, in the price of the prescription drug during the previous five years;

    (j) The 10 highest prices paid for the prescription drug during the previous calendar year in any country other than the United States;

    (k) Any other information that the manufacturer deems relevant to the price increase described in subsection (2)(b) of this section; and

    (L) The documentation necessary to support the information reported under this subsection.

H.B. 4005, ch. 7, § 2(3) (codified at Or. Rev. Stat. § 646A.689(3)).

9

By rule, DCBS requires such reports to include "a narrative description and explanation of all major financial and nonfinancial factors that influenced the decision to increase the wholesale acquisition cost of the drug product and to decide on the amount of the increase."  Or. Admin. Code 836-200-0530(2)(h).  That rule was promulgated under H.B. 4005's delegation of authority for DCBS to "adopt rules as necessary for carrying out the provisions of this section," as well as to "prescribe[]" the "form and manner" for reporting the information required to be disclosed under that law.  *See* H.B. 4005, ch. 7, § 2(12) (codified at Or. Rev. Stat. § 646A.689(13)); H.B. 4005, ch. 7, § 2(3) (codified at Or. Rev. Stat. § 646A.689(3)).

Upon enacting those provisions, the Oregon Legislature included a statement of legislative purpose in a preface to H.B. 4005.  *See* H.B. 4005, ch. 7.  Those purposes included "provid[ing] notice and disclosure of information relating to the cost and pricing of prescription drugs in order to provide accountability for prescription drug pricing" and "permit[ting] purchasers, both public and private, as well as pharmacy benefit managers, to negotiate discounts and rebates for prescription drugs."  H.B. 4005, ch. 7.  The Oregon Legislature further explained that those goals were related to its interests as "a major purchaser of prescription drugs through the Public Employees' Benefit Board, the Oregon Health Authority, the Department of Human Services and the

10

Department of Corrections," and as a provider of "major tax expenditures for health care through the tax exclusion of employer-sponsored health insurance coverage and the deductibility of the excess medical costs of individuals and families." *Id*.

### 2.    The Public-Interest Exception.

The second provision at issue is an exception to H.B. 4005's requirement that DCBS "shall post to its website" the information that is reported to it under that law's provisions, including but not limited to the reporting requirement discussed above. *See generally* H.B. 4005, ch. 7, § 2(9) (codified at Or. Rev. Stat. § 646A.689(9)).

That exception exempts from disclosure any information that is a trade secret, but only if disclosure is not in the public interest:

> The department may not post to its website any information described in subsection (9) of this section if:
>
> (A) The information is conditionally exempt from disclosure under [Or. Rev. Stat. §] 192.345 as a trade secret; and
>
> (B) The public interest does not require disclosure of the information.

H.B. 4005, ch. 7, § 2(10) (codified at Or. Rev. Stat. § 646A.689(10))

### B.    Plaintiff's Challenges

In the claims on which it prevailed, plaintiff raises facial challenges to both the reporting requirement and the public-interest exception.

11

### 1. The Reporting Requirement

In challenging the reporting requirement, plaintiff claims a facial violation of the First Amendment, contending that the law "constitute[s] impermissible efforts by Oregon to compel speech" in a manner that "discriminate[s] on the basis of speaker, content and viewpoint." (ER-230 ¶ 101). More specifically, plaintiff contends:

- that the reporting requirement "compel[s] certain pharmaceutical manufacturers to communicate publicly the State's designated message about their drug pricing decisions even when the manufacturers prefer to remain silent";

- that it "force[s] manufacturers to disseminate the State's messages that only changes or improvements in a drug can justify a price increase, and that manufacturers bear primary responsibility for increases in drug prices"; and

- that plaintiff's members "disagree with and would not otherwise endorse those messages, implicitly or explicitly."

(ER-230 ¶ 100).

### 2. The Public-Interest Exception

As for the public-interest exception, plaintiff claims a facial violation of the Fifth Amendment, contending that the law's contemplated disclosure of trade secrets amounts either to a "categorical taking" of plaintiff's members' "intellectual property rights" or in the alternative to a "regulatory taking" of those rights. (ER-232 ¶¶ 108–09).

12

### C.    The District Court's Ruling

The district court ruled in favor of plaintiff on both facial challenges, and it entered final judgment on those claims even though one of plaintiff's claims remained pending.

### 1.    The Reporting Requirement

Ruling in favor of plaintiff on its First Amendment claim, the district court categorized the reporting requirement as governing "commercial speech," meaning that one of two alternative levels of scrutiny applies.  (ER-32).  But it refused to apply the lower of those two levels of scrutiny, as recognized in *Zauderer v. Office of Disciplinary Counsel*, 471 U.S. 626, 105 S. Ct. 2265 (1985).  (ER-34).  In its view, the subject speech could not meet *Zauderer*'s requirement that the subject speech not be "controversial."  (ER-34 ("This Court finds that H.B. 4005's reporting requirements, viewed in the context of drug prices and health care costs, concern controversial information and *Zauderer* does not apply."))).

Because it declined to apply *Zauderer*, the district court instead applied intermediate scrutiny under *Central Hudson Gas & Electric Corp. v. Public Service Commission of New York*, 447 U.S. 557, 100 S. Ct. 2343 (1980).  (ER-35).  Under that standard, the district court invalidated the reporting requirement, concluding that it does not "directly advance" the law's stated

13

goals and is not "narrowly tailored" to advance those goals. (ER-36–37).

### 2. The Public-Interest Exception

In ruling for plaintiff on the Fifth Amendment claim, the district court concluded that the public-interest exception should be analyzed as a regulatory taking under the factors that the Supreme Court applied to trade secrets in *Ruckelshaus v. Monsanto Co.*, 467 U.S. 986, 104 S. Ct. 2862 (1984). (ER-14). Applying those factors, it concluded that all of them weighed in favor of a regulatory taking. (ER-14–16).

It further concluded that declaratory relief was available even in advance of any non-compensated disclosure of a trade secret, reasoning that no "adequate" means of obtaining compensation would be available. (ER-16–18). Thus, it entered an essentially prospective declaration that "any invocation of the Public Interest Exception by Defendant without simultaneously providing just compensation for that taking *would* accordingly violate the Fifth Amendment[.]" (ER-40) (emphasis added)).

### 3. Entry of Final Judgment

The district court's opinion and order on partial summary judgment recognized that plaintiff still has a pending claim under the Dormant Commerce Clause. (ER-24–28, 38; ER-40–41). But the district court nevertheless entered "final judgment" as to plaintiff's First and Fifth Amendment claims under Fed.

14

R. Civ. Proc. 54(b), expressly finding "no just reason for delay" as contemplated and required by that rule.[3]  (ER-40–41).

DCBS appeals from that final judgment.

### SUMMARY OF ARGUMENT

The district court erred in ruling that plaintiff, rather than defendant, was entitled to summary judgment on the challenges to H.B. 4005 raised in this case under the First and Fifth Amendment.

As for the First Amendment challenge to the reporting requirement, that law is permissible under the First Amendment if it satisfies the rational-basis standard that applies to routine disclosures—whether commercial or non-commercial—by participants in highly regulated markets.  And the reporting

---

[3]      The cited rule provides:

Judgment on Multiple Claims or Involving Multiple Parties. When an action presents more than one claim for relief—whether as a claim, counterclaim, crossclaim, or third-party claim—or when multiple parties are involved, the court may direct entry of a final judgment as to one or more, but fewer than all, claims or parties only if the court expressly determines that there is no just reason for delay.  Otherwise, any order or other decision, however designated, that adjudicates fewer than all the claims or the rights and liabilities of fewer than all the parties does not end the action as to any of the claims or parties and may be revised at any time before the entry of a judgment adjudicating all the claims and all the parties' rights and liabilities.

Fed. R. Civ. Proc. 54(b).

15

requirement easily survives review for a rational basis. That requirement serves Oregon's important interest in decreasing information asymmetry in, and thereby improving the efficiency of, a market in which it expends significant funds both directly and indirectly.

But even if this court were to apply a more probing analysis, it should conclude that the speech here is commercial in nature and that it therefore qualifies for review under the permissive standard the Supreme Court applies to laws that compel, rather than restrict, commercial speech. The reporting requirement survives review under that standard for the same reasons it would survive rational basis review. Indeed, because of the close connection between the reporting requirement and Oregon's interest in managing the market for prescription drugs, the reporting requirement would also survive review under intermediate scrutiny, if that were the applicable standard. Even if this court disagrees, it should invalidate only the impermissible parts of the reporting requirement, not the entirety of that reporting obligation.

On the Fifth Amendment challenge to the public-interest exception, plaintiff's claim fails first for lack of any injury traceable to the enactment of that law, which is a necessary element of standing to bring a facial challenge. That challenge also fails under a straightforward application of the Supreme Court's regulatory-takings jurisprudence. Regulatory-takings law provides the

16

correct framework because that is precisely what the Court applied in its only case analyzing whether disclosure of trade secrets amounts to a taking. That framework asks whether fairness and justice require the public to compensate for any loss of value caused by the disclosure, an inquiry that turns on three factors: the character of the governmental action; its economic impact; and its interference with reasonable investment-backed expectations. In this facial challenge, the character of the governmental action must be viewed as substantial because the challenged law allows disclosure only when it is affirmatively in the public interest. And the economic impact of disclosure may not be very significant when the value of an individual piece of trade secret information is measured in relation to the entire property to which its secrecy provides value. Finally, and most importantly, plaintiff can have no reasonable investment-backed expectation of confidentiality of information voluntarily submitted without an *express* promise of confidentiality. Even if this court disagrees, it should vacate the district court's award of prospective relief, which is generally not available in a takings case.

## STANDARD OF REVIEW

This court reviews *de novo* a ruling granting or denying summary judgment. *Branch Banking & Tr. Co. v. D.M.S.I., LLC*, 871 F.3d 751, 759 (9th Cir. 2017). Summary judgment is appropriate when, viewing the evidence in

17

the light most favorable to the non-moving party, there are no genuine issues of material fact. *Toguchi v. Chung*, 391 F.3d 1051, 1056 (9th Cir. 2004).

## ARGUMENT

As explained below, defendant—not plaintiff—was entitled to summary judgment in his favor on both the First Amendment claim and the takings claim.

**A.    The district court should have granted summary judgment for defendant rather than for plaintiff on the First Amendment claim.**

The reporting requirement challenged here survives the relevant standard of scrutiny under the First Amendment.  First, it should be upheld under the rational-basis standard that applies to regular governmental disclosures like the reporting requirement, regardless of whether the speech at issue is commercial or not.  But it can also be upheld under either of the alternative tests that apply to commercial speech.  Finally, even if plaintiff prevails, it is entitled at most to a judgment severing any unconstitutional portion of the reporting requirement from the rest of the law.

**1.    Whether it governs commercial speech or not, the reporting requirement is valid because it satisfies rational-basis scrutiny.**

First, any speech—commercial or otherwise—compelled by the reporting requirement amounts to the kind of regular governmental disclosures that are reviewed only under a rational-basis standard.  Because the reporting requirement survives rational-basis review, the district court should have granted summary judgment in favor of defendant on plaintiff's First

18

Amendment claim. In ruling otherwise, the district court misunderstood the purpose of the reporting requirement.

> **a.** **Compelled routine disclosures of factual information—commercial or otherwise—to the government is permissible if supported by a rational basis.**

At its core, the "freedom of thought protected by the First Amendment against state action includes both the right to speak freely and the right to refrain from speaking at all." *Full Value Advisors, LLC v. S.E.C.*, 633 F.3d 1101, 1108 (D.C. Cir. 2011) (internal quotation marks omitted). But the "paramount" concern animating those protections is that the government is prohibited from "compel[ling] a speaker to endorse a position contrary to his beliefs, or to affirm a belief and an attitude of mind he opposes." *Id.* (internal quotation marks and brackets omitted).

Disclosures between a regulated entity and its regulator do "not raise [those] same constitutional concerns." *See id.* (assessing First Amendment challenge to law requiring certain disclosures to the Securities and Exchange Commission); *see also Pharm. Care Mgmt. Ass'n v. Rowe*, 429 F.3d 294, 316 (1st Cir. 2005)[4] (holding that "routine disclosure of economically significant

---

[4]  Although the cited portion of *Rowe* contains the concurring opinion of Chief Judge Boudin and Judge Dyk, that two-judge concurrence is the controlling decision on the First Amendment analysis. *See Rowe*, 429 F.3d at 297–98 ("As to the association standing, Takings Clause, and First

*Footnote continued...*

19

information designed to forward ordinary regulatory purposes" do not "require an extensive First Amendment analysis").

Instead, such disclosures are "indistinguishable from other underlying and oft unnoticed forms of disclosure the Government requires for its essential operations." *Full Value Advisors,* 633 F.3d at 1109 (internal quotation marks omitted). Such routine disclosures most obviously include those required by judicial subpoenas. *See W. Virginia State Bd. of Educ. v. Barnette*, 319 U.S. 624, 645, 63 S. Ct. 1178 (1943) (Murphy, J., concurring) (rejecting First Amendment claim when "essential operations of government may require [disclosure] for the preservation of an orderly society,—as in the case of compulsion to give evidence in court").

But that category of routine disclosures is not limited to those required by judicial subpoena. It also includes "literally thousands of similar regulations on the books," such as "product labeling laws, environmental spill reporting, accident reports by common carriers, SEC reporting as to corporate losses and (most obviously) the requirement to file tax returns to government units who use the information to the obvious disadvantage of the taxpayer." *Rowe*, 429

---

*(…continued)*
Amendment issues, the joint concurring opinion of Chief Judge Boudin and Judge Dyk represents the opinion of the court.").

20

F.3d at 316. That is, such routine disclosures include those required of participants in highly regulated commercial markets.

Routine disclosures of that sort are subject only to "the general rational basis test governing all government regulations under the Due Process Clause." *Rowe*, 429 F.3d at 316. That is the standard that the First Circuit applied in *Rowe* when assessing a First Amendment claim raised by "middlemen" in the prescription drug market, who challenged a law that required them to disclose conflicts of interest and other information when entering into contracts with certain "covered entities." *Id*. at 298–99, 316. That is also the standard the District of Columbia Circuit applied in *Full Value Advisors*, when assessing a First Amendment challenge to the SEC disclosures at issue in that case. 633 F.3d at 1109. Finally, the Eighth Circuit applied no more exacting scrutiny when assessing a First Amendment challenge to an IRS form that required providing the government with financial information. *United States v. Sindel*, 53 F.3d 874, 877–78 (8th Cir. 1995).

Importantly, rational-basis review applies to such disclosures whether or not they are commercial in nature. Personal financial information and evidence offered in court are generally not commercial in nature. The question is not whether the information is commercial; instead, the question is whether the disclosure involves factual or non-expressive information necessary to the

21

operations of government.  Likewise, a disclosure qualifies as such a routine

regulatory disclosure so long as it is made to a government agency, even if that

agency has an obligation to publicly release the disclosed information.  For

example, rational-basis review applied in *Full Value Advisors* even though the

SEC was "required to publicly disclose" reported information except in limited

circumstances.  633 F.3d at 1108.  Put differently, if a disclosure requirement is

permissible under the First Amendment, then publication of that disclosure does

not amount to private speech that requires further analysis under free-speech

principles.  *See Riley v. Nat'l Fed'n of the Blind of N. Carolina, Inc.*, 487 U.S.

781, 800, 108 S. Ct. 2667 (1988) ("[A]s a general rule, the State may itself

publish the detailed financial disclosure forms it requires professional

fundraisers to file.  This procedure would communicate the desired information

to the public without burdening a speaker with unwanted speech during the

course of a solicitation.").

　　　Here, the reporting requirement is subject to rational-basis review

because, like the examples cited by the First Circuit in *Rowe*, it is the kind of

routine disclosure of economically significant and factual information designed

to forward ordinary regulatory purposes.

　　　The reporting of such information—including information about the

market for a particular drug, the profits and costs associated with manufacturing

22

and marketing it, and factors used to set its price—does not require plaintiff's members to endorse or affirm any beliefs or opinions about those purely factual matters or about anything else. Even an explanation of the factors influencing any price increase involves matters of historical fact, albeit in narrative form, and such narrative explanations are commonly required under judicial and legislative subpoenas. If the First Amendment prohibited such compulsion in *all* such circumstances—including even factual explanations—then the Fifth Amendment's privilege against self-incrimination would be redundant and unnecessary.

For those reasons, the reporting requirement is subject to simple rational-basis review, and the district court was wrong to conclude otherwise. (*See* ER-36 n.7 (acknowledging and implicitly rejecting the argument that "rational basis review applies because HB 4005 compels speech")).

### b. The reporting requirement survives rational-basis review.

Reviewed under a rational-basis standard, the reporting requirement is surely valid. A law fails under that familiar standard "if it fails to advance a legitimate governmental interest or it is an unreasonable means of advancing a legitimate government interest." *Montgomery v. Carr*, 101 F.3d 1117, 1130 (6th Cir. 1996).

23

Here, again, the stated purposes of H.B. 4005 was "provid[ing] notice and disclosure of information relating to the cost and pricing of prescription drugs in order to provide accountability for prescription drug pricing" and "permit[ting] purchasers, both public and private, as well as pharmacy benefit managers, to negotiate discounts and rebates for prescription drugs." H.B. 4005, ch. 7.

Those are legitimate government interests. First, transparency is a valid regulatory goal for its own sake. Robin Feldman & Charles Tait Graves, *Naked Price and Pharmaceutical Trade Secret Overreach*, 22 Yale J.L. & Tech. 61, 74 (2020) ("Lack of transparency prevents regulators from ferreting out information and evaluating the behavior they are charged with regulating."). But even if the state of Oregon had no interest as a *regulator* in promoting transparency in the consumer or commercial market for prescription drugs, it certainly has such an interest when it is itself a significant *participant* in that market, both directly as a purchaser of prescription drugs and indirectly as a provider of subsidies to market participants. *See* H.B. 4005, ch. 7 (noting the state's interests as "a major purchaser of prescription drugs" and as a provider of "major tax expenditures for health care"). *Id.*

And the collection of information about prescription drug costs, profits, and market conditions is directly related to providing such information to drug

24

purchasers, consistently with H.B. 4005's stated purpose. That fact alone is enough to satisfy rational-basis review.

Setting aside transparency for its own sake, collecting the information at issue here is also rationally related to facilitating negotiations by drug purchasers—more information allows drug purchasers to overcome the information asymmetry that might otherwise benefit manufacturers. For example, consider a purchaser who knows the extent to which an increase in drug price is attributable to an increase in discrete and quantifiable costs like purchasing ingredients or instead to more amorphous and difficult-to-quantify costs such as "overhead" (which might amount to a recharacterization of profits). That information allows a purchaser to understand when a drug's price is most amenable to negotiation. And when that information is mutually available for a variety of drugs being purchased or considered, it allows the manufacturer and the purchaser to structure large contracts in a way that is financially prudent for both of them.

The analysis might be different if the required disclosure could reasonably be viewed as doing more than merely collecting information and instead reflected "a veiled attempt to suppress unpopular ideas or information or manipulate the public debate through coercion rather than persuasion." *See Full Value Advisors, LLC*, 633 F.3d at 1108 (internal quotation marks omitted).

25

But the reporting requirements here do not suppress the rights of plaintiff's members to voice their opinions on drug pricing or other matters, and they do not affect the public debate on drug prices other than by increasing the information available to those who wish to participate in it. Instead, they merely collect information. For those reasons, those requirements do not offend the First Amendment.

>           **c.     The district court misunderstood the purpose of the reporting requirement when assessing whether that law advanced a legitimate government interest.**

In ruling for plaintiff, the district court ignored the purposes expressly stated in H.B. 4005 and appeared to assume, incorrectly, that the reporting requirement was intended to directly lower drug prices. (*See* ER-36–37). But that is not H.B. 4005's stated purpose. Thus, any lack of connection to lower prices is irrelevant.

Regardless, a better negotiating position for purchasers does bear a rational and direct connection to lowering price. *See* Feldman & Graves, 22 Yale J.L. & Tech. at 76 ("[A]n efficient and well-functioning pharmaceutical market thrives on the sunlight of information; it would wither in the dark."). Perhaps it is only a first and partial step towards that goal, but that is enough. *See Nat'l Ass'n for the Advancement of Psychoanalysis v. Cal. Bd. of Psychology*, 228 F.3d 1043, 1052–53 (9th Cir. 2000) ("The Supreme Court has

26

held that a state legislature addressing health and safety reform 'may take one step at a time, addressing itself to the phase of the problem which seems most acute to the legislative mind.  The legislature may select one phase of one field and apply a remedy there, neglecting the others.'" (quoting *Williamson v. Lee Optical of Okla., Inc.*, 348 U.S. 483, 489, 75 S. Ct. 461 (1955))).

Further, although the district court cited a lack of "studies or anecdotal evidence" to support a connection between more information and lower prices, rational-basis review does not require such support.  Even under strict scrutiny, the connection between a law and its stated purpose can turn simply on common sense.  *See Lorillard Tobacco Co. v. Reilly*, 533 U.S. 525, 555, 121 S. Ct. 2404 (2001) ("We have permitted litigants * * * even, in a case applying strict scrutiny, to justify restrictions based solely on history, consensus, and simple common sense."  (internal quotation marks and brackets omitted)).[5]  To require more would risk inviting judicial second-guessing of legislative policy-making, contrary to the usual rule that rational-basis review does not require the state even to "actually articulate at any time the purpose or rationale

---

[5]     Although the Court in *Lorillard* also contemplated that speech restrictions can be justified "by reference to studies and anecdotes," that discussion merely viewed studies and anecdotes as *sufficient* to satisfy rational-basis review; it did not suggest that studies and anecdotes are *necessary* for that purpose.

27

supporting" its decisions. *See United States v. Navarro*, 800 F.3d 1104, 1114

n.8 (9th Cir. 2015). If a legislature need not articulate its rationale, then it

likewise need not cite studies to support the efficacy of its chosen approach.

Given the district court's fundamental misunderstanding of the reporting

requirement's purpose, its analysis of the government's interest here was

incorrect, whether under the rational-basis standard or under the other standards

that apply to commercial speech as explained below.

**2.      In the alternative, the reporting requirement should be upheld under either of the tests that apply to commercial speech.**

Even if the reporting requirement is not analyzed under the permissive

standard applicable to routine disclosures by participants in highly regulated

commercial markets, that context weighs in favor of treating the speech here as

commercial in nature. And as compelled commercial speech, it satisfies the

equally permissive standard applied in *Zauderer v. Office of Disciplinary

Counsel*, 471 U.S. 626, 105 S. Ct. 2265 (1985). Or if *Zauderer* were

inapplicable, the reporting requirement would satisfy the somewhat more

exacting standard applied in *Central Hudson Gas & Electric Corp. v. Public

Service Commission of New York*, 447 U.S. 557, 100 S. Ct. 2343 (1980).

28

### a. The speech affected by the reporting requirement is commercial in nature.

The district court correctly concluded that the speech affected by the reporting requirement is commercial in nature.  (ER-30–32).

Commercial speech is "usually defined as speech that does no more than propose a commercial transaction."  *Ariix, LLC v. NutriSearch Corp.*, 985 F.3d 1107, 1115 (9th Cir. 2021) (internal quotation marks omitted).  But because of "the inherent difficulty of drawing bright lines that will clearly cabin commercial speech in a distinct category," that definition is "just a starting point."  *Id.* (internal quotation marks omitted).  Thus, the test remains "fact-driven" so as "to give effect to a common-sense distinction between commercial speech and other varieties of speech."  *Id.* (internal quotation marks omitted).

Despite the usual definition's starting point, then, "speech that does not propose a commercial transaction on its face can still be commercial speech."  *Id.*  In identifying when such non-transactional speech is commercial, "close question[s]" must be resolved by three "so-called *Bolger* factors" that can provide "strong support" for treating the speech as commercial.  *Id.* (internal quotation marks omitted; citing *Bolger v. Youngs Drug Prods. Corp.*, 463 U.S. 60, 103 S. Ct. 2875 (1983)).  Those factors ask:  (1) whether the speech is an advertisement; (2) whether the speech refers to a particular product; and (3)

29

whether the speaker has an economic motivation. *Id*. But even those factors are only "important guideposts" that "are not dispositive." *Id*.

Here, as the district court correctly explained, (ER-31), the reporting requirement affects speech that is not an advertisement, but that speech satisfies the other two *Bolger* factors. The speech pertains to a particular product: specifically, the prescription drug for which the price has increased. And it is economically motivated, as the manufacturer must comply with the disclosure requirements in order to profitably sell that drug product in the state of Oregon. Thus, the *Bolger* factors support treating the speech here as commercial.

And a similar conclusion can be reached by applying a common-sense and fact-driven view of the usual "proposes a commercial transaction" test. Here, because DCBS is required to publish the information reported under H.B. 4005 on its website, H.B. 4005, ch. 7, § 2(9) (codified at Or. Rev. Stat. § 646A.689(9)), all of that information could be viewed as akin to information placed on the label of a retail product or disclosed in the course of contract negotiations. That is, H.B. 4005 contemplates and expects commercial transactions in which the drugs are sold to purchasers, and the reported information is intended to facilitate and inform those transactions. From a common-sense standpoint, then, the speech here is commercial in nature.

30

As a regulation of commercial speech, the reporting requirement is subject to review under either the *Zauderer* standard or the *Central Hudson* standard. *Nat'l Ass'n of Wheat Growers v. Bonta*, 85 F.4th 1263, 1275 (9th Cir. 2023) (identifying that "two levels of scrutiny governing compelled commercial speech"). As explained below, the more permissive *Zauderer* standard is the correct framework, but the reporting requirement survives under either standard.

> **b.     The reporting requirement should be upheld under the permissive standard applied in *Zauderer*.**

This court has squarely decided that, when the government acts to *compel* commercial speech—as opposed to when it acts to restrict or prohibit commercial speech—*Zauderer* and not *Central Hudson* is the appropriate framework for analyzing a First Amendment challenge to that compulsion. *CTIA - The Wireless Ass'n v. City of Berkeley, California*, 928 F.3d 832, 842 (9th Cir. 2019) (explaining that this court applies "the intermediate scrutiny test mandated by *Central Hudson* in commercial speech cases where the government acts to restrict or prohibit speech," but "*Central Hudson*'s intermediate scrutiny test does not apply to compelled, as distinct from restricted or prohibited, commercial speech"); *Am. Beverage Ass'n v. City & Cnty. of San Francisco*, 916 F.3d 749, 756 (9th Cir. 2019) (*en banc*) (holding

31

that "*Zauderer* provides the appropriate framework to analyze a First Amendment claim involving compelled commercial speech").

To "qualif[y]" for analysis under *Zauderer*, the reporting requirement must:  (1) concern purely factual and uncontroversial information; (2) be reasonably related to a substantial government interest; and (3) not be unduly burdensome.  *Nat'l Ass'n of Wheat Growers*, 85 F.4th at 1275; *see also CTIA*, 928 F.3d at 845–49 (applying those factors); *Am. Beverage Ass'n*, 916 F.3d at 756–57 (similar).

As explained below, the reporting requirement qualifies for and satisfies those *Zauderer* requirements for much the same reasons it would survive rational-basis review.  Indeed, the two lines of cases—those applying *Zauderer* and those applying more general rational-basis review to routine governmental disclosures—differ only in their typical reach, which is overlapping.

*Zauderer* has typically been applied only to core commercial speech, meaning speech involved in negotiating contracts or in packaging or advertising products for sale.  *See, e.g.*, *Zauderer*, 471 U.S. at 6629–30 (involving restrictions on advertisements for legal services); *CTIA*, 928 F.3d at 837 (involving an ordinance that required "cell phone retailers to disclose information to prospective cell phone purchasers"); *Am. Beverage Ass'n*, 916

32

F.3d at 753 (involving an ordinance requiring a warning to be included in certain beverage advertisements).

By contrast, the more general rational-basis review of routine governmental disclosures (as discussed above) is not limited to core commercial speech, or to commercial speech at all—again, it applies to compulsion in the furtherance of routine governmental functions, including in non-commercial settings such as judicial or legislative factfinding or the collection taxes.

Those two categories of cases overlap when the government compels disclosure by a participant in a highly regulated industry such as the marketing of prescription drugs.  Or, put somewhat differently, even if this court has yet to extend *Zauderer* to speech outside of strictly defined commercial transactions, *Rowe* and *Full Value Advisors* support extending it to communications between regulated entities and their regulators, at least in highly regulated commercial industries.  For that reason, the district court's analysis was precisely backwards when it concluded that the regulatory context here "counsels against applying *Zauderer* here."  (*See* ER-35 ("Instead, by participating in the Oregon market, the pharmaceutical companies are required to share with Oregon, for public dissemination, information Oregon deemed relevant to prescription drug pricing.  While Oregon does not dictate the content of the disclosed

33

information, it does pose the questions the pharmaceutical companies must answer.  This, too, counsels against applying *Zauderer* here.")).

The overlap between the two standards finds support in decisions where this court and others have equated the *Zauderer* test to rational-basis review. *See, e.g.*, *Nationwide Biweekly Admin., Inc. v. Owen*, 873 F.3d 716, 732 (9th Cir. 2017) (referencing "*Zauderer* rational basis review"); *id.* at 734 (apparently reviewing under the rational-basis standard); *New York State Rest. Ass'n v. New York City Bd. of Health*, 556 F.3d 114, 132 (2d Cir. 2009) (describing "the rational basis test described in *Zauderer*"); *Rowe*, 429 F.3d at 316 (describing the *Zauderer* test as "akin" to rational-basis review).  Thus, once commercial speech qualifies as purely factual under the first *Zauderer* factor, assessment of the remaining factors mirrors the rational-basis analysis.  Defendant discusses each of those factors in turn below.

### i.    The reporting requirement concerns purely factual and uncontroversial information.

On the first *Zauderer* inquiry, the district court correctly concluded that the information collected under the reporting requirement—prescription drug costs, profits, and market conditions—is entirely factual.  (ER-33).  Even a narrative explanation of the factors influencing price increases is factual:  it does not ask for opinions but instead for a historical account of a how a decision was made.  A narrative explanation of a price increase is no less factual than,

34

for example, testimony about a party's understanding of what a particular contract term required, or the benefits that party expected to reap from a particular contract. *Cf. Nationwide Biweekly Admin., Inc. v. Owen*, 873 F.3d 716, 733 (9th Cir. 2017) ("The mere fact that a corporation can conjure up a possibly negative connotation of a word in a disclosure does not make the disclosure nonfactual.").

But the district court was incorrect to conclude that such information was controversial. (*See* ER-34). The only possible controversy at issue is over the prices that patients pay for prescription drug prices. Even assuming such a controversy, the reporting requirements do not ask plaintiff's members to take any side in that controversy. Asking for a factual explanation for a price increase does not require the expression of any opinion as to what individual patients should have to pay for prescription drugs. Mere adjacency to a putative controversy does not make the statement itself controversial. *Cf. Nat'l Ass'n of Wheat Growers*, 85 F.4th at 1277 (rejecting the notion that "any purely factual statement that can be tied in some way to a controversial issue is, for that reason alone, controversial" (internal quotation marks omitted)).

Responding more directly to plaintiff's allegations here, even an explanation of the factors influencing price increases does not require adopting *any* message about pricing decisions, let alone "the State's designated

35

message," and certainly no message as specific as an assertion that "only changes or improvements in a drug can justify a price increase, and that manufacturers bear primary responsibility for increases in drug prices." (*Compare* ER-230 ¶ 100).

Thus, the speech compelled in this case stands in sharp contrast to the kinds of speech deemed controversial in cases applying *Zauderer*.  For example, where a law required that clinics "whose primary purpose was to oppose abortion" must provide information about how to obtain abortions elsewhere, the Supreme Court concluded that the speech it compelled was too controversial under *Zauderer*.  *CTIA*, 928 F.3d at 845 (describing the holdings of *Nat'l Inst. of Family & Life Advocates v. Becerra*, 585 U.S. 755, 138 S. Ct. 2361 (2018) (*NIFLA*)).  That was so because abortion is "anything but an 'uncontroversial' topic, *NIFLA*, 585 U.S. at 769, and is instead the subject of a "heated political controversy," *CTIA*, 928 F.3d at 845.  Just as importantly, the compelled speech "took sides" in that controversy and "forc[ed] the clinic to convey a message fundamentally at odds with its mission."  *Id*.

But here, any controversy over drug prices does not approach the "heatedness" of the abortion debate, plaintiff's members are not organized for the purposes or "mission" of advancing either side of any drug-price controversy, and the disclosure of pricing and market information does not even

36

implicitly take either side of any such controversy.  Further, the information at issue is about manufacturers' own products, not alternatives.

As another example, this court has held that required warnings are impermissibly controversial when the warning pertains to risks that are the subject of "robust" scientific "debate."  *California Chamber of Commerce v. Council for Education and Research on Toxics*, 29 F.4th 468, 478 & n.10 (9th Cir. 2022); *see also Nat'l Ass'n of Wheat Growers*, 85 F.4th at 1278–80 (similar).  Here, unlike in those cases, none of the required disclosures are the subject of any scientific debate.

Indeed, the speech in the foregoing cases was more likely to be interpreted as controversial or expressing an opinion because that speech was directed at consumers in the course of providing products or services.  But here, the reporting requirements compel speech directed at DCBS, in an exercise of regulatory compliance.  Although the former might fairly be interpreted as expressing, endorsing, or encouraging some kind of viewpoint, the latter is not.

Given the purely regulatory context in which the speech here is compelled, the District of Columbia Circuit's analysis in *Nat'l Ass'n of Manufacturers v. S.E.C.*, 800 F.3d 518, 530 (D.C. Cir. 2015), is particularly instructive.  That opinion concluded that, where an S.E.C. rule required issuers of securities to report and publicly disclose that their products are not "conflict

37

free" under certain circumstances, that rule compelled controversial speech. *Id.* at 530; *see also id.* at 531 (Srinivasan, J., dissenting) (providing details about challenged rule).

Here, unlike in the conflict-minerals case, the reporting requirements do not require plaintiff's members to "use the government's preferred language" to describe its products, let alone any labels that "convey moral responsibility." *See Nat'l Ass'n of Manufacturers*, 800 F.3d at 530. The reporting requirement here might be as controversial as the "conflict free" rule if, for example, plaintiff's members were required to report whether a drug is "fairly priced" under some statutory definition of that term. But nothing in H.B. 4005 even approaches that kind of impermissible compulsion—far from dictating phrasing that plaintiff's members must use, the reporting requirement simply asks them to report purely factual information in whatever phrasing they choose.

For those reasons, the reporting requirements concern purely factual and noncontroversial information.

### ii.    The reporting requirement is reasonably related to a substantial government interest.

The reporting requirement is also reasonably related to a substantial government interest, largely for the same reasons it would survive rational-basis review. As explained in more detail above, the purposes of that requirement are to collect information about prescription drug prices to improve the negotiation

38

strength of drug purchasers, primarily by reducing the information asymmetry in the prescription drug market. That is a valid and substantial government interest in light of the significant funds that the state of Oregon expends both directly and indirectly on the purchase of prescription drugs. And increasing information is a common-sense way to improve outcomes that turn on that information. *Cf. Nat'l Elec. Mfrs. Ass'n v. Sorrell*, 272 F.3d 104, 113–14 (2d Cir. 2011) ("Commercial disclosure requirements are treated differently from restrictions on commercial speech because mandated disclosure of accurate, factual, commercial information does not offend the core First Amendment values of promoting efficient exchange of information or protecting individual liberty interests. Such disclosure furthers, rather than hinders, the First Amendment goal of the discovery of truth and contributes to the efficiency of the 'marketplace of ideas.'").

### iii. The reporting requirement is not unduly burdensome.

Finally, the reporting requirement is not unduly burdensome. A disclosure is unduly burdensome if it effectively "drown[s] out" the speaker's own message and "effectively rule[s] out the possibility" of the speaker maintaining its own message. *See Am. Beverage Ass'n*, 916 F.3d at 757 (internal quotation marks omitted). But requiring plaintiff's members to report information to DCBS does not drown out their ability to maintain their own

39

message as a general matter, especially when communicating with the public rather than with DCBS.

To the extent that plaintiff's members seek to convey any message in their regulatory reports, that is not protected speech. *See Nevada Comm'n on Ethics v. Carrigan*, 564 U.S. 117, 127, 131 S. Ct. 2343 (2011) ("This Court has rejected the notion that the First Amendment confers a right to use governmental mechanics to convey a message."). In any event, nothing in the reporting requirements prevents them from including a message in their reports. For example, if manufacturers choose to express opinions as to the fairness of their prices or as to who should be blamed for any excess in prices ultimately paid by patients, they are free (but not required) to offer such opinions when explaining price increases.

Leaving aside the substance of the reporting requirement's disclosure obligations, the fact of that requirement is not unduly burdensome either: as participants in a highly regulated industry, drug manufacturers already prepare and disclose much of the information required under H.B. 4005 in other public settings. (ER-138–39 ¶¶ 7–8).

40

> **c.    If *Zauderer* is inapplicable, the reporting requirement should be upheld under the somewhat more exacting standard applied in *Central Hudson*.**

If this court concludes that the reporting requirement does not qualify for analysis under *Zauderer*, it should nevertheless uphold that law under *Central Hudson*'s intermediate-scrutiny standard.  *Nat'l Ass'n of Wheat Growers*, 85 F.4th at 1282 ("Because no version of the [statutorily mandated warning] comes within the scope of the exception found in *Zauderer*, we consider whether it passes intermediate scrutiny under *Central Hudson*.").

Under that standard, the government may regulate commercial speech if (1) the regulation directly advances a substantial governmental interest, and (2) it is not more extensive than necessary to serve that interest.  *Id*. at 1282–83.

As explained above, the reporting requirement directly advances the Oregon Legislature's stated goals of increasing available information about prescription drug prices to improve the negotiation strength of drug purchasers by reducing the information asymmetry in the prescription drug market.

And that requirement is not more extensive than necessary to serve that interest, as drug manufacturers know better than any other market participant what a drug costs to develop and produce.  Even if the market also contains intermediaries that introduce additional costs between manufacture and consumption, the costs of production are an important—if not the most

41

important—part of the expenses entailed in bringing that drug to patients. Moreover, those costs are necessarily felt by the entire downstream market, unlike any additional costs imposed by intermediaries. Thus, requiring disclosures from manufacturers is an eminently reasonable place to start the process of developing a complete picture of drug costs for the purposes of negotiating prices.

Put differently, the Oregon Legislature was not required to effect its goal of increased information and transparency by mandating disclosure from every market participant and then implementing a broad regulatory framework to facilitate that data collection all at once. It was permitted to proceed in a stepwise fashion, and collecting data from the top of the market is surely the most reasonable place to start. Indeed, precisely because costs incurred and prices charged by manufacturers are felt by the entire market, a law directed at manufacturers is well-tailored to the purpose of collecting data on that market.

For that reason, the reporting requirement satisfies intermediate scrutiny. In ruling to the contrary, the district court ignored the purposes expressly stated in H.B. 4005 and assumed that the reporting requirement was intended to directly lower drug prices. As explained in the rational-basis analysis above, the district court's approach was incorrect. At a minimum, even if defendant is not entitled to summary judgment under an intermediate-scrutiny standard, the

42

stated purposes of H.B. 4005 and its efficacy create factual issues that require

trial and preclude summary judgment in favor of plaintiff.

> **3.  At most, plaintiff is entitled to a judgment severing any unconstitutional portion of the reporting requirement from the rest of the law.**

In plaintiff's summary judgment motion, it directed its argument to the

specific reporting requirement promulgated by rule in Or. Admin. Code 836-

200-0530(2)(h).  (*See* ER-183).  That rule—which calls for "a narrative

description and explanation of all major financial and nonfinancial factors that

influenced the decision to increase the wholesale acquisition cost of the drug

product and to decide on the amount of the increase"—implements subsection

(3)(c) of the reporting requirement, which requires reporting the "factors that

contributed to the price increase." *See* H.B. 4005, ch. 7, § 2(3)(c) (codified at

Or. Rev. Stat. § 646A.689(3)(c)).

Plaintiff thus focused its First Amendment challenge specifically on

subsection 2(3)(c) of the reporting requirement, and that is the only portion of

that law that the district court assessed as violating the First Amendment.  (*See*

ER-33–34 ("The pharmaceutical companies are the only entities involved in

that controversy required to offer an *explanation* to the public." (emphasis

added))).  Thus, if it prevails, plaintiff is entitled at most to a judgment severing

and invalidating only that portion of H.B. 4005 under the First Amendment.

43

*See generally Leavitt v. Jane L.*, 518 U.S. 137, 116 S. Ct. 2068 (1996) (analyzing severability as a question of state law); *Clear Channel Outdoor, Inc. v. City of Portland*, 262 P.3d 782, 790, 243 Or. App. 133 (2011) ("Oregon courts have long recognized the principle that an unconstitutional part of a statute or ordinance may be excised without destroying a separable part." (collecting cases)); Or. Rev. Stat. § 174.040 (generally creating a presumption of severability in state statutes).

The district court appears to have viewed this argument as waived for not being raised in briefing or oral argument on summary judgment. (ER-28 n.6 (citing *Comite de Jornaleros de Redondo Beach v. City of Redondo Beach*, 657 F.3d 936, 951 n.10 (9th Cir. 2011) (*en banc*))). But given how plaintiff had framed the issue in the summary judgment briefing, defendant had no reason to raise the issue until plaintiff proposed a judgment that reached farther than its arguments did. (*See* ER-127). And *Redondo Beach* is not applicable because, there, it does not appear that the argument at issue was raised at *any* point by a party; instead, it appears to have been raised by the dissent. 657 F.3d at 951 n.10. But here, by contrast, defendant did raise the issue in his objections to the proposed form of judgment. (ER-44–48). Moreover, *Redondo Beach* suggests that severability could be reached if it had at least been raised in the briefing on appeal, as it has been here.

44

Consistent with PhRMA's framing of its First Amendment claim, this court should remand for the district court to limit any relief for that claim to subsection (3)(c) of the challenged law.

**B.    The district court should have granted summary judgment for defendant rather than for plaintiff on the takings claim.**

The takings challenge to the public-interest exception here fails first for lack of standing.  Even if justiciable, that challenge fails because that challenge must be assessed under the standard governing regulatory takings, and because the challenged law is permissible under the multi-factor test applicable to such takings.  Finally, even if plaintiff should prevail on this claim, it is not entitled to the prospective relief that the district court ordered.

**1.    Plaintiff lacks standing for its facial takings challenge.**

Article III standing requires a plaintiff to show that it "has suffered an 'injury in fact' that is (a) concrete and particularized and (b) actual or imminent, not conjectural or hypothetical." *Friends of the Earth, Inc. v. Laidlaw Envtl. Servs. (TOC), Inc.*, 528 U.S. 167, 180–81, 120 S. Ct. 693 (2000).  While the risk of future injury may satisfy this standard, a plaintiff must prove that such a risk is "realistic" and "credible," not "imaginary or speculative." *Thomas v. Anchorage Equal Rights Comm'n*, 220 F.3d 1134, 1139–40 (9th Cir. 2000) (*en banc*) (internal citations omitted).

45

But plaintiff cannot establish any injury-in-fact in this facial challenge. As this court has explained, "in the takings context, the basis of a facial challenge is that the very enactment of the statute has reduced the value of the property or has effected a transfer of a property interest," resulting in "a single harm, measurable and compensable when the statute is passed." *Guggenheim v. City of Goleta*, 638 F.3d 1111, 1119 (9th Cir. 2010) (internal quotation marks omitted); *see also Keystone Bituminous Coal Ass'n v. DeBenedictis*, 480 U.S. 470, 494–95, 107 S. Ct. 1232 (1987) (explaining that a facial takings challenge is an "uphill battle" because it requires establishing whether the "mere enactment" of a law interferes with property rights). For example, the regulation in *Guggenheim* was a rent-control statute, which had the effect upon its initial passage of transferring rent from landlords to tenants. 638 F.3d at 1120.

Unlike a rent-control statute like the one in *Guggenheim*, the public-interest exception here had no immediate effect on private property. Although it contemplates disclosing (and thereby interfering with) trade secrets, such disclosure is not required by simple operation of law upon the statute's enactment; instead, such disclosure occurs only after trade secrets are reported to DCBS under H.B. 4005 and only after DCBS determines that disclosure is in the public interest. Because any resulting harm is entirely contingent on those

46

events, that harm is not one that is measurable and compensable upon the enactment of the statute. *Cf. Reilly*, 312 F.3d at 56 (Lipez, J., dissenting) ("[T]he relevant event for purposes of the Takings Clause is the actual (or imminent) disclosure of the tobacco companies' trade secrets.").

Because the public-interest exception applies only to information obtained by DCBS *after* the implementation of H.B. 4005—rather than before its enactment—the nature of the governmental action here is different from the one in *Ruckelshaus*. There, the challenged law was a 1978 amendment to an existing law, where the amendment expressly provided for disclosure by the EPA of trade secrets to "qualified requesters," 467 U.S. at 995–96, and it applied even to information that had been submitted to the EPA *before* 1978 under a previous version of the law that offered protections against such disclosure, *id*. at 1010–11. That is, the law in *Ruckelshaus* had the immediate and harmful effect, upon its enactment, of mandating disclosure of information that had *already* been submitted to the EPA.

Because the challenged statute here has no immediate and measurable effect on private property, plaintiff has suffered no injury. Even if a future disclosure under the statute might create an injury, such disclosures are entirely speculative at this juncture. (*See* ER-17 ("True, no such public disclosure has

47

yet occurred.")). And even those speculative disclosures would amount to injury only if they occurred without compensation.

The need for non-speculative injury-in-fact is tied to another standing requirement: redressability, or the availability of relief for a legal wrong. *See generally Spokeo, Inc. v. Robins*, 578 U.S. 330, 338, 136 S. Ct. 1540 (2016). When injury is only speculative, only prospective relief is possible. But, as explained below in section B.4, prospective relief is generally unavailable in takings cases, and this case is no exception. Thus, plaintiff lacks standing for lack of redressability as well.

### 2. Plaintiff's claim alleging a taking of trade secrets must be assessed as a regulatory-takings claim.

Under the Fifth Amendment, the Supreme Court "has distinguished between two branches of Takings Clause cases: physical takings and regulatory takings." *Philip Morris, Inc. v. Reilly*, 312 F.3d 24, 33 (1st Cir. 2002) (plurality opinion) (citing *Tahoe–Sierra Pres. Council, Inc. v. Tahoe Reg'l Planning Agency*, 535 U.S. 302, 323, 122 S. Ct. 1465 (2002)).

The Court has only once—in *Ruckelshaus v. Monsanto Co*., 467 U.S. 986, 104 S. Ct. 2862 (1984)—"addressed an alleged taking of trade secrets." *Reilly*, 312 F.3d at 33. In so doing, it "simply applied the multi-factored regulatory takings analysis" it enunciated in *Penn Cent. Transp. Co. v. City of*

48

*New York*, 438 U.S. 104, 98 S. Ct. 2646 (1978), without relying on any physical-takings cases. *Reilly*, 312 F.3d at 33–34 & n.6.

Because *Ruckelshaus* "limit[ed] its analysis to the regulatory takings sphere," *Reilly*, 312 F.3d at 35, this court has at least once viewed that case as establishing that a taking of trade secrets turns on the factors enunciated in *Penn Central.  See United States v. Liew*, 856 F.3d 585, 599 (9th Cir. 2017) (observing that *Ruckelshaus* establishes that a party's "trade secrets are property for the purposes of the Takings Clause of the Fifth Amendment but that a taking does not occur" absent some "interfere[nce] with the party's 'reasonable investment-backed expectations,'" which is one of the *Penn Central* factors, as discussed further below).[6]

For those reasons, the district court was correct to conclude that plaintiff's claim alleging a taking of trade secrets must be assessed as a regulatory-takings claim under the *Penn Central* factors.  (ER-14.)

---

[6]     *Liew* did not directly assess a claim alleging a taking of trade secrets, and defendant is unaware of any other case in which this court has done so.

49

### 3. The public-interest exception is not an impermissible regulatory taking of trade secrets under the *Penn Central* factors.

Because "it is well established that not every destruction or injury to property by governmental action" amounts to an unconstitutional "taking," an impermissible regulatory taking occurs only when a law interferes with private property in a way that "forces some people alone to bear public burdens which, in all fairness and justice, should be borne by the public as a whole." *PruneYard Shopping Ctr. v. Robins*, 447 U.S. 74, 82–83, 100 S. Ct. 2035 (1980). In assessing that question, the Court has consistently drawn from *Penn Central* a three-factor test that turns on

(1) the character of the governmental action;

(2) its economic impact; and

(3) its interference with reasonable investment-backed expectations.

*See, e.g.*, *Kaiser Aetna v. U.S.*, 444 U.S. 164, 175, 100 S. Ct. 383 (1979) (citing *Penn Central*, 438 U.S. at 124); *PruneYard*, 447 U.S. at 83 (similar, citing *Kaiser Aetna*). Indeed, *Ruckelshaus* itself turned on an application of those factors, though the Court in that case found the third "so overwhelming * * * that it dispose[d] of the taking question" as to at least some of the trade secrets at issue. 467 U.S. at 1005.

50

Here, plaintiff's facial challenge requires asking whether each of those factors would weigh in favor of a taking in *every* possible instance where a trade secret is disclosed under that law. *See United States v. Salerno*, 481 U.S. 739, 745, 107 S. Ct. 2095 (1987) ("A facial challenge to a legislative Act is, of course, the most difficult challenge to mount successfully, since the challenger must establish that no set of circumstances exists under which the Act would be valid."). Such a facial and hypothetical analysis is arguably incompatible with fact-intensive nature of the *Penn Central* factors. *See Keystone*, 480 U.S. 495 (explaining that the *Penn Central* factors require "ad hoc, factual inquiries" that "must be conducted with respect to specific property, and the particular estimates of economic impact and ultimate valuation relevant in the unique circumstances" (internal quotation marks omitted)).

But to the extent that those factors can be meaningful analyzed in a facial challenge, the public-interest exception here does not go beyond acceptable regulation on *any* of those factors. Thus, the district court was incorrect to conclude that "all the factors support finding a regulatory taking." (ER-16).

### a.    Assessed facially, the nature of the governmental action does not unfairly interfere with trade secrets.

Assessed in the context of a facial challenge, the public-interest exception does not, strictly speaking, interfere with trade secrets at all, let alone impermissibly. That is because—as explained above in connection with

51

standing—its enactment did not by itself reduce the value of or effect a transfer of any trade secrets at the time it was passed.

But even in the context of some anticipated future disclosure, assessing the nature-of-the-action factor here is difficult because the public-interest exception does not permit disclosure absent a determination that such disclosure is affirmatively in the public interest. *Contrast Reilly*, 312 F.3d at 44 (plurality opinion) (concluding that this factor weighed in favor of an impermissible taking where a regulation allowed "full disclosure" when such disclosure "'could' further public health"). In any such situation, the nature of the specific public interest claimed by DCBS would be "a crucial part of the regulatory takings equation," as would the extent of the disclosure. *Id*. at 44 (explaining that the analysis would be different depending on how the regulation promoted public health); *see also id*. at 54 (Lipez, J., dissenting) (observing that, under the plurality opinion's reasoning, the extent of the disclosure will be determinative of the takings analysis). Thus, the analysis might differentiate between one pharmaceutical trade secret fully disclosed to promote market efficiency and another secret partially disclosed to speed the development of medicine needed, for example, to combat a once-a-generation pandemic or to fill a wartime need for protection against biological warfare.

52

At least in this facial challenge, then, this court should assess the nature of the governmental action as though it serves the most important public interest that might in some case support disclosure, on par with combating a once-a-generation pandemic. So analyzed, this factor weighs against concluding that the public-interest exception exceeds the bounds of permissible regulation.

> **b.    Assessed facially, the disclosure of trade secrets does not necessarily have a significant economic impact.**

Under the *Penn Central* test, "any economic impact must be evaluated with respect to the value of the property as a whole." *CCA Associates v. United States*, 667 F.3d 1239, 1244 (Fed. Cir. 2011). That is, takings law does not divide property "into discrete segments and attempt to determine whether rights in a particular segment have been entirely abrogated." *Penn Central*, 438 U.S. at 130.

The property-as-a-whole analysis of course must begin, then, with a definition of "the proper unit of property against which to assess the effect of the challenged governmental action"—what is sometimes termed the "denominator" against which any diminution in value must be measured. *Murr v. Wisconsin*, 582 U.S. 383, 395, 137 S. Ct. 1933 (2017). That definition is so important because it "may be outcome determinative." *Id.* For example, if one defines the relevant property here solely as the trade secret disclosed under the

53

public-interest exception, then disclosure under that law destroys the entire
value of the relevant property.

Indeed, that is where the district court erred in analyzing the economic-
impact factor. (ER-15 (reasoning that "disclosure of a trade secret will destroy
that trade secret's value" even if "the trade secret that is revealed may not be the
pharmaceutical company's most valuable secret")). Whatever the proper
"denominator" should be, the *Penn Central* regulatory-takings analysis is
simply incompatible with an analysis that defines the "denominator" as
*identical* to specific property interest subject to the challenged regulation. *See
Murr*, 582 U.S. at 395 ("To the extent that any portion of property is taken, that
portion is always taken in its entirety; the relevant question, however, is
whether the property taken is all, or only a portion of, the parcel in question."
(internal quotation marks omitted)).

Such a narrow and outcome-determinative definition destroys the
difference between *Penn Central* regulatory-takings, "where the goal is usually
to determine how the challenged regulation affects the property's value to the
owner," and other takings, where the government has occupied, appropriated, or
otherwise destroyed *all* value in a property. *See Murr*, 582 U.S. at 395. That is,
by defining the relevant property-as-a-whole to be any trade secret that is
disclosed, the district court erroneously turned this regulatory-takings claim into

54

something else entirely, ignoring the Court's consistent admonition against limiting the "parcel" used as a denominator "in an artificial manner to the portion of property targeted by the challenged regulation." *Id*. at 396.  That analysis improperly "overstate[s] the effect of regulation on property." *Id*. at 396; *see also Tahoe-Sierra Pres. Council, Inc. v. Tahoe Reg'l Planning Agency*, 535 U.S. 302, 331, 122 S. Ct. 1465 (2002) (explaining that "the District Court erred when it disaggregated petitioners' property into * * * segments corresponding to the regulations at issue and then analyzed whether petitioners were deprived of all economically viable use" of each segment).

Instead of defining the denominator parcel as any trade secret being disclosed, the correct analysis here requires considering how a given trade secret provides value to a pharmaceutical manufacturer.  And that analysis—as in any properly conducted determination of the proper denominator—is incredibly fact-specific.  *See, e.g.*, *Murr*, 582 U.S. at 397–406 (conducting a highly fact-specific inquiry to determine the appropriate denominator parcel in a case involving real property).

Consider, for example, a trade secret such as the formulation of a unique product like Coca-Cola.  Some ingredients in that formula may be more secret than others, and the identity of one ingredient (such as water) may be less valuable information than its concentration relative to other ingredients, which

55

may in turn be less valuable information than the specific amount of that ingredient in each ounce of the product. But many well accepted regulations regularly require the disclosure to consumers of at least some of that information, even if it is claimed as a trade secret; indeed, consumers and producers are well accustomed to government-mandated ingredient lists on many products. *See generally Reilly*, 312 F.3d at 39–40 (plurality opinion) (quoting *Corn Products Ref. Co. v. Eddy*, 249 U.S. 427, 431, 39 S. Ct. 325 (1919) for the proposition that no taking results from "requr[ing] a manufacturer to disclose its ingredient list"). The permissibility of such regulations must rest at least in part on a conclusion that some ingredient information, even if secret, is not of significant economic value, or at least not significant when compared to the value of knowing the full and specific formula for creating the product. *Compare Ruckelshaus*, 467 U.S. at 997–98 (discussing trade secrets regarding "research and test data" connected with development of proprietary pesticide products).

Put differently, even where trade secret information has value, that value may only become significant when the information is combined with other information. For example, the specific amount of one flavoring additive in Coca-Cola may be secret, but it only has value when combined with other secret information about the amount of other flavoring additives. Likewise,

56

discrete bits of market information and manufacturing costs might all be secret and valuable, but that value can be realized only by combining all of that secret information, perhaps even with other trade secrets involving the formulation and production of the drugs at issue. Thus, the economic impact of disclosing any one piece of trade secret information may well be minimal when compared to the entire parcel of information necessary to derive any value from that information.

For those reasons, not all disclosures under the public-interest exception will have a significant economic impact. Indeed, even measuring the impact of any disclosure—especially under the parcel-as-a-whole approach—requires more fact-specific context than is possible to assess in a facial challenge such as this one.

### c. The disclosure of trade secrets under the public-interest exception does not upset any reasonable investment-backed expectations.

The final *Penn Central* factor most clearly weighs against a taking because no reasonable investor would expect confidentiality for trade secrets reported voluntarily and with knowledge that they could be publicly disclosed when in the public interest.

That is how this court has described the upshot of *Ruckelshaus*: "a taking does not occur when a party discloses its trade secrets to the Environmental

57

Protection Agency ('EPA') knowing that the EPA can use that information without permission after ten years, because such use does not interfere with the party's 'reasonable investment-backed expectations.'"  *United States v. Liew*, 856 F.3d 585, 599 (9th Cir. 2017); *see also Reilly*, 312 F.3d at 35 n.5 ("[*Ruckelshaus*] clearly establishes that a manufacturer who submits trade secret information under [a statutory framework that allows publication] will lose the right to subsequently claim an unconstitutional taking.").

That rule is the necessary result of a broader principle that constitutionally protected property interests are "created and their dimensions are defined by existing rules or understandings that stem from an independent source such as state law."  467 U.S. at 1001.  Thus, when the law provides investors with notice that certain information will be subject to disclosure if reported to a regulator, investors would understand that voluntarily reporting such information will destroy any reasonable expectation of confidentiality. *See Pharm. Care Mgmt. Ass'n v. Rowe*, 429 F.3d 294, 316 (1st Cir. 2005) ("If PBMs truly assumed that they would be free from disclosure requirements of the sort set forth in the Maine law here, this would be more wishful thinking than reasonable expectation.").  Far from having any reasonable expectation of confidentiality in this circumstance, an investor would have no trade secret at all:  "If an individual discloses his trade secret to others who are under no

58

obligation to protect the confidentiality of the information, or otherwise

publicly discloses the secret, his property right is *extinguished*." *Ruckelshaus*,

467 U.S. at 1002 (emphasis added).

And although the foregoing cases have cited *Ruckelshaus* for the

proposition that that no investment-backed expectation of confidentiality would

be reasonable as to information voluntarily submitted with *notice* that

disclosure of the information was permissible, *Ruckelshaus* in fact went even

further. It also held that no investment-backed expectation of confidentiality

would be reasonable even when the law "was silent" on the issue of disclosure.

467 U.S. at 1008–10. Instead, investors can reasonably expect confidentiality

of voluntarily submitted information only if they can point to an "express

promise" of confidentiality. *Ruckelshaus*, 467 U.S. at 1008 ("[A]bsent an

express promise, Monsanto had no reasonable, investment-backed expectation

that its information would remain inviolate in the hands of EPA."). Thus, the

Court in *Ruckelshaus* concluded that the only reasonable investment-backed

expectation of confidentiality applied to information submitted during a six-

year period when the law "had explicitly guaranteed" an "extensive measure of

confidentiality." *Id*. at 1011 ("This explicit governmental guarantee formed the

basis of a reasonable investment-backed expectation.").

59

Here, plaintiff's members have, under H.B. 4005, already submitted a substantial quantity of information that they claim to be trade secrets. (ER-138 ¶¶ 4–5 ("Manufacturers have asserted 4,865 trade secret claims in reports submitted to DCBS.")). But they reported that information not only without any express promise of confidentiality like the one in *Ruckelshaus*; rather, they reported it with full knowledge that any information they reported was subject to disclosure under the public-interest exception contained within the very same bill that imposed the reporting requirement in the first place. Moreover, they were on notice that *all* information submitted to the state has since 1987 been subject to a public-records law that also allowed disclosure of trade secrets when required by the public interest. *See* Or. Rev. Stat. § 192.345(2); *see also* 1987 Or. Laws ch. 373, §§ 23c, 23d. Thus, they cannot under *Ruckelshaus* claim any reasonable investment backed expectation involving that already-voluntarily-submitted information, let alone any taking resulting from disclosure of that information.

At most, perhaps plaintiff's members could object to any *future* submissions of trade secret information under H.B. 4005 because requiring them to make such submissions places an unconstitutional condition on their right to sell products in the state of Oregon. *See Ruckelshaus*, 467 U.S. at 1006–07 (assessing such an argument in the context of the reasonable-

investment-backed-expectations factor); *see also Reilly*, 312 F.3d at 35 n.5, 39, 46 (viewing the argument in that case through such a lens); *see also id*. at 48 (Selya, J., concurring in the judgment) (ultimately forming a majority and deciding the case on that basis).

But, particularly in a highly regulated industry "that has long been the source of public concern and the subject of government regulation"—like pesticide production and sale, as in *Ruckelshaus*, or like prescription drug manufacturing and sale here—such conditions are a burden that must be borne in exchange for the benefits of doing business in a civilized market. 467 U.S. at 1007. If those benefits do not outweigh the burdens created by disclosure of trade secrets, plaintiff's members may leave the Oregon drug market and continue their business elsewhere. *Id*. at 1007 & n.11 ("Because the market for Monsanto's pesticide products is an international one, Monsanto could decide to forgo registration in the United States and sell a pesticide only in foreign markets. Presumably, it will do so in those situations where it deems the data to be protected from disclosure more valuable than the right to sell in the United States.").

For those reasons, *Ruckelshaus* rejected a contention that the government could not condition the right to sell pesticides on a manufacturer's participation in a registration regime that required giving up confidentiality of trade secrets.

61

467 U.S. at 1007–08. The same analysis applies here. As this court has explained, the law "indubitably can place conditions on the grant of a statutory benefit," so long as "the party be aware of the condition and that the condition be rationally related to a government interest." *Ladd v. Law & Tech. Press*, 762 F.2d 809, 813 (9th Cir. 1985) (citing *Ruckelshaus*).

And although the First Circuit's *Reilly* decision concluded that the right to sell products cannot be subject to such conditions, that holding was wrong. *See* Amy Kapczynski, *The Public History of Trade Secrets*, 55 U.C. Davis L. Rev. 1367, 1422, 1427 (2022) (criticizing *Reilly* on this point); *see also Rowe*, 429 F.3d at 316 ("Whether or not the law strikes the right economic balance between competing producer and consumer interests, it is no more a taking than the requirement that public corporations disclose private corporate information about financial prospects to the public through regular SEC filings.").

### 4. Even if plaintiff were entitled to summary judgment, it is not entitled to prospective relief.

In ruling for plaintiff, the district court entered an essentially prospective declaration that "any invocation of the Public Interest Exception by Defendant without simultaneously providing just compensation for that taking *would* accordingly violate the Fifth Amendment[.]" (ER-40 (emphasis added)). In the opinion it issued to explain the judgment, the district court appeared to view that prospective declaration about future government action to be akin to

62

injunctive relief, relying on cases considering the availability of injunctive relief

on a takings claim. (ER-16–17 (discussing *Pharm. Research & Manufacturers*

*of Am. v. Williams*, 64 F.4th 932 (8th Cir. 2023), and *Knick v. Twp. of Scott,*

*Pennsylvania*, 588 U.S. 180, 139 S. Ct. 2162 (2019))).

But the Court held in *Knick* that, "because the federal and nearly all state

governments provide just compensation remedies to property owners who have

suffered a taking, *equitable relief is generally unavailable*." 588 U.S. at 201;

*see also id*. ("As long as an adequate provision for obtaining just compensation

exists, there is no basis to enjoin the government's action effecting a taking.").

To avoid that general bar on equitable and injunctive relief in takings

cases, the district court relied on the Eighth Circuit's holding in *Williams* that

*Knick* allows such relief in cases where, although the state provides a remedy

for obtaining compensation, that remedy is not adequate as contemplated in

*Knick*. *Williams*, 64 F.4th at 942–46. In *Williams*, the state remedy was

inadequate because it would force the plaintiff to litigate a "multiplicity of suits

having a community of facts and issues." *Id*. at 942–45 (emphasis and internal

quotation marks omitted).

But unlike in this case, the multiplicity of suits feared in *Williams* were

truly identical suits involving takings that were by no means speculative. That

case involved a challenge to a law requiring pharmaceutical manufacturers "to

63

provide any eligible individual with free insulin products."  64 F.4th at 936.

That challenge alleged a *per se* taking, not a regulatory taking of the sort at

issue here.  *Id*. at 939, 947.  And the defendant in that case did not even appear

to dispute that a taking had occurred; instead it raised only procedural defenses.

*Id*. at 939.  That is, state compensation procedures would have amounted to a

repetitive "and essentially endless" series of inverse condemnation proceedings

for each of "the thousands of units of insulin" already taken and expected to be

taken under the law, all in the absence of any real dispute over whether a taking

had occurred.  *Id*. at 939, 942 (internal quotation marks omitted).

  Here, by contrast, no disclosure has yet occurred and is entirely

speculative to anticipate.  (ER-17 ("True, no such public disclosure has yet

occurred.")).  Just as speculative is whether any yet-to-occur disclosure will

amount to a taking, as every future case will require applying each of the *Penn*

*Central* factors to a different trade-secret disclosure before any taking is found.

*Contrast Williams*, 64 F.4th at 947–48 ("The present case involves an allegation

of a *physical* taking of insulin, not a *regulatory* taking," meaning that the

"taking is 'a *per se* taking' that does not require a court to analyze other

factors." (emphases in original)).  Indeed, unlike in *Williams*, defendant here

actively disputes whether the challenged law would work a taking in any

circumstance.

64

Just as importantly, those disputes, unlike the ones in *Williams*, do not involve a "community of facts and issues" that are identical in every challenge to disclosure of a trade secret; in particular, as argued above, the economic-impact factor will vary depending on how a given trade secret provides value to its owner, which will in turn inform the definition of the "denominator" parcel used to assess that factor.  Likewise, the nature-of-the-government-action factor will vary depending on the public interest asserted by DCBS as a basis for disclosure.  Thus, the district court was mistaken to view this case as analogous to the unique circumstances presented in *Williams*.

Even with the kind of prospective declaratory judgment issued here, plaintiff's members would need to pursue a multiplicity of suits at least to determine the amount of damages resulting from any yet-to-be-disclosed trade secrets—the value of a trade secret is far more complicated to assess than the value of a commonly purchased product like insulin.  Thus, the prospective relief ordered in this case will not save anyone from the complex litigation that will surely be required to fix the amount of compensation in every case involving disclosure under the public-interest exception.  Precisely because prospective relief does not preclude a multiplicity of suits in this case, awarding that relief under the rationale of *Williams* is inappropriate, and this case does

65

not support departing from *Knick*'s default rule that prospective relief is unavailable in takings cases.

## CONCLUSION

The district court's judgment should be reversed, and this case should be remanded with instructions to enter summary judgment for defendant on the First Amendment and takings claims.

Respectfully submitted,

ELLEN F. ROSENBLUM
Attorney General
BENJAMIN GUTMAN
Solicitor General

/s/  Peenesh Shah
_____
PEENESH SHAH
Assistant Attorney General
peenesh.h.shah@doj.oregon.gov

Attorneys for Defendant-Appellant
Andrew Stolfi, Director, Oregon
Department of Consumer and
Business Services

## CERTIFICATE OF COMPLIANCE

Pursuant to Rule 32(a)(7), Federal Rules of Appellate Procedure, I certify that the Appellant's Opening Brief is proportionately spaced, has a typeface of 14 points or more and contains 13,888 words.

DATED:  July 5, 2024

/s/  Peenesh Shah
_____
PEENESH SHAH
Assistant Attorney General
peenesh.h.shah@doj.oregon.gov

Attorney for Defendant-Appellant
Andrew Stolfi, Director, Oregon
Department of Consumer and
Business Services

ELLEN F. ROSENBLUM
Attorney General
BENJAMIN GUTMAN
Solicitor General
PEENESH SHAH
Assistant Attorney General
1162 Court St.
Salem, Oregon 97301
Telephone: (503) 378-4402

Counsel for Appellant

IN THE UNITED STATES COURT OF APPEALS
FOR THE NINTH CIRCUIT

| | |
|---|---|
| PHARMACEUTICAL RESEARCH AND MANUFACTURERS OF AMERICA, | U.S.C.A. No. 24-1570 |
| Plaintiff-Appellee, | STATEMENT OF RELATED CASES |
| v. | |
| ANDREW STOLFI, in his official capacity as Director of the Oregon Department of Consumer and Business Services, | |
| Defendant-Appellant. | |

Pursuant to Rule 28-2.6, Circuit Rules of the United States Court of Appeals for the Ninth Circuit, the undersigned, counsel of record for Appellant, certifies that he has no knowledge of any related cases pending in this court.

Respectfully submitted,

ELLEN F. ROSENBLUM
Attorney General
BENJAMIN GUTMAN
Solicitor General

/s/  Peenesh Shah
_____
PEENESH SHAH
Assistant Attorney General
peenesh.h.shah@doj.oregon.gov

Attorneys for Defendant-Appellant

## CERTIFICATE OF SERVICE

I hereby certify that on July 5, 2024, I directed the Appellant's Opening Brief to be electronically filed with the Clerk of the Court for the United States Court of Appeals for the Ninth Circuit by using the appellate CM/ECF system.

I certify that all participants in the case are registered CM/ECF users and that service will be accomplished by the appellate CM/ECF system.

/s/  Peenesh Shah
_____

PEENESH SHAH
Assistant Attorney General
peenesh.h.shah@doj.oregon.gov

Attorney for Defendant-Appellant
Andrew Stolfi, Director, Oregon
Department of Consumer and
Business Services

SPH:bmg/964695441