No. 24-1570

_____

_____

IN THE UNITED STATES COURT OF APPEALS
FOR THE NINTH CIRCUIT

_____

PHARMACEUTICAL RESEARCH AND MANUFACTURERS OF
AMERICA,

    Plaintiff-Appellee,

        v.

ANDREW STOLFI, in his official capacity as Director of the Oregon
Department of Consumer and Business Services,

    Defendant-Appellant.

_____

APPELLANT'S EXCERPTS OF RECORD

_____

Appeal from the United States District Court
for the District of Oregon

_____

ELLEN F. ROSENBLUM
Attorney General
BENJAMIN GUTMAN
Solicitor General
PEENESH SHAH
Assistant Attorney General
1162 Court St. NE
Salem, Oregon 97301-4096
Telephone: (503) 378-4402
Peenesh.H.Shah@doj.oregon.gov

Attorneys for Appellant

_____

_____

**E.R.-2**

## APPELLANT'S EXCERPTS OF RECORD

Pursuant to Circuit Rule 30-1.7, appellant submits the following Appellant's Excerpts of Record, as indexed below.

### INDEX

| Clerk's Docket # | Document | E.R. # |
|---|---|---|
| 81 | Opinion | 3 |
| 77 | Declaratory Judgment | 39 |
| 75 | Defendant's Objections to Plaintiff's Proposed Declaratory Judgment | 42 |
| 75-1 | Proposed Declaratory Judgment | 50 |
| 75-2 | Proposed Declaratory Judgment | 53 |
| 74 | Transcript of Proceedings | 56 |
| 73 | Plaintiff's Proposed Declaratory Judgment | 123 |
| 62 | Joint Status Report | 129 |
| 60 | Stipulated Amendment to Complaint Removing Certain Claims Without Prejudice | 134 |
| 30 | Declaration of Cassandra Soucy | 137 |
| 25 | Plaintiff's Motion for Partial Summary Judgment and Supporting Memorandum | 141 |
|  | Email Notice of Electronic Filing | 190 |
| 1 | Complaint | 192 |
| 1-1 | Oregon Laws, Chapter 7 | 234 |
| 78 | Notice of Appeal | 245 |
|  | Civil Docket Report | 251 |

# IN THE UNITED STATES DISTRICT COURT

# FOR THE DISTRICT OF OREGON

| | |
|---|---|
| **PHARMACEUTICAL RESEARCH AND MANUFACTURERS OF AMERICA**, <br><br> Plaintiff, <br><br> v. <br><br> **ANDREW STOLFI**, in his official capacity as Director of the Oregon Department of Consumer and Business Services, <br><br> Defendant. | Case No. 6:19-cv-01996-MO <br><br> **OPINION** |

Jonathan M. Hoffman, David W. Cramer, and Thomas W. Purcell, MB Law Group, LLP, 117 SW Taylor St., Suite 200, Portland, OR 97204. Allon S. Kedem, Elisabeth S. Theodore, Jeffrey L. Handwerker, and R. Stanton Jones, Arnold & Porter Kaye Scholer LLP, 601 Massachusetts Ave. NW, Washington, D.C. 20001. Attorneys for Plaintiff.

Carla Scott, Shaunee Vanessa Morgan, and Brian Simmonds Marshall, Oregon Department of Justice, 100 SW Market Street, Portland, OR 97201. Attorneys for Defendant.

**MOSMAN, District Judge.**

The parties filed cross-motions for summary judgment. As this Court ruled at oral argument, and for the reasons to follow, Pharmaceutical Research and Manufacturers of America ("PhRMA") is entitled to summary judgment on its Takings Clause and First Amendment

PAGE 1 – OPINION

claims, and neither party is entitled to summary judgment on PhRMA's Commerce Clause claim.

As clarified upon the entry of declaratory judgment and in this Opinion, Oregon is entitled to

summary judgment on PhRMA's Supremacy Clause claim.

## BACKGROUND

In 2018 the Oregon legislature enacted a law providing for "drug-pricing transparency."

House Bill 4005, codified at O.R.S. 646A.680–692 ("HB 4005"). HB 4005 requires

pharmaceutical manufacturers to report information about specific new prescription drugs and

historical information about pricing for existing drugs to the Oregon Department of Consumer

and Business Services ("DCBS").

> [A] manufacturer shall report the information described in
> subsection (3) of this section to the department regarding each
> prescription drug for which:
>
> (a) The price was $100 or more for a one-month supply or for a
> course of treatment lasting less than one month; and
>
> (b) There was a net increase of 10 percent or more in the price of
> the prescription drug described in paragraph (a) of this subsection
> over the course of the previous calendar year.

§ 2(2).

HB 4005 defines "price" as the wholesale acquisition cost ("WAC") as defined in 42

U.S.C. § 1395w-3a(c)(6)(B). That section, in turn, provides,

> The term "wholesale acquisition cost" means, with respect to a
> drug or biological, the manufacturer's list price for the drug or
> biological to wholesalers or direct purchasers in the United States,
> not including prompt pay or other discounts, rebates or reductions
> in price, for the most recent month for which the information is
> available, as reported in wholesale price guides or other
> publications of drug or biological pricing data.

42 U.S.C. § 1395w-3a(c)(6)(B).

PAGE 2 – OPINION

For each prescription drug described in subsection 2, a manufacturer must report the following information:

(a) The name and price of the prescription drug and the net increase, expressed as a percentage, in the price of the drug over the course of the previous calendar year;

(b) The length of time the prescription drug has been on the market;

(c) The factors that contributed to the price increase;

(d) The name of any generic version of the prescription drug available on the market;

(e) The research and development costs associated with the prescription drug that were paid using public funds;

(f) The direct costs incurred by the manufacturer:

(A) To manufacture the prescription drug;

(B) To market the prescription drug;

(C) To distribute the prescription drug; and

(D) For ongoing safety and effectiveness research associated with the prescription drug;

(g) The total sales revenue for the prescription drug during the previous calendar year;

(h) The manufacturer's profit attributable to the prescription drug during the previous calendar year;

(i) The introductory price of the prescription drug when it was approved for marketing by the United States Food and Drug Administration and the net yearly increase, by calendar year, in the price of the prescription drug during the previous five years;

(j) The 10 highest prices paid for the prescription drug during the previous calendar year in any country other than the United States;

(k) Any other information that the manufacturer deems relevant to the price increase described in subsection (2)(b) of this section; and

PAGE 3 – OPINION

(l) The documentation necessary to support the information
reported under this subsection.

§ 2(3). If a manufacturer fails to comply with HB 4005's reporting requirements, it is subject to a civil penalty "not to exceed $10,000 per day of violation." § 3(2).

DCBS is required to post the manufacturers' reported information on its website unless (1) the information is a trade secret under Oregon law and (2) the public interest does not require disclosure. § 2(10). The parties refer to this as the "public-interest exception."

According to Cassandra Soucy, the Drug Pricing Transparency Coordinator at DCBS, as of May 26, 2020, 1,112 reports had been filed under HB 4005. Declaration of Cassandra Soucy ("Soucy Decl."), ECF 30 ¶ 4. DCBS posted information that was not claimed as a trade secret to its website. *Id.* ¶ 5. As of May 2020, DCBS had not disclosed any information a drug manufacturer claimed as a trade secret, and manufacturers had asserted 4,865 such claims. *Id.*

As of August 2020, DCBS had not made a final decision about whether any trade secrets claimed by PhRMA members were trade secrets and whether the public interest would require disclosure of those trade secrets. Supplemental Declaration of Cassandra Soucy ("Supp. Soucy Decl."), ECF 39 ¶ 5.

Both parties moved for partial summary judgment. Plaintiff's Motion for Partial Summary Judgment ("Pl.'s MSJ"), ECF 25; Defendant's Combined Motion for Partial Summary Judgment and Opposition to Plaintiff's Moton for Partial Summary Judgment ("Def.'s MSJ & Opp. to Pl.'s MSJ"), ECF 29. On June 16, 2023, the parties filed a Stipulated Amendment to Complaint Removing Certain Claims Without Prejudice, ECF 60. The only claims pending are those addressed by the parties' motions for partial summary judgment. *Id.* This Court held oral argument on January 11, 2024 and ruled orally, holding that the public-interest exception violated the Takings Clause of the Fifth Amendment; the public-interest exception did not

PAGE 4 – OPINION

violate the Supremacy Clause; there are disputes of fact as to whether HB 4005 violates the Commerce Clause; and HB 4005's reporting requirements violate the First Amendment. Plaintiff provided a proposed declaratory judgment, and the parties briefed their responses to that proposed judgment. This Court adopted Plaintiff's proposed declaratory judgment with a modification suggested by Oregon on the preemption claim.

## LEGAL STANDARDS

A party is entitled to summary judgment if the "movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The moving party has the burden of establishing the absence of a genuine dispute of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). The court must view the evidence in the light most favorable to the non-movant and draw all reasonable inferences in the non-movant's favor. *Clicks Billiards, Inc. v. Sixshooters, Inc.*, 251 F.3d 1252, 1257 (9th Cir. 2001).

When parties file cross-motions for summary judgment, the court "evaluate[s] each motion separately, giving the nonmoving party in each instance the benefit of all reasonable inferences." *A.C.L.U. of Nev. v. City of Las Vegas*, 466 F.3d 784, 790–91 (9th Cir. 2006) (quotation marks and citation omitted). In evaluating the motions, "the court must consider each party's evidence, regardless under which motion the evidence is offered." *Las Vegas Sands, LLC v. Nehme*, 632 F.3d 526, 532 (9th Cir. 2011) (citation omitted).

## DISCUSSION

Before addressing each of PhRMA's claims, two preliminary matters require discussion: standing and the standard for facial challenges.

PAGE 5 – OPINION

## A. Associational Standing

Article III of the Constitution limits the jurisdiction of federal courts to "Cases" and "Controversies." U.S. Const., art. III, § 2. "The doctrine of standing gives meaning to these constitutional limits by identifying those disputes which are appropriately resolved through the judicial process." *Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 157 (2014) (citation, footnote, brackets, and internal quotation marks omitted). For each claim, PhRMA needs to establish standing. *See Friends of the Earth, Inc. v. Laidlaw Env't Servs. (TOC), Inc.*, 528 U.S. 167, 185 (2000) ("[A] plaintiff must demonstrate standing separately for each form of relief sought." (citations omitted)). In its Complaint, PhRMA notes that it brings this action "on behalf of itself and its members." ECF 1 ¶ 1.

PhRMA concedes that it lacks standing to bring its claims on its own behalf, but it contends it can sue in a representational capacity. An association has standing to sue on behalf of its members if (1) "its members would otherwise have standing to sue in their own right," (2) "the interests it seeks to protect are germane to the organization's purpose," and (3) "neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit." *Hunt v. Wash. State Apple Advert. Comm'n*, 432 U.S. 333, 343 (1977). The second and third elements are satisfied—protecting pharmaceutical manufacturers from unconstitutional regulation is germane to PhRMA's purpose as a trade group of those manufacturers, and because PhRMA is pursuing a facial challenge, the participation of the individual members is unnecessary. As to the first element, like any Article III standing inquiry, an association must show that one of its members "(1) suffered an injury in fact, (2) that is fairly traceable to the challenged conduct of the defendant, and (3) that is likely to be redressed by a favorable judicial decision." *Spokeo, Inc. v. Robins*, 578 U.S. 330, 338 (2016) (citations omitted). For each of

PAGE 6 – OPINION

PhRMA's claims, this Opinion begins by addressing whether PhRMA's members would have standing.

## B.  Facial Challenges

PhRMA brings facial challenges to the public-interest exception and reporting requirements of HB 4005. "A facial challenge is an attack on a statute itself as opposed to a particular application." *City of Los Angeles v. Patel*, 576 U.S. 409, 415 (2015). "[A] plaintiff can only succeed in a facial challenge by 'establish[ing] that no set of circumstances exists under which the [statute] would be valid,' *i.e.*, that the law is unconstitutional in all of its applications." *Wash. State Grange v. Wash. State Republican Party*, 552 U.S. 442, 449 (2008) (alteration in original) (quoting *United States v. Salerno*, 481 U.S. 739, 745 (1987)). Such constitutional challenges are considered the most difficult to mount successfully. *Willis v. City of Seattle*, 943 F.3d 882, 886 (9th Cir. 2019) (citation omitted).

## C.  Fifth Amendment Taking

HB 4005 requires PhRMA's members to submit trade secrets to DCBS, and, if DCBS determines that the disclosure of those trade secrets would benefit the public interest, it must disclose them. In PhRMA's view, this amounts to a threatened unconstitutional taking, because as soon as a trade secret is published it loses its value. Oregon responds that the public-interest exception has not yet been invoked, and Oregon has put in place procedural safeguards to ensure that pharmaceutical companies have an opportunity to be heard before a trade secret is disclosed.

### 1.  PhRMA Has Standing to Bring Its Takings Claim

As noted at the outset, to establish standing, a plaintiff must show (1) an injury in fact, (2) a causal connection between the injury and the alleged conduct, and (3) redressability. An "injury in fact" must be "concrete and particularized" and "actual or imminent, not conjectural or

PAGE 7 – OPINION

hypothetical." *Spokeo, Inc.*, 578 U.S. at 339 (quoting *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560 (1992)).

*Injury and Causation*. "A plaintiff who challenges a statute must demonstrate a realistic danger of sustaining a direct injury as a result of the statute's operation or enforcement." *Babbitt v. United Farm Workers Nat'l Union*, 442 U.S. 289, 298 (1979). When a plaintiff's course of conduct is "arguably affected with a constitutional interest" and "the injury is certainly impending," that is enough for the injury-in-fact requirement. *Id.* Trade secrets are a form of property. *See Carpenter v. United States*, 484 U.S. 19, 26 (1987); *see also Ruckelshaus v. Monsanto Co.*, 467 U.S. 986, 1003–04 (1984). Therefore, the Fifth Amendment, applied to the states and judicial action, affords property protection for trade secrets. *See Chicago, B. & Q.R. Co. v. City of Chicago*, 166 U.S. 226 (1897). Public disclosure of a trade secret destroys its value. *See Hartley Pen Co. v. U.S. Dist. Ct.*, 287 F.2d 324, 328 (9th Cir. 1961) ("[T]he property in a trade secret is the power to make use of it to the exclusion of the world. If the world knows the process then the property disappears." (citation omitted)). If DCBS invoked the public-interest exception and posted a PhRMA member's trade secret online, then the statute would have caused the disclosure of the trade secret and uncompensated destruction of its value.

*Redressability*. PhRMA seeks a declaratory judgment[1] that the public-interest exception authorizes takings without just compensation, a constitutional violation. Oregon argues that this type of relief is not available for takings claims. In recent years, the Supreme Court has addressed the availability of declaratory and injunctive relief for takings claims in the context of ripeness, which this Court will address in the next subsection. For purposes of the *standing*

---

[1] PhRMA has abandoned any claims for injunctive relief. *See* ECF 44 at 3 ("PhRMA does not seek an injunction here.").

PAGE 8 – OPINION

analysis, this Court asks whether, if granted, the relief sought would rectify the injury. That

question is easily answered—yes. A declaratory judgment in PhRMA's favor would rectify the

threatened injuries.

### 2. PhRMA's Takings Claim Is Ripe

To the extent there is a difference between constitutional standing and ripeness in the

takings context,[2] it does not alter the analysis here. In pre-enforcement challenges, standing and

ripeness often "boil down to the same question." *See Susan B. Anthony List*, 573 U.S. at 157 n.5.

As a general matter, a facial challenge to a statute under the Takings Clause may be considered

ripe for adjudication if the enforcement of the statute would necessarily result in a taking of

property by the government. *See Hodel v. Va. Surface Min. & Reclamation Ass'n, Inc.*, 452 U.S.

264, 295 (1981); *see also Suitum v. Tahoe Reg'l Plan. Agency*, 520 U.S. 725, 736 n.10 (1997)

(explaining that a facial challenge in the takings context is usually ripe "the moment the

challenged regulation or ordinance is passed").

A trio of more recent Supreme Court decisions address ripeness in takings cases. In *Knick*

*v. Township of Scott*, the Court explained that "[a] property owner may bring a takings claim

under § 1983 upon the taking of his property without just compensation by a local government."

139 S. Ct. 2162, 2179 (2019). "As long as an adequate provision for obtaining just compensation

exists, there is no basis to enjoin the government's action effecting a taking." *Id.* at 2176.

---

[2] *See N. Mill St., LLC v. City of Aspen*, 6 F.4th 1216, 1229–30 (10th Cir. 2021) (holding
that *Williamson County*'s ripeness test is prudential, not jurisdictional); *Pharm. Rsch. & Mfrs. of
Am. v. Williams*, 64 F.4th 932, 950–51 (8th Cir. 2023) (Gruender, J., concurring) (concurring
insofar as the majority opinion "does not decide the question of whether the availability of
equitable relief implicates standing" for a takings claim); *Va. Hosp. & Healthcare Ass'n v.
Kimsey*, No. 20-2176, 2022 WL 604049, at *4 & n.3 (4th Cir. Mar. 1, 2022) ("Whether the
district court's grounds for dismissing the Takings and Preemption Claims were, as the court
thought, Rule 12(b)(1) issues of Article III standing—or were instead Rule 12(b)(6) issues of the
viability of those Claims—is a question that we acknowledge but need not resolve today.").

PAGE 9 – OPINION

Two years later, the Supreme Court clarified in *Pakdel v. City & County of San Francisco* that "administrative 'exhaustion of state remedies' is not a prerequisite for a takings claim when the government has reached a conclusive position." 594 U.S. 474, 480 (2021) (per curiam). The Court reasoned that "[the finality] requirement ensures that a plaintiff has actually been injured by the Government's action and is not prematurely suing over a hypothetical harm. Along the same lines, because a plaintiff who asserts a regulatory taking must prove that the government regulation has gone too far, the court must first know how far the regulation goes. Once the government is committed to a position, however, these potential ambiguities evaporate and the dispute is ripe for judicial resolution." *Id.* at 479 (citation, brackets, and internal quotation marks omitted).

That same year, the Supreme Court decided *Cedar Point Nursery v. Hassid*, 594 U.S. 139 (2021). In that case, the plaintiff sought a preliminary injunction to prevent a physical taking, and the defendants moved to dismiss. *Id.* at 145–46. The lower courts denied the preliminary injunction motion and granted the motion to dismiss, but the Supreme Court reversed the Ninth Circuit's judgment and remanded. The Supreme Court did not explicitly address whether a preliminary injunction was appropriate or available to the plaintiff in *Cedar Point*. But at least one circuit court has viewed *Cedar Point* as a tacit endorsement of the principle that a plaintiff may have a ripe takings claim even prior to an actual physical taking occurring. *See Barber v. Charter Township of Springfield*, 31 F.4th 382, 389 (6th Cir. 2022). Given this reading of *Cedar Point*, and other guidance from the Supreme Court, the Sixth Circuit concluded that "a claim for injunctive relief is ripe if the government has reached a final decision that will enable a future physical taking." *Id.*

PAGE 10 – OPINION

Here, under the plain terms of the statute, a disclosure under the public-interest exception would result in the taking of a trade secret. DCBS has no discretion—if a trade secret would benefit the public interest, then it must disclose it. This is not a land use case in which there is some mechanism for the government to grant a variance that has not yet been finalized. Nor, on this record, is there a known mechanism for PhRMA's members to seek compensation. The law here, and how it will apply to the pharmaceutical companies, is set. PhRMA has therefore shown "*de facto* finality" sufficient for its claim to ripen. *Pakdel*, 594 U.S. at 479. This claim is ripe for review. *See Philip Morris, Inc. v. Reilly*, 267 F.3d 45, 52–54 (1st Cir. 2001), *on reh'g en banc*, 312 F.3d 24, 30 (1st Cir. 2002) (En banc "review does not include revisiting the issues of whether the tobacco companies' claims are ripe . . . .").

### 3.   PhRMA Is Entitled to Summary Judgment on Its Takings Clause Claim

Having concluded that PhRMA's members, and so PhRMA, have standing, and the takings claim is ripe for adjudication, this Court next addresses the merits of the takings claim. Because this is a facial challenge, PhRMA must show that the public-interest exception would result in an unconstitutional taking in all applications.

Oregon argues that this claim fails because "PhRMA has not met its burden of proving that H.B. 4005 will 'take' trade secrets in *all* of its applications." Def.'s MSJ & Opp. to Pl.'s MSJ, ECF 29 at 16. PhRMA responds that it need only prove that the *public-interest exception* will "take" trade secrets whenever invoked. Plaintiff's Reply and Opposition ("Pl.'s Reply & Opp. to Def.'s MSJ"), ECF 34 at 9–11. PhRMA's framing is correct. On this claim, it is only challenging the public-interest exception, so the question is whether the public-interest exception will amount to an unconstitutional taking every time it is invoked, not HB 4005 writ large.

In general, Supreme Court precedent distinguishes between two types of takings: physical takings and regulatory takings. *Tahoe-Sierra Pres. Council, Inc. v. Tahoe Reg'l Plan. Agency*,

PAGE 11 – OPINION

535 U.S. 302, 323–24 (2002); *Reilly*, 312 F.3d at 33. The only Supreme Court case to address the appropriate categorization for a taking in the trade secret context is *Ruckelshaus v. Monsanto Co.*, 467 U.S. 986 (1984). There, the Court considered whether certain provisions of the Federal Insecticide, Fungicide, and Rodenticide Act constituted a taking. *Id.* at 990. Those provisions authorized the Environmental Protection Agency to disclose publicly some of the data submitted by companies applying for registration of pesticides. *Id.* The Court applied the regulatory takings test under *Penn Central Transportation Co. v. New York City*, 438 U.S. 104 (1978), to determine whether the statute worked a compensable taking of companies' trade secrets. *Id.* at 1004–14. Based on this precedent, this Court will analyze the public-interest exception under the regulatory takings scheme.

In *Ruckelshaus*, the Supreme Court identified several factors for courts to consider in determining whether a regulatory taking has occurred, including "the character of the governmental action, its economic impact, and its interference with reasonable investment-backed expectations." *Id.* at 1005 (citations omitted). The following analysis addresses each of these factors in turn.

*Character of the Governmental Action*. In assessing the character of the governmental action, this Court considers how the government regulates and what that regulation does to the property interest—here, the pharmaceutical companies' trade secrets. *See Reilly*, 312 F.3d at 41 (citing *Hodel*, 481 U.S. at 716). This Court takes this to mean it should look at the way in which the taking fits into the regulatory scheme, and the regulatory impact on the property. The public-interest exception mandates disclosure of the companies' trade secrets when the public interest so requires. On its face, HB 4005 does not explain how DCBS determines when the public interest requires publication of a trade secret. Practically, "[t]his places an extremely low burden

PAGE 12 – OPINION

on [Oregon]," *id.* at 44, which results in irrevocable individual loss. Further, "it is not at all clear that protecting the overall integrity of the [trade secrets] will interfere with [Oregon's] goal[s]." *Id.* This factor supports finding the application of the public-interest exception to work a taking.

*Economic Impact*. The law regarding economic impact is fairly straightforward. The inquiry is whether the regulation "impair[s] the value or use of [the] property" according to the owners' general use of their property. *PruneYard Shopping Ctr. v. Robins*, 447 U.S. 74, 83 (1980). Here, disclosure of a trade secret will destroy that trade secret's value. To be sure, the trade secret that is revealed may not be the pharmaceutical company's most valuable secret, but it is nonetheless information that gains value through being generally unknown to the public. Disclosure necessarily destroys all of that value. This factor favors finding that the public-interest exception works a taking.

*Reasonable Investment-Backed Expectations*. "Courts protect only reasonable expectations. Ideally, the relevant inquiry should recognize that not every investment deserves protection and that some investors inevitably will be disappointed." *Reilly*, 312 F.3d at 36 (emphasis omitted). In *Ruckelshaus*, the Supreme Court focused solely on this last factor because "the force of this factor is so overwhelming, at least with respect to certain of the data submitted by Monsanto to EPA, that it disposes of the taking question regarding those data." 467 U.S. at 1005. There, the Court made clear that, "[i]f, despite the data-consideration and data-disclosure provisions in the statute, Monsanto chose to submit the requisite data in order to receive a registration, it can hardly argue that its reasonable investment-backed expectations are disturbed when EPA acts to use or disclose the data in a manner that was authorized by law at the time of the submission." *Id.* at 1006–07. This result—that a company cannot claim it had a reasonable investment-backed expectation in secrecy when it submitted trade secrets to a government entity

PAGE 13 – OPINION

knowing that the government may disclose those trade secrets—has been repeated in later cases. *See Reilly*, 312 F.3d at 38; *Pharm. Care Mgmt. Ass'n v. Rowe*, 429 F.3d 294, 315 (1st Cir. 2005) (Boudin, C.J., and Dyk, J., jointly concurring and providing the controlling majority for the Takings Clause issue) ("There is no basis for forward-looking injunctive relief with respect to rebate contracts entered into after the statute's effective date.").

But in each of these cases, the entities voluntarily provided the trade secrets at issue. When that voluntariness is lacking, either because there is no quid pro quo, as there was in *Ruckelshaus*, or because disclosure is required, as in *Reilly*, then the regulatory takings factors, analyzed as a whole, point toward finding a taking or a threatened taking for purposes of a facial challenge. *See also Nollan v. Cal. Coastal Comm'n*, 483 U.S. 825, 833 n.2 (1987) (explaining that in *Ruckelshaus* the Court found that the Takings Clause was not violated because trade secrets were exchanged for the right to a valuable government benefit). And here, voluntariness is lacking. PhRMA's members were simply obligated to disclose by Oregon's positive law. Thus, this Court finds that PhRMA's members have a reasonable investment-backed expectation that the state will maintain the secrecy of the information that qualifies for trade secret protection. Because the members did not voluntarily hand over this information—in fact, they disclosed under protest—they are entitled to that expectation despite knowing of the public-interest exception. Because all the factors support finding a regulatory taking, this Court finds that the exercise of the public-interest exception works a regulatory taking.

*Availability of Declaratory Relief.* "As long as an adequate provision for obtaining just compensation exists, there is no basis to enjoin the government's action effecting a taking." *Knick*, 139 S. Ct. at 2176. A recent case from the Eighth Circuit is instructive in interpreting what constitutes an "adequate provision" under state law. There, the court held that injunctive

PAGE 14 – OPINION

and declaratory relief were available—and so, in that court's view, a takings claim was redressable—where the state's inverse condemnation procedure did not afford an adequate legal remedy. *Williams*, 64 F.4th at 946. The state law required drug manufacturers to provide insulin for free to residents who met certain criteria. *Id.* at 937. To receive just compensation for these repeated takings, manufacturers would be bound to litigate a multiplicity of suits so long as the law remained in effect, which the Eighth Circuit considered an inadequate remedy. *Id.* at 945. Relying on *Knick* and *Pakdel*, the Eighth Circuit reversed the district court's dismissal for lack of standing. *Id.* at 950.

Likewise here. Pharmaceutical companies are required to hand over trade secrets knowing that DCBS is under an obligation to disclose those trade secrets if the public interest so requires. As of May 2020, manufacturers had identified 4,865 trade secrets in their submissions to DCBS. Soucy Decl., ECF 30 ¶ 5. Unless just compensation is provided, a taking of private property for public use occurs with each mandated public disclosure. True, no such public disclosure has yet occurred. But PhRMA is left to guess whether that is due to this pending litigation or something else. In the meantime, the very real threat of destructive disclosure suffices for declaratory relief.

Even assuming some of the identified trade secrets do not qualify as such under the terms of the statute, pharmaceutical companies are still left in the same position as the plaintiffs in *Williams*: litigating a multiplicity of suits involving the same underlying takings. Oregon did not address the availability of a state compensation scheme until its reply, and it did not argue the adequacy of that scheme given these circumstances. *See* Defendant's Reply ("Def.'s Reply to

PAGE 15 – OPINION

Pl.'s MSJ"), ECF 38 at 11–12.[3] "[T]he legal remedy of damages is not 'complete, practical and efficient,' because it requires a repetitive succession of inverse condemnation suits. An inverse condemnation action to reimburse a manufacturer for each discrete alleged taking is incapable of compensating the manufacturers for the repetitive, future takings that will occur under the Act's requirements. By contrast, equitable relief would protect manufacturers from those future harms." *Williams*, 64 F.4th at 945 (quoting *Terrace v. Thompson*, 263 U.S.197, 214 (1923)); *see also E. Enterprises v. Apfel*, 524 U.S. 498, 522 (1998) ("Based on the nature of the taking alleged in this case, we conclude that the declaratory judgment and injunction sought by petitioner constitute an appropriate remedy under the circumstances, and that it is within the district courts' power to award such equitable relief.").

## D. Preemption

PhRMA argues that HB 4005's public-interest exception is preempted by the federal Defend Trade Secrets Act ("DTSA"), 18 U.S.C. §§ 1832–39. Oregon responds that it is not impossible to comply with both statutes, and that the public-interest exception does not frustrate the congressional purpose underlying the DTSA.

### 1. PhRMA Has Standing to Bring Its Preemption Claim

Because DCBS must disclose trade secrets that fall within the public-interest exception, there is the threat of possible disclosure of a trade secret, which could potentially constitute misappropriation under the DTSA. Along these same lines, misappropriation under the DTSA would impact a pharmaceutical company's property interest in its trade secret. In other words,

---

[3] This Court acknowledges that the briefing for this case was completed after *Knick* but before *Pakdel*. Nevertheless, Oregon did not respond to PhRMA's notice of supplemental authority addressing the Eighth Circuit's decision reversing the district court in *Williams*, *see* ECF 56, nor did it address the adequacy of the state's compensation scheme at oral argument on January 11, 2024.

the DTSA provides a civil cause of action for the loss of a trade secret, and if HB 4005 requires Oregon to disclose trade secrets despite the DTSA, then the pharmaceutical company has a concrete and particularized, though at this stage merely threatened, injury. This threatened enforcement of the public-interest exception, and concomitant injury despite a federal statute guarding against such injury, is sufficient for the injury-in-fact requirement. Likewise, there is no question that the public-interest exception would be the cause of the injury. And, according to PhRMA, severing the public-interest exception from HB 4005 would redress the injury. This Court is satisfied that PhRMA has standing to assert the preemption claim.

### 2. Oregon Is Entitled to Summary Judgment on the Preemption Claim

PhRMA argues that the public-interest exception is preempted by the DTSA. It relies on two types of conflict preemption. First, it argues that the disclosure mandated by the exception constitutes "misappropriation" of a trade secret under federal law, such that compliance with both statutes would be impossible. Second, it argues the public-interest exception is an obstacle to the full accomplishment of the DTSA's purposes and objectives because it nullifies the trade secrets that federal law protects. Pl.'s MSJ, ECF 25 at 22.

The DTSA authorizes the "owner of a trade secret that is misappropriated" to bring a civil action, 18 U.S.C. § 1836(b)(1), and grants the United States district courts original jurisdiction over such cases, 18 U.S.C. § 1836(c). Two provisions of the DTSA are relevant for the preemption analysis. First, the DTSA "does not prohibit or create a private right of action" in regard to "any otherwise lawful activity conducted by a governmental entity of . . . a State." 18 U.S.C. § 1833(a)(1). Second, the DTSA "shall not be construed to preempt or displace any other remedies, whether civil or criminal, provided by United States Federal, State, commonwealth, possession, or territory law for the misappropriation of a trade secret." 18 U.S.C. § 1838.

PAGE 17 – OPINION

As for § 1833(a)(1), PhRMA argues that "[t]his sort of broadly worded saving clause 'does not bar the ordinary working of conflict preemption principles.'" Pl.'s MSJ, ECF 25 at 28 (quoting *Geier v. Am. Honda Motor Co.*, 529 U.S. 861, 869 (2000)). Instead, it goes on, "Congress typically uses such language, which is scattered throughout the U.S. Code, to indicate that federal law is not meant to 'dominate the field' exclusively." *Id.* (quoting *Int'l Paper Co. v. Ouellette*, 479 U.S. 481, 492 (1987)). According to PhRMA, saving clauses like § 1833(a)(1) do not "override principles of conflict preemption, and the Supreme Court has repeatedly 'decline[d] to give broad effect to saving clauses where doing so would upset the careful regulatory scheme established by federal law.'" *Id.* (quoting *United States v. Locke*, 529 U.S. 89, 106 (2000)).

As for § 1838, PhRMA treats this as the linchpin of understanding the relationship between the DTSA and state-law schemes. It argues that this section shows that, "while Congress did not want to preempt trade secret *protections* provided by state law, Congress *did* want to preempt other, non-remedial forms of state law." Pl.'s MSJ, ECF 25 at 27.

There is a dearth of authority on the DTSA and its interaction with state laws. PhRMA points this Court to a situation from Nevada. There, a state law, SB 539, required drug manufactures to report information about reasons for certain price increases. Pl.'s Reply & Opp. to Def.'s MSJ, ECF 34 at 15. As here, PhRMA challenged the law, arguing that it violated the Takings Clause and the Supremacy Clause. *Id.* Nevada conceded that disclosure of trade secrets under that law would constitute 'misappropriation' for which a court may award relief pursuant to the DTSA, and it adopted regulations that prevented disclosure of trade secrets as defined by federal law. *Id.* PhRMA voluntarily dismissed its claims without prejudice.

PAGE 18 – OPINION

For its part, Oregon cites a case from the District of Massachusetts, *Fast Enterprises, LLC v. Pollack*, Civil Action No. 16-CV-12149-ADB, 2018 WL 4539685 (D. Mass. Sept. 21, 2018), which involved a Massachusetts public records law. Plaintiff sued the Secretary and CEO of the Massachusetts Department of Transportation with the goal of enjoining her from disclosing its trade secrets pursuant to the public records law. The court concluded that it lacked subject matter jurisdiction. In particular, the court held that § 1833(a)(1), the saving clause, meant that a DTSA claim could not be maintained against a state performing lawful state activities.

### i.    Impossibility Preemption

PhRMA argues that it is impossible to comply with both the public-interest exception and the DTSA, and so the public-interest exception is preempted by federal law. Pl.'s MSJ, ECF 25 at 22–25. Federal law preempts state law when it is impossible to comply with both sets of laws. *See Fla. Lime & Avocado Growers, Inc. v. Paul*, 373 U.S. 132, 142–43 (1963). Impossibility preemption has been recognized as a "demanding defense." *Wyeth v. Levine*, 555 U.S. 555, 573 (2009).

Oregon responds that, "[i]n the speculative event that DCBS posts a PhRMA member's trade secrets online, it would not constitute misappropriation because it would only occur after the drug manufacturer was afforded robust due process to prevent disclosure pursuant to administrative rules promulgated under H.B. 4005." Def.'s MSJ & Opp. to Pl.'s MSJ, ECF 29 at 12 (citations and emphasis omitted). This argument is unpersuasive—process alone does not keep disclosure from being misappropriation. *See* Pl.'s Reply & Opp. to Def.'s MSJ, ECF 34 at 15 ("Whatever 'process' the State chooses to undertake *before* disclosing a trade secret under the

PAGE 19 – OPINION

public-interest exception, the fact remains that every such disclosure still qualifies as a misappropriation under the DTSA.").

But it is not clear that disclosure would be misappropriation under the DTSA. The DTSA defines misappropriation, in part, as disclosure of a trade secret of another without express or implied consent by a person who, at the time of disclosure, knew or had reason to know that the knowledge of the trade secret was acquired under circumstances giving rise to a duty to maintain the secrecy of the trade secret. 18 U.S.C. § 1839(5). DCBS is not under an absolute duty to maintain secrecy because HB 4005 permits disclosure in certain circumstances. Because disclosure under the public-interest exception would not constitute misappropriation under the DTSA, then it would be possible to comply with both sets of laws. Likewise, taken on its face, the saving clause in § 1833(a)(1) would prevent PhRMA's members from bringing a claim under the DTSA for the state's disclosure of its trade secrets. It is possible to comply with both statutes.

### ii. Obstacle Preemption

Federal law also impliedly preempts state laws that pose an "obstacle" to the "full purposes and objectives" of Congress. *See Hines v. Davidowitz*, 312 U.S. 52, 67 (1941). In its obstacle preemption cases, the Supreme Court has held that state law impermissibly interferes with federal goals if it frustrates Congress's intent to adopt a uniform system of federal regulation; conflicts with Congress's goal of establishing a regulatory "ceiling" for certain products or activities; or impedes the vindication of a federal right. *See id.*; *Geier*, 529 U.S. at 875, 879; *Felder v. Casey*, 487 U.S. 131, 153 (1988).

The Supreme Court has cautioned that obstacle preemption does not justify a "freewheeling judicial inquiry" into whether state laws are "in tension" with federal objectives;

PAGE 20 – OPINION

such a standard would undermine the principle that "it is Congress rather than the courts that preempts state law." *Chamber of Com. of U.S. v. Whiting*, 563 U.S. 582, 607 (2011).

Here, the parties agree broadly that the objective of the DTSA is to provide a private cause of action and remedies for owners of trade secrets. *See* Pl.'s MSJ, ECF 25 at 27; Def.'s MSJ & Opp. to Pl.'s MSJ, ECF 29 at 13–14. They diverge on the specifics—PhRMA sees the DTSA as promoting innovation and American jobs, whereas Oregon trains on the DTSA's focus on providing a remedy for those who have had their trade secrets stolen.

By its text, the DTSA protects against misappropriation of trade secrets—it creates a federal regime, which works in tandem with state trade secrets regimes, to ensure holders of trade secrets have recourse should their trade secrets be disclosed. And by its text, the DTSA does not appear to be intended to cabin the ability of states to impose reporting requirements. Therefore, Oregon is entitled to summary judgment on the preemption claim.

### E.  Dormant Commerce Clause

PhRMA argues that HB 4005 facially violates the dormant Commerce Clause because, by tying its reporting requirements to the federally defined WAC, it directly controls interstate commerce. Oregon responds that HB 4005 does not regulate or discriminate against extra-territorial commerce, and any impact HB 4005 has on out-of-state commerce is constitutionally permitted.

#### 1.  PhRMA Has Standing to Bring its Commerce Clause Claim

PhRMA has standing to assert its dormant Commerce Clause claim because, according to PhRMA, HB 4005 through its current operation is controlling commerce by imposing regulatory consequences on nationwide price changes. If PhRMA is correct, then the manufacturers are being regulated by an unconstitutional statute, and such regulation is a legally cognizable harm that a declaratory judgment can remedy. *See Lujan*, 504 U.S. at 562.

PAGE 21 – OPINION

**2. Neither Party Is Entitled to Summary Judgment on the Commerce Clause Claim**

"The Constitution vests Congress with the power to 'regulate Commerce . . . among the several States.'" *Nat'l Pork Producers Council v. Ross*, 598 U.S. 356, 368 (2023) (ellipsis in original) (quoting U.S. Const., art. I, § 8, cl. 3). The Supreme Court has held that the Commerce Clause "also 'contain[s] a further, negative command,' one effectively forbidding the enforcement of 'certain state [economic regulations] even when Congress has failed to legislate on the subject.'" *Id.* (alterations in original) (quoting *Okla. Tax Comm'n v. Jefferson Lines, Inc.*, 514 U.S. 175, 179 (1995)).

It is useful to note what PhRMA is *not* arguing. PhRMA does not argue that HB 4005 discriminates against out-of-state economic interests. *See* Pl.'s Reply & Opp. to Def.'s MSJ, ECF 34 at 22. PhRMA does not argue that HB 4005 has the practical effect of controlling commerce outside of Oregon. Pl.'s Resp. to Def.'s Notice of Suppl. Authority, ECF 58 at 1 ("PhRMA does not contend that the Disclosure Law has the practical effect of controlling out-of-state commerce." (emphasis omitted)). Instead, PhRMA argues that HB 4005 directly "controls commerce in all 50 States by imposing regulatory consequences on nationwide price moves" and that this "violate[s] the Commerce Clause per se." Pl.'s MSJ, ECF 25 at 31 (alteration in original) (quoting *Nat'l Collegiate Athletic Ass'n v. Miller*, 10 F.3d 633, 638 (9th Cir. 1993)).

This argument is similar to that made by PhRMA in *PhRMA v. David*. *See* ECF 43. There, SB 17, a California law, tied disclosure requirements for pharmaceutical manufacturers to the WAC, similar to HB 4005. In particular, SB 17 required the manufacturer of a prescription drug to notify certain purchasers at least 60 days before increasing the drug's federally defined WAC if (1) a course of therapy has a WAC of more than $40, and (2) the proposed increase would result in a cumulative increase of 16 percent or more over the two calendar years before the current year. Manufacturers were required to provide the date and amount of the planned

PAGE 22 – OPINION

increase, as well as a statement as to whether a change or improvement in the drug necessitated the price increase and describing the change, if one occurred. PhRMA argued that SB 17 directly regulated commerce by tying state reporting requirements to the federally defined WAC.

The district court held that PhRMA was not entitled to summary judgment. It reasoned, "PhRMA relies on a general proposition that because the WAC is federally defined and must be uniform nationwide, SB 17 directly regulates out-of-state drug prices. However, this alone does not render SB 17 unconstitutional. There are genuine disputes of material fact as to whether providing advance notice of certain increases in a prescription drug's WAC results in either direct or extraterritorial regulation." *Pharm. Rsch. & Mfrs. of Am. v. David*, 510 F. Supp. 3d 891, 900 (E.D. Cal. 2021), *aff'd and remanded sub nom. Pharm. Rsch. & Mfrs. of Am. v. Landsberg*, No. 21-16312, 2022 WL 2915588 (9th Cir. July 25, 2022).

The Ninth Circuit affirmed:

> The district court correctly determined that "PhRMA claims SB 17 directly impacts out-of-state drug prices but what that impact may actually be remains unclear." While PhRMA argues that the advance notice provision freezes drug prices nationwide, WAC is a nationwide list price set by manufacturers for each drug that does not reflect the final transaction price. In its opposition to summary judgment, California presented expert testimony that changes in WAC are not directly tied to changes in a drug's final transaction price. Additionally, while PhRMA correctly notes that WAC is sometimes used in negotiations of drug prices in federal Medicare reimbursement and state Medicaid reimbursement programs, California's experts explained that the frequency of WAC's use in these reimbursement formulas and WAC's precise effects in calculating reimbursement amounts remains unclear. With regard to private contractual negotiations, the district court correctly found that PhRMA provides no "explanation or examples as to how these market transactions will be impacted, especially since such contracts involve negotiations on a wide array of factors, including rebates and discounts." And PhRMA fails to identify a single party unable to increase the WAC on a pharmaceutical drug due to SB 17's advance notice requirement.

PAGE 23 – OPINION

*Landsberg*, 2022 WL 2915588, at *1. After the Ninth Circuit affirmed, PhRMA stipulated to dismissal with prejudice.

PhRMA argues that the district court's Commerce Clause conclusion rested on a factually and legally incorrect distinction between its case and *NCAA v. Miller*, 10 F.3d 633 (9th Cir. 1993). ECF 44. PhRMA continues to rely heavily on *NCAA v. Miller* for its dormant Commerce Clause argument.

*NCAA v. Miller* dealt with a Nevada statute that "require[d] any national collegiate athletic association to provide a Nevada institution, employee, student-athlete, or booster who is accused of a rules infraction with certain procedural due process protections during an enforcement proceeding in which sanctions may be imposed." 10 F.3d at 637 (footnotes omitted). Many of these procedures were not required by the NCAA's own enforcement program, and the statute allowed a Nevada state district court to enjoin any NCAA proceeding that violated the statute. *Id.* The statute also prohibited the NCAA from expelling its Nevada members. *Id.*

Individuals from the University of Nevada, Las Vegas ("UNLV"), who were charged with NCAA rules violations, asserted their right to have the proceedings comply with the Nevada statute. *Id.* The NCAA then sought declaratory and injunctive relief in federal court, arguing that the statute violated the Commerce Clause and the Contracts Clause. *Id.* "The district court found that the Statute violate[d] both the Commerce Clause and the Contracts Clause and enjoined its application to the NCAA's proceeding . . . ." *Id.*

On appeal, the Ninth Circuit agreed with the district court's conclusion but not its reasoning. The Ninth Circuit held that the statute violated the Commerce Clause per se because it directly regulated interstate commerce. *Id.* at 638. The statute "regulate[d] only interstate

PAGE 24 – OPINION

organizations which are engaged in interstate commerce." *Id.* "In order to avoid liability . . . , the NCAA would [have been] forced to adopt Nevada's procedural rules for Nevada schools" for enforcement proceedings throughout the country. *Id.* The Ninth Circuit further noted that the statute's "extraterritorial reach also violate[d] the Commerce Clause because of its potential interaction or conflict with similar statutes in other jurisdictions." *Id.* "The critical inquiry is whether the practical effect of the regulation is to control conduct beyond the boundaries of the State." *Id.* (quoting *Healy v. Beer Inst., Inc.*, 491 U.S. 324, 336 (1989)).

Given the information available at this stage, this Court cannot determine the practical effect of HB 4005 on interstate commerce. Hypothetically, if a pharmaceutical manufacturer feared changing the WAC because of the Oregon reporting requirements, then Oregon could "control" out-of-state commerce. But *NCAA v. Miller* is not so on-point as to resolve the question as a matter of law. In *NCAA v. Miller*, Nevada was forcing organizations to institute certain procedural protections whenever it instituted a proceeding involving someone from Nevada. Given the nature of the NCAA's relationship with its member institutions, they would have been unlikely to grant UNLV such a special status, with its attendant competitive advantages. It was not far-fetched to assume that the Nevada statute would destroy the NCAA.[4] Here, Oregon is forcing companies to provide information whenever an essentially interstate figure increases. The companies can *do* whatever they choose, but there is a chance they must *tell* Oregon. *Compare Ass'n for Accessible Medicines v. Frosh*, 887 F.3d 664, 672–73, 675 (4th Cir. 2018) (striking down a Maryland price gouging law as violating the dormant Commerce

---

[4] It is worth noting that at the time of the Nevada litigation, UNLV was competing in men's basketball at the highest level, and won a national championship in 1990. This all happened under Coach Jerry "Tark the Shark" Tarkanian and amidst several NCAA investigations.

PAGE 25 – OPINION

Clause because it "instruct[ed] prescription drug manufacturers that they are prohibited from charging an 'unconscionable' price in the initial sale of a drug, which occurs outside [the state's] borders"). But this record does not establish anything like the extraterritorial impact at issue in *NCAA v. Miller*.[5]

This Court's prior ruling on the Takings Clause claim also bears on this analysis. If pharmaceutical companies were forced to choose between handing over trade secrets with no assurance as to compensation and avoiding the Oregon market, then that Hobson's choice could bring HB 4005 more in line with the regulations in *NCAA v. Miller*. However, without that provision, this Court cannot conclude as a matter of law that HB 4005 violates the Commerce Clause. Having to report to Oregon could result in companies making different choices in other states, but PhRMA has not provided evidence of that result. Likewise, because the effect of HB 4005 is not known, Oregon is also not entitled to judgment as a matter of law.

## F.  First Amendment

At the outset, this Court notes that the parties assume that HB 4005's reporting requirements[6] regulate speech protected by the First Amendment. *See* Def.'s MSJ & Opp. to

---

[5] Because this Court finds that *NCAA v. Miller* does not control the outcome of this issue, it does not address whether *NCAA v. Miller* remains good law in light of *National Pork Producers*.

[6] In the briefing on the proposed declaratory judgment, Oregon suggested that PhRMA's First Amendment arguments reached only HB 4005 § 2(3)(c), which requires pharmaceutical companies to explain the factors that contributed to a price increase. *See* ECF 75. Oregon asked this Court to sever only that subsection from the statute. *Id.* Because Oregon did not raise this severability argument in its briefs or at oral argument, this Court declined to enter its proposed judgment and declines to address these arguments in this Opinion. *See Comite de Jornaleros de Redondo Beach v. City of Redondo Beach*, 657 F.3d 936, 951 n.10 (9th Cir. 2011) (en banc) (facial attack under the First Amendment) ("Because the City has waived any argument regarding severability by failing to raise it in its briefs or at oral argument, we do not consider it here." (citations omitted)).

PAGE 26 – OPINION

Pl.'s MSJ, ECF 29 at 19–27. PhRMA argues that strict scrutiny applies because HB 4005 regulates private speech, and that the reporting requirements do not satisfy strict scrutiny. PhRMA further argues that even under rational basis review, the reporting requirements are facially unconstitutional. Oregon responds that the reporting requirements are subject only to rational basis review because they compel disclosure of commercial speech, and that the reporting requirements satisfy that level of scrutiny.

### 1. PhRMA Has Standing to Bring Its First Amendment Claim

PhRMA has standing to assert its First Amendment claim. PhRMA alleges that HB 4005's reporting requirements infringe on its members' First Amendment right to free speech by "compelling manufacturers—and only manufacturers—to speak." Pl.'s MSJ, ECF 25 at 31–38. Forced compliance with an "unlawful regulation" is itself a legally cognizable harm, which the court can remedy by declaring the regulation invalid. *Lujan*, 504 U.S. at 562. In other words, the injury is being forced to speak and, according to PhRMA, endorse Oregon's messaging, while other entities are not. HB 4005's reporting requirements cause that injury, and a decision that those requirements violate the First Amendment would redress the injury.

### 2. PhRMA Is Entitled to Summary Judgment on Its First Amendment Claim

The First Amendment imposes stringent limits on the government's authority either to restrict or compel speech by private citizens and organizations. *See Texas v. Johnson*, 491 U.S. 397 (1989); *Wooley v. Maynard*, 430 U.S. 705 (1977); *W. Va. State Bd. of Educ. v. Barnette*, 319 U.S. 624 (1943). To succeed on a facial challenge under the First Amendment, PhRMA must show that a "substantial number of [HB 4005's] applications are unconstitutional, judged in relation to [its] plainly legitimate sweep." *See Wash. State Grange*, 552 U.S. at 449 n.6 (citation and internal quotation marks omitted).

PAGE 27 – OPINION

### a. HB 4005's Reporting Requirements Regulate Commercial Speech

The parties disagree about the type of speech HB 4005 regulates. PhRMA argues that HB 4005 regulates companies' private speech, not commercial speech. Oregon responds that manufacturers need only disclose commercial speech. As explained below, this Court concludes that HB 4005's reporting requirements regulate commercial speech.

PhRMA provides a string of cases standing for the proposition that commercial speech is defined as "speech that does no more than pose a commercial transaction." Pl.'s Reply & Opp. to Def.'s MSJ, ECF 34 at 28 (citation omitted). According to PhRMA, because the disclosures required under HB 4005 do not pose a commercial transaction, the speech is not commercial. But a recent Ninth Circuit case, *Ariix, LLC v. NutriSearch Corp.*, 985 F.3d 1107 (9th Cir. 2021), complicates the analysis. There, the Ninth Circuit explained that while commercial speech is usually defined, as PhRMA suggests, as speech that does no more than propose a commercial transaction, this definition is "just a starting point" and courts should "try to give effect to a common-sense distinction between commercial speech and other varieties of speech." *Id.* (citations and internal quotation marks omitted). In the Ninth Circuit, the "commercial speech analysis is fact-driven, due to the inherent difficulty of drawing bright lines that will clearly cabin commercial speech in a distinct category." *Id.* (quoting *First Resort, Inc. v. Herrera*, 860 F.3d 1263, 1272 (9th Cir. 2017)).

"[S]peech that does not propose a commercial transaction on its face can still be commercial speech." *Id.* (citing *Bolger v. Youngs Drug Prods. Corp.*, 463 U.S. 60, 66–68 (1983)). "Where the facts present a close question, 'strong support' that the speech should be characterized as commercial speech is found where [1] the speech is an advertisement, [2] the speech refers to a particular product, and [3] the speaker has an economic motivation." *Hunt v. City of Los Angeles*, 638 F.3d 703, 715 (9th Cir. 2011) (citations omitted). These are the "*Bolger*

PAGE 28 – OPINION

factors." *Id.* "These so-called *Bolger* factors are important guideposts, but they are not dispositive." *Ariix, LLC*, 985 F.3d at 1116 (citations omitted).

Here, the speech is not an advertisement—the pharmaceutical companies are not trying to sell drugs through the HB 4005 disclosures. But the speech does refer to a particular product in that it centers on the drugs for which the disclosures are required. As for the third *Bolger* factor, the Ninth Circuit has explained that it "asks whether the speaker acted *primarily* out of economic motivation, not simply whether the speaker had any economic motivation." *Ariix, LLC*, 985 F.3d at 1116. "[E]conomic motivation is not limited simply to the expectation of a direct commercial transaction with consumers. Courts have found commercial speech even when it involves indirect benefits, such as benefits to employee compensation, improvements to a brand's image, general exposure of a product, and protection of licensees' interests. Importantly, the type of economic motivation is not the focus; rather, the crux is on whether the speaker had an adequate economic motivation so that the economic benefit was the primary purpose for speaking." *Id.* at 1117 (citations and footnote omitted). "[T]he question is context-specific and requires determining whether the speaker's purpose primarily turns on the economic benefit that the speaker receives from the speech." *Id.* at 1117 n.7.

Applying the *Bolger* factors, whether HB 4005 regulates commercial or private speech is a close question. The disclosure requirements are triggered by price changes and introductions of products to the market, and the content of the disclosures relates to costs and pricing. HB 4005 at its core deals with the economics of prescription pricing. The pharmaceutical companies are acting out of an economic motivation in that they are compelled to provide that economic information in order to participate in the market. But recognizing the option to participate in a market as an economic motivation for purposes of categorizing speech could result in state laws

PAGE 29 – OPINION

that regulate all sorts of information receiving a lower level of scrutiny by virtue of being merely associated with a market.

Taking at face value *Ariix*'s instructions that neither the proposing-a-transaction test nor the *Bolger* factors are dispositive and that courts should "try to give effect to a common-sense distinction between commercial speech and other varieties of speech," 985 F.3d at 1115–16, this Court takes a wholistic approach to disclosures under HB 4005. Viewing the context of the disclosures as a whole, the speech at issue here is best categorized as commercial speech.

### b. Intermediate Scrutiny Applies

As the Ninth Circuit recently explained, "The Supreme Court recognizes two levels of scrutiny governing compelled commercial speech. First, under *Central Hudson* [*Gas & Electric Corp. v. Public Service Commission of New York*, 447 U.S. 557 (1980)], the Court applies intermediate scrutiny, which requires the government to directly advance a substantial governmental interest, and the means chosen must not be more extensive than necessary. Second, there is the lower standard applied in *Zauderer* [*v. Office of Disciplinary Counsel*, 471 U.S. 626 (1985)], which requires the compelled speech be reasonably related to a substantial government interest and not be unjustified or unduly burdensome." *Nat'l Ass'n of Wheat Growers v. Bonta*, 85 F.4th 1263, 1275 (9th Cir. 2023) (citations and internal quotation marks omitted). "To qualify for review under *Zauderer*, the compelled commercial speech at issue must disclose 'purely factual and uncontroversial information.'" *Id.* at 1275 (quoting *Zauderer*, 471 U.S. at 651).

Oregon would have this Court apply *Zauderer* because, in its view, that standard necessarily applies to compulsions of commercial speech. Def.'s MSJ & Opp. to Pl.'s MSJ, ECF 29 at 19–27. PhRMA would have this Court distinguish *Zauderer* and its progeny. Those cases, it argues, "involved a law that compelled disclosure of the features of a good or service in connection with offering it for sale." Pl.'s Reply & Opp. to Def.'s MSJ, ECF 34 at 32 (citations

PAGE 30 – OPINION

omitted). Further, PhRMA argues, HB 4005 requires pharmaceutical companies to distribute

controversial messages, making *Zauderer* inapplicable. *Id.* at 33.

This Court begins by addressing whether the disclosures mandated by HB 4005 concern

"purely factual and uncontroversial information." First, HB 4005 generally asks for disclosures

of purely factual information, such as the time the drug has been on the market and the name of

any generics. The only non-factual information HB 4005 asks for is the pharmaceutical

companies' narrative explanations justifying certain increases in price. But this is not the kind of

non-factual information courts consider problematic under *Zauderer*—the government is not

asking pharmaceutical companies to share the government's opinion, but their own explanations

and opinions. Second, *Zauderer* requires that the disclosure be uncontroversial. The Ninth

Circuit has articulated a nexus requirement between the potentially controversial aspects of the

speech and the organization's opposition to the speech:

> We do not read the Court as saying broadly that any purely factual
> statement that can be tied in some way to a controversial issue is,
> for that reason alone, controversial. The dispute in [*National
> Institute of Family & Life Advocates v. Becerra*, 585 U.S. 755
> (2018) ("*NIFLA*"),] was whether the state could require a clinic
> whose primary purpose was to oppose abortion to provide
> information about "state-sponsored services," including abortion.
> While factual, the compelled statement took sides in a heated
> political controversy, forcing the clinic to convey a message
> fundamentally at odds with its mission. Under these circumstances,
> the compelled notice was deemed controversial within the meaning
> of *Zauderer* and *NIFLA*.

*CTIA – The Wireless Ass'n v. City of Berkeley*, 928 F.3d 832, 845 (9th Cir. 2019); *see also Nat'l

Ass'n of Wheat Growers*, 85 F.4th at 1277 ("*NIFLA* tells us that the topic of the disclosure and its

effect on the speaker is probative of determining whether something is subjectively

controversial."). Here, HB 4005 requires pharmaceutical companies to speak on a controversial

topic and, in particular, justify why they fall on one side—what Oregon deems the wrong side—

PAGE 31 – OPINION

of that controversy. The pharmaceutical companies are the only entity involved in that controversy required to offer an explanation to the public. This Court finds that HB 4005's reporting requirements, viewed in the context of drug prices and health care costs, concern controversial information and *Zauderer* does not apply.

This Court notes that the analysis required under *Zauderer* is an uneasy fit for the facts here. Take *Zauderer* itself as an example. There, the state compelled an attorney to disclose information in addition to the advertising he was already engaging in. 471 U.S. at 651. The message required by the government was an addendum. And the same is true for many cases applying *Zauderer*'s rationale. *See, e.g.*, *CTIA*, 928 F.3d 832; *Am. Beverage Ass'n v. City & County of San Francisco*, 916 F.3d 749, 753 (9th Cir. 2019) (en banc); *Nationwide Biweekly Admin., Inc. v. Owen*, 873 F.3d 716 (9th Cir. 2017); *Nat'l Ass'n of Mfrs. v. SEC*, 800 F.3d 518 (D.C. Cir. 2015); *Rowe*, 429 F.3d 294; *Env't Def. Ctr., Inc. v. EPA*, 344 F.3d 832 (9th Cir. 2003); *Nat'l Elec. Mfrs. Ass'n v. Sorrell*, 272 F.3d 104 (2d Cir. 2001). A principle emerges from these applications: A factual, uncontroversial addition to already-occurring commercial communication is not so offensive to the freedom of speech to require an exacting level of scrutiny. For those situations, a level of scrutiny akin to rational basis will suffice.

As this case illustrates, however, compulsions of commercial speech are not always of the type addressed by *Zauderer*. Here, the pharmaceutical companies are not already engaged in commercial speech to which the disclosures compelled under HB 4005 are appended. *See Am. Beverage Ass'n*, 916 F.3d at 753. Nor are the companies operating storefronts in which the government requires the sharing or posting of certain information. *See CTIA*, 928 F.3d 832; *Am. Hosp. Ass'n v. Azar*, 468 F. Supp. 3d 372, 391 (D.D.C.) (explaining that *Zauderer* applied in part because the compelled disclosure was "directly relevant to the terms under which the services

PAGE 32 – OPINION

will be available," namely payment rendered (quotation marks , citation, and alteration omitted)), *aff'd*, 983 F.3d 528 (D.C. Cir. 2020). Instead, by participating in the Oregon market, the pharmaceutical companies are required to share with Oregon, for public dissemination, information Oregon deemed relevant to prescription drug pricing. While Oregon does not dictate the content of the disclosed information, it does pose the questions the pharmaceutical companies must answer. This, too, counsels against applying *Zauderer* here.

### c. HB 4005's Reporting Requirements Cannot Survive Intermediate Scrutiny

Having concluded that *Zauderer*'s lower level of scrutiny is inapplicable, this Court turns to *Central Hudson*. Under the *Central Hudson* standard, the government may compel a disclosure of commercial speech only if (1) it directly advances a substantial governmental interest, and (2) the restriction is not more extensive than necessary to serve that interest. *Central Hudson*, 447 U.S. at 566. The fit between the legislature's ends and its means "need not be perfect nor the single best to achieve those ends, but one whose scope is narrowly tailored to achieve the legislative objective." *Am. Acad. of Pain Mgmt. v. Joseph*, 353 F.3d 1099, 1111 (9th Cir. 2004) (citation omitted). Oregon bears the burden of justifying its disclosure law. *See Edenfield v. Fane*, 507 U.S. 761, 770–71 (1993); *Bolger*, 463 U.S. at 71 n.20. As the Supreme Court has made clear, "[t]his burden is not satisfied by mere speculation or conjecture; rather, a governmental body seeking to sustain a restriction on commercial speech must demonstrate that the harms it recites are real and that its restriction will in fact alleviate them to a material degree." *Edenfield*, 507 U.S. at 770–71 (citations omitted); *see also Ibanez v. Fla. Dep't of Bus. & Prof. Reg., Bd. of Acct.*, 512 U.S. 136, 143 (1994) ("The State's burden is not slight . . . .").

Oregon contends that HB 4005 serves "to provide accountability for prescription drug pricing to permit purchasers, both public and private, as well as pharmacy benefit managers, to

PAGE 33 – OPINION

negotiate discounts and rebates for prescription drugs consistent with existing state and federal law." Def.'s MSJ & Opp. to Pl.'s MSJ, ECF 29 at 23. Oregon further argues that it has a substantial interest "in providing Oregon prescription drug buyers with better information about the price of prescription drugs." Def.'s Reply to Pl.'s MSJ, ECF 38 at 17; *see also id.* at 18 (Reporting requirements under HB 4005 "reflect [Oregon's] attempt to provide accountability for prescription drug pricing and increase consumer knowledge of the prescription drug market." (citations omitted)).

Assuming that these are substantial interests, Oregon has nevertheless failed to show how HB 4005 will in fact directly advance them.[7] The requirement that a regulation directly advance the asserted interest is "critical," because without it, the government "could [interfere with] commercial speech in the service of other objectives that could not themselves justify a burden on commercial expression." *Rubin v. Coors Brewing Co.*, 514 U.S. 476, 487 (1995) (citation omitted). To establish direct advancement, the government may refer "to studies and anecdotes pertaining to different locales altogether, or even . . . based solely on history, consensus, and simple common sense." *Lorillard Tobacco Co. v. Reilly*, 533 U.S. 525, 555 (2001) (citations and internal quotation marks omitted). Oregon claims that the "[s]elf-reported information from drug manufacturers about the various factors that contribute to rising drug prices" will result in increased transparency, which "can then be expected to enhance information available in the market and allow markets to function more efficiently, which would benefit consumers, including the state, which itself is a large purchaser of prescription drugs." Def.'s MSJ & Opp. to Pl.'s MSJ, ECF 29 at 24. In its briefing before this Court, Oregon cites no studies or anecdotal

---

[7] As mentioned elsewhere, Oregon argued in its briefing and at oral argument that rational basis review applies because HB 4005 compels speech. Thus, Oregon did not squarely address the direct advancement and narrow tailoring requirements under *Central Hudson*.

PAGE 34 – OPINION

evidence to support these assertions, and, without more, they amount to little more than speculation. *Cf. Am. Hosp. Ass'n v. Azar*, 468 F. Supp. 3d at 395 n.25 ("The agency's reliance on numerous studies here is hardly comparable to the pure speculation undergirding other agency actions that have been struck down under *Central Hudson*." (citations omitted)) (collecting cases).

Indeed, during the public hearings for HB 4005, when asked how the law would "actually reduce the cost of prescription drugs in Oregon," one state representative responded, "I don't think we know yet." ECF 31, Ex. 1 at 15–16. The representative went on, "I think we'll learn a lot as we watch this law play out. . . . And my hope would be is that we gain some understanding about why the cost of these medications go up, and then maybe we can make smarter regulation." *Id.* Oregon has not identified studies or evidence to show how the reporting requirements of HB 4005 will directly advance its legislative goals, and the record it has created does nothing to advance such a connection.

Likewise, Oregon has failed to demonstrate that HB 4005 is narrowly tailored to advance its stated goals. For instance, the law is underinclusive—it requires only one type of entity in a complex supply chain to provide justifications for price increases. To be sure, pharmaceutical companies have leeway under the text of the law to explain how other actors impact prices, but that leeway does not justify burdening the First Amendment rights of only PhRMA's members in service of acquiring information that may prove useful. Asking one actor among many to explain itself is underinclusive given Oregon's own framing of the issue HB 4005 is aimed at addressing: rising drug prices caused by a combination of factors. While Oregon may be correct that regulation can be piecemeal and preliminary without being unconstitutionally underinclusive, *see* Def.'s MSJ & Opp. to Pl.'s MSJ, ECF 29 at 24 ("[L]aws are not required to solve every part of

PAGE 35 – OPINION

every problem to be valid."), it still fails to explain why the underinclusive nature of HB 4005's reporting requirements is nonetheless narrowly tailored. Put differently, while there may be a justification for beginning its approach with this compulsion of this speech from these companies, Oregon does not elucidate that justification.

Because HB 4005's reporting requirements cannot, on this record, survive intermediate scrutiny, this Court is satisfied that they likewise would not survive if analyzed as regulating private speech rather than commercial speech. *See NIFLA*, 585 U.S. at 773; *Yim v. City of Seattle*, 63 F.4th 783, 793 (9th Cir. 2023), *cert. denied sub nom. Yim v. Seattle*, 144 S. Ct. 693 (2024). The private speech framework would compel this Court to apply at least intermediate scrutiny, if not strict. *See Riley v. Nat'l Fed'n of the Blind of N.C., Inc.*, 487 U.S. 781, 795 (1988); *McIntyre v. Ohio Elections Comm'n*, 514 U.S. 334, 348, 355 (1995); *Wooley v. Maynard*, 430 U.S. at 714. The preceding discussion addressing intermediate scrutiny would apply with full force.

## CONCLUSION

For these reasons, and the reasons discussed at oral argument, PhRMA is entitled to summary judgment on its Takings Clause and First Amendment claims. Neither party is entitled to summary judgment on PhRMA's Commerce Clause claim. Oregon is entitled to summary judgment on PhRMA's Supremacy Clause claim.

**IT IS SO ORDERED.**

DATED this 19th day of March, 2024.

/s/ Michael W. Mosman
Michael W. Mosman
United States District Judge

PAGE 36 – OPINION

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

EUGENE DIVISION

PHARMACEUTICAL RESEARCH AND
MANUFACTURERS OF AMERICA,

Plaintiff,

v.

ANDREW STOLFI, in his official capacity as
Director of the Oregon Department of
Consumer and Business Services,

Defendant.

Case No.  6:19-cv-01996-MO

DECLARATORY JUDGMENT

**DECLARATORY JUDGMENT**

Pending before the Court are the Parties' Cross-Motions for Partial Summary Judgment

on Plaintiff's challenge to Oregon's House Bill 4005, 2018 Or. L. Ch. 7. Plaintiff alleges that

H.B. 4005 violates the Takings Clause of the Fifth Amendment of the United States Constitution;

is preempted by the Defend Trade Secrets Act and the Supremacy Clause of the United States

Page 1 -   DECLARATORY JUDGMENT

Constitution; violates the Commerce Clause of the United States Constitution; and violates the First Amendment of the United States Constitution.

The Court **GRANTS IN PART and DENIES IN PART** Plaintiff's Motion for Partial Summary Judgment, ECF No. 25, and **GRANTS IN PART and DENIES IN PART** Defendant's Motion for Partial Summary Judgment, ECF No. 29. Specifically, the Court **GRANTS** Plaintiff's Motion for Summary Judgment on its claim under the Takings Clause of the Fifth Amendment; **GRANTS** Defendant's Motion for Partial Summary Judgment on Plaintiff's preemption claim; **DENIES** the Parties' Cross-Motions for Summary Judgment on Plaintiff's Commerce Clause claim; and **GRANTS** Plaintiff's Motion for Summary Judgment on its First Amendment claim. ECF No. 71.

Per that ruling and the Declaratory Judgment Act, 28 U.S.C. § 2201(a), the Court hereby:

(1) **DECLARES** that the publication of a manufacturer's trade secrets under the Public Interest Exception, House Bill No. 4005, 2018 Or. L. Ch. 7, § 2(10)(a), constitutes a taking of private property under the Fifth Amendment to the United States Constitution, and that any invocation of the Public Interest Exception by Defendant without simultaneously providing just compensation for that taking would accordingly violate the Fifth Amendment; and

(2) **DISMISSES WITH PREJUDICE** Plaintiff's claim that House Bill 4005, 2018 Or. L. Ch. 7, §2(10)(a), is preempted by the Defend Trade Secrets Act and the Supremacy Clause; and

(3) **DECLARES** that H.B. 4005's reporting requirement, House Bill 4005, 2018 Or. L. Ch. 7, § 2(3), violates the First Amendment to the United States Constitution and is, therefore, unenforceable.

This judgment completely resolves Plaintiff's Fifth Amendment, preemption, and First Amendment claims. The Court hereby certifies that "there is no just reason for delay" of entry of final judgment on these claims. Fed. R. Civ. P. 54(b). The Court's entry of judgment at this stage

Page 2 -    DECLARATORY JUDGMENT

will award Plaintiff with an enforceable declaratory judgment. The claims subject to this judgment involve no material facts intertwined with Plaintiff's remaining claim under the Commerce Clause, and allowing appellate review of this final judgment on fewer than all of Plaintiff's claims is likely to lead to the termination of this litigation. The Court therefore enters this judgment as its final judgment on the Second Claim (First Amendment), the Third Claim (Defend Trade Secrets Act and Supremacy Clause), and the Fourth Claim (Takings Clause of the Fifth Amendment) of Plaintiff's Complaint, ECF No. 1. Fed. R. Civ. P. 54(b). The Parties' Cross-Motions are **DENIED** in other respects consistent with the Court's oral ruling.

A full basis for these rulings, in addition to those stated on the record, will be set forth in a written opinion to follow.

DATED February 16, 2024.

/s/ Michael W. Mosman
Michael W. Mosman
United States District Court Judge

ELLEN F. ROSENBLUM
Attorney General
CARLA A. SCOTT #054725
BRIAN S. MARSHALL #196129
Senior Assistant Attorneys General
SHAUNEE MORGAN #194256
Assistant Attorney General
Department of Justice
100 SW Market Street
Portland, OR 97201
Telephone: (971) 673-1880
Fax: (971) 673-5000
Email:  Carla.A.Scott@doj.state.or.us
        Brian.S.Marshall@doj.state.or.us
        Shaunee.Morgan@doj.state.or.us

Attorneys for Defendant Andrew Stolfi

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

EUGENE DIVISION

| | |
|---|---|
| PHARMACEUTICAL RESEARCH AND MANUFACTURERS OF AMERICA,<br><br>Plaintiff,<br><br>v.<br><br>ANDREW STOLFI, in his official capacity as Director of the Oregon Department of Consumer and Business Services,<br><br>Defendant. | Case No.  6:19-cv-01996-MO<br><br>DEFENDANT'S OBJECTIONS TO PLAINTIFF'S PROPOSED DECLARATORY JUDGMENT |

Page 1 -   DEFENDANT'S OBJECTIONS TO PLAINTIFF'S PROPOSED DECLARATORY
           JUDGMENT
           BM2/bs4

## I.    INTRODUCTION

The Director of the Oregon Department of Consumer and Business Services (the "State") objects to two provisions of the proposed judgment submitted by Plaintiff Pharmaceutical Research and Manufacturers of America ("PhRMA") (ECF 73).

First, the Court's First Amendment judgment should be limited to the aspect of H.B. 4005 that PhRMA challenged. The First Amendment claim PhRMA alleged in its complaint and argued on summary judgment concerned a specific provision of the annual reports that required manufacturers provide a narrative describing "[t]he factors that contributed to a price increase." H.B. 4005 § 2(3)(c). Incongruously, PhRMA now proposes that the Court declare that every part of section 2(3), not only subsection (c), violates the First Amendment—that is, the requirement to file an annual report is unconstitutional in its entirety. The Court should limit its declaratory judgment to the provision of H.B. 4005 that PhRMA actually challenged.

Second, the Court should reject PhRMA's preemption claim on its merits rather than rule that the claim is moot. Because the Court's Takings Clause ruling requires only that the State *pay* "just compensation" if it releases a trade secret, the Takings Clause ruling does not resolve PhRMA's claim that the federal Defend Trade Secrets Act *prohibits* the State from releasing trade secrets. The Court should therefore reach the merits of PhRMA's claim and grant summary judgment to the State on that claim.

The State therefore submits that its proposed form of judgment, not PhRMA's, correctly follows from the Court's resolution of the parties' summary judgment motions.[1] *See* Attachments

---

[1] The State respectfully maintains that its motion for summary judgment should have been granted on all claims.  It nevertheless files these objections regarding the form of the Court's judgment without prejudice to its right to appeal the Court's resolution of the summary judgment motions and its final judgment.

Page 2 -    DEFENDANT'S OBJECTIONS TO PLAINTIFF'S PROPOSED DECLARATORY
            JUDGMENT
            BM2/bs4

1 (proposed judgment) and 2 (redline comparison with PhRMA's proposed judgment, ECF 73 at 4–6).

## II.  ARGUMENT

**A.    The Court's First Amendment judgment should be limited to H.B. 4005 § 2(3)(c)'s request for "[t]he factors that contributed to [a] price increase."**

### 1.    PhRMA's complaint and motion challenge only Section 2(3)(c).

PhRMA's proposed judgment asks for a declaration that the entirety of H.B. 4005's reporting requirement under Section 2(3) violates the First Amendment. However, such a broad declaration runs counter to the narrow arguments PhRMA has made in this case, which focus exclusively on Section 2(3)(c)'s requirement that manufacturers report "[t]he factors that contributed to the price increase" of drugs covered by the law.

PhRMA's proposed judgment would condemn many elements of the annual reports apart from the narrative inquiry PhRMA challenged. Those purely objective data include:

(a) The name and price of the prescription drug and the net increase, expressed as a percentage, in the price of the drug over the course of the previous calendar year;
(b) The length of time the prescription drug has been on the market; …
(d) The name of any generic version of the prescription drug available on the market;
(e) The research and development costs associated with the prescription drug that were paid using public funds;
(f) The direct costs incurred by the manufacturer:
    (A) To manufacture the prescription drug;
    (B) To market the prescription drug;
    (C) To distribute the prescription drug; and
    (D) For ongoing safety and effectiveness research associated with the prescription drug;
(g) The total sales revenue for the prescription drug during the previous calendar year;
(h) The manufacturer's profit attributable to the prescription drug during the previous calendar year;
(i) The introductory price of the prescription drug when it was approved for marketing by the United States Food and Drug Administration and the net yearly increase, by calendar year, in the price of the prescription drug during the previous five years;
(j) The 10 highest prices paid for the prescription drug during the previous calendar year in any country other than the United States;

Page 3 -   DEFENDANT'S OBJECTIONS TO PLAINTIFF'S PROPOSED DECLARATORY
      JUDGMENT
      BM2/bs4

(k) Any other information that the manufacturer deems relevant to the price increase described in subsection (2)(b) of this section; and
(L) The documentation necessary to support the information reported under this subsection.

Aside from cursory references to H.B. 4005's other reporting requirements for general background purposes, PhRMA is silent on how any of those data elements specifically offends the First Amendment. Instead, PhRMA's complaint and its briefing on the cross-motions for summary judgment show that its First Amendment claim is squarely trained on the requirement that manufacturers explain the reason for a price increase (§ 2(3)(c)):

- "Requiring manufacturers to *justify* price increases over the State's thresholds implies that such increases are inherently pernicious…." ECF 1 ¶ 59 (emphasis added).

- "[H.B. 4005], by requiring manufacturers to report the *reasons* for price increases above the State's disapproval threshold … requires communication, and implicit validation, of views that the manufacturers dispute and would not otherwise convey." *Id*. ¶ 60(b) (emphasis added).

- "The disclosures…misleadingly suggest that price increases can be legitimate only if they are based on a 'change or improvement in the prescription drug.'" *Id*. ¶ 66.

- "Not only must [manufacturers] create and submit to DCBS reports identifying the factors that have contributed to price increases … their reports must specify the 'major financial and nonfinancial factors that influenced the decision to increase the wholesale acquisition cost of the drug product and to decide on the amount of the increase[.]' These requirements reflect the State's view…that manufacturers are solely responsible for price increases." ECF 25 at 42.

- "HB 4005 forces one particular market participant to *justify* its role in raising…prices…." *Id*. at 45 (emphasis added).

Page 4 -   DEFENDANT'S OBJECTIONS TO PLAINTIFF'S PROPOSED DECLARATORY JUDGMENT
BM2/bs4

- "Nor is it clear why retail purchases will be better able to make purchasing decisions if they have access to 'a *narrative description and explanation* of all major financial and nonfinancial factors that influenced [a manufacturer's] decision to increase the wholesale acquisition cost of [a] drug.'" *Id.* at 48 (bracketing in original; emphasis added).

- "[T]he disclosures concern the internal decision-making process of manufacturers regarding the prices at which they list drug prices…." ECF 34 at 41.

- "A manufacturer's assessment of its *own* motivations for adjusting a drug's list price, and what 'factors…contributed to the price increase,'… inherently calls for expression of an opinion…." *Id.* (emphasis in original).

- "Every time a manufacturer submits a report describing 'the factors that contributed to the price increase,' it reinforces the State's message that manufacturers can only be trusted to make (what the State deems) appropriate price increases if forced to justify those decisions to the State." *Id.* at 42.

- "[T]he State never explains how forcing manufacturers to *justify* decisions about list prices helps consumers make well-informed choices." *Id.* (emphasis added).

PhRMA did not argue that these principles extend to a First Amendment bar to requiring submission of data to a regulatory agency. Nor could it: the very authority PhRMA relies on makes clear that the First Amendment does not bar such a state regulatory requirement. *See Riley v. Nat'l Fed'n of the Blind of N. Carolina, Inc.*, 487 U.S. 781, 800 (1988) ("[A]s a general rule, the State may itself publish the detailed financial disclosure forms it requires professional fundraisers to file. This procedure would communicate the desired information to the public without burdening a speaker with unwanted speech during the course of a solicitation.").

PhRMA argued that, without H.B. 4005, "no manufacturer would create these reports or submit them to DCBS …; nor would manufacturers choose to have their information … disseminated on the internet." ECF 25 at 34. That may be true of the narrative description

Page 5 -   DEFENDANT'S OBJECTIONS TO PLAINTIFF'S PROPOSED DECLARATORY
             JUDGMENT
             BM2/bs4

required by Section 2(3)(c), but manufacturers have *already* made public much of the other data requested by Section 2(3). As PhRMA acknowledges, "[c]onsumers already know a drug's WAC, which is public…." ECF 34 at 43. The same is true of other data elements. *See* H.B. 4005 § 2(3)(b) (time drug has been on the market); *id.* § 2(3)(a), (*i*) (past WAC prices); *id.* § 2(3)(d) (generic alternatives); *see also* U.S. Food & Drug Administration, Orange Book Preface (Jan. 25, 2024), available at https://www.fda.gov/drugs/development-approval-process-drugs/orange-book-preface (explaining FDA's public determinations of generic therapeutic equivalency); ORS 689.515(1)(e) (relying on FDA decisions on generic equivalency).

PhRMA's First Amendment challenge was limited to Section 2(3)(c), not the other requirements of Section 2(3).

**2.    Section 2(3)(c) is severable from the remaining requirements of Section 2(3).**

Because the substance of PhRMA's First Amendment challenge focused on the specific disclosure requirement in Section 2(3)(c), only that section should be declared unlawful. State law governs whether state statutes are severable. *Leavitt v. Jane L.*, 518 U.S. 137, 137 (1996). "Oregon courts have long recognized the principle that an unconstitutional part of a statute or ordinance may be excised without destroying a separable part." *Clear Channel Outdoor, Inc. v. City of Portland*, 243 Or. App. 133, 144 (2011) (collecting cases). ORS 174.040 provides that:

> if any part of [a] statute is held unconstitutional, the remaining parts shall remain in force unless: (1) the statute provides otherwise; (2) The remaining parts are so essentially and inseparably connected with and dependent upon the unconstitutional part that it is apparent that the remaining parts would not have been enacted without the unconstitutional part; or (3) The remaining parts, standing alone, are incomplete and incapable of being executed in accordance with the legislative intent.

PhRMA's proposed judgment reflects that the unconstitutional parts of H.B. 4005 can be severed from the rest of the law as it only declares that Section 2(3), rather than H.B. 4005 as a whole, is unconstitutional.

Page 6 -    DEFENDANT'S OBJECTIONS TO PLAINTIFF'S PROPOSED DECLARATORY JUDGMENT
BM2/bs4

Similarly, none of the ORS 174.040's prohibitions would apply if Section 2(3)(c) were severed. First, H.B. 4005 includes no provision precluding severability. Second, the individual data elements required for disclosure are independent of each other and severing Section 2(3)(c) would not frustrate the State's ability to collect the remaining information. Finally, the Legislative Assembly enacted H.B. 4005, in part, to "provide notice ... of information relating to the cost and pricing of prescription drugs...." H.B. 4005, preamble. The remaining sections, which include costs associated with manufacturing, marketing, and distributing the drugs covered by H.B. 4005, would continue to fulfil this legislative purpose.

\* \* \*

Consistent with PhRMA's framing of its First Amendment claim and the applicable case law, the State respectfully requests that the Court issue a judgment finding only that Section 2(3)(c) of H.B. 4005 violates the First Amendment and is, consequentially, unenforceable.

**B.     The Court should enter judgment for the State Defendant on PhRMA's Defend Trade Secrets Act preemption claim.**

PhRMA's proposed judgment asks the Court to dismiss its Defend Trade Secrets Act claim as moot, consistent with the Court's minute order (ECF 71) and its ruling at the conclusion of the summary judgment hearing (ECF 74 at 64:12–13). That claim, however, is not moot, and the State proposes that the Court grant summary judgment to the Defendant on the merits of that claim for the reasons the Court articulated at the summary judgment hearing. ECF 74 at 11:10–12:13, 64:13–14 ("I would grant summary judgment to the State on the preemption claims.").

As PhRMA's proposed judgment reflects, the Takings Clause judgment only declares that disclosure of a trade secret would constitute a taking and entitle the manufacturer to just compensation for the taking. That declaration does *not* mean that the Takings Clause *prohibits* the State from releasing such information. *See* ECF 74 at 39:18–40:8 (PhRMA's counsel arguing the declaration "is not the functional equivalent of a taking because it would still leave the State to its choice of … paying just compensation").

Page 7 -    DEFENDANT'S OBJECTIONS TO PLAINTIFF'S PROPOSED DECLARATORY JUDGMENT
            BM2/bs4

Department of Justice
100 SW Market Street
Portland, OR 97201
(971) 673-1880 / Fax: (971) 673-5000

Thus, the Plaintiff's claim, which asks the Court to hold that federal law *prohibits* the State from releasing trade secrets, is not mooted by the Court's Takings Clause judgment. For that reason, the Court should enter judgment for the State Defendant on the Defend Trade Secrets Act preemption claim for the reasons it concluded that the claim failed as a matter of law. ECF 74 at 11:10–12:13.

### III. CONCLUSION

Consistent with the Court's ruling on the parties' summary judgment motions (ECF 71), the Court should enter the form of judgment attached to these objections (Attachment 1) instead of PhRMA's proposed judgment (ECF 73 at 4–6).

DATED February <u>5</u>, 2024.

Respectfully submitted,

ELLEN F. ROSENBLUM
Attorney General

*s/ Brian Simmonds Marshall*
CARLA A. SCOTT #054725
BRIAN SIMMONDS MARSHALL #196129
Senior Assistant Attorneys General
SHAUNEE MORGAN #194256
Assistant Attorney General
Trial Attorneys
Tel (971) 673-1880
Fax (971) 673-5000
Carla.A.Scott@doj.state.or.us
Brian.S.Marshall@doj.state.or.us
Shaunee.Morgan@doj.state.or.us
Of Attorneys for Defendant Andrew Stolfi

Page 8 -   DEFENDANT'S OBJECTIONS TO PLAINTIFF'S PROPOSED DECLARATORY
JUDGMENT
BM2/bs4

**E.R.-50**

ELLEN F. ROSENBLUM
Attorney General
CARLA A. SCOTT #054725
BRIAN S. MARSHALL #196129
Senior Assistant Attorneys General
SHAUNEE MORGAN #194256
Assistant Attorney General
Department of Justice
100 SW Market Street
Portland, OR 97201
Telephone: (971) 673-1880
Fax: (971) 673-5000
Email: Carla.A.Scott@doj.state.or.us
         Brian.S.Marshall@doj.state.or.us
         Shaunee.Morgan@doj.state.or.us

Attorneys for Defendant Andrew Stolfi

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

EUGENE DIVISION

| | |
|---|---|
| PHARMACEUTICAL RESEARCH AND MANUFACTURERS OF AMERICA, <br><br> Plaintiff, <br><br> v. <br><br> ANDREW STOLFI, in his official capacity as Director of the Oregon Department of Consumer and Business Services, <br><br> Defendant. | Case No.  6:19-cv-01996-MO <br><br> [PROPOSED] DECLARATORY JUDGMENT |

**[PROPOSED] DECLARATORY JUDGMENT**

Pending before the Court are the Parties' Cross-Motions for Partial Summary Judgment

on Plaintiff's challenge to Oregon's House Bill 4005, 2018 Or. L. Ch. 7. Plaintiff alleges that

H.B. 4005 violates the Takings Clause of the Fifth Amendment of the United States Constitution;

is preempted by the Defend Trade Secrets Act and the Supremacy Clause of the United States

Page 1 -   [PROPOSED] DECLARATORY JUDGMENT
             BM2/bs4/42353805

Constitution; violates the Commerce Clause of the United States Constitution; and violates the First Amendment of the United States Constitution.

The Court **GRANTS IN PART and DENIES IN PART** Plaintiff's Motion for Partial Summary Judgment, ECF No. 25, and **GRANTS IN PART and DENIES IN PART** Defendant's Motion for Partial Summary Judgment, ECF No. 29. Specifically, the Court **GRANTS** Plaintiff's Motion for Summary Judgment on its claim under the Takings Clause of the Fifth Amendment; **GRANTS** Defendant's Motion for Partial Summary Judgment on Plaintiff's preemption claim; **DENIES** the Parties' Cross-Motions for Summary Judgment on Plaintiff's Commerce Clause claim; and **GRANTS** Plaintiff's Motion for Summary Judgment on its First Amendment claim. ECF No. 71.

Per that ruling and the Declaratory Judgment Act, 28 U.S.C. § 2201(a), the Court hereby:

(1)     **DECLARES** that the publication of a manufacturer's trade secrets under the Public Interest Exception, House Bill No. 4005, 2018 Or. L. Ch. 7, § 2(10)(a), constitutes a taking of private property under the Fifth Amendment to the United States Constitution, and that any invocation of the Public Interest Exception by Defendant without simultaneously providing just compensation for that taking would accordingly violate the Fifth Amendment; and

(2)     **DISMISSES WITH PREJUDICE** Plaintiff's claim that House Bill 4005, 2018 Or. L. Ch. 7, §2(10)(a), is preempted by the Defend Trade Secrets Act and the Supremacy Clause; and

(3)     **DECLARES** that H.B. 4005's reporting requirement, House Bill 4005, 2018 Or. L. Ch. 7, § 2(3)(c), violates the First Amendment to the United States Constitution and is, therefore, unenforceable.

This judgment completely resolves Plaintiff's Fifth Amendment, preemption, and First Amendment claims. The Court hereby certifies that "there is no just reason for delay" of entry of final judgment on these claims. Fed. R. Civ. P. 54(b). The Court's entry of judgment at this stage

Page 2 -    [PROPOSED] DECLARATORY JUDGMENT
        BM2/bs4/42353805

will award Plaintiff with an enforceable declaratory judgment. The claims subject to this judgment involve no material facts intertwined with Plaintiff's remaining claim under the Commerce Clause, and allowing appellate review of this final judgment on fewer than all of Plaintiff's claims is likely to lead to the termination of this litigation. The Court therefore enters this judgment as its final judgment on the Second Claim (First Amendment), the Third Claim (Defend Trade Secrets Act and Supremacy Clause), and the Fourth Claim (Takings Clause of the Fifth Amendment) of Plaintiff's Complaint, ECF No. 1. Fed. R. Civ. P. 54(b). The Parties' Cross-Motions are **DENIED** in other respects consistent with the Court's oral ruling.

A full basis for these rulings, in addition to those stated on the record, will be set forth in a written opinion to follow.

DATED _____, 2024.

_____
Michael W. Mossman
United States District Court Judge

Page 3 -    [PROPOSED] DECLARATORY JUDGMENT
BM2/bs4/42353805

Department of Justice
100 SW Market Street
Portland, OR 97201
(971) 673-1880 / Fax: (971) 673-5000

ELLEN F. ROSENBLUM
Attorney General
CARLA A. SCOTT #054725
BRIAN S. MARSHALL #196129
Senior Assistant Attorneys General
SHAUNEE MORGAN #194256
Assistant Attorney General
Department of Justice
100 SW Market Street
Portland, OR 97201
Telephone: (971) 673-1880
Fax: (971) 673-5000
Email:  Carla.A.Scott@doj.state.or.us
        Brian.S.Marshall@doj.state.or.us
        Shaunee.Morgan@doj.state.or.us

Attorneys for Defendant Andrew Stolfi

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

EUGENE DIVISION

| | |
|---|---|
| PHARMACEUTICAL RESEARCH AND MANUFACTURERS OF AMERICA,<br><br>            Plaintiff,<br><br>    v.<br><br>ANDREW STOLFI, in his official capacity as Director of the Oregon Department of Consumer and Business Services,<br><br>            Defendant. | Case No.  6:19-cv-01996-MO<br><br>[PROPOSED] DECLARATORY JUDGMENT |

**[PROPOSED] DECLARATORY JUDGMENT**

Pending before the Court are the Parties' Cross-Motions for Partial Summary Judgment

on Plaintiff's challenge to Oregon's House Bill 4005, 2018 Or. L. Ch. 7. Plaintiff alleges that

H.B. 4005 violates the Takings Clause of the Fifth Amendment of the United States Constitution;

is preempted by the Defend Trade Secrets Act and the Supremacy Clause of the United States

Page 1 -    [PROPOSED] DECLARATORY JUDGMENT
            BM2/bs4/42353805

Constitution; violates the Commerce Clause of the United States Constitution; and violates the First Amendment of the United States Constitution.

The Court **GRANTS IN PART and DENIES IN PART** Plaintiff's Motion for Partial Summary Judgment, ECF No. 25, and **GRANTS IN PART and DENIES IN PART** Defendant's Motion for Partial Summary Judgment, ECF No. 29. Specifically, the Court **GRANTS** Plaintiff's Motion for Summary Judgment on its claim under the Takings Clause of the Fifth Amendment; **GRANTS** Defendant's Motion for Partial Summary Judgment on Plaintiff's preemption claim; **DENIES** the Parties' Cross-Motions for Summary Judgment on Plaintiff's Commerce Clause claim; and **GRANTS** Plaintiff's Motion for Summary Judgment on its First Amendment claim. ECF No. 71.

Per that ruling and the Declaratory Judgment Act, 28 U.S.C. § 2201(a), the Court hereby:

(1) **DECLARES** that the publication of a manufacturer's trade secrets under the Public Interest Exception, House Bill No. 4005, 2018 Or. L. Ch. 7, § 2(10)(a), constitutes a taking of private property under the Fifth Amendment to the United States Constitution, and that any invocation of the Public Interest Exception by Defendant without simultaneously providing just compensation for that taking would accordingly violate the Fifth Amendment; and

(2) **DISMISSES WITH PREJUDICE** Plaintiff's claim that House Bill 4005, 2018 Or. L. Ch. 7, §2(10)(a), is preempted by the Defend Trade Secrets Act and the Supremacy Clause; and

(3) **DECLARES** that H.B. 4005's reporting requirement, House Bill 4005, 2018 Or. L. Ch. 7, § 2(3)(c), violates the First Amendment to the United States Constitution and is, therefore, unenforceable.

This judgment completely resolves Plaintiff's Fifth Amendment, preemption, and First Amendment claims. The Court hereby certifies that "there is no just reason for delay" of entry of final judgment on these claims. Fed. R. Civ. P. 54(b). The Court's entry of judgment at this stage

**Deleted:** At a motion hearing on the Parties' Cross-Motions for Partial Summary Judgment held on January 11, 2024, ECF Nos. 25 and 29, tT

**Deleted:** issued an oral ruling

**Deleted:** ING

**Deleted:** YING

**Deleted:** DENYING

**Deleted:** ED

**Deleted:** DENIED

**Deleted:** as moot as to both Parties

**Deleted:** D

**Deleted:** ED

**Deleted:** , ECF No. 71,

**Deleted:** AS MOOT



Department of Justice
100 SW Market Street
Portland, OR 97201
(971) 673-1880 / Fax: (971) 673-5000

will award Plaintiff with an enforceable declaratory judgment. The claims subject to this judgment involve no material facts intertwined with Plaintiff's remaining claim under the Commerce Clause, and allowing appellate review of this final judgment on fewer than all of Plaintiff's claims is likely to lead to the termination of this litigation. The Court therefore enters this judgment as its final judgment on the Second Claim (First Amendment), the Third Claim (Defend Trade Secrets Act and Supremacy Clause), and the Fourth Claim (Takings Clause of the Fifth Amendment) of Plaintiff's Complaint, ECF No. 1. Fed. R. Civ. P. 54(b). The Parties' Cross-Motions are **DENIED** in other respects consistent with the Court's oral ruling.

A full basis for these rulings, in addition to those stated on the record, will be set forth in a written opinion to follow.

DATED _____, 2024.

_____
Michael W. Mossman
United States District Court Judge

Page 3 -    [PROPOSED] DECLARATORY JUDGMENT
           BM2/bs4/42353805

Department of Justice
100 SW Market Street
Portland, OR 97201
(971) 673-1880 / Fax: (971) 673-5000

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

PORTLAND DIVISION

| | | |
|---|---|---|
| PHARMACEUTICAL RESEARCH AND MANUFACTURERS OF AMERICA, | ) ) ) | |
| Plaintiff, | ) ) | Case No. 6:19-cv-01996-MO |
| v. | ) ) | January 11, 2024 |
| ANDREW STOLFI, in his official capacity as Acting Director of the Oregon Department of Consumer and Business Services, | ) ) ) ) ) ) | |
| Defendant. | ) ) | Portland, Oregon |

ORAL ARGUMENT

TRANSCRIPT OF PROCEEDINGS

BEFORE THE HONORABLE MICHAEL W. MOSMAN

UNITED STATES DISTRICT COURT SENIOR JUDGE

APPEARANCES

FOR THE PLAINTIFF:

          Allon S. Kedem
          Arnold & Porter
          601 Massachusetts Ave., NW
          Washington, DC 20001

FOR THE PLAINTIFF:

          David W. Cramer
          MB Law Group LLP
          117 SW Taylor Street
          #200
          Portland, OR 97204

FOR THE DEFENDANT:

          Brian Simmonds Marshall
          Oregon Department of Justice
          Trial Division
          Special Litigation Unit
          100 SW Market Street
          Portland, OR 97201

FOR THE DEFENDANT:

          Shaunee Vanessa Morgan
          Oregon Department of Justice
          Trial Division
          100 SW Market Street
          Portland, OR 97201

COURT REPORTER:    Jill L. Jessup, CSR, RMR, RDR, CRR, CRC
                   United States District Courthouse
                   1000 SW Third Avenue, Room 301
                   Portland, OR 97204
                   (503)326-8191

                        * * *

TRANSCRIPT OF PROCEEDINGS

(January 11, 2024)

(In open court:)

THE COURT:  You can go ahead and be seated.  Give me just a second to get settled.  It's not my courtroom; so it takes me a minute to figure out where everything is.

All right.  Would you mind just briefly introducing yourselves, so I know who's here, starting with counsel for plaintiff.

MR. KEDEM:  Allon Kedem on behalf of plaintiff.

THE COURT:  Thank you.

MR. CRAMER:  David Cramer on behalf of plaintiff.

MR. MARSHALL:  Brian Marshall for the State defendant.

MS. MORGAN:  Shaunee Morgan also for the State defendant.

THE COURT:  Mr. Cramer, would you pull that microphone closer to you?

And the way we'll do it is just to keep it so I can hear you better.  You'll probably do almost all of this just seated.  That way, the microphone will be closer to you.

Thank you for your very helpful briefing in this case. I have reviewed what you have submitted.  I know it's been a short period of time; but, hey, I'm a senior judge.  I have nothing better to do.  So I took the chance to review what

you've submitted.  I want to first verify what appears to be clear from the briefing, and that is that after this -- the history of this case that is currently pending before me are only the four claims that are the subject of the cross motions for summary judgment.  That's the entirety of the case at this point.

Is that correct?

MR. KEDEM:  Yes, Your Honor.

THE COURT:  All right.

And you agree?

MR. MARSHALL:  We do, Your Honor.

THE COURT:  All right.  The parties are familiar -- and I am too -- with the governing law for summary judgment and, in particular, the way that sort of plays out in a multivariate fashion for cross-motion for summary judgment -- you kind of have to switch hats a little bit to make that work, but that's the law I'm applying here.

I thought what would be helpful would be for me to make some fairly extensive initial remarks about my tentative thoughts about the case, walking through the whole case, and then I'll hear oral argument.

The way this will work is I'm going to lay this out as though I were making a final ruling, except where I'm not -- where I'm not sure, and -- but that doesn't mean I am.  That doesn't mean you're not at liberty to push back on anything

that I have said, but it just means that, if, at the end of oral argument, nothing has changed for me, then I'll just stand by what I say at the outset, and that's why I will be fairly extensive right now.

But we're not here only to hear my voice.  I mean, we're here for your arguments, and you should feel free to contest any of the conclusions that I tentatively make at the outset here.

I'm not going to go over the procedural history of the case.  It does come up in the sense that it does come into play that I am aware that this case has taken far too long, that the system has kept you all waiting for far too long, and that may come into play in terms of some of the decisions that I make about how to move forward.

There are a couple of predicate issues that run across most or all of the claims.  The first is associational standing, and I do tentatively find, as to all four claims, that plaintiff has what we would think of as representational capacity standing in this case; that its members would otherwise have standing to sue -- that is, that they can show injury and traceability and redressability -- that the interests at stake, the way it's teed up in this motion, are germane to the organization's purpose and to the members' corporate purposes; and that neither the claim itself nor the relief sought require the

members' involvement to be advanced adequately here before me.

So I tentatively find representational standing satisfied as to each claim.  The second thing to think about, that runs across all the claims, is that both -- while the plaintiff is bringing a facial challenge and both sides are litigating it as a facial challenge, not as-applied, and so that typically means that a plaintiff has to show no set of circumstances under which the statute would be valid.

As you know and as you have briefed, that's slightly different for First Amendment challenges.  There, the plaintiff must show a substantial number of what will -- I'm just going to call this 4005 -- the substantial number of 4005's applications are unconstitutional, judged in relation to its plainly legitimate sweep.

All right.  Turning to the claims themselves, I'm going to discuss them in two separate groups.  First, two claims that challenge just the public interest exception, that's the takings claim and preemption, and the two that challenge 4005 as a whole, that's the commerce clause and First Amendment.

Let's start with the takings claim.

Immediately, we have another predicate issue with the takings claim, and that's redressability as to the members'

potential claims here, keeping in mind that's a facial challenge. So is declaratory relief available for takings claims, especially in advance of the actual taking, and is this facial challenge ripe for adjudication? And my tentative answer to those two questions is "Yes" and "Yes."

A facial challenge to a statute -- I'm now just turning to *Hodel*, which is just basic law on this. A facial challenge to a statute under the takings clause can be considered ripe for adjudication if the enforcement of the statute would necessarily result in a taking of the property by the government.

And there's several factors here that help me find finality and redressability here.

First, there's no question that the potential future disclosures that are in play here, under the public interest exception, would encompass trade secrets. And it can be determined today -- without further litigation or discovery, it can be determined today whether or not those disclosures of trade secrets would constitute a taking. Third, it's nonspeculative. The government is, in fact, currently in possession of these trade secrets. Although plaintiffs still have the beneficial use of them, but the government has these trade secrets, and the government has asserted the statutory authority to disclose them. In fact, fourth, it goes a little bit beyond that. The statutory scheme is

that -- that a finding of public interest re: trade secrets under this scheme makes disclosure nondiscretionary, mandatory, for Oregon. So for these factors, I tentatively find that the takings claim is ripe or redressable, however you want to phrase it.

Turning to the merits.

Question one: Is this a per se taking? Is it alleged as a per se taking or a regulatory taking?

And here I turn to the *Ruckelshaus v. Monsanto* opinion. I think that case, which has been frequently cited, requires me to find the public interest exception is a regulatory taking. Therefore, several factors apply. One, the character -- getting to the merits, if it's a regulatory taking, then I look at the character of the government action, its economic impact, and its interference with reasonable investment-backed expectations.

It's this last factor that's the driving factor of the analysis. The other two are kind of pedestrian. But it's this one that comes up in *Ruckelshaus* and other cases and kind of drives the train here.

Give me just a second.

So, as I said, it's this interference with reasonable investment-backed expectations. In *Ruckelshaus v. Monsanto,* the Court talked about it this way: The statute in play there also gave Monsanto -- well, just so you know, I'm now

quoting from 1006 to 1007.  "The statute also gave Monsanto notice that much of the health, safety, and efficacy data provided by it could be disclosed to the general public at any time.  If, despite the data consideration and data disclosure provisions in the statute, Monsanto chose to submit the requested data in order to receive a registration, it can hardly be argued that its reasonable investment-backed expectations are disturbed when the EPA acts to use or disclose the data in a manner that was authorized by law at the time of the submission; or, in sum, a company cannot claim it had a reasonable investment-backed expectation in secrecy when it voluntarily submitted trade secrets to a government entity, knowing the government might disclose those secrets."

I added the word "voluntary" because that's the word I get when *Monsanto* talks about the company Monsanto choosing to submit the requested data as a sort of quid pro quo to get the registration that was in play in that case.

And when that voluntariness is lacking, either because there is no quid pro quo or there -- as there was in *Monsanto*, or because disclosure is required, as in the First Circuit case of *Rowe*, then the regulatory takings factors, analyzed as a whole, point towards finding a taking or a threatened taking for facial challenge purposes.

And here, in my tentative opinion, the element of

voluntariness is lacking.  Plaintiff's members were simply obligated to disclose by Oregon's positive law.

I'll say one more thing on that subject, on the merits of taking, which I find trends toward plaintiff's favor when I determine that the disclosure doesn't fit the kind of voluntariness discussion of either *Monsanto* or *Philip Morris*.  It would be cleaner, in some ways, on the question of voluntariness, if this were here in the setting of a -- like a preliminary injunction case or even cleaner, I suppose, on determining the issue of voluntariness, for plaintiff to refuse to provide the data and be punished for it by the State and then sue, but that isn't required, in my view.  It's not required to take one of the two Hobson's choices of unconstitutional -- allegedly unconstitutional disclosure or suffer state government punishment in order to assert the argument here.

And, in any event, even if that were required, I wouldn't require it in this case because of the delay that's been baked into this case already through no fault of the litigants.

If this case were eight months old, I might say, "You know, you don't really have -- you haven't really shown me involuntariness.  I'm going to send you back to do this, you know, in a different way."  I'm not going to do that in this case.

So I don't find, as an initial matter, that the -- that the merits of the takings case cut against plaintiff or, to put it in terms of the factors that -- that the reasonable investment-backed expectations are not thwarted here, because of voluntary disclosure. Instead, I find fundamentally involuntary disclosure and that those factors aren't present here.

So, in my view, plaintiff has shown a threatened regulatory taking and, on the merits, would prevail.

The second challenge to the public interest exception piece of 4005 is preemption, and that involves both impossibility preemption and obstacle preemption. The argument is that -- on impossibility preemption, the argument is that Oregon cannot comply with both the DTSA, a federal statute protecting trade secrets, and 4005, a state statute mandating, under certain circumstances, disclosure of those secrets. And stated that simply, it seems impossible. The fly in the ointment for impossibility is a § 1833(a)(1) of the DTSA, which states that "The DTSA," quote, "does not prohibit or create a private right of action in regard to any otherwise lawful activity conducted by a state."

And I think that's fairly simple. In my view, this piece of the federal command found in the DTSA creates congressionally approved space for something like

Section 4005 and makes it, therefore, not impossible for the State to comply with both.

The same basic analysis, in my view, is true for obstacle preemption. Section 4005 does not pose an obstacle to the full purposes and objectives of Congress when Congress has textually stated those purposes and objections -- objectives in a way that allows for something like Section 4005. Really, nor does 4005, working with § 1833(a)(1), amount to an exception that swallows the rule. The overarching purposes of the DTSA go on unhindered, for the most part, by the existence of Section 4005.

So I would not find preemption, either impossibility or obstacle.

I'll turn now to the two challenges to Section 4002 -- 4005 as a whole.

So the first is the commerce clause, and plaintiff argues here that HB 4005 directly controls commerce in all 50 states by imposing regulatory consequences on nationwide price moves. I think that's page 31 of the brief. And two cases are instructive here. The first is *NCAA v. Miller*. For a basketball fan like me, that's a really fun case to think about. That's a Ninth Circuit 1993.

So just for context, this is UNLV-involved, with their coach Jerry "Tark the Shark" Tarkanian, who took UNLV to four Final Four appearances, and one 1990 national

championship. 1990 being the year before the Ninth Circuit decides this case.

All of that under the cloud of multiple NCAA investigations, two of which resulted in Tarkanian suing the NCAA and receiving seven-figure settlements.

So, to put it simply, this was a fight between Tarkanian, the hero of Nevada; the State of Nevada; and NCAA. What, for our purposes, is -- is, in that case, a facial challenge, went forward; and, I think, because it was, without further factual development, obvious how this would play out to assert -- to effect an economic impact on all the NCAA across all the 50 states.

And it sort of worked like this: The NCAA is a voluntary organization. What Nevada did was say, "Look, in Nevada, at least, you, the NCAA, have to do special things. You have to provide more notice, and you have to provide more protections, and you have to -- there's no -- there's no hidden" -- what's the word I am looking for? -- "hidden accusers. You have to be able to see and know all your accusers. A district court has to be able to review what happens." There's a lot of protections in Nevada for the NCAA to operate against either a Nevada athlete or institution or even a Nevada donor.

And what the Court correctly, in my view, held there was that that's a tail, Nevada, that will wag the entire dog

of the NCAA.  Because it's a voluntary organization that requires absolute uniform enforcement standards nationwide; and so, you know, Dean Smith and John Thompson and, god forbid, Bobby Knight -- they are not going to go along with Jerry Tarkanian having a different set of rules more favorable to him than the ones they have to operate under; so it will either -- it will either do -- it will do one of two things:  It will either require the NCAA nationwide to do what Nevada requires in Nevada, in order to keep alive, or it will result in the disintegration of the NCAA, both of which have substantial economic impacts in all 50 states. And they knew that without further factual development.

The other case is *PhRMA v. David* out of the Ninth Circuit 2022, out of, I think, the Eastern District of California.  And the argument there was that the regulatory burden of California's scheme triggered, in part, by wholesale acquisition cost changes, WAC changes, would ripple out over the country and, as a practical matter, impact sales or sales prices everywhere, and the district court, affirmed by the Ninth Circuit, said it just wasn't that clear, for summary judgment purposes, that -- just as one example, WAC movement would be directly tied to final transaction price movement, and so summary judgment was denied.

To some extent, "Which of these applies here?" is a --

is a question of obviousness.  Without knowing more, you know what will happen next if the NCAA imposes Nevada rules nationwide or doesn't.  But without knowing more, you don't know what will happen next in California if WAC movement triggers regulatory obligations in California.  You just don't know yet what impact that will have on final transaction prices.  Which is more like our case?  And the answer is the -- the correct answer to every question in law school.  Which is what?  What's the correct answer to every question in law school?

I'll give a gold star to whoever gets it right.  It's just two words.

MR. KEDEM:  Are you --

MS. MORGAN:  It depends?

MR. KEDEM:  Most recent?

MS. MORGAN:  It depends?

THE COURT:  It depends.  It depends.  Because, in my view, with the public interest exception in place in this statute, then I think I know the answer to what happens next.  I think, if the risk calculation is, "Hey, we can comply with Oregon at the risk of worldwide disclosure of our trade secrets on a website that anyone can read," then I think I can know, without more discovery or anything else -- I think any economist would tell me "You can know that that's going to reverberate backwards out across the whole

country or forwards."  That is, when people contemplate WAC changes or even new drug introductions, they're going to have to calculate into their decision-making Oregon. Everywhere they are, they're all going to have to think about Oregon.

Conversely, without the public interest exception in play, now we have a much more nuanced multivariate picture that is not dominated by one elephant in the room: trade secret disclosure.  Now it's a lot more like *Davis/Landsberg -- Landsberg*; and, in my view, if that's the case, then I would do the same thing the judge did in the Eastern District.  I would deny summary judgment both ways because I don't know the answer to what will happen, and I don't know for sure who will have to take what into account without that in play.

So it might not play out this way at the end of oral argument; but, currently, since I have tentatively taken the public interest exception off the table, then here, for the dormant -- for the commerce clause, I would deny summary judgment both ways.

The last claim is First Amendment, and the first question arising there is the private or commercial speech. I should go backwards.  I think I wanted to talk about one issue that I missed here.

I think I discussed the difference between per se and

regulatory taking -- right? -- with *Ruckelshaus*?  All right.

MR. MARSHALL:  Not in detail, Your Honor.  You did say that both were there and you thought it was more -- it was closer to regulatory -- that the regulatory takings analysis would --

THE COURT:  My tentative view was that, thanks to *Ruckelshaus*, this was regulatory taking.

All right.  First Amendment.  First question, predicate question, is it private or commercial?

I've taken a look at what methodology there is for deciding when something is commercial speech, and without being too critical of my fellow judges who've written in this area, it seems like there's sort of two things going on:  One is that there are a series of -- there's a methodological inquiry with tests to apply, questions to answer, that will lead you to one or the other, and the other is a refrain repeated in a bunch of cases that, you know, there's also this kind of Gestaltish almost Potter Stewart approach to the question of, you know, just if it feels like commercial speech, then you should probably call it commercial speech.

So I'll just say I don't really like the latter very much.  I don't like to -- I don't like to look inside my soul and decide what I'm feeling today about commercial speech in order to get the answer here; so I'm going to

start by applying the tests that are out there, known, and on the table.

So the first test says that commercial speech is essentially speech that poses a commercial transaction. Plaintiffs have relied pretty heavily on that in *Ericks* (phonetic).

The answer to that question, in this case, is easy. Is the speech here proposing a commercial transaction?

No.

But a number of cases, not the least of which is *Bolger*, suggests that that's not the only question. And they say that where the facts present a close question, there are other things to look at.

So the first question I have is, "What facts prevent that close question?" Because you've only given me one test so far, and so is it telling me -- if it's a close question, whether it's proposing a commercial transaction or not -- "Look further"? Because then I'd say it's not even a close question. It's not proposing a commercial transaction in any way, but I think, rather, it's almost a tail-end methodology that works -- sort of works backwards.

If at any point you think this is a close question, apply these other *Bolger* factors, and there are basically three.

So look to whether the speech is in an advertisement.

No.

Look to whether it refers to particular products.

Yes, it does.

And look to whether the speaker has an economic motivation, whether the primary purpose for speaking is economic.

And that doesn't have to be just directly making money off of a sale of a transaction. You can have an economic motivation by speech that enhances your brand image. You can have an economic motivation by speech that cuts employee wages or insurance costs. So there's a lot of ways to have an economic motivation. But I don't think having an economic motivation describes all speech that is anything to do with my business. I don't think that's a fair reading of that phrase, and so here I struggle to say that the speech we're talking about here has primarily an economic motivation. And if I'm right about that, then most of these factors point in plaintiff's favor.

And that would mean that it's, to my surprise, private speech.

If it's private speech, Oregon doesn't even contest the rest of the test, and it -- and this statute would certainly, in my view, fail strict scrutiny under private speech. But because it's a fuzzy issue and because, if you, like, put a gun to my head and said, "You have to do the

Gestaltish thing," then I'd probably say it's commercial speech, and then I'm going to go ahead and analyze it also under commercial speech.

Now, the other question is whether it's regulatory commercial speech or compelled. And there's an important difference. Because if you are looking at regulatory commercial speech under *Central Hudson*, then you're at intermediate scrutiny, and if you're looking at compelled commercial speech under *Zauderer*, then you're at lower than intermediate. You're looking at basic, rational basis kind of scrutiny.

So under *Zauderer*, which is a 1985 Supreme Court case, the government can compel truthful disclosure of commercial speech as long as the compelled disclosure is reasonably related to a substantial government interest. There's rational basis, or something close to it. Less than intermediate, anyway. As long as it reasonably related to a substantial government interest and involves, quote, "purely factual and uncontroversial information," closed quote.

The Ninth Circuit has followed up on that in *CTIA* to suggest that there's a nexus between the potentially controversial aspects of the speech and the organization's opposition to it or their business mission.

But even so, I think there are two ways to -- so that's the question for our purposes here: To decide whether it's

regulatory or compelled commercial speech. I do find that the information is fundamentally factual. So the question is, is the State requiring the production of uncontroversial information?

So there's two ways to think about that: One is pragmatic, and the other is technical.

The technical way would be to say, "Just look at the information." Not the context in which the information is being provided, just the information itself.

So, you know, a state could, for example, force an abortion rights provider to post the length in centimeters of a 20-week-old fetus. You can say, "Well, that information is not controversial, just in the abstract." Tell us its length, on average, and that's -- you know, the information itself is -- no one is fighting about that. There are not big debates about the length of a 20-week-old fetus, but -- so that's the technical. But the pragmatic look would say, "Oh, my gosh." You know, "You're asking me to provide information that just plugs me into this gigantic firestorm of a debate that I don't want to be in." And I think here the better course is to say, "Well, yes, some of the information demanded is certainly factual, and the information itself, you know, sort of accounting, data-driven price analytics just alone on a piece of paper may not be that controversial, but it's being plugged into a

highly controversial public debate."

So I don't think the *Zauderer* test is met. I think, instead, intermediate scrutiny applies ala *Central Hudson*. And so once that test is applied, I don't think the statute passes intermediate scrutiny for, I think, pretty obvious reasons.

And for what it's worth, that means that, even if it's not commercial speech, it's private speech. Then if we know that it doesn't pass intermediate *Central Hudson* scrutiny, then we know that also a fortiori doesn't pass private speech scrutiny.

So, to recap, in terms of results for what I've tentatively said, on the takings clause, I would grant summary judgment for plaintiff as to actual public disclosure of trade secrets under the public interest exception.

On preemption, my ruling -- there would be no actual ruling on preemption because it would be obviated by my ruling on takings. But, once again, because of the length of delay baked into this case and the desire to avoid unnecessary further delay, I would say that, for what it's worth, if I were to rule on preemption, I would grant summary judgment to the State of Oregon on both impossibility and obstacle.

On the commerce clause, without the public interest

exception on the table, that is, with having found the public interest exception to be a taking and, therefore, unconstitutional under the Fifth Amendment, then I would say that the remainder of 4005, that it's application in this case to the -- the way that plays out under the commerce clause is currently unknown, and I would deny summary judgment to each side.

For what it's worth, once again, if the dormant commerce clause were on the table, if I were analyzing the -- excuse me.  If the public interest exception were on the table and I were forced to analyze the dormant commerce clause with that in place in the statutory scheme, I would grant summary judgment to plaintiffs tracking *NCAA*.

On the First Amendment, either as private speech or as regulatory commercial speech under my analysis, I would grant summary judgment to plaintiff.

Let's take these one at a time, and I'll start with plaintiff each time, even though they are cross-motions, just as a matter of convenience.

Anything you wish to add to what I've said already -- add or dispute or explain -- on the takings claim?

MR. KEDEM:  Just one very small point, Your Honor. You raised the question whether it would be somewhat cleaner if the parties had come here on a preliminary injunction

because then it would really put the issue very squarely.  I just wanted to give you a little bit of background that at the outset of this case the parties met to discuss whether it would make sense to talk about a preliminary injunction; and, instead, they came to an agreement that, because the issues in this case were purely legal, they could agree to a briefing schedule that would have this teed up as a legal matter pretty quickly without the need for discovery, and that's how we ended up in that situation.

THE COURT:  Thank you.  That's useful background.

On the takings claim, anything you wish to add to what you've written?

MR. MARSHALL:  Yes, Your Honor.  I think the first part, which I think goes to both takings and preemption, that is significant, is that the public interest disclosure provision has never been exercised by DCBS.  The 2023 annual report, which is not before the Court, but -- well, I'll just start with something that is before the Court, is that these reports have been filed since July 1, 2019, on an annual basis.  Now they're filed on March 15th of each year. There have been a number of trade secrets claimed.

The Soucy declaration says that in no instance --

THE COURT:  Something bumping up against 5,000 -- right? -- trade secrets claimed?

MR. MARSHALL:  In 2023 -- by the time it was 2023,

there's 10,500, is what the annual report says; so that would be, I guess, through the 2022, and that's over 1,900 reports.  And so that could be a claim of a particular data element relating to the expenses or any number of things.

In no instance has DCBS said, "This is, in fact, a trade secret"; but it, nevertheless, is in the public interest to disclose it.

So one of our arguments is that that presents --

THE COURT:  May I ask you whether that's -- whether that fact is influenced by the pendency of this litigation at all or not?

In other words, have both parties sort of sat on their hands a little bit, compared to what they might otherwise do, because of the pendency of this case?

MR. MARSHALL:  I think it's possible.  I think the record is silent on that particular question, but I think that the -- I do think that the facts are inconsistent, and I would not have an expectation inconsistent with the idea that this would be necessarily frequently robustly used in order to disclose the vast majority of the, you know, 10,500 data elements.

THE COURT:  You wouldn't have to disclose the vast majority to have a plausible case here; right?  I mean, some significant number, less than even 51 percent, let alone whatever "vast majority" means, would be sufficient; right?

MR. MARSHALL:  I think, if there were -- I -- part of the question here is -- goes to the -- goes to the underlying merits of whether it makes more sense to address the regulatory takings question in the context of individual instances of a regulatory taking, as opposed to the way that the plaintiffs would like to frame it, which is purely the fact that it is, in fact, a trade secret is enough information alone.

THE COURT:  You mean as-applied as opposed to facial?

MR. MARSHALL:  Correct.

THE COURT:  There are two scenarios in which no taking ever occurs; right?  And the question in my mind is just whether those are plausible.

One is that the State never finds public interest, in which case there would never be a taking; right?

MR. MARSHALL:  That's one.  Yes.  Agreed.

THE COURT:  The other is that the State never finds that anything actually is a trade secret because you are entitled to make decisions about that as well under the statutory scheme; right?

MR. MARSHALL:  Well, yes, I would agree with that. And also -- although there would be a -- at a minimum, the state law and potentially a federal jurisdiction over the question of whether that was an accurate determination,

**E.R.-82**

but there's a --

THE COURT:  Well, let's keep with the simplest one, that the State never found public interest exception. There would never be, in your view, a taking; right?

MR. MARSHALL:  Certainly.

THE COURT:  But would you agree that, sitting here today, that's a highly unlikely, implausible scenario that there's never a public interest exception disclosure of an acknowledged trade secret?

I'm not asking you to say there will be in the vast majority.  I'm just saying isn't it highly unlikely, for our purposes, speaking pragmatically, that this scheme is going to result in zero disclosures of trade secrets under the public interest exception?

MR. MARSHALL:  I think it's an unknown.  I think it's a genuine unknown, depending on the policymaker's decisions in individual instances, as to whether or not to exercise the public interest exception or not.

THE COURT:  You say "exercise," but you agree that if the decision-makers find that the public interest exception applies to what's otherwise a State's -- a trade secret, that disclosure's then mandatory; right?

MR. MARSHALL:  I do agree with that.

THE COURT:  All right.

MR. MARSHALL:  But I want to add to your list of

two scenarios. I mean, those are two scenarios in which there is no trade secret that is ever disclosed, but there also is a third scenario under which a trade secret is disclosed; but, under the regulatory takings analysis, it, in fact, is not a regulatory taking, that once the *Ruckelshaus* factors are applied, that the Court would determine that it is not, in fact, a taking.

And the piece of this analysis that I think is really significant -- I would say that there are two pieces of -- that I would like to address. One is about the character of the taking, that being the first element under *Ruckelshaus*, and the nature of the trade secrets that we're discussing here today.

The places where the courts have found there to be trade secret regulatory takings in, for example, the tobacco case out of the First Circuit -- we're talking about the ingredients list and the actual way you make a cigarette. In *Ruckelshaus*, we're talking about actual chemical formulation.

So these are -- I would characterize those as crown jewel-type trade secrets. None of the information that is part of these regulatory filings is how do you make a particular pill? How do you manufacture it? How would a generic competitor be able to recreate this using your research and development as a guidepost to be able to

compete more effectively against you?

THE COURT: How do I know, on this record, that companies place a significantly higher value on product ingredients as opposed to company pricing?

MR. MARSHALL: I mean, I think you probably don't, and I think that's part of the point of why doing this as a generalization over the label trade secret that companies do a number of things that have, at least, marginal competitive value and keep -- choose to keep them secret, but the character of some of those secrets is a greater value than others. So to come in and say the fact alone that we know that it enjoys trade secret protection and is therefore entitled to that label is enough to then determine that it will be a regulatory taking under the *Ruckelshaus* formulation is, I think, a jump.

THE COURT: You're suggesting the character of the government taking might be influenced by how valuable what's being taken is?

MR. MARSHALL: Absolutely.

THE COURT: And if the character of the government taking is something of low value, then you might fail on the merits as a plaintiff?

MR. MARSHALL: Yes, Your Honor.

THE COURT: But one difficulty I have with that is that I don't know the answer. You're suggesting today that

I can know, but the answer to that is that the character is low, that companies place a lower value on their pricing scheme than on their product ingredients.  I mean, that might well be true.  I just don't know it, and you don't know in what way that can be buttressed by this record.  So what do I do with that today?

MR. MARSHALL:  I think you deny summary judgment for the plaintiffs and -- and, in part, the -- the other -- this goes back to the question of whether these regulatory takings issues should be decided on a facial basis, and we -- both sides have scoured the books to see if there are any situations in which someone where -- in which there's been this sort of broad holding on a facial basis over a category of -- of takings of sort of intangible intellectual property or trade secrets, and I don't think we have anything that would sweep so widely on a facial basis to make that kind of determination.  And our point is simply that that is a factually intensive inquiry that requires really digging into the individual data elements and determining how does *Ruckelshaus* apply to this particular situation?

I want to go to the --

THE COURT:  I don't know.  I don't know what you learn with more discovery.  You know, if I said, "Go ahead and take your opponent's 30(b)(6) deposition and ask your

opponent if they place a really high value on their pricing information," I'm pretty sure I know what the answer will be.  So I'm not sure we get much further down the road even if it's an as-applied challenge.

I will say this:  My experience is somewhat, to my surprise, when I took the bench, that people will fight to the death to prevent disclosure of their pricing schemes.  So that's my limited experience with trade secret cases.

MR. MARSHALL:  I mean, the other piece of that, that I think is relevant here, really relates to the staleness of the information.  If you're talking about something where you have pricing information or cost information that is four or five years old at this stage, is that the same as tomorrow or what your future pricing is or three-months-ago pricing?  I think those are very different questions.

In addition, also on the cost component -- I'm not suggesting that we do discovery in order to determine that on a going-forward basis.  What I'm saying is that to make -- and I think what the Court is suggesting is that it would award a declaratory judgment to say that, any time that there is a trade secret that is disclosed under the public interest exception, it constitutes a taking, which I think would be a judgment that would then, I suppose, allow -- would bind our side to have lost the merits and

then have to determine, if -- if it then exercised the public interest exception, that it would then have -- it would then, I guess, be required to compensate any member of PhRMA who, then, in a subsequent state court case, said, "You took my data -- my trade secret."

My suggestion is not that we have discovery with PhRMA here today but rather that those questions and whether *Ruckelshaus* applies and how it applies are best determined after -- after the State discloses something under the public interest exception that is, in fact, a trade secret, and then there's a trial about whether or not that fails or passes *Ruckelshaus*.

And if the -- I mean, one of the reasons why your question is --

THE COURT:  I don't want to belabor this too much.

MR. MARSHALL:  Okay.

THE COURT:  I mean, you've told me that you don't -- you're not really suggesting that we need more discovery.  What we need is an actual case.  And the difference between an actual case and this moment in time right now is more discovery.  And that's really the difference.  We'd learn more in an actual case about these things.

You said there were two things that you thought needed to be discussed.  The first one was the character of the

government action.  What's the other one?

MR. MARSHALL:  The other is the voluntariness question that was provided.

And I think my understanding of *Monsanto* is that it had a very light understanding of what "voluntariness" was.

In *Monsanto*, what you needed to do was to register a particular chemical -- I'll get the industry details wrong -- but in order to participate in that market at all, and it wasn't as if this was some sort of special benefit and it was because it was participating in a highly regulated industry.

And here, we're in a highly regulated industry.  The -- what is voluntary here is PhRMA members or other -- it's not even just PhRMA members.  It's all pharmaceutical manufacturers, their participation in manufacturing drugs for the Oregon market, and it's voluntary in that sense. And I think that's the same sense that *Monsanto* was voluntary as well.

So I want to --

THE COURT:  So you're contending that you meet some form of voluntariness here?

MR. MARSHALL:  That's right.

THE COURT:  You have to obey Oregon's positive law on this subject in order to be in our market, but you can choose to not be in our market.

MR. MARSHALL:  That's right.

I think that's the same choice that the EPA posed to *Monsanto* in that area.

Now, there was a specific slice of that time where, because EPA policy changed, that they said, "Well, that's an unfair surprise," effectively because you didn't expect that.  But I think for anything that would be after the March 2018 passage of this law or perhaps the effective date it wouldn't sweep in.  It would be within that period where Monsanto -- in *Monsanto*, the Supreme Court found that there was sufficient notice to the regulated industry, that these -- by registering your chemicals, that they would be disclosed.  And, therefore, it was not a regulatory taking under -- you know, under that three-factor analysis.

THE COURT:  All right.  Thank you.

MR. MARSHALL:  I have -- on the takings question, I just want to go back to the form of relief.  And I think this is a trick question because of *Knick*, and *Knick* says -- and this was after our primary briefs, I believe, were filed, although I could be -- no, I'm wrong about that.  It was decided before -- before our -- before our briefs were filed.  But *Knick* says there's no injunctive relief for a takings claim.

THE COURT:  I understood --

MR. MARSHALL:  Okay.

THE COURT:  -- the plaintiff not to be seeking injunctive relief here.

Is that correct?

MR. KEDEM:  That's correct.

THE COURT:  Just declaratory relief.

MR. MARSHALL:  And so then the question is what is the declaration -- what value is the declaration providing? And is the declaration -- it's intended to say that the -- that, in the future, the first part of a takings case has been satisfied simply by the Court's judgment and that we would be bound by issue preclusion in a future case seeking compensation, or is the declaration that because we haven't provided compensation in advance, providing the public interest, that it -- that we are, therefore, incapable of making this release?

And my answer is that the first of those is what the only plausible declaration would say.  And then the second part of that answer is that that is not a declaratory judgment that should be issued.  That we should -- if the point is that we're going to issue a declaration saying that I believe that there -- that if Oregon does this, it will, in fact, be a taking and then just compensation will be owed, that the more -- the wiser course is to rather have that adjudication in a specific instance about a particular data element that is, in fact, released.

And so if the declaratory judgment is the functional equivalent of an injunction, in our view, that is against what *Knick* has said, which is that a state is always allowed to take for public purpose, but it still must pay compensation and that if --

THE COURT:  I guess, the problem I have with that is that very many declaratory judgments have future injunctive impact as a practical matter.  If I say that the -- that Los Angeles police using a chokehold is unconstitutional, then the Los Angeles police are going to permanently quit using the chokehold or suffer grave consequences.  So it shapes behavior, but it's not actually an injunction.

I don't -- I don't have a lot of control over what a declaration of what the Constitution requires does in the future.  But one of the things it very often does is permanently alter future behavior; right?

MR. MARSHALL:  I agree with that, but I think it's -- it's important, in this instance, for -- I think that the thing that distinguishes it from this -- the hypothetical that you provided is, first, the takings cases are different because just compensation is what the -- the only remedy that is available is.  Injunctive relief, when it is for a public purpose, is not available.  And the government can continue to do that.

Then the second reason why I am suggesting that a declaratory judgment should not be issued, it goes back to our earlier discussion of the difficulty of providing the *Ruckelshaus* factors and analyzing the *Ruckelshaus* factors in a context in which you have to have the abstraction of simply the trade secret label, which applies to a large variety of information that's being submitted by PhRMA members rather than an individual situation about a particular data element or a set of data elements of a particular draw -- drug and that both the compensatory component of that relief and the *Ruckelshaus* factors would be best handled by the Court in a single case that considers those factorings in tandem, and then, also, if the State loses --

THE COURT:  I'm sorry to interrupt, but if we had a single case, separate from your argument that we might better understand the character of the government action here, the actual economic value of the property, then at the end of that single case, if plaintiff won and the jury found that the disclosure of that particular trade secret, under the public interest exception was a taking, then at that -- on the day that that happens, aren't -- isn't the State then in the same shoes as it would be in if there had been a declaratory judgment for the future after that?

MR. MARSHALL:  Sure.  If we lost.  But the

question is should we litigate that question in the specific, or should we litigate it here today in the abstract?

THE COURT:  So, again, you've made one argument that it's better to wait, being that you'd have some kind of factual development of the character of the government action, but what other advantage is there to wait and litigate a particular case versus decide today?

Because it seems to me, in terms of your argument, that today's decision has odd and troubling future impacts. Those same future impacts flow from a jury verdict as from a declaratory judgment action.

MR. MARSHALL:  Well, as I understand what the Court is suggesting, though, is it's different, that we're talking about one -- my -- the premise of my argument is that among those 10,500 data elements, they might win some, and we might win some.  Of course, which ones we think we would win and would lose under the takings analysis would probably influence the determination of the public interest that DCBS exercises.  And when there is a particular disclosure, the jury's decision or the Court's decision, if it were on summary judgment, would be about that data element, not the broad question of is the trade secret label sufficient alone to make determination that it is, in fact, going to be a taking once -- once there is a disclosure

based on the public interest exception?

THE COURT:  Thank you.  I believe I understand that point.

Anything else on this first takings argument?

MR. KEDEM:  Your Honor, would I get a chance to respond?

THE COURT:  One moment.

MR. MARSHALL:  No, Your Honor.

THE COURT:  Thank you very much.

Yes, sir.

MR. KEDEM:  So if I may start just with the remedy, in *Knick* itself, the plaintiff asked for two things: She asked for an injunction and for a declaration.  The Court explained she couldn't get an injunction, but it granted her the declaration.

The declaration does not say that she was entitled to compensation at some future point through some future state process.  What it said is that a taking is -- a violation of the Fifth Amendment is complete when the government takes property without simultaneously paying just compensation, and that is the nature of the declaration that we would be asking for here, that the government is not allowed to invoke the public interest exception and thereby take trade secrets from manufacturers unless at the time of that taking it pays just compensation.

That is not the functional equivalent of an injunction because it would still leave the State to its choice of either not going through with the taking or, if it wants to go through with it, paying just compensation, but it would not be on the manufacturer to sue separately and get compensation on the back end.  It would be incumbent on the State to pay compensation at the time of the disclosure to spread the burden of that destruction.

THE COURT:  That's your remedy argument.

What else?

MR. KEDEM:  So when we're asking about whether it matters that this has never been exercised, all you need is a credible threat of enforcement.  That's the standard.

THE COURT:  Let me put my question to you.  The character of your opponent's argument has been, in part, this: that it's one thing to say that -- as I have said, that the voluntariness question, as I have called it, cuts in plaintiff's favor and, therefore, suggests under that piece of the *Ruckelshaus* analysis that there is a taking. Because you had a reasonable investment-backed expectation and secrecy that was vitiated by the disclosure, but the character of the argument is that's only one-third of the analysis and that there are points of the analysis, including the character of the government action, that are better resolved one by one; and, in fact, even if you knew

the answer to one, even if you picked one of your trade secrets and waited for disclosure and litigated it and won, you still wouldn't know the answer to others because it wouldn't control.  It might control on the idea that you didn't produce voluntarily, but there'd be other things you need to prove, so that, even if systemically we know the right answer to prong three of *Ruckelshaus* -- the argument runs -- we don't systemically know the answer to prong one, for example, of *Ruckelshaus*.

What's your answer to that?

MR. KEDEM:  I think we do systemically know the answer because every single invocation of the public interest exception has the same two features.  One is that the information qualifies as a trade secret under Oregon law.  And the very definition of a trade secret -- this is a cross-referenced definition -- refers to information that obtains its value from not generally being known.

So you know that 100 percent of that secrecy, that advantage that you get from not having your information generally known, is destroyed when it's published on the internet.

Now, my friend is correct that sometimes it will be a great destruction of value but other times a minimal destruction of value.  But in every case there is still some destruction of value because you know that it's a trade

secret.

THE COURT: So I take your argument to be that even a minimal destruction of value will qualify as a taking under the three-prong *Ruckelshaus* analysis. If I look at the character of the government action and I say "It did take something. It disclosed a trade secret, but the trade secret was kind of ho-hum" --

MR. KEDEM: Right. That goes to the amount of --

THE COURT: -- that goes to the amount but not the fact of taking is your argument?

MR. KEDEM: That's correct.

And if you look at the *Loretto v. Teleprompter* case -- now, admittedly, that was not a *Penn Central* factors case, but there was an argument in that case that there was only a minimal -- in violation of the plaintiff's rights because, you know, there was a minor intrusion on his property, and the Court said that just goes to the amount of the compensation due, not to whether there was a violation of the Fifth Amendment in the first place, and that's our argument here.

THE COURT: Thank you very much.

MR. KEDEM: One other point. My friend argues that, *Monsanto* said once a book -- once a law is on the books and you know, going forward, that your property will be subject to the law; therefore, there can be no taking or,

at a minimum, that you are essentially voluntarily walking into that regulatory scheme.  That was the precise argument made in the dissent in the *Nollan v. California Coastal Commission* case where Justice Brennan argued that, once a law is on the books, it qualifies and limits the property rights, such that any taking that occurs after that is no longer a taking.

Justice Scalia, in a very long footnote, Footnote 2, rejected that argument.  If you'll permit me, I'll just quickly read it.

"The dissent cites our opinion in *Ruckelshaus* as support for the peculiar proposition that a unilaterally claim of entitlement by the government can alter property rights.  In *Monsanto*, however, we found merely that the takings clause was not violated by giving effect to the government's announcement that application for the right to a valuable government benefit of obtaining registration of an insecticide would confer upon the government a license to use and disclose the trade secrets contained in the application."

The *Cedar Point Nursery v. Hassid* case again makes the same point, that *Monsanto* only held that, if you are trying to get something from the government and the condition for getting that is to make a disclosure, you cannot turn around and claim that your trade secrets were being taken in

violation of the Fifth Amendment.  That is not what we have here.

THE COURT:  What if the thing you are trying to get from the government is the opportunity to engage in commerce in that state?

MR. KEDEM:  So I don't think that -- so, again, the -- the *Nollan* case actually speaks directly to this, and it says, essentially, even though a court -- it says, "The right to build on one's property, even though its exercise can be subject to legitimate permitting requirements, cannot remotely be described as a governmental benefit."

And I would suggest the same thing is true.  The right of manufacturers to operate in commerce nationwide, although it is obviously subject to legitimate permitting requirements -- that is not the same thing as some special benefit that the State of Oregon confers on manufacturers.

THE COURT:  All right.  Thank you.

MR. KEDEM:  One other point.  I -- I know I should just be quiet, and I will in a second.  Just on the --

THE COURT:  I think if you know you should be quiet, you should be quiet.

MR. KEDEM:  Okay.  Fair enough, Your Honor.  Fair enough.

THE COURT:  Preemption.  So that went the State's way, even though it may, of course, be obviated if I make

the ruling that I suggested on takings.

So I'll start again with plaintiff.

MR. KEDEM:  Thank you, Your Honor.

I understand your ruling.  I understand the basis for the ruling.  Just on your point that the exception in § 1833 wouldn't swallow the whole DTSA, I grant that; it would, however, swallow all of the separate preemption provision of § 1838.  There is another provision that talks about preemption.  It uses the word "preemption," unlike § 1833.  And if it were true that the saving clause of § 1833 said that anything that a state does is essentially kosher, then there would be no point for Congress to have enacted that separate preemption provision.

The separate preemption provision also says that there's a special carve-out for -- there's a special carve-out for disclosures under the Federal Freedom of Information Act.  Again, that doesn't make any sense, if you read the saving clause the way that the State does, but it also only specifically talks about the Federal Freedom of Information Act.  State Freedom of Information laws, like HB 4005, are not included.  So we think it makes more sense to read § 1833, just as an announcement by Congress, that it doesn't want the federal DTSA to occupy the field.

And just one other point --

THE COURT:  Can I just ask? § 1833(a)(1) carves

out lawful activity conducted by a government entity, certainly of a state.  So you're saying that the FOIA exception would be superfluous if you read all of § 1833(a)(1)?

MR. KEDEM:  So I think the FOIA exception in § 1838 will be superfluous if you read § 1833(a) as saying essentially what a state authorizes is permissible.  Because if that's true, why do you need a separate provision dealing with -- specifically with Freedom of Information Act under the federal FOIA?

THE COURT:  Because it's not from a state.

MR. KEDEM:  The first provision, if I recall, it -- it refers, not just to a state, but laws of the United States.

THE COURT:  Right.  That's what I was asking.

MR. KEDEM:  Right.  I misunderstood, Your Honor.

THE COURT:  Thank you.

Do you wish to add anything to the preemption discussion?

MR. MARSHALL:  We don't, Your Honor.

THE COURT:  Thank you.

So on the dormant commerce clause, you know, I -- I pose this as sort of a contest between *NCAA v. Miller* versus *PhRMA v. David*.  I'll start with plaintiff again.

MR. KEDEM:  Nothing to add, Your Honor.

THE COURT: For the State?

MR. MARSHALL: Your Honor, I think that our principal response is that we want to -- that we ought to incorporate -- *National Pork Products* is a very significant gloss on this area of law; and, in particular, the extra territoriality theory of --

THE COURT: Tell me why you think that is. Go ahead and explain.

MR. MARSHALL: Well, I think that the -- as I understand PhRMA's argument, which was presented to the Court before *National Pork Products* was decided, was that -- was, effectively, that anything that was triggered based on regulation outside the State's borders, or most anything that was triggered on that, would be per se unlawful under the dormant commerce clause on some sort of extraterritoriality principle that *National Pork Products* disagrees with, and so --

THE COURT: Just so I'm clear, I thought plaintiff's argument, both in California and here and elsewhere, I think, goes like this: that if a state imposes a significant regulatory burden on a national pricing scheme, that the decision-makers in the national pricing scheme, if the single state's burden -- let's start with California -- if the single state's burden is significant, they are then going to have to take into account, and maybe

forego economic activity nationwide, driven by the regulatory burden of a single state.  That's the argument, isn't it, basically?

MR. KEDEM:  Yes, Your Honor.

THE COURT:  So what does *Pork Products* do to the argument?

MR. MARSHALL:  I think it rejects it, in Section 3 in particular, which was joined by five justices and was an opinion of the Court said that that theory of extraterritoriality is no longer part of the dormant commerce clause and that it -- and that, instead, it is refocusing that analysis on an antidiscrimination principle that PhRMA is not pursuing any argument about here.

And so I think --

THE COURT:  But direct into -- in-state -- favoring of in-state business as opposed to out-of-state business?

MR. MARSHALL:  Correct.

THE COURT:  So if you want to sell maple sugar in California, you've got to pay a higher price, or something like that?

MR. MARSHALL:  Yes.  Or, you know, it could be a little -- you can be less obvious about it and still fail that test, but that that is, in essence, the core of that.

Now, I think *NCAA v. Miller* is probably still a hard

case for Nevada, even with -- with some of the gloss here because --

THE COURT:  That's a pretty obvious in-state favoring, isn't it?

MR. MARSHALL:  Yes.  So they would still end up losing under that, and it would also make it pretty hard to play basketball games across state lines, which, I think, is probably a discrimination in the particular instance of sports here, but there is --

THE COURT:  It would be hard unless you quit paying your players under the table; then it -- then it would be --

MR. MARSHALL:  I'm saying, if one side gets to pay them and the other side doesn't, it may not be a fair contest, and so the sports league may have a difficult time operating across state lines; and, in that sense, it would discriminate against interstate commerce.

And so that's -- that's our argument.

THE COURT:  Do you wish to respond to that case application here?

MR. KEDEM:  Sure.  Very briefly.

We submitted a supplemental response on *National Pork Producers*.  That case is obviously different because the only thing it restricted was the sale within California of meat that had certain features.  And it's true that there

were sort of indirect spillover effects on the way businesses chose to conduct themselves outside the state, but those were indirect.  There was no sort of nationally inherently uniform aspect to the way that pork was produced.  There was no reason you couldn't have a separate stream for the California market.  That's different from the wholesale acquisition cost, which --

THE COURT:  It's the uniformity of the WAC that you think separates this from other cases that just involve people deciding whether to meet California or New York's regulatory burdens?

MR. KEDEM:  That's correct.

THE COURT:  Thank you.

All right.  First Amendment.

I think, since I'm on the fence a little bit on this one in terms of private versus commercial, I'll start with the defense here.  So anything you wish to add here?

MS. MORGAN:  Sure.  Thank you, Your Honor.  I'll say your struggle about private versus commercial is understandable, but I do think there are enough cases in the record to show that the definition of what constitutes commercial speech is broader than the narrow definition that you talked about earlier about just, you know, prescribing a kind of purchase and sale of products, and --

THE COURT:  So I'm clear, is it your position,

then, that not only this is commercial speech, but that it's compelled commercial speech, as opposed to regulatory?

MS. MORGAN:  That's right.  Because our understanding of *Central Hudson* is it applies just the restrictions on speech.  And that, the Court can look to -- I think it's *CTIA*, where that court said that *Central Hudson*'s intermediate scrutiny test does not apply to compelled as distinct from restricted or prohibited commercial speech.

THE COURT:  And is it your view that the core way to decide between *Zauderer*'s test and *Central Hudson*'s test -- one core fact is whether the required speech, compelled speech, is uncontroversial or not?  Or is that, in your view, a misstatement of the test?

MS. MORGAN:  No, that's included in the test, Your Honor.  I was talking about the larger regulatory versus compelled speech distinction you were making.

I think I understand that -- the cases to be looking to *Central Hudson* for restrictions on speech, as opposed to what we have here, which is compelled speech.

But underneath *Zauderer*, yes, I think for sure one of the factors --

THE COURT:  What you're saying is that one of the two, compelled or restricted, will at least take this out of private speech --

MS. MORGAN:  Exactly.

THE COURT:  -- and get to commercial speech?

MS. MORGAN:  Yes.

THE COURT:  Once you get to commercial speech, why would I view the compel -- the speech that's required here to be uncontroversial?

MS. MORGAN:  So if you look at what the courts have done when they analyze controversy -- I understood the Court to be saying that the -- the framework you were saying is plugging an individual's factual statements into a controversy, but *SEC* is an example of what the courts mean when they -- when they talk about controversy, and so is the *NIFLA* case.  And in both of those examples, the state is telling the individual what to say.  And so in *SEC*, that was the case where the individuals had to disclose whether or not the diamonds were conflict-free, and the *NIFLA* case was the abortion -- abortion -- or pregnancy centers were required to place information about abortion services.

And in both of those cases -- or *NIFLA*, particularly, I think, has a good analysis of what the courts mean when they talk about controversy.

Let me find the --

THE COURT:  Well, the question of it being compelled affirmative speech, that is, you're not just compelled to speak, but you're ordered as to what to say,

that's *NIFLA*, that's -- that's different than -- so the idea that it's compelled is different than whether it's controversial; right?

MS. MORGAN:  Yes.

THE COURT:  You can be compelled to say something noncontroversial, and you might still have a First Amendment claim.

MS. MORGAN:  Yes.  But I don't read the cases to be kind of analyzing controversy in a generic way.  You know, the conflict-free diamonds, the idea there was that the conflict was -- or the label was, the court says, conveying moral responsibility for the Congo War.  It requires an issuer to tell consumers that its products are ethically tainted, and we just don't have a similar dynamic here where PhRMA members or drug manufacturers, in general, disclosing the cost of a drug or how long that drug has been on the market, doesn't rise to the level of the controversy that the cases have identified.

Particularly, when we're considering that the --

THE COURT:  Is that because the statute is agnostic about what they say --

MS. MORGAN:  Yes.

THE COURT:  -- or because the subject matter is not controversial?

You'll agree the subject matter is controversial;

right?

MS. MORGAN:  Well, I think it depends on how we're defining the subject matter, and I understand PhRMA to be saying that the subject matter is the high cost of prescription drugs generally and that speaking at all about drugs means that they're adopting the State's message that they are solely responsible or primarily responsible for that.

THE COURT:  Before we get that far, you agree -- right? -- that the subject matter of drug pricing is controversial?

MS. MORGAN:  I think it's of public interest, and I don't know that we would say it's -- I don't know that we would say it's controversial.  I think it's of public interest to the State.  I -- I understand PhRMA --

THE COURT:  One way to phrase it, I guess, is it's a subject people are mad about; right?

MS. MORGAN:  Sure.  And people have personal interest and investment in it.

THE COURT:  If you're a pharmaceutical company, you are being asked to enter into an arena and say something on a subject people are mad about.  I mean, that's controversy, isn't it?

You may be right that the message they think they're being required to say isn't what they're being required to

say at all.

But just at 40,000 feet, is the subject matter controversial?  I guess I have a hard time not calling it controversial.

MS. MORGAN:  And I just don't -- when I think about -- you know, when the courts have analyzed it, conflict-free diamonds versus abortion, I don't know that the cost of prescription drugs, particularly considering the information that's being required, rises to that level; and I don't have and neither does PhRMA -- we've not -- neither side has presented to the Court kind of a test to decide or determine what constitutes controversial or not.  We only have the standards of --

THE COURT:  The one point you want to make is this isn't particularly controversial.  Assuming it is, then, I think, the next point you were starting to make is there's a difference between *NIFLA* in this case -- because in *NIFLA* a pregnancy center was being forced to post signage telling people where they could go get a state-paid-for abortion, and so that's compelled -- what I call compelled actual speech, contrary to the organization's mission; and you're saying here that, while they're being compelled to answer a question, the State doesn't care on which side or what the answer is; right?

MS. MORGAN:  That's right.  And --

THE COURT:  What do you make of *Riley* suggesting that -- that being forced to speak at all, whether -- you know, no matter what your viewpoint is, being forced to speak at all on a subject you don't want to speak about is compelled speech?

MS. MORGAN:  Well, I don't think we disagree that this is compelled speech.  What we're saying is that this is allowable compelled speech under the *Zauderer* analysis.

So we understand PhRMA to be saying, "We would rather not speak," but what *Zauderer* allows is for the government to compel commercial speech that's factual, uncontroversial, and reasonably related to its interest, and we think we fit within that framework.

THE COURT:  Really, the core argument that you're making here today is that to be compelled to speak about drug pricing is uncontroversial.  Factual, yes, I'll give you that, and also uncontroversial.  That's your argument?

MS. MORGAN:  Well, not -- I'm not sure that I'm clear on what the Court means.  If the question is are people mad about --

THE COURT:  The facts of *Zauderer* is that you can compel speech.  It's okay to compel it.  It's allowable if the information you're compelling, meeting a government interest, is also factual, as opposed to, I suppose, opinion, and uncontroversial.  And you're saying the

plaintiff has failed part of that test because they haven't shown that they're being compelled to provide information that's uncontroversial.  You're saying it's not controversial?

MS. MORGAN:  We're saying the information -- because the courts are looking not at the what -- the broader context.  The courts are looking at what is the -- is the information factual and --

THE COURT:  So I posited sort of a technical way of looking at it and a broader way of looking at it, and you're suggesting that, if you just look at the numbers that they're being told to provide, there's really nothing controversial about those numbers.  You have to add a lot more than what they've been asked to provide before you get to the level of controversy?

MS. MORGAN:  Right.  And I think both the *SEC* and the *NIFLA* case -- the court -- the court did that, in terms of adding, I guess, additional, not background information, but it -- you could see the kind of heightened attention to those issues and the severity of the feelings on both sides, and that's just not a part of this dynamic here.

THE COURT:  Thank you very much.

MS. MORGAN:  I think those are my two points.

THE COURT:  Thank you.

Do you wish to respond?

MR. KEDEM:  Just a few quick points, Your Honor.

First, to your original question whether it makes sense to look at this in the sort of *Bolger* technical sense or more of a Gestalt way, I think, if you look at the rationale for the *Zauderer* test, I think it talks about that in terms of advertisements because, at issue in that case was an advertisement by a lawyer where he said, "I will take you on a contingency basis," but he didn't disclose that he would also charge certain fees and costs, and the Court said, since he was already engaged in advertising, he only had a minimal First Amendment interest in not making certain additional disclosures alongside that advertising.

Every single case that we found and every case that the State cites in which *Zauderer* has been applied, it is that sort of advertising where you have to make additional disclosures in order for the advertising not to be deceptive or to fully apprise people about what you're offing for sale.

Here, we don't have any advertising.  These disclosures are not connected to advertising.  And they also don't concern the nature of what's being offered for sale.  They are about -- disclosures about the internal thought process of a manufacturer -- why it chose to increase a price for instance; and that is a type of information which *Zauderer*, as far as we're aware, has never been applied.

The second point I want to make goes to this idea of controversy.  If you had a city, for instance, that said there's going to be some controversial issue that people are going to come up and discuss at a town meeting but anyone who is sitting in the crowd has to get up and say why they're there, why it matters to them, or justify their presence there, I think there's no dispute that that would be the sort of compelled speech that would implicate First Amendment rights.

And I think we have, essentially, something here.  We have a subject of great debate on which there's a lot of attention being paid; and manufacturers, to a large extent, are being singled out to have to sort of step up and justify themselves by disclosing this additional information, and we think, for that reason, it doesn't fit within the *Zauderer* framework.

And then just very briefly, even under *Zauderer*, the State actually has to justify its rule with some amount of evidence.  It's true it's not intermediate scrutiny, but we don't have literally anything from the State here.  We essentially challenged the State in the last two pages of our brief to come up with something to substantiate its law, and you can see in the last two pages of their sur-reply brief, we don't think they came up with anything.

THE COURT:  Thank you very much.

I'll take a brief break and then give you my ruling.

(Pause-in-proceedings.)

THE COURT:  Folks, I want to start with what I probably should have said at the outset, which is that I apologize for how long this case has taken to get to this point.  It shouldn't have taken this long, but I'm glad we got this far.

And I want to also sincerely thank you for your help with oral argument.  It's been very fine.  Very helpful to me.  Very useful points made, and so I appreciate that.  The professionalism and the quality of the oral argument and the briefs is encouraging, I guess, I would say.

There are three points brought up by oral argument, in particular, in which I feel like my initial remarks were inadequate, that I want to pick up.  It's not -- I'm not going to pick up everything that has been discussed, nor will I say that there are no other ways in which my initial remarks were inadequate, but these three, in particular, I want to pick up.

The first is that, to find a taking, I should look at not only at *Ruckelshaus*'s what I call sort of the voluntariness issue, but all three elements of *Ruckelshaus*, and I think that that's a fair point.  And the first two are the character of the government action and its economic impact.

And here, in my view, after hearing oral argument, I think the defendant's argument, to put it sort of colloquially, gets to liability, not damages, in a way. It gets to the amount owed, not to the taking. And, in my view, the character of the government action is the factor that looks at not whether what was taken has high value versus low value, but whether it was a total taking versus partial. You know, whether the City's taking a few inches of your front yard for your sidewalk or whether part of your beneficial use of the property is being limited in some way versus all of it -- that's what that's getting at. And here, both for prong one, character, and for its economic impact -- we're talking about in every possible conceivable case under the public interest exception to 4005, a total erasure of the value of the intellectual property. A complete, as I have said, worldwide disclosure of the information totally erasing its value. And so I think in every case, while I don't know whether the property, the trade secret at issue, is, as you've said, the crown jewel of the company or not, I do know the character of the government action -- I knew -- I know what the government will do. It will disclose the trade secret. And I know its economic impact on the property. It will destroy its value.

And so, in my view, that means that *Ruckelshaus*, across all three factors, can be applied systematically as opposed

to individually by cases.

The second argument sort of hinges on the first a little bit, and that is that this case -- it would be wiser to litigate this question case by case. And so what that makes me do, I think, is ask myself, "If I let one case go forward, if a particular trade secret gets disclosed and litigated and a jury decides, how will that advance the ball? What will that jury know that I don't know today?"

And, of course, one thing the jury will know -- well, of course, today, at the start of the day, and at the start of the jury trial, neither side will know who wins, but one side is going to win either way. So let's assume plaintiff wins the jury trial. So that jury will know the amount of damages, and I don't know that; but I'm not being asked to decide that either. So the jury knows the answer to a question I'm not being asked; so that doesn't change the analysis much. And the jury will know some facts about that trade secret, in particular. But, otherwise, I think, in terms of what I'm being asked, that jury won't know anything important that I don't know today, and that sort of flows from my answer to the first point.

So I think those two points are worth a little further discussion.

I'm sorry. I had one other point in mind. So one other point was brought up that I didn't cover in my initial

remarks, and that's the point that to date there have been no disclosures under the statute.

So the first and most obvious problem with that argument, part of why I didn't deal with it in my initial remarks, is that it's not in the record. I don't mean that critically. It's just not. It's just not a point that I can use because it's not a part of the record of this case that up to this point of oral argument there have been no disclosures.

The second is that -- that I don't know why there have been no disclosures. Quite frankly, I would be extremely surprised, given the posture of this litigation, if State litigation decision-makers hadn't decided that disclosures had to wait until a court ruled on whether a disclosure would be constitutional or not.

So that's sort of a thumb on the scale here that I don't know.

And, in any event, the decision out of a mass of filings not to disclose some of them simply reduces the set of filings subject to a declaratory relief. In other words, there's no declaration that plaintiff seeks today or that it will get that does anything to follow on the heels of the decision by the State not to disclose information. It's only disclosure. To be clear, it's not providing information to the State in the first place. Although that

was an argument made here.  It's only disclosure that triggers declaratory relief.

And so unless there's some possibility realistically that there will never be any disclosure, a possibility I've rejected for our purposes today, the fact that there have currently been no disclosures doesn't affect the analysis, in my view.

So with those additional thoughts in mind and standing on what I said earlier, I now make final my earlier tentative rulings.

I grant summary judgment for plaintiffs on the takings claim.  That erases the need to rule on the preemption claim.  Although, as I've said, I would grant summary judgment to the State on the preemption claims.

I denied summary judgment to both sides on the commerce clause claim.  Although, as I have said, that would change if I hadn't already granted summary judgment on the takings claim removing the public exception -- the public interest exception out of the case.

And I find that, either as commercial speech on a controversial topic, therefore triggering intermediate scrutiny, or as private speech, which would be intermediate scrutiny or higher, this speech -- this compelled speech violates the First Amendment.

I'll issue a minute order to that effect, giving you

just the rulings, so you know them.  And I will also issue a judgment.  I am going to issue a written opinion, but that written opinion will post-date the judgment for your purposes in calculating your time to appeal.

So you have gotten my rulings, and you know why I'm going to rule.  So you know what you need to know to start working your appeal.

And before you've started very hard at all on your briefing, you'll also have my written opinion.

I'm going to ask the plaintiff to submit to its opponent and try to work out a declaration that comports with what I've said but meets legitimate objections by the State and submit it either agreed to, of course, with the reservation that you disagree with the ruling but agree to the form of the judgment, or submit it as plaintiff's suggested version with the explanation by the defense about what you object to.  Submit a form of judgment to that effect within ten days.

And I'll then enter the judgment -- I'll enter a minute order probably tomorrow, with these rulings in it.

Anything further from plaintiff today?

MR. KEDEM:  No, Your Honor.

THE COURT:  From defense?

MR. MARSHALL:  Your Honor, just a point of clarification.  It seems that there will not be a judgment

Case: 24-1570, 07/05/2024, DktEntry: 16.1, Page 121 of 261
Case 6:19-cv-01996-MO    Document 74    Filed 02/01/24    Page 66 of 67

**E.R.-121**

on the commerce clause claim in either direction.  Is the intention that, if we're not able to resolve that in some manner through a dismissal, that we'll be issuing a partial judgment on the other claims?

THE COURT:  Yes.  Good question.  Yes.  If you don't resolve it, then it's a partial judgment.

Your next question will be will I support appeal of a partial judgment, and the answer to that question is "Yes."

There's a -- there's a step I take in that whole process.  It's not certifying appeal, but it's something close to it and where I agree that appeal would be useful.

It leaves open the possibility, even though I say so, that the Ninth Circuit simply says, "You've got to wait," but that's up to them.

Thank you.  Anything else from the defense?

MR. MARSHALL:  I don't think so, Your Honor.

THE COURT:  We'll be in recess.

(Hearing concluded.)

C E R T I F I C A T E


PHARMACEUTICAL RESEARCH AND MANUFACTURERS OF AMERICA

v.

ANDREW STOLFI

Case No. 19-cv-01996-MO

Oral Argument

January 11, 2024


I certify, by signing below, that the foregoing is a true and correct transcript of the record, taken by stenographic means, of the proceedings in the above-entitled cause.  A transcript without an original signature, conformed signature, or digitally signed signature is not certified.


/s/Jill L. Jessup, CSR, RMR, RDR, CRR, CRC
_____

Official Court Reporter        Signature Date: 1/16/2024
Oregon CSR No. 98-0346         CSR Expiration Date: 9/30/2026

**E.R.-123**

**Jonathan M. Hoffman, OSB No. 754180**
jhoffman@mblglaw.com
**David W. Cramer, OSB No. 113621**
dcramer@mblglaw.com
MB LAW GROUP, LLP
117 SW Taylor Street, Suite 200
Portland, OR 97204
Telephone: 503-914-2015

**Allon Kedem,** *pro hac vice*
allon.kedem@arnoldporter.com
**Jeffrey L. Handwerker,** *pro hac vice*
jeffrey.handwerker@arnoldporter.com
**R. Stanton Jones,** *pro hac vice*
stanton.jones@arnoldporter.com
**Elisabeth S. Theodore,** *pro hac vice*
elisabeth.theodore@arnoldporter.com
ARNOLD & PORTER KAYE SCHOLER LLP
601 Massachusetts Avenue, NW
Washington, DC 20001
Telephone: 202-942-5000
*Attorneys for Plaintiff*

## UNITED STATES DISTRICT COURT

## DISTRICT OF OREGON

## EUGENE DIVISION

| | |
|---|---|
| PHARMACEUTICAL RESEARCH AND MANUFACTURERS OF AMERICA, <br><br> Plaintiff, <br><br> v. <br><br> ANDREW STOLFI, in his official capacity as Director of the Oregon Department of Consumer and Business Services, <br><br> Defendant. | Case No. 6:19-cv-01996-MO <br><br><br> **PLAINTIFF'S PROPOSED DECLARATORY JUDGMENT** |

**PLAINTIFF'S PROPOSED DECLARATORY JUDGMENT**

On January 11, 2014, the Court held a hearing on the Parties' Cross-Motions for Partial Summary Judgment. ECF Nos. 25 and 29. At the hearing, the Court issued an oral ruling **GRANTING IN PART and DENYING IN PART** Plaintiff's Motion for Partial Summary Judgment, ECF No. 25, and **DENYING** Defendant's Motion for Partial Summary Judgment, ECF No. 29. In an order entered on the docket the next day, the Court ordered Plaintiff to file within 10 days a proposed declaratory judgment reflecting the Court's ruling. ECF No. 71. Plaintiff has drafted the attached proposed declaratory order to reflect Plaintiff's understanding of the Court's January 11 oral rulings.

Plaintiff has conferred with Defendant about the proposed judgment. The Parties have agreed that it would be appropriate for the Court to enter final judgment under Rule 54(b) on the three claims that the Court has fully resolved: the Takings Clause, preemption, and First Amendment claims. Entry of a final judgment on those claims would allow for an immediate appeal without the need for certification of an interlocutory appeal under 28 U.S.C. § 1292(b). The Parties therefore respectfully request that final judgment be entered under Rule 54(b).

Defendant objects to Plaintiff's proposed form of judgment on the First Amendment and preemption claims and has asked the Court for on opportunity to file written objections to the proposal. In accordance with the Court's scheduling order, ECF No. 72, Defendant's objections will be due 14 days from this filing, and Plaintiff's response will be due 14 days after those objections are filed.

Page 2 -   PLAINTIFF'S PROPOSED DECLARATORY JUDGMENT

MB LAW GROUP, LLP
Attorneys at Law
117 SW Taylor Street, Suite 200
Portland, OR  97204
Telephone: 503-914-2015
Facsimile: 503-914-1725

Finally, the Parties continue to discuss the appropriate path forward for resolution of the dormant Commerce Clause claim and commit to inform the Court as soon as they have agreed on a proposal for addressing that claim.

DATED: January 22, 2024.

MB LAW GROUP, LLP

s/ David W. Cramer
Jonathan M. Hoffman, OSB No. 754180
jhoffman@mblglaw.com
David W. Cramer, OSB No. 113621
dcramer@mblglaw.com

Allon Kedem
allon.kedem@arnoldporter.com
Jeffrey L. Handwerker
jeffrey.handwerker@arnoldporter.com
R. Stanton Jones
stanton.jones@arnoldporter.com
Elisabeth S. Theodore
elisabeth.theodore@arnoldporter.com
ARNOLD & PORTER KAYE SCHOLER LLP

**Attorneys for Plaintiff Pharmaceutical Research and Manufacturers of America**

Page 3 -   PLAINTIFF'S PROPOSED DECLARATORY JUDGMENT

MB LAW GROUP, LLP
Attorneys at Law
117 SW Taylor Street, Suite 200
Portland, OR  97204
Telephone: 503-914-2015
Facsimile: 503-914-1725

**UNITED STATES DISTRICT COURT**

**DISTRICT OF OREGON**

**EUGENE DIVISION**

|  |  |
|---|---|
| PHARMACEUTICAL RESEARCH AND MANUFACTURERS OF AMERICA, <br><br> Plaintiff, <br><br> v. <br><br> ANDREW STOLFI, in his official capacity as Director of the Oregon Department of Consumer and Business Services, <br><br> Defendant. | Case No. 6:19-cv-01996-MO <br><br> **[PROPOSED] DECLARATORY JUDGMENT** |

**[PROPOSED] DECLARATORY JUDGMENT**

Pending before the Court are the Parties' Cross-Motions for Partial Summary Judgment on Plaintiff's challenge to Oregon's House Bill 4005, 2018 Or. L. Ch. 7. Plaintiff alleges that H.B. 4005 violates the Takings Clause of the Fifth Amendment of the United States Constitution; is preempted by the Defend Trade Secrets Act and the Supremacy Clause of the United States Constitution; violates the Commerce Clause of the United States Constitution; and violates the First Amendment of the United States Constitution.

At a motion hearing on the Parties' Cross-Motions for Partial Summary Judgment held on January 11, 2024, ECF Nos. 25 and 29, the Court issued an oral ruling **GRANTING IN PART and DENYING IN PART** Plaintiff's Motion for Partial Summary Judgment, ECF No. 25, and **DENYING** Defendant's Motion for Partial Summary Judgment, ECF No. 29. Specifically, the Court **GRANTED** Plaintiff's claim under the Takings Clause of the Fifth Amendment; **DENIED**

Plaintiff's preemption claim as moot as to both Parties; **DENIED** the Parties' Cross-Motions for Summary Judgment on Plaintiff's Commerce Clause claim; and **GRANTED** Plaintiff's First Amendment claim. ECF No. 71.

Per that ruling, ECF No. 71, and the Declaratory Judgment Act, 28 U.S.C. § 2201(a), the Court hereby:

(1) **DECLARES** that the publication of a manufacturer's trade secrets under the Public Interest Exception, House Bill No. 4005, 2018 Or. L. Ch. 7, § 2(10)(a), constitutes a taking of private property under the Fifth Amendment to the United States Constitution, and that any invocation of the Public Interest Exception by Defendant without simultaneously providing just compensation for that taking would accordingly violate the Fifth Amendment; and

(2) **DISMISSES AS MOOT** Plaintiff's claim that House Bill 4005, 2018 Or. L. Ch. 7, § 2(10)(a), is preempted by the Defend Trade Secrets Act and the Supremacy Clause; and

(3) **DECLARES** that H.B. 4005's reporting requirement, House Bill 4005, 2018 Or. L. Ch. 7, § 2(3), violates the First Amendment to the United States Constitution and is, therefore, unenforceable.

This judgment completely resolves Plaintiff's Fifth Amendment, preemption, and First Amendment claims. The Court hereby certifies that "there is no just reason for delay" of entry of final judgment on these claims. Fed. R. Civ. P. 54(b). The Court's entry of judgment at this stage will award Plaintiff with an enforceable declaratory judgment. The claims subject to this judgment involve no material facts intertwined with Plaintiff's remaining claim under the Commerce Clause,

and allowing appellate review of this final judgment on fewer than all of Plaintiff's claims is likely to lead to the termination of this litigation. The Court therefore enters this judgment as its final judgment on the Second Claim (First Amendment), the Third Claim (Defend Trade Secrets Act and Supremacy Clause), and the Fourth Claim (Takings Clause of the Fifth Amendment) of Plaintiff's Complaint, ECF No. 1. Fed. R. Civ. P. 54(b). The Parties' Cross-Motions are **DENIED** in other respects consistent with the Court's oral ruling.

A full basis for these rulings, in addition to those stated on the record, will be set forth in a written opinion to follow.


**DATED:** _____, 2024    _____

Michael W. Mosman
United States District Court Judge

**Jonathan M. Hoffman, OSB No. 754180**
jhoffman@mblglaw.com
**David W. Cramer, OSB No. 113621**
dcramer@mblglaw.com
MB LAW GROUP, LLP
117 SW Taylor Street, Suite 200
Portland, OR 97204
Telephone: (503) 914-2015

**Jeffrey L. Handwerker,** *pro hac vice*
jeffrey.handwerker@arnoldporter.com
**Allon Kedem,** *pro hac vice*
allon.kedem@arnoldporter.com
**R. Stanton Jones,** *pro hac vice*
stanton.jones@arnoldporter.com
**Elisabeth S. Theodore,** *pro hac vice*
elisabeth.theodore@arnoldporter.com
ARNOLD & PORTER
  KAYE SCHOLER LLP
601 Massachusetts Avenue, NW
Washington, DC 20001
Telephone:  (202) 942-5000
*Attorneys for Plaintiff*

**Ellen F. Rosenblum**
Attorney General
**Carla A. Scott, OSB No. 054725**
Senior Assistant Attorney General
carla.a.scott@doj.state.or.us
**Brian Simmonds Marshall, OSB No. 196129**
Senior Assistant Attorney General
Brian.S.Marshall@doj.state.or.us
**Shaunee Morgan, OSB No. 194256**
Assistant Attorney General
Shaunee.Morgan@doj.state.or.us
Department of Justice
100 SW Market Street
Portland, OR 97201
Telephone: (971) 673-1880
*Attorneys for Defendant*

## UNITED STATES DISTRICT COURT

## DISTRICT OF OREGON

## EUGENE DIVISION

| | |
|---|---|
| PHARMACEUTICAL RESEARCH AND MANUFACTURERS OF AMERICA,<br><br>Plaintiff,<br><br>v.<br><br>ANDREW STOLFI, in his official capacity as Acting Director of the Oregon Department of Consumer and Business Services,<br><br>Defendant. | Case No. 6:19-cv-01996-IM<br><br>**JOINT STATUS REPORT** |

Page 1 -    JOINT STATUS REPORT

On June 30, 2023, the Court ordered Plaintiff Pharmaceutical Research and Manufacturers of America (PhRMA) and Defendant Andrew Stolfi, the Acting Director of the Oregon Department of Consumer and Business Services, to confer and provide a joint status report on this case. The Parties have conferred and jointly answer the Court's inquiries below.

1. **A brief summary of the case, including a summary of the claims, and this Court's basis for jurisdiction**

On December 9, 2019, PhRMA filed a complaint challenging the constitutionality of two Oregon laws: (1) House Bill No. 2658, 2019 Or. L. Ch. 436 (Advance Notification Law) and (2) House Bill No. 4005, 2018 Or. L. Ch. 7 (Disclosure Law). ECF No. 1. The Advance Notification Law requires pharmaceutical manufacturers to provide 60 days' advance notice of certain price increases to Oregon prior to implementing those increases. The Disclosure Law requires manufacturers to disclose annually certain information to Oregon's Department of Consumer and Business Services if certain price increases go into effect. PhRMA alleged that both laws violate the Commerce Clause, First Amendment, Supremacy Clause, and the Takings Clause of the U.S. Constitution. PhRMA's claims are asserted under 42 U.S.C. § 1983 and the United States Constitution. The Court has federal-question jurisdiction under 28 U.S.C. § 1331.

PhRMA's claims challenging the Disclosure Law and the Advance Notification Law have proceeded on separate tracks. The Parties agreed that PhRMA's challenge to the Disclosure Law should be resolved through cross-motions for summary judgment, and the Parties agreed to resolution of that challenge based on a discovery plan that involved forgoing disclosures under Federal Rule of Civil Procedure 26(a)(1). *See* ECF Nos. 22-23. The Court entered an order agreeing with the Parties' proposal. *See* ECF No. 24. The Parties then fully briefed the cross-motions for summary judgment, *see* ECF Nos. 25, 29, 34, 38, and the Parties presented oral

Page 2 -    JOINT STATUS REPORT

argument to the Court on the cross-motions on January 14, 2021, *see* ECF No. 45. The Parties

have also filed notices of supplemental authority. *See* ECF Nos. 43-44, 46-51, 56-58. The cross-

motions are ripe for decision.

The Parties initially stayed claims challenging the Advance Notification Law pending

resolution of a then-pending challenge to a similar California law, *see* ECF No. 22, and the Court

stayed those claims in light of the Parties' agreement, *see* ECF No. 24. After resolution of that

separate challenge, the Parties in this case conferred and agreed that the Complaint should be

amended so that PhRMA's claims challenging the Advance Notification Law are removed from

the Complaint without prejudice. The Parties have accordingly stipulated to removal of such

claims without prejudice pursuant to Federal Rule of Civil Procedure 15(a)(2). *See* ECF No. 60.

Following that stipulation, only PhRMA's claims challenging the Disclosure Law remain pending.

2. **A brief summary of the Parties' joint discovery plan, including any outstanding discovery that the Parties intend to conduct**

As noted, only PhRMA's claims challenging the Disclosure Law remain pending, and the

Parties' cross-motions for summary judgment are ripe for decision. The Parties have agreed that

no further discovery is necessary to resolve those claims, *see* ECF No. 53-1 at 3, and there is no

plan to conduct additional discovery.

3. **Any upcoming scheduled deadlines (i.e. upcoming dispositive motions deadline) or upcoming scheduled settlement conferences**

There are no upcoming scheduled deadlines in this case.

4. **Proposed trial dates (please include several proposed dates, as the Court cannot guarantee availability on the Parties' first choice of dates)**

The Parties have agreed that the cross-motions for summary judgment regarding PhRMA's

challenge to the Disclosure Law present legal issues that can be resolved at summary judgment

Page 3 -    JOINT STATUS REPORT

based on the existing factual record and have agreed that no further discovery is necessary to resolve those claims. Accordingly, the Parties do not anticipate going to trial. In the event that the Court rules a trial is necessary on some or all of PhRMA's claims, the Parties respectfully propose that they should confer and provide proposed trial dates after the Court determines which claims, if any, merit a trial.

**5. Whether the Parties would consent to a magistrate judge**

All Parties do not consent to a Magistrate Judge.

DATED: July 5, 2023.

MB LAW GROUP, LLP

 s/ David W. Cramer
Jonathan M. Hoffman, OSB No. 754180
jhoffman@mblglaw.com
David W. Cramer, OSB No. 113621
dcramer@mblglaw.com
117 SW Taylor Street, Suite 200
Portland, OR 97204
Telephone: (503) 914-2015

Jeffrey L. Handwerker
jeffrey.handwerker@arnoldporter.com
Allon Kedem
allon.kedem@arnoldporter.com
R. Stanton Jones
stanton.jones@arnoldporter.com
Elisabeth S. Theodore
elisabeth.theodore@arnoldporter.com
ARNOLD & PORTER KAYE SCHOLER LLP
601 Massachusetts Avenue, NW
Washington, DC 20001
Telephone:  (202) 942-5000
*Attorneys for Plaintiff Pharmaceutical Research and Manufacturers of America*

ELLEN F. ROSENBLUM
Attorney General


 s/ Brian Simmonds Marshall
Carla A. Scott, OSB No. 054725
Senior Assistant Attorney General
Brian Simmonds Marshall, OSB No. 196129
Senior Assistant Attorney General
Shaunee Morgan, OSB No. 194256
Assistant Attorney General
Trial Attorneys
Tel: (971) 673-1880
carla.a.scott@doj.state.or.us
Brian.S.Marshall@doj.state.or.us
Shaunee.Morgan@doj.state.or.us
*Attorneys for Defendant*

**Jonathan M. Hoffman, OSB No. 754180**
jhoffman@mblglaw.com
**David W. Cramer, OSB No. 113621**
dcramer@mblglaw.com
MB LAW GROUP, LLP
117 SW Taylor Street, Suite 200
Portland, OR 97204
Telephone: (503) 914-2015

**Jeffrey L. Handwerker,** *pro hac vice*
jeffrey.handwerker@arnoldporter.com
**Allon Kedem,** *pro hac vice*
allon.kedem@arnoldporter.com
**R. Stanton Jones,** *pro hac vice*
stanton.jones@arnoldporter.com
**Elisabeth S. Theodore,** *pro hac vice*
elisabeth.theodore@arnoldporter.com
ARNOLD & PORTER
   KAYE SCHOLER LLP
601 Massachusetts Avenue, NW
Washington, DC 20001
Telephone:  (202) 942-5000
*Attorneys for Plaintiff*

**Ellen F. Rosenblum**
Attorney General
**Carla A. Scott, OSB No. 054725**
Senior Assistant Attorney General
carla.a.scott@doj.state.or.us
**Brian Simmonds Marshall, OSB No. 196129**
Senior Assistant Attorney General
Brian.S.Marshall@doj.state.or.us
**Shaunee Morgan, OSB No. 194256**
Assistant Attorney General
Shaunee.Morgan@doj.state.or.us
Department of Justice
100 SW Market Street
Portland, OR 97201
Telephone: (971) 673-1880
*Attorneys for Defendant*

# UNITED STATES DISTRICT COURT

## DISTRICT OF OREGON

## EUGENE DIVISION

| | |
|---|---|
| PHARMACEUTICAL RESEARCH AND MANUFACTURERS OF AMERICA,<br><br>Plaintiff,<br><br>v.<br><br>ANDREW STOLFI, in his official capacity as Director of the Oregon Department of Consumer and Business Services,<br><br>Defendant. | Case No. 6:19-cv-01996-AA<br><br>**STIPULATED AMENDMENT TO COMPLAINT REMOVING CERTAIN CLAIMS WITHOUT PREJUDICE** |

**E.R.-135**

## STIPULATED AMENDMENT TO COMPLAINT
## REMOVING CERTAIN CLAIMS WITHOUT PREJUDICE

Pursuant to Rule 15(a)(2) of the Federal Rules of Civil Procedure, IT IS HEREBY STIPULATED, by and between Plaintiff Pharmaceutical Research and Manufacturers of America (PhRMA) and Defendant Andrew Stolfi, in his official capacity as Director of the Oregon Department of Consumer and Business Services, that PhRMA's Complaint (ECF No. 1) is AMENDED such that PhRMA's claims regarding Oregon's Advance Notification Law, House Bill No. 2658, 2019 Or. L. Ch. 436, are REMOVED from the Complaint without prejudice. *See Hells Canyon Pres. Council v. U.S. Forest Serv.,* 403 F.3d 683, 687–88 (9th Cir. 2005).

After this Amendment, PhRMA is no longer challenging H.B. No. 2658. This Amendment has no effect on PhRMA's separate claims against Oregon's Disclosure Law, House Bill No. 4005, 2018 Or. L. Ch. 7, which remain pending. *See* ECF No. 45.

It is further STIPULATED that Defendant's Answer to the Original Complaint, ECF No. 21, shall constitute the Answer to the Complaint as amended by this filing. The Parties' Motions for Partial Summary Judgment, ECF Nos. 25, 29, are therefore unaffected by this amendment to the Complaint and remain pending before the Court.

DATED: June 16, 2023.

ELLEN F. ROSENBLUM
Attorney General

s/ Brian Simmonds Marshall
CARLA A. SCOTT #054725
BRIAN SIMMONDS MARSHALL #196129
Senior Assistant Attorneys General
SHAUNEE MORGAN #194256
Assistant Attorney General
Tel (971) 673-1880
Carla.A.Scott@doj.state.or.us
Brian.S.Marshall@doj.state.or.us
Shaunee.Morgan@doj.state.or.us
**Attorneys for Defendant Andrew Stolfi**

Page 1 -    STIPULATION OF DISMISSAL IN PART

MB LAW GROUP, LLP
Attorneys at Law
117 SW Taylor Street, Suite 200
Portland, OR 97204
Telephone: 503-914-2015
Facsimile: 503-914-1725

**E.R.-136**

MB LAW GROUP, LLP


s/ David W. Cramer

Jonathan M. Hoffman, OSB No. 754180
jhoffman@mblglaw.com
David W. Cramer, OSB No. 113621
dcramer@mblglaw.com

Allon Kedem
allon.kedem@arnoldporter.com
Jeffrey L. Handwerker
jeffrey.handwerker@arnoldporter.com
R. Stanton Jones
stanton.jones@arnoldporter.com
Elisabeth S. Theodore
elisabeth.theodore@arnoldporter.com
ARNOLD & PORTER KAYE SCHOLER LLP

**Attorneys for Plaintiff Pharmaceutical Research
and Manufacturers of America**

MB LAW GROUP, LLP
Attorneys at Law
117 SW Taylor Street, Suite 200
Portland, OR 97204
Telephone: 503-914-2015
Facsimile: 503-914-1725

ELLEN F. ROSENBLUM
Attorney General
SHAUNEE  MORGAN # 194256
Assistant Attorney General
CARLA A. SCOTT #054725
Senior Assistant Attorney General
Department of Justice
100 SW Market Street
Portland, OR 97201
Telephone: (971) 673-1880
Fax: (971) 673-5000
Email:  Shaunee.Morgan@doj.state.or.us
        Carla.A.Scott@doj.state.or.us

Attorneys for Defendant

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

EUGENE DIVISION

| | |
|---|---|
| PHARMACEUTICAL RESEARCH AND MANUFACTURERS OF AMERICA, <br><br> Plaintiff, <br><br> v. <br><br> ANDREW STOLFI, in his official capacity as Director of the Oregon Department of Consumer and Business Services, <br><br> Defendant. | Case No.  6:19-cv-01996-AA <br><br> DECLARATION OF CASSANDRA SOUCY IN SUPPORT OF DEFENDANT'S COMBINED MOTION FOR PARTIAL SUMMARY JUDGMENT AND OPPOSITION TO PLAINTIFF'S MOTION FOR PARTIAL SUMMARY JUDGMENT |

I, Cassandra Soucy, hereby declare:

1.    I am the Drug Pricing Transparency Program Coordinator at Oregon Department

of Consumer and Business Services (DCBS).

Page 1 -    DECLARATION OF CASSANDRA SOUCY IN SUPPORT OF DEFENDANT'S
            COMBINED MOTION FOR PARTIAL SUMMARY JUDGMENT AND OPPOSITION
            TO PLAINTIFF'S MOTION FOR PARTIAL SUMMARY JUDGMENT
            S6M/db5/10238495-v1

2.      In 2018, the Oregon legislature enacted a law providing for drug-pricing transparency. House Bill 4005, 2018 Or. L. Ch. 7, codified at ORS 646A.680 – 646A.692 (H.B. 4005).

3.      My job duties include implementing H.B. 4005.  H.B. 4005 requires pharmaceutical manufacturers to report information regarding specific new prescription drugs and certain historical information in annual reports relating to pricing for existing drugs to DCBS (e.g., the length of time the drug has been on the market; the name of generic versions of the prescription drugs available on the market; historical pricing).  DCBS is, in turn, required to post that information on its website unless (1) the information is a trade secret and (2) the public interest does not require disclosure.

4.      To date, 1,112 reports have been filed under H.B. 4005.

5.      DCBS has posted, via its website, data elements from those reports that were not claimed as trade secret.  *See* https://dfr.oregon.gov/drugtransparency/data/Pages/index.aspx.  To date, DCBS has not disclosed any information a drug manufacturer has claimed as a trade secret. Manufacturers have asserted 4,865 trade secret claims in reports submitted to DCBS.

6.      Review of these claims is ongoing as reports are made and DCBS is beginning to make initial determinations on trade secret claims.  The trade secret determination process provides an opportunity for the manufacturer to appeal DCBS' determination before a final determination is made. Manufacturers are also provided 21-days' notice before any information claimed to be trade secret is publicly posted.

7.      In conducting its review of information claimed as trade secrets, DCBS has observed that much of the information claimed as trade secret by the manufacturers has in fact been published by those manufacturers elsewhere in press releases, U.S. Securities and Exchange Commission (SEC) filings, or otherwise, and are therefore not trade secrets.

Page 2 -   DECLARATION OF CASSANDRA SOUCY IN SUPPORT OF DEFENDANT'S
            COMBINED MOTION FOR PARTIAL SUMMARY JUDGMENT AND OPPOSITION
            TO PLAINTIFF'S MOTION FOR PARTIAL SUMMARY JUDGMENT
        S6M/db5/10238495-v1

Department of Justice
100 SW Market Street
Portland, OR 97201
(971) 673-1880 / Fax: (971) 673-5000

8.      For example, one manufacturer submitted lengthy narrative descriptions for its marketing and pricing methodology of a new drug report and claimed that this information was trade secrets.  DCBS staff subsequently found all the information on publicly available websites such as the manufacturer's own website, press releases from the manufacturer, SEC 10K filings, and clinical trial information submitted to the FDA.

9.      Another manufacturer claimed the price of the drug in other countries was a trade secret.  DCBS requested additional information asking for more information on why this was a trade secret when most companies did not claim prices in other countries as a trade secret. The manufacturer then withdrew its trade secret claim.

10.      Similarly, one manufacturer claimed its entire filing as a trade secret. DCBS communicated with the manufacturer that the trade name, generic name, and wholesale acquisition cost of the drug reported were not trade secrets since this information was available on the manufacturer's website. The manufacturer agreed that this information was not a trade secret.

11.      Further, some manufacturers have rescinded their trade secret claims after seeing that similar information submitted by other manufacturers had been publicly displayed on DCBS' website.

12.      If DCBS determines that particular information is rightly claimed as a trade secret, DCBS will not publicize that information unless the public interest requires it.  This will be decided on a case-by-case basis.  It is possible that none of the information a PhRMA member has submitted to DCBS contains trade secrets.  It is also possible that, even if a PhRMA member has provided trade secrets to DCBS, disclosure to the public may not be required by the public interest.

13.      In addition to the explicit data requested under H.B. 4005, drug manufacturers are also allowed to submit any additional information they deem relevant to the price increase

Page 3 -    DECLARATION OF CASSANDRA SOUCY IN SUPPORT OF DEFENDANT'S COMBINED MOTION FOR PARTIAL SUMMARY JUDGMENT AND OPPOSITION TO PLAINTIFF'S MOTION FOR PARTIAL SUMMARY JUDGMENT
S6M/db5/10238495-v1

covered by the law and many have done so. Some have provided clarification about the breakdown of their direct costs associated with manufacturing, marketing, or distributing the prescription drug. Others have used the opportunity to clarify that various information related to the price increase was not available to them because the drug was acquired from another manufacturer.

**I declare under penalty of perjury that the foregoing is true and correct.**

EXECUTED on May  26 , 2020.

_s/ Cassandra Soucy_
CASSANDRA SOUCY

Page 4 -   DECLARATION OF CASSANDRA SOUCY IN SUPPORT OF DEFENDANT'S COMBINED MOTION FOR PARTIAL SUMMARY JUDGMENT AND OPPOSITION TO PLAINTIFF'S MOTION FOR PARTIAL SUMMARY JUDGMENT

S6M/db5/10238495-v1

**Jonathan M. Hoffman, OSB No. 754180**
jhoffman@mblglaw.com
**David W. Cramer, OSB No. 113621**
dcramer@mblglaw.com
MB LAW GROUP, LLP
117 SW Taylor Street, Suite 200
Portland, OR 97204
Telephone: 503-914-2015

**Allon Kedem,** *pro hac vice*
allon.kedem@arnoldporter.com
**Jeffrey L. Handwerker,** *pro hac vice*
jeffrey.handwerker@arnoldporter.com
**R. Stanton Jones,** *pro hac vice*
stanton.jones@arnoldporter.com
**Elisabeth S. Theodore,** *pro hac vice*
elisabeth.theodore@arnoldporter.com
ARNOLD & PORTER KAYE SCHOLER LLP
601 Massachusetts Avenue, NW
Washington, DC 20001
Telephone:  202-942-5000
*Attorneys for Plaintiff*

# UNITED STATES DISTRICT COURT

## DISTRICT OF OREGON

### EUGENE DIVISION

| | |
|---|---|
| PHARMACEUTICAL RESEARCH AND MANUFACTURERS OF AMERICA, | Case No. 6:19-cv-01996-AA |
| Plaintiff, | **PLAINTIFF'S MOTION FOR PARTIAL SUMMARY JUDGMENT AND SUPPORTING MEMORANDUM** |
| v. | |
| LOU SAVAGE, in his official capacity as Acting Director of the Oregon Department of Consumer and Business Services, | *ORAL ARGUMENT REQUESTED* |
| Defendant. | |

MB LAW GROUP, LLP
Attorneys at Law
117 SW Taylor Street, Suite 200
Portland, OR  97204
Telephone: 503-914-2015
Facsimile: 503-914-1725

## LR 7-1 CERTIFICATION

In compliance with LR 7-1, plaintiff Pharmaceutical Research and Manufacturers of America (PhRMA) has made a good faith effort through telephone conferences and via email to resolve disputes raised by this motion and was unable to do so.

## MOTION FOR PARTIAL SUMMARY JUDGMENT

Pursuant to Rule 56, PhRMA hereby moves for partial summary judgment on its claims that House Bill No. 4005, 2018 Or. L. Ch. 7, violates the Takings Clause of the Fifth Amendment; is preempted under the Supremacy Clause; violates the dormant Commerce Clause; and violates the First Amendment. Consistent with the parties' joint stipulation of March 9, 2020, *see* ECF No. 22, this motion does not address PhRMA's separate claims against House Bill No. 2658, 2019 Or. L. Ch. 436; litigation of those claims remains stayed pending the resolution of PhRMA's challenge to a similar law enacted by California, *PhRMA v. David*, No. 2:17-cv-02573-MCE-KJN (E.D. Cal. July 31, 2019).

MB LAW GROUP, LLP
Attorneys at Law
117 SW Taylor Street, Suite 200
Portland, OR  97204
Telephone: 503-914-2015
Facsimile: 503-914-1725

# TABLE OF CONTENTS

LR 7-1 CERTIFICATION ............................................................................................ II

MOTION FOR PARTIAL SUMMARY JUDGMENT ................................................ II

TABLE OF AUTHORITIES ...................................................................................... IV

INTRODUCTION ....................................................................................................... 1

BACKGROUND ......................................................................................................... 3

    A.    PhRMA's Members Spend Billions to Develop Innovative Medicines in Reliance on Legal Protections for Their Intellectual Property ..................... 3

    B.    HB 4005 Forces Drug Manufacturers to Publicly Reveal Their Trade Secrets ............................................................................................................ 8

    C.    This Suit ..................................................................................................... 12

STANDARD OF REVIEW ....................................................................................... 13

ARGUMENT ............................................................................................................. 14

I.    HB 4005's Public-Interest Exception Facially Violates the Fifth Amendment's Takings Clause ............................................................................................... 14

    A.    Drug Manufacturers Have Constitutionally Protected Property Rights in the Confidentiality of Their Trade Secrets, Which Publication Destroys ................. 14

    B.    HB 4005 Violates the Takings Clause Every Time It Requires Disclosure of a Manufacturer's Trade Secrets ........................................................................... 18

II.    Federal Trade-Secret Law Preempts HB 4005 ................................................ 22

    A.    Disclosure Under HB 4005 Is Misappropriation Under the DTSA ........... 22

    B.    HB 4005 Conflicts with the Purposes and Objectives of the DTSA ......... 25

III.    On Its Face, HB 4005 Violates the Dormant Commerce Clause ..................... 29

IV.    HB 4005 Facially Violates the First Amendment ........................................... 31

    A.    HB 4005 Must Satisfy Heightened Scrutiny ............................................ 32

    B.    HB 4005 Would Not Satisfy Rational Basis Review, and Certainly Not Strict Scrutiny ............................................................................................. 36

CONCLUSION .......................................................................................................... 38

Page iii -   PLAINTIFF'S MOTION FOR PARTIAL SUMMARY JUDGMENT

MB LAW GROUP, LLP
Attorneys at Law
117 SW Taylor Street, Suite 200
Portland, OR 97204
Telephone: 503-914-2015
Facsimile: 503-914-1725

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Am. Beverage Ass'n v. City & Cty. of S.F.*,
916 F.3d 749 (9th Cir. 2019) ...................................................................................33

*Am. Title Ins. v. Lacelaw Corp.*,
861 F.2d 224 (9th Cir. 1988) ...................................................................................13

*Arizona v. United States*,
567 U.S. 387 (2012) ...........................................................................................26, 27

*Armstrong v. United States*,
364 U.S. 40 (1960) ............................................................................................15, 20

*AT&T Co. v. Cent. Office Tel., Inc.*,
524 U.S. 214 (1998) ..................................................................................................28

*Biotechnology Indus. v. Dist. of Columbia*,
496 F.3d 1362 (Fed. Cir. 2007) ...............................................................................25

*C.A.R. Transp. Brokerage Co. v. Darden Rests., Inc.*,
213 F.3d 474 (9th Cir. 2000) ...................................................................................13

*Chi. & Nw. Transp. Co. v. Kalo Brick & Tile Co.*,
450 U.S. 311 (1981) ..................................................................................................28

*Clairmont v. Sound Mental Health*,
632 F.3d 1091 (9th Cir. 2011) .................................................................................37

*Crosby v. Nat'l Foreign Trade Council*,
530 U.S. 363 (2000) ......................................................................................22, 25, 26

*English v. Gen. Elec. Co.*,
496 U.S. 72 (1990) ....................................................................................................25

*First English Evangelical Lutheran Church of Glendale v. Los Angeles Cty.*,
482 U.S. 304 (1987) ............................................................................................14, 21

*Frudden v. Pilling*,
742 F.3d 1199 (9th Cir. 2014) .................................................................................33

*Gade v. Nat'l Solid Wastes Mgmt. Ass'n*,
505 U.S. 88 (1992) ....................................................................................................25

Page iv - PLAINTIFF'S MOTION FOR PARTIAL SUMMARY JUDGMENT

MB LAW GROUP, LLP
Attorneys at Law
117 SW Taylor Street, Suite 200
Portland, OR 97204
Telephone: 503-914-2015
Facsimile: 503-914-1725

*Geier v. Am. Honda Motor Co.,*
    529 U.S. 861 (2000)...............................................................................................28, 29

*Healy v. Beer Inst.,*
    491 U.S. 324 (1989)......................................................................................................29

*Hines v. Davidowitz,*
    312 U.S. 52 (1941)........................................................................................................25

*Hodel v. Va. Surface Mining & Reclamation Ass'n.*
    452 U.S. 264 (1981)......................................................................................................21

*Hughes v. Oklahoma,*
    441 U.S. 322 (1979)......................................................................................................29

*Hurley v. Irish-Am. Gay, Lesbian & Bisexual Grp. of Bos.,*
    515 U.S. 557 (1995)......................................................................................................35

*IKON Office Sols., Inc. v. Am. Office Prods., Inc.,*
    178 F. Supp. 2d 1154 (D. Or. 2001) ...........................................................................21

*Int'l Dairy Foods Ass'n v. Amestoy,*
    92 F.3d 67 (2d Cir. 1996) ...........................................................................................37

*Int'l Paper Co. v. Ouellette,*
    479 U.S. 481 (1987)......................................................................................................28

*Janus v. Am. Fed'n of State, Cty., & Mun. Emps., Council 31,*
    138 S. Ct. 2448 (2018).............................................................................................32, 33

*Kaiser Aetna v. United States,*
    444 U.S. 164 (1979)......................................................................................................17

*Kimball Laundry Co. v. United States,*
    338 U.S. 1 (1949).........................................................................................................15

*Lingle v. Chevron USA Inc.,*
    544 U.S. 528 (2005)......................................................................................................17

*Lucas v. S.C. Coastal Council,*
    505 U.S. 1003 (1992)...............................................................................................16, 17

*Lynch v. United States,*
    292 U.S. 571 (1934)......................................................................................................15

MB LAW GROUP, LLP
Attorneys at Law
117 SW Taylor Street, Suite 200
Portland, OR  97204
Telephone: 503-914-2015
Facsimile: 503-914-1725

*Maryland v. Louisiana*,
451 U.S. 725 (1981)...............................................................................................22

*Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*,
475 U.S. 574 (1986)...............................................................................................13

*Morales v. Trans World Airlines, Inc.*,
504 U.S. 374 (1992)...............................................................................................28

*Motor Coach Emps. v. Lockridge*,
403 U.S. 274 (1971)...............................................................................................28

*Mut. Pharm. Co. v. Bartlett*,
570 U.S. 472 (2013)...........................................................................................22, 25

*Nat'l Ass'n of Mfrs. v. SEC*,
800 F.3d 518 (D.C. Cir. 2015)...............................................................................36

*Nat'l Collegiate Athletic Ass'n v. Miller* (*NCAA*),
10 F.3d 633 (9th Cir. 1993) ...............................................................................30, 31

*Nat'l Inst. of Family & Life Advocates v. Becerra* (*NIFLA*),
138 S. Ct. 2361 (2018)........................................................................................33, 34

*Nike, Inc. v. McCarthy*,
285 F. Supp. 2d 1242 (D. Or. 2003), *aff'd*, 379 F.3d 576 (9th Cir. 2004) .............20

*Nixon v. United States*,
978 F.2d 1269 (D.C. Cir. 1992)..............................................................................17

*Palazzolo v. Rhode Island*,
533 U.S. 606 (2001)...........................................................................................16, 17

*Pelican Bay Forest Prods., Inc. v. W. Timber Prods., Inc.*,
443 P.3d 651 (Or. Ct. App. 2019)...........................................................................21

*Penn Cent. Transp. Co. v. City of New York*,
438 U.S. 104 (1978).........................................................................................9, 18, 20

*Philip Morris, Inc. v. Reilly*,
312 F.3d 24 (1st Cir. 2002) (en banc)............................................................... *passim*

*PhRMA v. David*,
No. 2:17-cv-02573-MCE-KJN (E.D. Cal. July 31, 2019) .....................................12

MB LAW GROUP, LLP
Attorneys at Law
117 SW Taylor Street, Suite 200
Portland, OR  97204
Telephone: 503-914-2015
Facsimile: 503-914-1725

*PLIVA, Inc. v. Mensing,*
    564 U.S. 604 (2011)................................................................................................25

*Reed v. Town of Gilbert,*
    135 S. Ct. 2218 (2015)................................................................................34, 35, 36

*Riley v. Nat'l Fed'n of the Blind of N.C., Inc.,*
    487 U.S. 781 (1988)................................................................................................33

*Rosenberger v. Rector & Visitors of Univ. of Va.,*
    515 U.S. 819 (1995)..........................................................................................34, 35

*Ruckelshaus v. Monsanto Co.,*
    467 U.S. 986 (1984)........................................................................12, 15, 16, 18, 19

*Rumsfeld v. Forum for Acad. & Inst. Rights, Inc.,*
    547 U.S. 47 (2006)..................................................................................................31

*Sam Francis Found. v. Christies, Inc.,*
    784 F.3d 1320 (9th Cir. 2015) ...............................................................................30

*Sorrell v. IMS Health Inc.,*
    564 U.S. 552 (2011)................................................................................34, 35, 36, 38

*St. Michael's Convalescent Hosp. v. California,*
    643 F.2d 1369 (9th Cir. 1981) ...............................................................................16

*Turner Broad. Sys., Inc. v. FCC,*
    512 U.S. 622 (1994)................................................................32, 33, 34, 35, 37

*United Haulers Ass'n v. Oneida-Herkimer Solid Waste Mgmt. Auth.,*
    550 U.S. 330 (2007)................................................................................................29

*United States v. Locke,*
    529 U.S. 89 (2000)..................................................................................................28

*United States v. Palmer,*
    128 U.S. 262 (1888)................................................................................................15

*W. Va. Bd. of Ed.* v. *Barnette,*
    319 U.S. 624 (1943)................................................................................................32

*Williams-Yulee v. Fla. Bar,*
    135 S. Ct. 1656 (2015)............................................................................................36

Page vii -  PLAINTIFF'S MOTION FOR PARTIAL SUMMARY JUDGMENT

MB LAW GROUP, LLP
Attorneys at Law
117 SW Taylor Street, Suite 200
Portland, OR 97204
Telephone: 503-914-2015
Facsimile: 503-914-1725

**Constitutional Provisions, Statutes, and Rules**

U.S. Const. art. I, § 8, cl. 3 ...................................................................................29

U.S. Const. art. VI, cl. 2 .......................................................................................22

U.S. Const. amend. V ............................................................................................14

18 U.S.C. § 1833(a)(1) ..........................................................................................28

18 U.S.C. § 1835(a) .................................................................................................7

18 U.S.C. § 1836(a) .........................................................................................24, 25

18 U.S.C. § 1836(b) ............................................................................................7, 23

18 U.S.C. § 1838 .........................................................................................26, 27, 29

18 U.S.C. § 1839(3) ..........................................................................................7, 8, 23

18 U.S.C. § 1839(5)(B) ......................................................................................23, 24

42 U.S.C. § 1395w-3a(c)(6)(B) ........................................................................2, 8, 30

Pub. L. No. 114-153, §2 (2016) ..............................................................................7

Uniform Trade Secrets Act § 1(2)(ii) .......................................................................6

Uniform Trade Secrets Act § 1(4) ...........................................................................6

ORS 192.345 .....................................................................................................10, 11

ORS 192.345(2) ......................................................................................................19

ORS 307.020(1)(a)(I) .............................................................................................18

ORS 646.461 to .475 ...............................................................................................18

ORS 646.461(4) ..............................................................................................6, 11, 19

MB LAW GROUP, LLP
Attorneys at Law
117 SW Taylor Street, Suite 200
Portland, OR  97204
Telephone: 503-914-2015
Facsimile: 503-914-1725

2018 Or. L. Ch. 7

    Preamble ...................................................................................................................21, 36, 37

    § 2(1) .........................................................................................................................2, 8, 30

    § 2(2) .....................................................................................................................................8

    § 2(3) ............................................................................................................9, 10, 20, 32, 33

    § 2(4) ....................................................................................................................................8

    § 2(5) ......................................................................................................................9, 10, 20

    § 2(6) .....................................................................................................................10, 20

    § 2(7) .................................................................................................................................10

    § 2(9) ...........................................................................................................................10, 33

    § 2(10) .....................................................................................................1, 11, 12, 14, 18, 26

    § 3(2) .................................................................................................................................10

    § 13(3) ...............................................................................................................................10

    § 15 ....................................................................................................................................10

2019 Or. L. Ch. 436 .....................................................................................................12

Or. Admin. Code 836-200-0530(2)(h) ...........................................................9, 32, 33, 38

Or. Admin. Code 836-200-0540 ........................................................................................11

Or. Admin. Code 836-200-0560 ........................................................................................10

Fed. R. Civ. P. 26(a)(1) .....................................................................................................13

Fed. R. Civ. P. 56(a) .........................................................................................................13

**Legislative Materials**

H.R. Rep. No. 114-529 (2016) ....................................................................................7, 23, 26

S. Rep. No. 114-220 (2016) .......................................................................................1, 7, 23, 27

162 Cong. Rec. H2028 (2016) ...........................................................................................6, 23

**Other Authorities**

America's Biopharmaceutical Cos., *Medicines in Development 2018 Report: Cancer*; https://onphr.ma/2RdP0RN ..........................................................................................4

America's Biopharmaceutical Cos., *Medicines in Development 2018 Report: Heart Disease & Stroke*, https://onphr.ma/2RqcgMq ...................................................................4

2 William Blackstone, *Commentaries on the Laws of England* (1769) ........................................15

MB LAW GROUP, LLP
Attorneys at Law
117 SW Taylor Street, Suite 200
Portland, OR 97204
Telephone: 503-914-2015
Facsimile: 503-914-1725

DCBS, *Prescription Drug Price Transparency Results and Recommendations* (2019), https://dfr.oregon.gov/drugtransparency/Documents/Prescription-Drug-Price-Transparency-Annual-Report-2019.pdf...................................................................................10

Joseph A. DiMasi, et al., *Innovation in the Pharmaceutical Industry: New Estimates of R&D Costs*, 47 J. Health Econ. 20 (2016), https://bit.ly/33JtBCE .......................4

FDA, *Novel Drug Approvals for 2018*, https://bit.ly/382egAv .........................................3

FDA, *Novel Drug Approvals for 2019*, https://bit.ly/37UXgMu.......................................3

FDA, *Paving the Way for Personalized Medicine* 4 (2013), https://bit.ly/2PdIjwq .........5

*Hearing on an Emerging Disease Threat: How the U.S. Is Responding to COVID-19, the Novel Coronavirus Before the S. Comm. on Health, Educ., Labor and Pensions*, 116th Cong. (2020) (statement of Dr. Robert Kadlec, Assistant Secretary for Preparedness and Response, U.S. Dep't of Health & Human Servs.), https://bit.ly/33oW5Dj ...............................................................................4

Matthew Herper, *The Cost of Creating a New Drug Now $5 Billion, Pushing Big Pharma to Change*, Forbes (Aug. 11, 2013), https://bit.ly/2m6Y2m1 ......................................5

JP Hughes, et al., *Principles of Early Drug Discovery*, 162(6) Br. J. of Pharmacol. (2011), https://www.ncbi.nlm.nih.gov/pmc/articles/PMC3058157.............................................5

Alex Knapp, *Coronavirus Drug Update: The Latest Info on Pharmaceutical Treatments and Vaccines*, Forbes (Mar. 22, 2020), https://bit.ly/2vq3426 ..............................4

Asher Mullard, *2018 FDA Drug Approvals*, Nature (Jan. 15, 2019), https://go.nature.com/2CmHeMp ...............................................................................3

Rick Mullin, *Tufts Study Finds Big Rise in Cost of Drug Development*, Chem. & Eng'g News (Nov. 20, 2014), https://bit.ly/2LnuH0D .......................................................4, 5

PhRMA, *Biopharmaceuticals in Perspective* (2019), https://onphr.ma/2wy2lMP .........5

Alexander Schuhmacher et al., *Changing R&D Models in Research-Based Pharmaceutical Companies*, 14 J. Transl. Med. 105 (2016), https://bit.ly/33KBRlT............5, 6

Kim Thomas, *The Price of Health: The Cost of Developing New Medicines*, The Guardian (Mar. 30, 2016), https://bit.ly/2kliNY5.......................................................4

MB LAW GROUP, LLP
Attorneys at Law
117 SW Taylor Street, Suite 200
Portland, OR  97204
Telephone: 503-914-2015
Facsimile: 503-914-1725

## INTRODUCTION

"[T]rade secrets are an integral part of the operation, competitive advantage, and financial success of many U.S.-based companies." S. Rep. No. 114-220, at 1 (2016). That is certainly true for pharmaceutical manufacturers, which spend billions of dollars each year investigating and developing new life-saving and life-enhancing drugs for patients. Manufacturers make hefty investments in these potential medicines in reliance on strong legal protections for their intellectual property, which allow them to compete in the marketplace based on quality and price. Oregon, like every other state, has long protected manufacturers' property interest in their trade secrets.

Yet in February 2018, the Oregon legislature passed a sweeping and unconstitutional new law, House Bill No. 4005, 2018 Or. L. Ch. 7, that threatens to upend this competitive balance. HB 4005 targets confidential and proprietary information that drug manufacturers use to make their advertising, cost, marketing, pricing, and production decisions. The law forces manufacturers to turn these trade secrets over to the State, in the form of periodic reports that manufacturers must create to justify drug-price increases. The law also requires the Department of Consumer and Business Services (DCBS) to publish manufacturers' confidential information on its website whenever the agency deems publication to be in "[t]he public interest." *Id.* § 2(10)(a)(B). Under the guise of this new "public interest" exception to trade-secret protections, Oregon HB 4005 allows competitors, and the public at large, to gain insight into a manufacturer's most-sensitive business information. Oregon's law is unconstitutional on four separate grounds.

Page 1 -   PLAINTIFF'S MOTION FOR PARTIAL SUMMARY JUDGMENT

MB LAW GROUP, LLP
Attorneys at Law
117 SW Taylor Street, Suite 200
Portland, OR 97204
Telephone: 503-914-2015
Facsimile: 503-914-1725

*First*, HB 4005 violates the Takings Clause of the Fifth Amendment by taking drug manufacturers' property without "just" compensation—indeed, without *any* compensation. Manufacturers have a well-established and long-recognized property right in their trade secrets, which retain value only so long as they remain confidential. But DCBS's publication on its website of a manufacturer's sensitive information "publicly discloses the secret," causing the manufacturer's "property right [to be] extinguished." *Ruckelshaus v. Monsanto Co.*, 467 U.S. 986, 1002 (1984). The taking is categorical and entirely uncompensated. HB 4005 thus inflicts on manufacturers the precise harm that the Fifth Amendment was adopted to prevent: forcing private property owners to shoulder the burden of the government's public-policy choices.

*Second*, HB 4005 conflicts with, and is therefore preempted by, federal law governing trade secrets. Recognizing that protection for trade secrets is critical to American businesses, Congress enacted the Defend Trade Secrets Act of 2016 (DTSA) to enhance existing state-law safeguards. The DTSA prohibits misappropriation, defined to include disclosure of the very same advertising, cost, marketing, pricing, and production information that HB 4005 authorizes DCBS to publish. Oregon's law does not merely fall below the federal baseline; it effectively nullifies federal protections, thereby undermining innovation and competition in the pharmaceutical industry.

*Third*, HB 4005 impermissibly interferes with interstate commerce, in violation of the dormant Commerce Clause. The law's onerous reporting requirements are tied to increases in a drug's "wholesale acquisition cost as defined in 42 U.S.C. § 1395w-3a(c)(6)(B)," 2018 Or. L. Ch. 7 § 2(1)(i)—that is, the drug's *national* list price, which is defined by federal law and must be "uniform" across the United States. Answer ¶ 24. By imposing adverse consequences on out-

Page 2 -    PLAINTIFF'S MOTION FOR PARTIAL SUMMARY JUDGMENT

MB LAW GROUP, LLP
Attorneys at Law
117 SW Taylor Street, Suite 200
Portland, OR 97204
Telephone: 503-914-2015
Facsimile: 503-914-1725

of-state transactions, HB 4005 directly restricts commerce that takes place beyond Oregon's borders, something the Commerce Clause forbids a state to do.

*Fourth*, HB 4005 violates the First Amendment by forcing pharmaceutical manufacturers (but no other participants in the prescription-drug market) to create reports justifying their pricing decisions. These reports, which DCBS publishes on the internet, impermissibly require manufacturers not only to disclose pricing information and justifications—speech the manufacturers maintain should not be compelled—but to endorse the State's preferred message that they are solely to blame for increases in drug prices. Government-compelled speech of that nature infringes core First Amendment protections: Oregon may not compel manufacturers to endorse messages with which the manufacturers disagree.

For each of these reasons, summary judgment should be granted invalidating HB 4005.

## BACKGROUND

**A.    PhRMA's Members Spend Billions to Develop Innovative Medicines in Reliance on Legal Protections for Their Intellectual Property**

PhRMA is a trade association whose members develop cutting-edge medicines prescribed by doctors and used by patients throughout the nation, including in Oregon. Last year, the Food and Drug Administration approved a record 59 new drugs,[1] and PhRMA members were responsible for much of that innovation.[2] Pharmaceutical manufacturers invest huge sums— billions annually—to research, test, manufacture, and ultimately distribute these new products. Because those investments must be recovered through sales in a competitive marketplace, manufacturers depend on strong legal protection for their proprietary business information.

---

[1]    Asher Mullard, *2018 FDA Drug Approvals*, Nature (Jan. 15, 2019), https://go.nature.com/2CmHeMp.

[2]    U.S. Food & Drug Admin., *Novel Drug Approvals for 2018*, https://bit.ly/382egAv; FDA, *Novel Drug Approvals for 2019*, https://bit.ly/37UXgMu.

Page 3 -    PLAINTIFF'S MOTION FOR PARTIAL SUMMARY JUDGMENT

MB LAW GROUP, LLP
Attorneys at Law
117 SW Taylor Street, Suite 200
Portland, OR 97204
Telephone: 503-914-2015
Facsimile: 503-914-1725

### 1. Manufacturers invest heavily in new drugs

As the FDA has recognized, novel drugs "frequently provide important new therapies for patients."[3]  Biopharmaceutical companies use new technologies and advances in scientific knowledge to develop groundbreaking therapies for combatting—and potentially curing—devastating diseases.  Researchers, for example, are currently developing:  almost 300 medicines and vaccines that use the immune system to combat cancer; and "novel treatment[s] … for the potential to reverse brain damage suffered from a stroke."[4]  And of particular note at present, PhRMA's members are at the forefront of efforts to develop vaccines to combat COVID-19 and treatments to mitigate its effects; in collaboration with federal and state agencies, manufacturers are already scaling up the capacities required to test and produce those life-saving medicines.[5]

The cost of all this innovation is staggering.  Pharmaceutical manufacturers invest billions of dollars each year on research and development.[6]  On average, a manufacturer spends 10 to 15 years—and between $1.8 and $2.8 billion—developing a single new drug.[7]  And the

---

[3]  *Id.*

[4]  America's Biopharmaceutical Cos., *Medicines in Development 2018 Report: Cancer* 5–6; https://onphr.ma/2RdP0RN; America's Biopharmaceutical Cos., *Medicines in Development 2018 Report: Heart Disease & Stroke* 3, https://onphr.ma/2RqcgMq.

[5]  *Hearing on an Emerging Disease Threat: How the U.S. Is Responding to COVID-19, the Novel Coronavirus Before the S. Comm. on Health, Educ., Labor and Pensions*, 116th Cong. (2020) (statement of Dr. Robert Kadlec, Assistant Secretary for Preparedness and Response, U.S. Dep't of Health & Human Servs.), https://bit.ly/33oW5Dj; Alex Knapp, *Coronavirus Drug Update: The Latest Info on Pharmaceutical Treatments and Vaccines*, Forbes (Mar. 22, 2020), https://bit.ly/2vq3426.

[6]  *E.g.*, PhRMA, *Biopharmaceuticals in Perspective* 33 (2019), https://onphr.ma/2wy2lMP; Alexander Schuhmacher et al., *Changing R&D Models in Research-Based Pharmaceutical Companies*, 14 J. Transl. Med. 105 (2016), https://bit.ly/33KBRlT; Kim Thomas, *The Price of Health: The Cost of Developing New Medicines*, The Guardian (Mar. 30, 2016), https://bit.ly/2kliNY5.

[7]  Joseph A. DiMasi, et al., *Innovation in the Pharmaceutical Industry: New Estimates of R&D Costs*, 47 J. Health Econ. 20, 25, 31 (2016), https://bit.ly/33JtBCE; Rick Mullin, *Tufts Study*

Page 4 -    PLAINTIFF'S MOTION FOR PARTIAL SUMMARY JUDGMENT

MB LAW GROUP, LLP
Attorneys at Law
117 SW Taylor Street, Suite 200
Portland, OR  97204
Telephone: 503-914-2015
Facsimile: 503-914-1725

required investments in time and expense are continually increasing.[8]  There are many reasons why:  Clinical drug-development takes more time, as clinical trials become more complex; attempts to identify suitable molecules during early drug discovery often result in failure; attrition rates during the research phase are high; and demands by regulatory authorities and purchasers are escalating.[9]

The low likelihood of securing FDA approval substantially magnifies the risks to manufacturers.  For the most prolific developers of new drugs—that is, the most active pharmaceutical manufacturers—"95% of the experimental medicines that are studied in humans fail to be both effective and safe," leading to rejection by the FDA.[10]  Even for medicines that are approved and that do reach patients, manufacturers may not earn back the full costs of research and development.  And the increased focus on novel medicines for small patient populations only makes it harder for manufacturers to recoup their investments.  Drug treatments are becoming increasingly personalized, taking into consideration a patient's "genetic, anatomical, and physiological characteristics."[11]  These targeted drugs are often critical in treating rare illnesses, yet they cost more to develop and, in some cases, generate little financial return.

To recoup their hefty investments, pharmaceutical manufacturers must calibrate prices and market their products using proprietary methods that aim to balance competing concerns.

---

*Finds Big Rise in Cost of Drug Development*, Chem. & Eng'g News (Nov. 20, 2014), https://bit.ly/2LnuH0D.

[8]   Schuhmacher, *supra* note 6; Rick Mullin, *supra* note 7.

[9]   *Id.*; JP Hughes, et al., *Principles of Early Drug Discovery*, 162(6) Br. J. of Pharmacol. (2011), https://www.ncbi.nlm.nih.gov/pmc/articles/PMC3058157.

[10]   Matthew Herper, *The Cost of Creating a New Drug Now $5 Billion, Pushing Big Pharma to Change*, Forbes (Aug. 11, 2013), https://bit.ly/2m6Y2m1.

[11]   U.S. Food & Drug Admin., *Paving the Way for Personalized Medicine* 4 (2013), https://bit.ly/2PdIjwq.

Page 5 -   PLAINTIFF'S MOTION FOR PARTIAL SUMMARY JUDGMENT

MB LAW GROUP, LLP
Attorneys at Law
117 SW Taylor Street, Suite 200
Portland, OR  97204
Telephone: 503-914-2015
Facsimile: 503-914-1725

Foremost among these are promoting patients' access to life-changing medicines, while at the same time generating the capital necessary to enable continued scientific innovation. Because the drug marketplace is highly competitive—and growing more so every year—manufacturers depend on strong protections for their confidential business methods, which themselves require significant time and resources to develop.

### 2.    Protection for trade secrets:  federal Defend Trade Secrets Act

Every state in the nation has adopted legal protections for trade secrets. The vast majority—49 States, including Oregon—have adopted some form of the Uniform Trade Secrets Act (UTSA), which codifies the common-law tort of misappropriation of confidential information. The UTSA defines a "trade secret" as information that "derives independent economic value" from not being "generally known," and that has been protected by "efforts that are reasonable under the circumstances to maintain its secrecy." UTSA § 1(4); *see* ORS 646.461(4). To protect trade secrets, the UTSA authorizes suit to stop a "misappropriation," defined to include several types of "disclosure or use of a trade secret of another." UTSA § 1(2)(ii).

In 2016, Congress enacted the Defend Trade Secrets Act. Legislators understood that federal protection was necessary because "trade secrets are increasingly becoming the foundation of businesses across the country, with one estimate placing the value of trade secrets in the United States at $5 trillion." 162 Cong. Rec. H2028, H2033 (2016) (statement of Rep. Nadler). "With so much at stake, it is absolutely vital … [to] include strong protections." *Id*. "By improving trade secret protection," Congress intended the DTSA to "incentivize future

Page 6 -    PLAINTIFF'S MOTION FOR PARTIAL SUMMARY JUDGMENT

MB LAW GROUP, LLP
Attorneys at Law
117 SW Taylor Street, Suite 200
Portland, OR  97204
Telephone: 503-914-2015
Facsimile: 503-914-1725

innovation while protecting and encouraging the creation of American jobs."  S. Rep. No. 114-220, at 3.

Although every state protects trade secrets, Congress saw the need to give businesses engaged in interstate commerce a uniform remedy for misappropriation.  *See* H.R. Rep. No. 114-529, at 4 (2016) ("[S]tate laws vary in a number of ways and contain built-in limitations that make them not wholly effective in a national and global economy.").  The DTSA thus creates a federal private right of action for misappropriation of trade secrets "related to a product or service used in, or intended for use in, interstate or foreign commerce."  Pub. L. No. 114-153, § 2 (2016) (codified at 18 U.S.C. § 1836(b)).  The broad federal definition of "trade secret" under the DTSA was modeled on the UTSA:  It covers "all forms and types of financial, business, scientific, technical, economic, or engineering information," no matter in what form, so long as the owner has "taken reasonable measures to keep such information secret," and the information "derives independent economic value, actual or potential, form not being generally known" by others.  18 U.S.C. § 1839(3)(A)(i).

The DTSA is designed to allow businesses "to move quickly to Federal court … to stop trade secrets from winding up being disseminated and losing their value."  H.R. Rep. No. 114-529, at 6; *accord* S. Rep. No. 114-220, at 3.  It authorizes private civil actions by trade-secret owners, who can obtain injunctive relief "to prevent any actual or threatened misappropriation" of a trade secret, as well as compensatory and exemplary damages.  18 U.S.C. § 1836(b)(3).  The DTSA also empowers a court to "enter such orders and take such other action as may be necessary and appropriate to preserve the confidentiality of trade secrets."  *Id.* § 1835(a).

Page 7 -    PLAINTIFF'S MOTION FOR PARTIAL SUMMARY JUDGMENT

MB LAW GROUP, LLP
Attorneys at Law
117 SW Taylor Street, Suite 200
Portland, OR  97204
Telephone: 503-914-2015
Facsimile: 503-914-1725

### B.      HB 4005 Forces Drug Manufacturers to Publicly Reveal Their Trade Secrets

On February 28, 2018, the Oregon Legislative Assembly passed the Prescription Drug Price Transparency Act, 2018 Or. L. Ch. 7, commonly known as HB 4005. The law imposes numerous requirements on a manufacturer of any "prescription drug that is sold in [Oregon]." *Id.* § 2(1)(e). The regime forces manufacturers to provide periodic reports with confidential information about the development, pricing, and marketing of new and existing prescription drugs. It also authorizes DCBS to disclose and disseminate that information publicly.

#### 1.      Reporting requirements

For existing prescription drugs, HB 4005's reporting requirements apply whenever "[t]he price was $100 or more for a one-month supply or for a course of treatment lasting less than one month," if the drug's net price increased by 10% or more over the preceding calendar year. *Id.* § 2(2). The law defines "price" to mean the drug's "wholesale acquisition cost as defined in 42 U.S.C. § 1395w-3a(c)(6)(B)"—that is, the drug's federally defined, national list price (often referred to as its WAC). *Id.* § 2(1)(i).

For each covered prescription drug, manufacturers must submit to DCBS annual reports that include the following information:

- the net increase in price over the course of the previous calendar year;

- the factors that contributed to the price increase;

- the research and development costs that were paid using public funds;

- the direct costs incurred in manufacturing, marketing, and distributing the drug, as well as the costs of ongoing safety and effectiveness research;

- the total sales revenue and profit during the previous calendar year;

- the introductory price when the drug was approved for marketing by the FDA and the net yearly increase, by calendar year, in price during the previous five years;

Page 8 -    PLAINTIFF'S MOTION FOR PARTIAL SUMMARY JUDGMENT

MB LAW GROUP, LLP
Attorneys at Law
117 SW Taylor Street, Suite 200
Portland, OR 97204
Telephone: 503-914-2015
Facsimile: 503-914-1725

- the 10 highest prices paid in other countries during the previous calendar year;

- any other information relevant to the price increase; and

- all documentation necessary to support the information reported.

*Id.* § 2(3). DCBS regulations further require manufacturers to include, in their reports, "a narrative description and explanation of all major financial and nonfinancial factors that influenced the decision to increase the wholesale acquisition cost of the drug product and to decide on the amount of the increase." Or. Admin. Code 836-200-0530(2)(h).

HB 4005 also imposes additional reporting obligations. Pharmaceutical manufacturers must provide DCBS with detailed information annually regarding all patient-assistance programs involving covered drugs that are offered to Oregon consumers. 2018 Or. L. Ch. 7 § 2(5). And when a manufacturer launches a *new* prescription drug, if the price "exceeds the threshold established by the Centers for Medicare and Medicaid Services for specialty drugs in the Medicare Part D program," the manufacturer must report the following to DCBS within 30 days, regardless of whether the drug has been sold in Oregon:

- a description of the marketing used in the introduction of the drug;

- the methodology used to establish the price of the drug;

- if the drug was not developed by the manufacturer, the price paid to acquire the drug and the date of acquisition;

- the manufacturer's estimate of the average number of patients who will be prescribed the drug each month; and

- the research and development costs paid using public funds.

*Id.*

All reports—for new and existing drugs and for patient-assistance programs—must be made "in the form and manner prescribed by [DCBS]." *Id.* § 2(3), (6). DCBS may demand that

Page 9 -   PLAINTIFF'S MOTION FOR PARTIAL SUMMARY JUDGMENT

MB LAW GROUP, LLP
Attorneys at Law
117 SW Taylor Street, Suite 200
Portland, OR 97204
Telephone: 503-914-2015
Facsimile: 503-914-1725

manufacturers further substantiate their required reports with "supporting documentation or additional information concerning the report." *Id.* § 2(7)(a). And DCBS "may use any prescription drug price information [DCBS] deems appropriate to verify that manufacturers have properly reported price increases as required." *Id.* § 2(4). Manufacturers that fail to submit timely reports, provide required information, or respond in a timely manner to any request may face fines of up to $10,000 per day. *Id.* § 3(2); *see* Or. Admin. Code 836-200-0560.

HB 4005's reporting requirements for new drugs became operative on March 15, 2019, and for existing drugs on July 1. 2018 Or. L. Ch. 7 §§ 13(3), 15. According to DCBS, pharmaceutical manufacturers submitted 534 price-increase reports on the first day of required reporting for existing drugs, and submitted 196 reports for new drugs within the first six months of the law's operation. DCBS, *Prescription Drug Price Transparency Results and Recommendations* at 20, 22 (2019).[12] PhRMA's members have made timely disclosures in accordance with HB 4005's reporting requirements. Answer ¶¶ 90, 91.

### 2. Public disclosure of reported information

HB 4005 directs DCBS to "post to its website" all of the information that pharmaceutical manufacturers are required to report: the drug-pricing disclosures, 2018 Or. L. Ch. 7 § 2(3), the patient-assistance program disclosures, *id.* § 2(5), and the new-drug disclosures, *id.* § 2(6). *See id.* § 2(9)(b). DCBS also must post on its website all of the prescription drugs that meet the law's reporting thresholds and the names of the drugs' manufacturers. *Id.* § 2(9)(a).

The internet-posting requirement applies unless (1) the relevant information is "conditionally exempt from disclosure under ORS 192.345 as a trade secret," and (2) DCBS

---

[12] https://dfr.oregon.gov/drugtransparency/Documents/Prescription-Drug-Price-Transparency-Annual-Report-2019.pdf.

Page 10 - PLAINTIFF'S MOTION FOR PARTIAL SUMMARY JUDGMENT

MB LAW GROUP, LLP
Attorneys at Law
117 SW Taylor Street, Suite 200
Portland, OR 97204
Telephone: 503-914-2015
Facsimile: 503-914-1725

determines that "the public interest does not require disclosure of the information." *Id.* § 2(10)(a). The referenced statute, ORS 192.345, contains protection for trade secrets under Oregon's Public Records Law. Modeled on the UTSA's definition, it broadly defines a "trade secret" as "any formula, plan, pattern, process, tool, mechanism, compound, procedure, production data, or compilation of information which is not patented, which is known only to certain individuals within an organization and which is used in a business it conducts, having actual or potential commercial value, and which gives its user an opportunity to obtain a business advantage over competitors who do not know or use it." *Cf.* ORS 646.461(4) (defining "trade secret" under the Oregon Uniform Trade Secrets Act).

HB 4005 thus creates an exception to existing state-law protections for manufacturers' trade secrets. DCBS must publish these trade secrets whenever DCBS deems publication to be in the "public interest." 2018 Or. L. Ch. 7 § 2(10)(a). DCBS has adopted regulations to implement this provision. *See* Or. Admin. Code 836-200-0540. To request that information be exempted from disclosure, the manufacturer must file, along with its report, a written explanation demonstrating the following:

(A) The information is not patented;

(B) The information is known only to certain individuals within the manufacturer's organization and used in a business the organization conducts;

(C) The information has actual or potential commercial value;

(D) The information gives the manufacturer an opportunity to obtain a business advantage over competitors who do not know or use it; and

(E) *The public interest does not require disclosure of the information.*

*Id.* § (1)(b) (emphasis added). The regulations do not clarify what information the "public interest" requires to be disclosed.

Page 11 -   PLAINTIFF'S MOTION FOR PARTIAL SUMMARY JUDGMENT

MB LAW GROUP, LLP
Attorneys at Law
117 SW Taylor Street, Suite 200
Portland, OR  97204
Telephone: 503-914-2015
Facsimile: 503-914-1725

If DCBS decides to publish information claimed to be a trade secret, a manufacturer has only 15 days to request reconsideration from DCBS's Director. *Id.* §§ (3), (4). If, on the other hand, DCBS declines to publish the information, then it must post to its website "a report describing the nature of the information and the [D]epartment's basis for withholding the information from disclosure." 2018 Or. L. Ch. 7 § 2(10)(b).

## C.     This Suit

On December 9, 2019, PhRMA filed a complaint challenging both HB 4005 and House Bill No. 2658, 2019 Or. L. Ch. 436 (Advance Notification Law). The Advance Notification Law requires manufacturers to provide 60 days' notice before increasing the WAC of certain brand-name medicines. Compl. ¶¶ 41–48. PhRMA alleges that the Advance Notification Law violates the dormant Commerce Clause, because it authorizes a single state (Oregon) to freeze the list price for drugs sold nationwide for a 60-day period. *Id.* ¶¶ 49-57, 96-98. PhRMA also alleges that the Advance Notification law violates the First Amendment, by forcing manufacturers to create statements in defense of their drug-pricing decisions, in terms that endorse Oregon's preferred message that manufacturers are solely responsible for high prices. *Id.* ¶¶ 58-66, 99-102.

On March 9, 2020, the parties entered into a joint stipulation, *see* ECF No. 22, staying claims challenging Oregon's Advance Notification Law pending the resolution of PhRMA's challenge to a similar law enacted by California, *PhRMA v. David*, No. 2:17-cv-02573-MCE-KJN (E.D. Cal. July 31, 2019). In that case, the district court denied California's motion to dismiss, ruling that PhRMA had properly alleged that California's law "compels [PhRMA's] members to speak when they would rather remain silent, contrary to the First Amendment"; and

Page 12 -   PLAINTIFF'S MOTION FOR PARTIAL SUMMARY JUDGMENT

MB LAW GROUP, LLP
Attorneys at Law
117 SW Taylor Street, Suite 200
Portland, OR  97204
Telephone: 503-914-2015
Facsimile: 503-914-1725

that the law's "notice requirements improperly impact the nationwide WAC list prices of prescription drugs, contrary to the Commerce Clause." *Id.*, slip op. at 1 (citations omitted). Summary judgment briefing in that case is ongoing.

The parties here further agreed that, as to HB 4005, summary judgment is the proper mechanism for resolving PhRMA's claims. ECF No. 22. The parties also agreed to forgo disclosures under Rule 26(a)(1). *Id.* Finally, in light of the parties' shared interest in an expeditious resolution of this case, they agreed to an expedited briefing schedule, which the Court adopted in a scheduling order. ECF No. 24.

## STANDARD OF REVIEW

Under Federal Rule of Civil Procedure 56(a), "[t]he court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." A plaintiff moving for summary judgment "has the initial burden of establishing the absence of a genuine issue of fact on each issue material to its case." *C.A.R. Transp. Brokerage Co. v. Darden Rests., Inc.*, 213 F.3d 474, 480 (9th Cir. 2000). To make that showing, the plaintiff may rely upon "admissions in the pleadings," which "are generally binding on the parties and the Court." *Am. Title Ins. v. Lacelaw Corp.*, 861 F.2d 224, 226 (9th Cir. 1988). To defeat summary judgment, the opposing party must "do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986)

MB LAW GROUP, LLP
Attorneys at Law
117 SW Taylor Street, Suite 200
Portland, OR 97204
Telephone: 503-914-2015
Facsimile: 503-914-1725

## ARGUMENT

I. **HB 4005'S PUBLIC-INTEREST EXCEPTION FACIALLY VIOLATES THE FIFTH AMENDMENT'S TAKINGS CLAUSE**

The Fifth Amendment provides that "private property [shall not] be taken for public use, without just compensation." This proscription, which applies to the States through the Fourteenth Amendment, is "designed to bar Government from forcing some people alone to bear public burdens which, in all fairness and justice, should be borne by the public as a whole." *First English Evangelical Lutheran Church of Glendale v. Los Angeles Cty.*, 482 U.S. 304, 318-19 (1987) (quotation marks omitted). The Takings Clause thus prevents public officials from taking or destroying the value of private property unless they simultaneously provide adequate compensation.

HB 4005 creates a public-interest exception to trade-secret protections. The law violates the Takings Clause because it requires pharmaceutical manufacturers to provide—and DCBS to publish online—manufacturers' confidential and proprietary business information, whenever DCBS deems disclosure to be in the "public interest." 2018 Or. L. Ch. 7 § 2(10)(a)(B). Publication of a trade secret is equivalent to its destruction. Each time the government invokes the public-interest exception, therefore, it deprives a manufacturer of existing state-law protections and destroys the trade secret's *entire* value, working an unconstitutional taking of property for which Oregon offers no compensation.

A. **Drug Manufacturers Have Constitutionally Protected Property Rights in the Confidentiality of Their Trade Secrets, Which Publication Destroys**

As its text indicates, the Fifth Amendment protects all forms of "private property." Although many Takings Clause cases arise in the context of laws that affect real estate, the protection extends to personal property. Thus, the Supreme Court has on repeated occasions

Page 14 - PLAINTIFF'S MOTION FOR PARTIAL SUMMARY JUDGMENT

MB LAW GROUP, LLP
Attorneys at Law
117 SW Taylor Street, Suite 200
Portland, OR 97204
Telephone: 503-914-2015
Facsimile: 503-914-1725

recognized the Clause's application to "intangible property rights protected by state [or federal] law." *Ruckelshaus*, 467 U.S. at 1003; *see, e.g.*, *Armstrong v. United States*, 364 U.S. 40, 49 (1960) (mechanic's lien); *Kimball Laundry Co. v. United States*, 338 U.S. 1, 10 (1949) (business's "going concern value"); *Lynch v. United States*, 292 U.S. 571, 579 (1934) (contractual rights); *United States v. Palmer*, 128 U.S. 262, 271 (1888) (patent rights).

In *Ruckelshaus*, the Supreme Court expressly ruled that trade secrets are a constitutionally protected form of private property. At issue there were "health, safety, and environmental data" that pesticide manufacturers were required to submit to EPA under federal law. 467 U.S. at 998. Manufacturers had developed and given EPA their data, which were protected by state trade-secret laws, under conditions designed "to ensure [their] secrecy." *Id.* at 998. But a statutory amendment added a new "public disclosure" provision, which authorized EPA to publish the data to any competitor who agreed to pay a reasonable price for it. *Id.* at 992. Monsanto, a pesticide manufacturer subject to the disclosure requirement, sued under the Takings Clause on the ground that disclosure of its data interfered with its "property interest protected by the Fifth Amendment." *Id.* at 1000.

The Supreme Court agreed. Drawing on authorities dating back to English common law, the Court explained that the constitutional "notion of 'property' … extends beyond land and tangible goods and includes the products of an individual's 'labour and invention.'" *Id.* at 1003 (quoting 2 William Blackstone, *Commentaries on the Laws of England* 405 (1769)). That includes "[t]rade secrets," a long-recognized form of intellectual property that "ha[s] many of the characteristics of more tangible forms of property." *Id.* at 1002. Monsanto's trade secrets were accordingly "deserving of the protection of the Taking Clause." *Id.* at 1003. Numerous courts,

MB LAW GROUP, LLP
Attorneys at Law
117 SW Taylor Street, Suite 200
Portland, OR  97204
Telephone: 503-914-2015
Facsimile: 503-914-1725

Case 6:19-cv-01970-AA Document 25 Filed 03/24/2016 Page 26 of 49
Case 24-1976, 07/05/2024, DktEntry 16.1, Page 166 of 261

**E.R.-166**

both before and after *Ruckelshaus*, have similarly afforded constitutional protection to trade secrets. *See, e.g.*, *Philip Morris, Inc. v. Reilly*, 312 F.3d 24, 31-33 (1st Cir. 2002) (en banc) (ingredient list for tobacco products); *St. Michael's Convalescent Hosp. v. California*, 643 F.2d 1369, 1374 (9th Cir. 1981) (cost information of healthcare provider).

The value of a trade *secret*, as the name suggests, depends on preserving its *secrecy*. "The right to exclude others is generally one of the most essential sticks in the bundle of rights," and for a trade secret "the right to exclude others is central to the very definition of the property interest." *Ruckelshaus*, 467 U.S. at 1011. Once the trade secret has been disclosed "to others who are under no obligation to protect the confidentiality of the information," "[the] property right is extinguished." *Id.* at 1002. Thus, in *Ruckelshaus*, the Supreme Court held that forcing Monsanto to disclose proprietary business data to its competitors had "destroy[ed]" the value of that data and amounted to a taking. *Id.* at 1012. And in *St. Michael's*, the Ninth Circuit held that even the government's "failure to provide adequate protection to assure [a trade secret's] confidentiality … can amount to [an] unconstitutional 'taking' of property by destroying it, or by exposing it to the risk of destruction by public disclosure or by disclosure to competitors." 643 F.2d at 1374 (brackets and citation omitted).

Accordingly, when a law compels businesses to turn over their proprietary information, and also authorizes the government to publish that information, the law has been deemed a taking on its face. The Supreme Court's takings jurisprudence has sometimes distinguished between per se or "categorical" takings, in which governmental regulation "denies all economically beneficial or productive use" of property, *Lucas v. S.C. Coastal Council*, 505 U.S. 1003, 1015 (1992), and so-called "regulatory" takings, which "fall short of eliminating all

MB LAW GROUP, LLP
Attorneys at Law
117 SW Taylor Street, Suite 200
Portland, OR  97204
Telephone: 503-914-2015
Facsimile: 503-914-1725

economically beneficial use," *Palazzolo v. Rhode Island*, 533 U.S. 606, 617 (2001). The former category always requires just compensation without further inquiry, while the latter obliges a court to evaluate "factors" such as "the regulation's economic effect on the [property-holder], the extent to which the regulation interferes with reasonable investment-backed expectations, and the character of the government action." *Id.* (citing *Penn Cent. Transp. Co. v. City of New York*, 438 U.S. 104, 124 (1978)).

Laws that compel the publication of trade secrets are properly considered "categorical" takings. For one thing, such laws "deprive [the] owner of *all* economically beneficial use of her property." *Lingle v. Chevron USA Inc.*, 544 U.S. 528, 538 (2005) (brackets and quotation marks omitted). As the Supreme Court has explained, "total deprivation of beneficial use is, from the [owner's] point of view, the equivalent of a physical appropriation." *Lucas*, 505 U.S. at 1017; *see Lingle*, 544 U.S. at 539 ("[T]he complete elimination of a property's value is the determinative factor."). For another thing, the forced publication of trade secrets, like the physical invasion of real property, "eviscerates the owner's right to exclude others from … using her property—perhaps the most fundamental of all property interests." *Lingle*, 544 U.S. at 539; *see Kaiser Aetna v. United States*, 444 U.S. 164, 179-80 (1979) ("[T]he 'right to exclude,' so universally held to be a fundamental element of the property right, falls within this category of interests that the Government cannot take without compensation."). As to both types of property—trade secrets and land—the value "is inextricably tied to both the demand of others for access and the legal enforceability of the owner's right to exclude." *Reilly*, 312 F.3d at 51 (Selya, J., concurring). There is accordingly "no principled reason to refrain from extending per se takings analysis to alleged takings of trade secrets." *Id.*; *see Nixon v. United States*, 978 F.2d

Page 17 -   PLAINTIFF'S MOTION FOR PARTIAL SUMMARY JUDGMENT

MB LAW GROUP, LLP
Attorneys at Law
117 SW Taylor Street, Suite 200
Portland, OR  97204
Telephone: 503-914-2015
Facsimile: 503-914-1725

1269, 1284 (D.C. Cir. 1992) (government's attempt to exclude personal property from "the *per se* takings doctrine … fails for want of authority or logic").

Even if a forced-disclosure law were merely considered a "regulatory" taking, however, it would still constitute a taking on its face.  In *Ruckelshaus*, the Supreme Court recited the familiar *Penn Central* factors, but ultimately considered only one of them—the effect on manufacturers' investment-backed expectations—because "the force of this factor [was] so overwhelming."  467 U.S. at 1005.  "Once the data that constitute a trade secret are disclosed to others," the Court explained, "the holder of the trade secret has lost his property interest in the data."  *Id.* at 1011.  In other words, because every operation of the law led to the complete destruction of the property's value, the law on its face effected a taking.  The Court accordingly held that Monsanto's data, if it otherwise qualified for trade-secret protection under Missouri law, could not be published without compensation.  *Id.* at 1013; *see Reilly*, 312 F.3d at 51 (Selya, J., concurring) (explaining that *Ruckelshaus* established a categorial rule); *see also id.* at 52 (Lipez, J., dissenting) (acknowledging the majority's "facial" ruling that "mere enactment of the Disclosure Act constituted a taking" (brackets and quotation marks omitted)).

**B.      HB 4005 Violates the Takings Clause Every Time It Requires Disclosure of a Manufacturer's Trade Secrets**

HB 4005's public-interest exception, by requiring publication of a manufacturer's "trade secrets" whenever DCBS deems disclosure to be in the "public interest," 2018 Or. L. Ch. 7 § 2(10)(a)(B), effects a taking of private property on its face.

Like every other state, Oregon has long afforded protection to trade secrets, investing their owners with property rights enforceable through civil litigation.  *See* Oregon Uniform Trade Secrets Act, ORS 646.461 to .475; *cf.* ORS 307.020(1)(a)(I) (deeming "[t]rade secrets," for

Page 18 -   PLAINTIFF'S MOTION FOR PARTIAL SUMMARY JUDGMENT

MB LAW GROUP, LLP
Attorneys at Law
117 SW Taylor Street, Suite 200
Portland, OR  97204
Telephone: 503-914-2015
Facsimile: 503-914-1725

purposes of Oregon tax law, as a form of "[i]ntangible personal property"). HB 4005 uses a nearly identical definition of "trade secret." *Compare* ORS 646.461(4) (definition under Oregon Uniform Trade Secrets Act), *with* ORS 192.345(2) (definition under HB 4005). Both definitions apply to a wide variety of confidential business information that "is known only to certain individuals," has "actual or potential commercial value," and affords its possessor "a business advantage over competitors who do not know or use it." ORS 192.345(2). Any data that qualifies as a trade secret under HB 4005 thus will also, as a matter of law, qualify for trade-secret protection under Oregon property law. And since the public-interest exception applies exclusively to drug manufacturers' "trade secret[s]," 2018 Or. L. Ch. 7 § 10(a)(A), the exception will result in disclosure of a trade secret—otherwise protected under state law—every time DCBS invokes it. Or put another way: The *only* information DCBS can publish under the public-interest exception are trade secrets; the exception applies to no other kind of data.

There is accordingly no constitutionally valid application of the public-interest exception. Just as the disclosure laws at issue in *Ruckelshaus* and *Reilly* did, therefore, HB 4005 takes private property without just compensation in every instance of disclosure under the public-interest exception. Each publication by DCBS invariably means that "the holder of the trade secret has lost his property interest in the data." *Ruckelshaus*, 467 U.S. at 1011. Indeed, the taking here is even more aggressive than in those cases, where the statutes did not expressly strip legal protection from the information, and the government was permitted but not required to disclose it. And as in those cases, publication here means the destruction of *all* "investment-backed expectations"—a "factor" that is "so overwhelming" as to render unnecessary any further

Page 19 - PLAINTIFF'S MOTION FOR PARTIAL SUMMARY JUDGMENT

MB LAW GROUP, LLP
Attorneys at Law
117 SW Taylor Street, Suite 200
Portland, OR 97204
Telephone: 503-914-2015
Facsimile: 503-914-1725

inquiry. *Id.* at 1005; *see Reilly*, 312 F.3d at 42 ("The Disclosure Act essentially destroys the tobacco companies' trade secrets."); *id.* at 49-50 (Selya, J. concurring).

Consideration of the other two *Penn Central* factors would only reinforce the conclusion that HB 4005 takes private property. The "character of the governmental action" at issue here weighs heavily against its constitutionality. *Penn Central*, 438 U.S. at 124. Disclosure of trade secrets under the public-interest exception is "not a mere 'consequential incidence' of a valid regulatory measure," *Armstrong*, 364 U.S. at 48, but in fact the exception's *sole* purpose and effect. As the Supreme Court said of the liens destroyed by the government in *Armstrong*, prior to the law's operation, property-holders "admittedly had compensable property. Immediately afterwards, they had none. This was not because their property vanished into thin air. It was because the Government for its own advantage destroyed the value of the [property]." *Id.* HB 4005 destroys the value of pharmaceutical manufacturers' property in precisely the same way.

Eliminating trade-secret protection for pharmaceutical manufacturers' confidential information will also have a profound "economic impact," *Penn Central*, 438 U.S. at 124, not only on manufacturers subject to the disclosure requirements, but also on the national market for prescription drugs. The information covered by HB 4005 spans a wide array of sensitive business data, including: production, marketing, and distribution costs; pricing data; and sales revenue and profit data. 2018 Or. L. Ch. 7 § 2(3); *see id.* § 2(5) (similar for patient-assistance programs); *id.* § 2(6) (similar for new drugs). These are some of the most sensitive data that businesses have—used by manufacturers to make strategic choices about how to recoup their multi-billion-dollar investments in the products they have developed. Courts uniformly recognize the value of this type of information. *See, e.g., Nike, Inc. v. McCarthy*, 285 F. Supp.

Page 20 -   PLAINTIFF'S MOTION FOR PARTIAL SUMMARY JUDGMENT

MB LAW GROUP, LLP
Attorneys at Law
117 SW Taylor Street, Suite 200
Portland, OR 97204
Telephone: 503-914-2015
Facsimile: 503-914-1725

2d 1242, 1245 (D. Or. 2003) ("confidential marketing and product information"), *aff'd*, 379 F.3d 576 (9th Cir. 2004); *IKON Office Sols., Inc. v. Am. Office Prods., Inc.*, 178 F. Supp. 2d 1154, 1169–70 (D. Or. 2001) ("pricing information and marketing strategy"); *Pelican Bay Forest Prods., Inc. v. W. Timber Prods., Inc.*, 443 P.3d 651, 658 (Or. Ct. App. 2019) (customer information). HB 4005 thus requires drug companies to give their competitors an unprecedented window into their internal decision-making.

Loss of trade-secret protection will also put pharmaceutical manufacturers at a disadvantage vis-à-vis "purchasers, both public and private, as well as pharmacy benefit managers," when "negotiat[ing] discounts and rebates for prescription drugs." 2018 Or. L. Ch. 7 (preamble). Indeed, that was the point: HB 4005 expressly states that the purpose of forcing disclosure is to tilt the marketplace towards purchasers and away from manufacturers. *See id.* Whatever the merits of that goal as a policy matter, the State may not achieve it by "forcing [manufacturers] alone to bear [the] public burden." *First English*, 482 U.S. at 318-19 (citation omitted). And all of these adverse effects extend well beyond Oregon. For trade secrets, as noted above, disclosure anywhere means disclosure everywhere. *See supra* pp. 21-22. HB 4005 thus nullifies manufacturers' rights under the property laws of all 50 States.

In sum, because forced disclosures under the public-interest exception necessarily involve trade secrets; because the law not only lacks confidentiality safeguards, but also affirmatively nullifies those trade secrets; and because manufacturers receive no compensation for this deprivation, HB 4005's public-interest exception violates the Takings Clause on its face. *See Hodel v. Va. Surface Mining & Reclamation Ass'n.* 452 U.S. 264, 295-96 (1981) ("The test to be applied in considering this facial challenge is fairly straightforward. A statute regulating

MB LAW GROUP, LLP
Attorneys at Law
117 SW Taylor Street, Suite 200
Portland, OR 97204
Telephone: 503-914-2015
Facsimile: 503-914-1725

the uses that can be made of property effects a taking if it denies an owner economically viable use of his [property]." (quotation marks omitted)).

## II. FEDERAL TRADE-SECRET LAW PREEMPTS HB 4005

"A fundamental principle of the Constitution is that Congress has the power to preempt state law." *Crosby v. Nat'l Foreign Trade Council*, 530 U.S. 363, 372 (2000) (citing the Supremacy Clause, Art. VI, cl. 2). State enactments that conflict with federal law accordingly "must yield." *Id.* HB 4005 conflicts with the federal trade-secret statute—the Defend Trade Secrets Act of 2016—for two reasons. First, the disclosure mandated by HB 4005 constitutes "misappropriation" of a trade secret under federal law, such that compliance with both statutes would be impossible. Second, even if compliance with both were technically possible, Oregon's disclosure law, which nullifies the very same trade secrets that federal law protects, stands as an obstacle to the full accomplishment of the DTSA's purposes and objectives. Either conflict would be sufficient to render HB 4005 preempted and thus unenforceable.

### A. Disclosure Under HB 4005 Is Misappropriation Under the DTSA

"When federal law forbids an action that state law requires," then "the state law is 'without effect,'" because federal law preempts it. *Mut. Pharm. Co. v. Bartlett*, 570 U.S. 472, 486 (2013) (quoting *Maryland v. Louisiana*, 451 U.S. 725, 746 (1981)). That is the case here: The DTSA forbids trade-secret "misappropriation," and every disclosure under HB 4005's public-interest exception qualifies as a DTSA "misappropriation." Compliance with state law would therefore contravene federal law—a conflict that the Supremacy Clause resolves in favor of the federal enactment.

Although every state in the country protects trade secrets, Congress enacted the DTSA because variation among state laws was undermining their "effective[ness]" in protecting

Page 22 -   PLAINTIFF'S MOTION FOR PARTIAL SUMMARY JUDGMENT

MB LAW GROUP, LLP
Attorneys at Law
117 SW Taylor Street, Suite 200
Portland, OR 97204
Telephone: 503-914-2015
Facsimile: 503-914-1725

businesses operating "across state lines." H.R. Rep. No. 114-529, at 4. Congress recognized, too, that destruction of a trade secret through disclosure causes irreparable harm: "[U]nlike patents, once this information is disclosed it instantly loses its value and the property right itself ceases to exist." 162 Cong. Rec. at H2034 (statement of Rep. Lee). Congress accordingly resolved to "provide a single, national standard for trade secret misappropriation," and to create an enforceable right under federal law "to move quickly to Federal court … to stop trade secrets from winding up being disseminated and losing their value." H.R. Rep. No. 114-529, at 6; *accord* S. Rep. No. 114-220, at 3.

The resulting legislation, the DTSA, is "[c]arefully balanced to ensure an effective and efficient remedy for trade secret owners." H.R. Rep. No. 114-529, at 6. The statute broadly defines a "trade secret" as comprising "all forms and types of financial, business, scientific, technical, economic, or engineering information," if the information meets two requirements: the owner "has taken reasonable measures to keep such information secret"; and the information "derives independent economic value, actual or potential, from not being generally known." 18 U.S.C. § 1839(3). The DTSA's centerpiece is its prohibition on "misappropriation," which covers several ways that a trade secret might be disclosed and thus destroyed. As relevant here, misappropriation includes the "disclosure or use of a trade secret of another without express or implied consent by a person who … at the time of disclosure or use, knew or had reason to know that the knowledge of the trade secret was … derived from or through a person who owed a duty to the person seeking relief to maintain the secrecy of the trade secret." *Id.* § 1839(5)(B).

Recognizing that trade-secret owners are best positioned to protect their own property, Congress authorized private suits to stop misappropriation. *Id.* § 1836(b). An owner may thus

Page 23 -   PLAINTIFF'S MOTION FOR PARTIAL SUMMARY JUDGMENT

MB LAW GROUP, LLP
Attorneys at Law
117 SW Taylor Street, Suite 200
Portland, OR  97204
Telephone: 503-914-2015
Facsimile: 503-914-1725

bring a civil action seeking an injunction "to prevent any actual or threatened misappropriation" and damages, including exemplary damages. *Id.* § 1386(b)(3)(A)(i), (B). Finally, Congress instructed that a court "*shall* enter such orders and take such other action as may be necessary and appropriate to preserve the confidentiality of trade secrets." *Id.* § 1835(a) (emphasis added).

HB 4005 conflicts with federal law because it requires disclosure of the very same information that the DTSA protects. Each statute defines "trade secret" in broad, nearly identical terms, to include a range of closely held business information that derives value from its confidentiality. That definitional alignment is to be expected: Both the federal and state definitions derive from the UTSA. *Supra* pp. 11, 16-17. A "trade secret" under the DTSA is a "trade secret" under HB 4005.

Whenever HB 4005's public-interest exception applies, therefore, it violates the DTSA's prohibition on trade-secret "misappropriation." Such disclosure fits the definition quoted above: Disclosure occurs "without express or implied consent" of the affected drug manufacturer. 18 U.S.C. § 1839(5)(B). And in posting such information, DCBS's Director is "[1] a person who … at the time of disclosure or use, knew or had reason to know that the knowledge of the trade secret was … derived from or through [2] a person who owed a duty to [3] the person seeking relief to maintain the secrecy of the trade secret." *Id.* In other words, the Director [person 1] acquires the trade-secret information through an official working for a drug manufacturer [person 2], and that official "owed a duty" to the manufacturer [person 3] "to maintain the secrecy of the trade secret."

Forced disclosure of a trade secret under HB 4005 is thus "misappropriation" under the DTSA. That, by itself, is sufficient to create a conflict under which the state law is preempted.

MB LAW GROUP, LLP
Attorneys at Law
117 SW Taylor Street, Suite 200
Portland, OR 97204
Telephone: 503-914-2015
Facsimile: 503-914-1725

As the Supreme Court has explained, if it is impossible to comply with "state law" duties without violating federal law (or *vice versa*), a federal/state conflict is "inherent." *PLIVA, Inc. v. Mensing*, 564 U.S. 604, 623 (2011) (plurality op.); *see Bartlett*, 570 U.S. at 491 (rejecting, for preemption purposes, any "distinction" between "'exposure to liability' and a statutory 'legal mandate'" (citation omitted)). But the DTSA also expressly treats misappropriation as a "violation" of federal law. 18 U.S.C. § 1836(a). To comply with HB 4005 is to "violat[e]" the DTSA—the very definition of a conflict under the Supremacy Clause.

### B. HB 4005 Conflicts with the Purposes and Objectives of the DTSA

Even if compliance with both the DTSA and HB 4005 were technically possible, a state law nevertheless "actually conflicts with federal law … where [the] state law 'stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress.'" *English v. Gen. Elec. Co.*, 496 U.S. 72, 79 (1990) (quoting *Hines v. Davidowitz*, 312 U.S. 52, 67 (1941)); *see Gade v. Nat'l Solid Wastes Mgmt. Ass'n*, 505 U.S. 88, 106 (1992) ("Any state legislation which frustrates the full effectiveness of federal law is rendered invalid by the Supremacy Clause." (brackets and citation omitted)). To determine whether a state statute poses an obstacle to federal policy, therefore, courts must rigorously scrutinize both the legislature's "purpose" and the "law's actual effect." *Gade*, 505 U.S. at 105 (citation omitted); *see Biotechnology Indus. v. Dist. of Columbia*, 496 F.3d 1362, 1372 (Fed. Cir. 2007) ("Our conflict inquiry is a searching one that ranges beyond the literal text of the statute."). The required inquiry is comprehensive: "[T]he entire scheme of the statute must of course be considered and that which needs must be implied is of no less force than that which is expressed." *Crosby*, 530 U.S. at 373 (citation omitted).

MB LAW GROUP, LLP
Attorneys at Law
117 SW Taylor Street, Suite 200
Portland, OR  97204
Telephone: 503-914-2015
Facsimile: 503-914-1725

HB 4005 "frustrate[s]" the DTSA's aims and deprives "its provisions [of] their natural effect." *Id.* at 373 (citation omitted).  Congress enacted the DTSA to provide a federal baseline protecting the confidential information of interstate businesses.  But whereas federal law *protects* trade secrets against disclosure, HB 4005 *requires* their disclosure whenever DCBS determines that doing so would be in the "public interest."  2018 Or. L. Ch. 7 § 2(10)(a)(B).  Each time the State invokes the public-interest exception, the result is disclosure—and thus destruction—of a DTSA-protected trade secret.  Oregon's law therefore does far more than merely "interfere with the careful balance struck by Congress," although such interference would be sufficient for preemption.  *Arizona v. United States*, 567 U.S. 387, 406 (2012).  It affirmatively "undermine[s] federal law," by extinguishing the confidentiality that federal law aims to promote.  *Id.* at 416. Little would be left of the DTSA if states could simply authorize disclosure of the very same trade secrets that the DTSA protects.

The conflict is further underscored by another DTSA provision, which specifically identifies certain state and federal laws that are *not* preempted:

> Except as provided in section 1833(b), this chapter shall not be construed to preempt or displace any other remedies, whether civil or criminal, provided by United States Federal, State, commonwealth, possession, or territory law for the misappropriation of a trade secret, or to affect the otherwise lawful disclosure of information by any Government employee under section 552 of title 5 (commonly known as the Freedom of Information Act).

18 U.S.C. § 1838.  Several features of this provision are notable.  It specifies that the DTSA is not intended "to preempt or displace … other *remedies*," including state-law remedies, "for the misappropriation of a trade secret."  *Id.* (emphasis added); *see* H.R. Rep. No. 114-529, at 13 ("[T]he remedies provided in [the DTSA] are intended to coexist with, and not to preempt, influence, or modify applicable State law governing when an injunction should issue in a trade

Page 26 -  PLAINTIFF'S MOTION FOR PARTIAL SUMMARY JUDGMENT

MB LAW GROUP, LLP
Attorneys at Law
117 SW Taylor Street, Suite 200
Portland, OR 97204
Telephone: 503-914-2015
Facsimile: 503-914-1725

E.R.-177

secret misappropriation matter."). The obvious implication is that, while Congress did not want to preempt trade secret *protections* provided by state law, Congress *did* want to preempt other, non-remedial forms of state law. And HB 4005 is the direct opposite of a state remedy for misappropriation: Rather than protecting trade secrets, it destroys them.

Other features of § 1838 reinforce the conflict. In specifying that the DTSA does not "affect the otherwise lawful disclosure of information by any Government employee under" the federal Freedom of Information Act, Congress signaled its expectation that other "disclosure[s] of information by Government employees" *would be* precluded, even if such disclosures were "otherwise lawful." In particular, Congress did *not* exempt state officials acting under state freedom-of-information laws like HB 4005. And it is especially telling that Congress, in specifying what is *not* preempted, singled out the federal Freedom of Information Act, which contains an express exemption from disclosure for "trade secrets and commercial or financial information obtained from a person and privileged or confidential." 5 U.S.C. § 552(b)(4). Thus, even where federal law authorizes disclosure by federal officials, it limits such disclosure to protect trade secrets.

Finally, HB 4005 conflicts with the "goals [of] federal law." *Arizona*, 567 U.S. at 406. "By improving trade secret protection," the DTSA aims to "incentivize future innovation while protecting and encouraging the creation of American jobs." S. Rep. No. 114-220, at 3. That purpose is obviously undermined by Oregon's law, which removes the incentives for pharmaceutical innovation by exposing a manufacturer's business strategy to its competitors. Manufacturers will therefore have less reason to invest substantial money and time in developing the type of "commercially valuable, proprietary information" that Congress viewed as "an

Page 27 -   PLAINTIFF'S MOTION FOR PARTIAL SUMMARY JUDGMENT

MB LAW GROUP, LLP
Attorneys at Law
117 SW Taylor Street, Suite 200
Portland, OR 97204
Telephone: 503-914-2015
Facsimile: 503-914-1725

integral part of the operation, competitive advantage, and financial success" of the American economy. *Id.* at 1. At a minimum, the federal and state laws evince a profound "[c]onflict in technique" regarding their treatment of trade secrets, which "can be fully as disruptive to the system Congress erected as conflict in overt policy." *Motor Coach Emps. v. Lockridge*, 403 U.S. 274, 287 (1971).

These fundamental inconsistencies cannot be avoided by relying on the DTSA's saving clause, which provides: "In General.—This chapter does not prohibit or create a private right of action for … any otherwise lawful activity conducted by a governmental entity of the United States, a State, or a political subdivision of a State." 18 U.S.C. § 1833(a)(1). This sort of broadly worded saving clause "does *not* bar the ordinary working of conflict preemption principles." *Geier v. Am. Honda Motor Co.*, 529 U.S. 861, 869 (2000). Instead, Congress typically uses such language, which is scattered throughout the U.S. Code, to indicate that federal law is not meant to "dominate the field" exclusively. *Int'l Paper Co. v. Ouellette*, 479 U.S. 481, 492 (1987). That much is made clear by the phrase "prohibit or create," which speaks in the comprehensive terms of field preemption.

Such a saving clause does not, however, override principles of conflict preemption, and the Supreme Court has repeatedly "decline[d] to give broad effect to saving clauses where doing so would upset the careful regulatory scheme established by federal law." *United States v. Locke*, 529 U.S. 89, 106 (2000); *see Int'l Paper*, 479 U.S. at 494 ("[W]e do not believe Congress intended to undermine this carefully drawn statute through a general saving clause."); *see also, e.g., AT&T Co. v. Cent. Office Tel., Inc.*, 524 U.S. 214, 227-28 (1998) (Communications Act); *Morales v. Trans World Airlines, Inc.*, 504 U.S. 374, 384-85 (1992) (Federal Aviation Act); *Chi.*

Page 28 -  PLAINTIFF'S MOTION FOR PARTIAL SUMMARY JUDGMENT

MB LAW GROUP, LLP
Attorneys at Law
117 SW Taylor Street, Suite 200
Portland, OR  97204
Telephone: 503-914-2015
Facsimile: 503-914-1725

& *Nw. Transp. Co. v. Kalo Brick & Tile Co.*, 450 U.S. 311, 328-31 (1981) (Interstate Commerce Act). The DTSA's saving clause similarly cannot be read to permit state and local governments to engage in misappropriation at will, which would effectively "defeat [the DTSA's] own objective[]" of nationwide uniformity. *Geier*, 529 U.S. at 872. And such an unduly broad reading would also render other parts of the same law surplusage. As noted, §1838 clarifies that the DTSA "shall not be construed … to affect the otherwise lawful disclosure of information by any Government employee under … the [federal] Freedom of Information Act." That clarification would be wholly unnecessary if the saving clause itself were meant to authorize governmental disclosures whenever permitted by law.

## III.    ON ITS FACE, HB 4005 VIOLATES THE DORMANT COMMERCE CLAUSE

The Constitution gives Congress exclusive authority to "regulate Commerce … among the several States." Art. I, § 8, cl. 3. The Commerce Clause thus "reflect[s] a central concern of the Framers that[,] … in order to succeed, the new Union would have to avoid the tendencies toward economic Balkanization that had plagued relations among the Colonies and later among the States under the Articles of Confederation." *Hughes v. Oklahoma*, 441 U.S. 322, 325 (1979). In light of that purpose, the Supreme Court has "long interpreted the Commerce Clause as an implicit restraint on state authority, even in the absence of a conflicting federal statute." *United Haulers Ass'n v. Oneida-Herkimer Solid Waste Mgmt. Auth.*, 550 U.S. 330, 338 (2007). This is the "so-called 'dormant' aspect of the Commerce Clause." *Id.*

The dormant Commerce Clause, "at a minimum," prohibits a single State from directly controlling commerce that takes place beyond its borders. *Healy v. Beer Inst.*, 491 U.S. 324, 336 (1989). The most blatant form of such impermissible regulation is a price control, like the 60-

Page 29 -   PLAINTIFF'S MOTION FOR PARTIAL SUMMARY JUDGMENT

MB LAW GROUP, LLP
Attorneys at Law
117 SW Taylor Street, Suite 200
Portland, OR 97204
Telephone: 503-914-2015
Facsimile: 503-914-1725

day freeze on national drug prices imposed by the Advance Notification Law. *See* Compl. ¶¶ 49-57, 96-98. Direct price controls like the Advance Notification Law are flatly unconstitutional, and PhRMA expects to move for summary judgment on that ground once PhRMA's pending challenge to California's version of the Advance Notification Law is resolved.

But the dormant Commerce Clause also forbids other types of state laws that control commerce nationwide. *See, e.g.*, *Sam Francis Found. v. Christies, Inc.*, 784 F.3d 1320, 1323-25 (9th Cir. 2015) (en banc); *Nat'l Collegiate Athletic Ass'n v. Miller* (*NCAA*), 10 F.3d 633, 638-39 (9th Cir. 1993). HB 4005 does just that, by tying its onerous reporting requirements to increases in a drug's "wholesale acquisition cost as defined in 42 U.S.C. § 1395w-3a(c)(6)(B)," 2018 Or. L. Ch. 7 § 2(1)(i)—that is, its *national* list price. Oregon thus penalizes PhRMA's members for their nationwide commercial conduct. Because the WAC by definition must be "uniform" throughout the country, *see* Answer ¶ 24, a manufacturer cannot avoid being subjected to Oregon's law, or penalized for failure to comply with it, by adjusting its prices in Oregon. To avoid HB 4005's onerous requirements, a manufacturer must adjust its drug prices nationwide. Yet the Commerce Clause does not permit a single state to impose its own "procedures" on commercial transactions "throughout the country." *NCAA*, 10 F.3d at 639.

In *NCAA*, for instance, Nevada enacted a statute requiring any national collegiate athletic association "to provide a Nevada institution, employee, student-athlete, or booster who is accused of a rules infraction with certain procedural due process protections during an enforcement proceeding." *Id.* at 637. Although the law ostensibly applied only within Nevada, the Ninth Circuit struck it down as inconsistent with the Commerce Clause. As the court explained, the entity most directly regulated by the law (the NCAA) was deeply "engaged in

Page 30 -   PLAINTIFF'S MOTION FOR PARTIAL SUMMARY JUDGMENT

MB LAW GROUP, LLP
Attorneys at Law
117 SW Taylor Street, Suite 200
Portland, OR 97204
Telephone: 503-914-2015
Facsimile: 503-914-1725

interstate commerce": It arranged "events that call for transportation of teams across state lines," "nationwide amateur athlete recruiting," and "lucrative national and regional television broadcasting." *Id.* at 638. As a national organization, moreover, the NCAA had to apply its internal rules "even-handedly and uniformly on a national basis." *Id.* (citation omitted). Consequently, Nevada's law would have "a profound effect on the way the NCAA enforces its rules and regulates the integrity of its product," including in "enforcement proceedings throughout the country." *Id.* at 638-39. That type of direct effect by one state's laws on out-of-state conduct, the Ninth Circuit concluded, "violate[s] the Commerce Clause per se." *Id.* at 638.

The same reasoning applies here. HB 4005 targets pharmaceutical companies engaged in interstate commerce and ties its reporting requirements to increases in a drug's national list price (WAC), as defined by federal law. Like the NCAA's internal rules, the WAC is set under a single standard that applies "even-handedly and uniformly on a national basis." *Id.*; *see* Answer ¶ 24 ("uniform"). And like Nevada's law, HB 4005 would have "a profound effect" on the interstate market, including by nullifying trade-secret protection for manufacturers' confidential information whenever Oregon decides that disclosure would be in the public interest. *NCAA*, 10 F.3d at 638; *see supra* pp. 19-27. HB 4005 directly controls commerce in all 50 States by imposing regulatory consequences on nationwide price moves. HB 4005 accordingly "violate[s] the Commerce Clause per se." *NCAA*, 10 F.3d at 638.

## IV.    HB 4005 FACIALLY VIOLATES THE FIRST AMENDMENT

Just as the First Amendment forbids government censorship, it also "prohibits the government from telling people what they must say." *Rumsfeld v. Forum for Acad. & Inst. Rights, Inc.*, 547 U.S. 47, 61 (2006). HB 4005 violates that command, by compelling

MB LAW GROUP, LLP
Attorneys at Law
117 SW Taylor Street, Suite 200
Portland, OR 97204
Telephone: 503-914-2015
Facsimile: 503-914-1725

manufacturers—and only manufacturers—to speak: Not only must they create and submit to DCBS reports identifying the factors that have contributed to price increases, 2018 Or. L. Ch. 7 § 2(3), their reports must specify the "major financial and nonfinancial factors that influenced the decision to increase the wholesale acquisition cost of the drug product and to decide on the amount of the increase," Or. Admin. Code 836-200-0530(2)(h). These requirements reflect the State's view, which manufacturers are forced implicitly to endorse, that manufacturers are solely responsible for price increases. Those features render the law unconstitutional: "[A] law commanding 'involuntary affirmation' of objected-to beliefs [requires] 'even more immediate and urgent grounds' than a law demanding silence." *Janus v. Am. Fed'n of State, Cty., & Mun. Emps., Council 31*, 138 S. Ct. 2448, 2464 (2018) (quoting *W. Va. Bd. of Ed.* v. *Barnette*, 319 U.S. 624, 633 (1943)). No such immediate or urgent grounds exist here.

**A.      HB 4005 Must Satisfy Heightened Scrutiny**

"At the heart of the First Amendment lies the principle that each person should decide for himself or herself the ideas and beliefs deserving of expression, consideration, and adherence." *Turner Broad. Sys., Inc., v. FCC*, 512 U.S. 622, 641 (1994). This constitutional precept, on which "[o]ur political system and cultural life rest," reflects inherent skepticism of all government efforts to influence public debate by controlling private speech. *Id.* Statutes and regulations that target certain categories of speech "because of its content" accordingly face "the most exacting scrutiny," under which the government must show they are narrowly tailored to serve a compelling interest. *Id.* at 642, 653; *see id.* at 680 (O'Connor, J., concurring in part) ("There must be some pressing public necessity, some essential value that has to be preserved; and even then the law must restrict as little speech as possible to serve the goal.").

Page 32 -   PLAINTIFF'S MOTION FOR PARTIAL SUMMARY JUDGMENT

MB LAW GROUP, LLP
Attorneys at Law
117 SW Taylor Street, Suite 200
Portland, OR  97204
Telephone: 503-914-2015
Facsimile: 503-914-1725

"Laws that compel speakers to utter or distribute speech bearing a particular message are subject to the same rigorous scrutiny." *Id.* at 642 (majority op.). Because such laws allow the government to "manipulate the public debate through coercion rather than persuasion," *Turner Broad.*, 512 U.S. at 641, they inherently undermine "our democratic form of government," as well as "the search for truth," *Janus*, 138 S. Ct. at 2464. Worse still, "[f]orcing free and independent individuals to endorse ideas they find objectionable is always demeaning," because it coerces them into "betraying their convictions." *Id.*; *see Riley v. Nat'l Fed'n of the Blind of N.C., Inc.*, 487 U.S. 781, 795 (1988) (forcing a speaker to convey a message "necessarily alters the content of the speech"). For these reasons, laws compelling speech generally receive the "most exacting" form of judicial review. *Turner Broad.*, 512 U.S. at 642; *e.g., Am. Beverage Ass'n v. City & Cty. of S.F.*, 916 F.3d 749, 759 (9th Cir. 2019) (Ikuta, J., concurring in part) ("strict scrutiny" (citing *Nat'l Inst. of Family & Life Advocates v. Becerra* (*NIFLA*), 138 S. Ct. 2361, 2372-73 (2018))); *Frudden v. Pilling*, 742 F.3d 1199, 1207 (9th Cir. 2014) (same).

HB 4005 bears all the hallmarks of government-compelled speech. For each covered drug that triggers the statutory threshold, the law requires pharmaceutical manufacturers to produce and provide DCBS with a detailed report, 2018 Or. L. Ch. 7 § 2(3), which must include (among other information) "a narrative description and explanation of all major financial and nonfinancial factors that influenced the decision to increase the wholesale acquisition cost of the drug product and to decide on the amount of the increase," Or. Admin. Code 836-200-0530(2)(h). The State then makes the reported information public, by publishing it on DCBS's website. 2018 Or. L. Ch. 7 § 2(9)(a). There can be no doubt that this speech is compelled. To state the obvious, no manufacturer would create these reports or submit them to DCBS unless

Page 33 -  PLAINTIFF'S MOTION FOR PARTIAL SUMMARY JUDGMENT

MB LAW GROUP, LLP
Attorneys at Law
117 SW Taylor Street, Suite 200
Portland, OR  97204
Telephone: 503-914-2015
Facsimile: 503-914-1725

required to do so by law; nor would manufacturers choose to have their information—much of it sensitive and confidential—disseminated on the internet.

HB 4005 faces heightened scrutiny for another reason:  It strays far from the neutrality that the First Amendment requires for government regulation of private speech.  For one thing, it targets a limited group—pharmaceutical manufacturers—in distinction from other market participants, such as pharmacy benefit managers, wholesalers, pharmacies, and the State itself. This singling out is contrary to the established rule that "government regulation may not favor one speaker over another."  *Rosenberger v. Rector & Visitors of Univ. of Va.,* 515 U.S. 819, 828 (1995).  In targeting only a "narrow class of disfavored speakers," *Sorrell v. IMS Health Inc.*, 564 U.S. 552, 573 (2011), HB 4005 is anything but evenhanded.

Even more fundamentally, HB 4005 represents "governmental control over the *content* of messages expressed by private individuals," something the First Amendment typically "does not countenance."  *Turner Broad.*, 512 U.S. at 641 (emphasis added); *see NIFLA*, 138 S. Ct. at 2371 (content-based speech regulations "are presumptively unconstitutional" (quoting *Reed v. Town of Gilbert*, 135 S. Ct. 2218, 2226 (2015))).  To determine whether a particular law is content-based, courts look at the law "on its face" and apply a "common-sense" test:  "Government regulation of speech is content based if a law applies to particular speech because of the topic discussed or the idea or message expressed."  *Reed*, 135 S. Ct. at 2227 (quotation marks omitted).  Statutes that "defin[e] regulated speech by particular subject matter" or "by its function or purpose" thus "are subject to strict scrutiny."  *Id.*  The information required by HB 4005—which focuses on a specific topic (manufacturers' pricing decisions)—plainly is "defin[ed] … by [a] particular subject matter."

Page 34 -   PLAINTIFF'S MOTION FOR PARTIAL SUMMARY JUDGMENT

MB LAW GROUP, LLP
Attorneys at Law
117 SW Taylor Street, Suite 200
Portland, OR  97204
Telephone: 503-914-2015
Facsimile: 503-914-1725

What's more, on its face the law traffics in precisely the type of content-based restriction most anathema to First Amendment values: "discrimination among viewpoints." *Reed*, 135 S. Ct. at 2230; *see Rosenberger*, 515 U.S. at 829 ("Viewpoint discrimination is … an egregious form of content discrimination."). Laws that categorize private speech on the basis of viewpoint "pose the inherent risk that the Government seeks not to advance a legitimate regulatory goal, but to suppress unpopular ideas or information or manipulate the public debate through coercion rather than persuasion. These restrictions raise the specter that the Government may effectively drive certain ideas or viewpoints from the marketplace." *Turner Broad.*, 512 U.S. at 641 (brackets and quotation marks omitted). For these reasons, a determination that the government is regulating private speech in a viewpoint-discriminatory manner is "all but dispositive." *Sorrell*, 564 U.S. at 571.

HB 4005 is designed to advance the view, which pharmaceutical manufacturers dispute, that manufacturers alone are responsible for the high price of prescription drugs. The *only* market participants that HB 4005 requires to justify their role in setting drug prices are manufacturers; others face no comparable obligation. Moreover, justification is required only for price *increases*. Oregon's tactic here is not subtle. A classic means of promoting a particular viewpoint is to "shape [an] expression by speaking on one subject while remaining silent on another. The message it disfavor[s] is not difficult to identify." *Hurley v. Irish-Am. Gay, Lesbian & Bisexual Grp. of Bos.*, 515 U.S. 557, 574 (1995).

So too here. HB 4005 forces one particular market participant to justify its role in raising (but not lowering) prices, thereby attributing sole responsibility to that participant; the State then disseminates the information—and hence its own preferred message—to the public. The law "on

Page 35 -   PLAINTIFF'S MOTION FOR PARTIAL SUMMARY JUDGMENT

MB LAW GROUP, LLP
Attorneys at Law
117 SW Taylor Street, Suite 200
Portland, OR 97204
Telephone: 503-914-2015
Facsimile: 503-914-1725

**E.R.-186**

its face burdens disfavored speech by disfavored speakers," *Sorrell*, 564 U.S. at 564, and therefore is "presumptively unconstitutional and may be justified only if the government proves that [it is] narrowly tailored to serve compelling state interests," *Reed*, 135 S. Ct. at 2226.

**B.    HB 4005 Would Not Satisfy Rational Basis Review, and Certainly Not Strict Scrutiny**

"[I]t is the rare case in which a State demonstrates that a speech [law] is narrowly tailored to serve a compelling interest." *Williams-Yulee v. Fla. Bar*, 135 S. Ct. 1656, 1665-66 (2015) (quotation marks omitted).  This is not such a rare case.  HB 4005 itself asserts several justifications for its requirements, *see* 2018 Or. L. Ch. 7 (preamble), but the law is not even rationally related—much less narrowly tailored—to serve a governmental interest sufficient to justify the burden on speech that it imposes.

First, the State asserts an interest in "the price and cost of prescription drugs," including drugs purchased by the State itself.  *Id.*  That interest cannot justify burdening manufacturers' speech rights, however, particularly given HB 4005's statement of intent "to permit a manufacturer of a prescription drug to voluntarily make pricing decisions regarding a prescription drug, including decisions that result in price increases."  *Id.*  Nor, if controlling prices were the goal, would the law's reporting requirements be remotely effective.  The only possible way the compelled statements could curb drug prices would be through public shaming. But while "requiring a company to publicly condemn itself is undoubtedly a more 'effective' way for the government to stigmatize and shape behavior than for the government to have to convey its views itself," that only "makes the requirement more constitutionally offensive, not less so."  *Nat'l Ass'n of Mfrs. v. SEC*, 800 F.3d 518, 530 (D.C. Cir. 2015) (brackets and quotation marks omitted).  In any event, the reports are not tied to the prices paid by the State or

MB LAW GROUP, LLP
Attorneys at Law
117 SW Taylor Street, Suite 200
Portland, OR  97204
Telephone: 503-914-2015
Facsimile: 503-914-1725

by Oregon residents, but instead to increases in the WAC—the national list price—which is different than the prices paid by consumers. Answer ¶ 21. The State also lacks power to regulate nationwide drug prices, and certainly cannot regulate speech as a backdoor means of achieving the same objective. *See Clairmont v. Sound Mental Health*, 632 F.3d 1091, 1100 (9th Cir. 2011) ("Where the government may not prohibit certain speech, it also many not threaten to exert economic pressure on a private employer in order to produce a result which it could not command directly." (brackets and quotation marks omitted)).

Second, the State has claimed an interest in "provid[ing] notice and disclosure of information relating to the cost and pricing of prescription drugs in order to provide accountability for prescription drug pricing." 2018 Or. L. Ch. 7 (preamble). Insofar as the State is claiming a general interest in educating *itself*, that is hardly a "pressing public necessity," *Turner Broad.*, 512 U.S. at 680 (O'Connor, J., concurring in part), and certainly does not justify compelling "manufacturers to speak against their will," *Int'l Dairy Foods Ass'n v. Amestoy*, 92 F.3d 67, 74 (2d Cir. 1996); *see id.* (if educational interest were "alone sufficient, there is no end to the information that states could require manufacturers to disclose"). Indeed, if the State were truly interested in accountability for how drugs are priced, it would not have requested information only from manufacturers. Nor can the State explain why, if *self*-education is the goal, the reports must be disclosed publicly.

Insofar as the State contends that its goal is facilitating informed decision-making *by the public*, that goal is neither justified nor advanced by the reporting requirement. If genuinely committed to educating the public about drug prices, the State would have required *other* supply-chain participants—including the State itself, a major purchaser—to provide information about

Page 37 - PLAINTIFF'S MOTION FOR PARTIAL SUMMARY JUDGMENT

MB LAW GROUP, LLP
Attorneys at Law
117 SW Taylor Street, Suite 200
Portland, OR 97204
Telephone: 503-914-2015
Facsimile: 503-914-1725

their own market activities, which affect actual prices.  Answer ¶ 21.  Nor is it clear why retail purchasers will be better able to make purchasing decisions if they have access to "a narrative description and explanation of all major financial and nonfinancial factors that influenced [a manufacturer's] decision to increase the wholesale acquisition cost of [a] drug."  Or. Admin. Code 836-200-0530(2)(h).  There is accordingly an insufficient "fit between the legislature's ends and the means chosen to accomplish those ends."  *Sorrell*, 564 U.S. at 572 (citation omitted)).

## CONCLUSION

HB 4005 violates the Takings Clause, the Supremacy Clause, the dormant Commerce Clause, and the First Amendment. The Court should grant judgment for PhRMA on its claims against HB 4005.

DATED: March 24, 2020.

MB LAW GROUP, LLP

s/ Jonathan M. Hoffman
Jonathan M. Hoffman, OSB No. 754180
jhoffman@mblglaw.com
David W. Cramer, OSB No. 113621
dcramer@mblglaw.com
117 SW Taylor Street, Suite 200
Portland, OR 97204
Telephone: (503) 914-2015

Allon Kedem
allon.kedem@arnoldporter.com
Jeffrey L. Handwerker
jeffrey.handwerker@arnoldporter.com
R. Stanton Jones
stanton.jones@arnoldporter.com
Elisabeth S. Theodore
elisabeth.theodore@arnoldporter.com
ARNOLD & PORTER KAYE SCHOLER LLP
601 Massachusetts Avenue, NW
Washington, DC 20001
Telephone:  (202) 942-5000

**Attorneys for Plaintiff Pharmaceutical Research and Manufacturers of America**

MB LAW GROUP, LLP
Attorneys at Law
117 SW Taylor Street, Suite 200
Portland, OR  97204
Telephone: 503-914-2015
Facsimile: 503-914-1725

## CERTIFICATE OF COMPLIANCE

This memorandum complies with the applicable word-count limitation under LR 7-2(b) because it contains 10,983 words, including headings, footnotes, and quotations, but excluding the caption, table of contents, table of cases and authorities, signature block, exhibits, and any certificates of counsel.

DATED: March 24, 2020.

MB LAW GROUP, LLP

 s/ Jonathan M. Hoffman
Jonathan M. Hoffman, OSB No. 754180
jhoffman@mblglaw.com
David W. Cramer, OSB No. 113621
dcramer@mblglaw.com
117 SW Taylor Street, Suite 200
Portland, OR 97204
Telephone: (503) 914-2015

Allon Kedem
allon.kedem@arnoldporter.com
Jeffrey L. Handwerker
jeffrey.handwerker@arnoldporter.com
R. Stanton Jones
stanton.jones@arnoldporter.com
Elisabeth S. Theodore
elisabeth.theodore@arnoldporter.com
ARNOLD & PORTER KAYE SCHOLER LLP
601 Massachusetts Avenue, NW
Washington, DC 20001
Telephone: (202) 942-5000

**Attorneys for Plaintiff Pharmaceutical Research and Manufacturers of America**

MB LAW GROUP, LLP
Attorneys at Law
117 SW Taylor Street, Suite 200
Portland, OR  97204
Telephone: 503-914-2015
Facsimile: 503-914-1725

**E.R.-190**

## Belford Dorisdae

| | |
|---|---|
| **From:** | info@ord.uscourts.gov |
| **Sent:** | Tuesday, March 24, 2020 2:12 PM |
| **To:** | nobody@ord.uscourts.gov |
| **Subject:** | Activity in Case 6:19-cv-01996-AA Pharmaceutical Research and Manufacturers of America v. Savage Motion for Partial Summary Judgment |

**This is an automatic e-mail message generated by the CM/ECF system. Please DO NOT RESPOND to this e-mail because the mail box is unattended.**

**\*\*\*NOTE TO PUBLIC ACCESS USERS\*\*\* Judicial Conference of the United States policy permits attorneys of record and parties in a case (including pro se litigants) to receive one free electronic copy of all documents filed electronically, if receipt is required by law or directed by the filer. PACER access fees apply to all other users. To avoid later charges, download a copy of each document during this first viewing. However, if the referenced document is a transcript, the free copy and 30 page limit do not apply.**

### U.S. District Court

### District of Oregon

## Notice of Electronic Filing

The following transaction was entered by Hoffman, Jonathan on 3/24/2020 at 2:11 PM PDT and filed on 3/24/2020

| | |
|---|---|
| **Case Name:** | Pharmaceutical Research and Manufacturers of America v. Savage |
| **Case Number:** | 6:19-cv-01996-AA |
| **Filer:** | Pharmaceutical Research and Manufacturers of America |
| **Document Number:** | 25 |

**Docket Text:**

**Motion for Partial Summary Judgment . Oral Argument requested. Filed by Pharmaceutical Research and Manufacturers of America. (Hoffman, Jonathan)**

**6:19-cv-01996-AA Notice has been electronically mailed to:**

Allon S. Kedem    allon.kedem@arnoldporter.com

Carla Scott    carla.a.scott@doj.state.or.us, marianna.almasi@doj.state.or.us, savanna.valenzuela@doj.state.or.us

David W. Cramer    dcramer@mblglaw.com, skuehn@mblglaw.com

Elisabeth S. Theodore    elisabeth.theodore@arnoldporter.com

Jeffrey L. Handwerker    jeffrey.handwerker@arnoldporter.com

Jonathan M. Hoffman    jhoffman@mblglaw.com, adarling@mblglaw.com, skuehn@mblglaw.com

R. Stanton Jones    stanton.jones@arnoldporter.com

**E.R.-191**

Sarah K. Weston    sarah.weston@doj.state.or.us, dorisdae.belford@doj.state.or.us, marianna.almasi@doj.state.or.us

**6:19-cv-01996-AA Notice will <u>not</u> be electronically mailed to:**

The following document(s) are associated with this transaction:

**Document description:**Main Document
**Original filename:**Not Available
**Electronic document Stamp:**
[STAMP ordStamp_ID=875559790 [Date=3/24/2020] [FileNumber=6938859-0] [
9fc070f3be57181b8aa425a78eda556acc07a5f4dd53186532027ffe5234c231cc304e
a43c46d396ac7df3e450a7f63639dfbbd149be31c41bccc84355e15992]]

**Jonathan M. Hoffman, OSB No. 754180**
jhoffman@mblglaw.com
**David W. Cramer, OSB No. 113621**
dcramer@mblglaw.com
MB LAW GROUP, LLP
117 SW Taylor Street, Suite 200
Portland, OR 97204
Telephone: 503-914-2015

Attorneys for Plaintiff

## UNITED STATES DISTRICT COURT

## DISTRICT OF OREGON

## EUGENE DIVISION

PHARMACEUTICAL RESEARCH AND
MANUFACTURERS OF AMERICA,

Plaintiff,

v.

LOU SAVAGE, in his official capacity as
Acting Director of the Oregon Department of
Consumer and Business Services,

Defendant.

Case No. 6:19-cv-01996

**COMPLAINT**
Declaratory and Injunctive Relief (42 U.S.C.
§ 1983 and 28 U.S.C. §§ 2201, 2202)

## INTRODUCTION

1.      In this action, Plaintiff, Pharmaceutical Research and Manufacturers of America

("PhRMA"), on behalf of itself and its members, seeks to prevent unconstitutional enforcement

of two recent Oregon laws, House Bill No. 4005, 2018 Or. L. Ch. 7 (the "Disclosure Law,"

attached as Exhibit A) and House Bill No. 2658, 2019 Or. L. Ch. 436 (the "Advance Notification

Page 1 -     COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

MB LAW GROUP, LLP
Attorneys at Law
117 SW Taylor Street, Suite 200
Portland, OR 97204
Telephone: 503-914-2015
Facsimile: 503-914-1725

Law," attached as Exhibit B).  Separately and together, these laws impose nationwide restraints on the list price of biopharmaceutical manufacturers' products and intentionally bind every other state in the nation to Oregon's policy choices regarding prescription drug pricing.  The laws also compel pharmaceutical manufacturers to turn over a host of competitively sensitive, trade-secret information—including manufacturers' reasons for price increases—and then threaten to disclose that sensitive information to the public.

2.      Specifically, the Disclosure Law requires wide-ranging disclosures whenever a pharmaceutical manufacturer either increases a product's federally defined national list price—known as the "wholesale acquisition cost" or "WAC"—by at least 10 percent compared to the prior calendar year, or introduces a new prescription drug that costs more than $670 for a one-month supply.  For each product meeting those thresholds, the manufacturer must make multiple disclosures to Oregon's Department of Consumer and Business Services, including a narrative description of all "factors that contributed to the price increase" and also must provide competitively sensitive, trade-secret-protected information about the costs of manufacturing, marketing, and distributing the product.  The Disclosure Law then mandates that the Department publish all this information—even a manufacturer's trade secrets—on its website, so long as the Department deems such public disclosure to be in the "public interest."

3.      The Advance Notification Law compels pharmaceutical manufacturers to make additional disclosures and also imposes nationwide direct restraints on prices.  Under the Advance Notification Law, if a manufacturer plans to increase a brand-name product's WAC such that, on the effective date of the increase, the WAC will have increased by at least 10 percent or $10,000 over the preceding twelve months, the manufacturer must provide notice to

Page 2 -     COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

MB LAW GROUP, LLP
Attorneys at Law
117 SW Taylor Street, Suite 200
Portland, OR  97204
Telephone: 503-914-2015
Facsimile: 503-914-1725

Case 1:19-cv-01981-JMF Document 16-1 Filed 12/09/19 Page 3 of 42
Case: 24-1596, 07/05/2024, DktEntry: 16.1, Page 194 of 261

**E.R.-194**

the Department and then wait 60 days before implementing any increase in the product's WAC.

Because under federal law the WAC is uniform nationwide, the law's 60-day notice requirement

prevents the manufacturer from raising its WAC in any state for 60 days after notice is given.

Further, the law not only bars the manufacturer from increasing the price, but also requires it to

disclose to the State—and potentially for the State then to disclose to the public—competitively

sensitive information such as the date and amount of the proposed increase, and whether the

increase "is necessitated by a change to or improvement in the prescription drug."

4.      The Disclosure Law and Advance Notification Law are unconstitutional on four

grounds.

5.      *First*, both laws violate the dormant Commerce Clause by restricting drug prices

nationwide.  The Disclosure Law's intrusive disclosure requirements and its threat to strip trade-

secret protection are tied to the federally defined and national WAC.  The Advance Notification

Law likewise imposes a nationwide ban on increases in the WAC for qualifying drugs for 60

days after a manufacturer notifies the State that it intends to increase the product's WAC above

the statutory threshold.  The dormant Commerce Clause prohibits such attempts by one state to

foist its policies onto other states.

6.      For example, the Supreme Court in *Brown-Forman Distillers Corp. v. N.Y. State

Liquor Authority*, 476 U.S. 573 (1986), struck down an analogous state ban on price changes.

The New York law challenged there required distillers to file a monthly price list and to affirm

that the listed in-state prices were no higher than those charged in other states.  The law thus

imposed a temporary nationwide ban on decreasing prices below those in New York.  The

Page 3 -   COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

MB LAW GROUP, LLP
Attorneys at Law
117 SW Taylor Street, Suite 200
Portland, OR  97204
Telephone: 503-914-2015
Facsimile: 503-914-1725

Supreme Court held that New York could not regulate price changes outside the state. Oregon cannot do so either.

7. *Second*, both the Disclosure Law and the Advance Notification Law violate the First Amendment by compelling speech. Both laws require pharmaceutical manufacturers to communicate to the State—and often to the public—subjective information about their pricing decisions in a manner that endorses the State's preferred message. In particular, the Advance Notification Law forces manufacturers to declare that they plan to increase the WAC of a prescription drug in 60 days, even if they wish to provide less notice or none. As part of this process, the Advance Notification Law endorses only one potential justification for a price increase—a "change or improvement" in the drug—and compels manufacturers to state whether they can invoke that justification, no matter what other well-grounded reasons a manufacturer may have. The Disclosure Law not only compels manufacturers to disclose commercially sensitive, trade-secret information, but also requires them to create a narrative description of the factors that led to the price increase or the initial launch price.

8. In compelling this speech, the Disclosure Law and the Advance Notification Law impermissibly discriminate based on speaker, content, and viewpoint. They discriminate based on the speaker by singling out pharmaceutical manufacturers and forcing them to speak about price increases. They discriminate based on content and viewpoint by formulating implicit and explicit messages—that manufacturers alone are responsible for the prices that patients and others pay for prescription drugs, that manufacturers owe the State an explanation for their pricing decisions, and that only changes or improvements to a drug can justify increases to the

Page 4 -   COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

MB LAW GROUP, LLP
Attorneys at Law
117 SW Taylor Street, Suite 200
Portland, OR  97204
Telephone: 503-914-2015
Facsimile: 503-914-1725

WAC beyond what the State deems appropriate—and by forcing manufacturers to endorse and convey those messages.

9.     *Third*, both laws also conflict with, and are therefore preempted by, federal law governing trade secrets.  Recognizing that protection of trade secrets is critical to U.S. businesses, Congress enhanced existing state-law safeguards by enacting the Defend Trade Secrets Act of 2016 ("DTSA").  The DTSA sets a federal baseline for trade-secret protection, which extends to sensitive and confidential advertising, cost, marketing, pricing, and production information.  The Disclosure Law and the Advance Notification Law do not merely fall below the federal baseline.  They compel disclosure of these valuable trade secrets, threaten to extinguish their value by publishing them to the world, and effectively nullify federal protections in the DTSA, thereby undermining innovation and competition in the American pharmaceutical industry.

10.     *Fourth*, both laws' threatened abrogation of trade-secret protection also effects an unconstitutional taking of property without *any* compensation—let alone "just compensation"— and thus violates the Fifth Amendment's Takings Clause.  The laws threaten to deprive affected manufacturers of trade-secret protection for their confidential information, forcing disclosure to the State and potentially requiring dissemination on the Internet, including to third-party payers and competitors.  Before the Disclosure Law and the Advance Notification Law, these materials qualified as trade secrets under the laws of every state, including Oregon.  Trade secrets are property; the Disclosure Law and Advance Notification Law destroy the value of that property without just compensation.

MB LAW GROUP, LLP
Attorneys at Law
117 SW Taylor Street, Suite 200
Portland, OR  97204
Telephone: 503-914-2015
Facsimile: 503-914-1725

11.     PhRMA thus seeks a declaration that the Disclosure Law and the Advance Notification Law violate the dormant Commerce Clause, infringe First Amendment rights, are preempted by federal trade-secret law, and take manufacturers' intellectual property without compensation in violation of the Takings Clause.  PhRMA also seeks an injunction prohibiting Defendant from implementing or enforcing either law.

## PARTIES

12.     PhRMA is a non-profit corporation organized under Delaware law, with its headquarters in Washington, D.C.  PhRMA serves as the pharmaceutical industry's principal public policy advocate, representing the interests of its members before Congress, the Executive Branch, state regulatory agencies and legislatures, and the courts.  Among other objectives, PhRMA seeks to advance public policies that foster continued medical innovation and to educate the public about the process for discovering and developing new drugs.  PhRMA members are leading research-based pharmaceutical and biotechnology companies in America, devoted to discovering and developing new medications that allow people to live longer, healthier, and more productive lives.[1]

13.     Defendant Lou Savage is the Acting Director of the Oregon Department of Consumer and Business Services ("DCBS" or "the Department") and is sued in his official capacity only.  As Acting Director of DCBS, Defendant Savage is responsible for the implementation and execution of the Disclosure Law and the Advance Notification Law.

---

[1] A full list of PhRMA members is available at http://www.phrma.org/about/members.

Page 6 -    COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

MB LAW GROUP, LLP
Attorneys at Law
117 SW Taylor Street, Suite 200
Portland, OR  97204
Telephone: 503-914-2015
Facsimile: 503-914-1725

## JURISDICTION AND VENUE

14.     PhRMA's causes of action arise under 42 U.S.C. § 1983 and the United States Constitution.  The Court has jurisdiction under 28 U.S.C. § 1331.

15.     Venue is proper in this district under 28 U.S.C. § 1391(b) because PhRMA's claims arise in this judicial district and because Defendant resides and performs his official duties in this district.

16.     An actual controversy exists between the parties within the meaning of 28 U.S.C. § 2201, and this Court has the authority under 28 U.S.C. §§ 2201 and 2202 to grant PhRMA declaratory and injunctive relief from the Disclosure Law and the Advance Notification Law.

## FACTUAL ALLEGATIONS

### *PhRMA Members Spend Enormous Sums on Research and Development*

17.     PhRMA members develop life-saving and life-enhancing medicines that are promoted, prescribed, and sold throughout the nation, including in Oregon.  Pharmaceutical manufacturers, including PhRMA's members, invest huge sums in the research and development of new medicines.  Between 2000 and 2018, the U.S. Food and Drug Administration ("FDA") approved more than 550 new drugs.[2]  PhRMA members were responsible for much of this innovation.  They are also responsible for 19 of the 59 novel drugs that FDA approved in 2018 and 15 of the 41 novel drugs approved to date in 2019.[3]  FDA has recognized that novel drugs "frequently provide important new therapies for patients."[4]

---

[2] Asher Mullard, *2018 FDA Drug Approvals*, Nature (Jan. 15, 2019), https://go.nature.com/2CmHeMp.

[3] *See* FDA, *Novel Drug Approvals for 2018*, https://bit.ly/382egAv; FDA, *Novel Drug Approvals for 2019*, https://bit.ly/37UXgMu.

[4] *Id.*

Page 7 -    COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

MB LAW GROUP, LLP
Attorneys at Law
117 SW Taylor Street, Suite 200
Portland, OR  97204
Telephone: 503-914-2015
Facsimile: 503-914-1725

18.     The cost of developing innovative medicines is staggering.  On average, a manufacturer spends 10 to 15 years—and approximately $2.6 billion—developing a single new medicine.[5]  PhRMA members invest billions each year on research and development.[6]  Further, the required investments in time and expense to research and develop a new drug are continually increasing.[7]  Among many reasons for these increases, clinical drug development takes more time as the required research grows more and more complex, attrition rates during the research phase are high, and demands by regulatory authorities and payers are escalating.[8]

19.     The low likelihood of securing FDA approval magnifies the risk.  As of 2018, FDA approved only 14 percent of drug candidates that entered clinical testing.[9]  For example, it has rejected 99 percent of proposed Alzheimer drugs.[10]  According to an estimate focusing on the most prolific developers of new drugs, "95% of the experimental medicines that are studied

---

[5] Joseph A. DiMasi, et al., *Innovation in the Pharmaceutical Industry: New Estimates of R&D Costs*, 47 J. Health Econ. 20, 25–26 (2016), https://bit.ly/33JtBCE.

[6] *See, e.g.*, PhRMA, *2019 Profile: Biopharmaceutical Research Industry* (2019), https://onphr.ma/2Rh5c50; Alexander Schuhmacher et al., *Changing R&D Models in Research-Based Pharmaceutical Companies*, 14 J. Transl. Med. 105 (Apr. 27, 2017), https://bit.ly/33KBRlT (some pharmaceutical companies have invested over $10 billion per novel drug); Kim Thomas, *The Price of Health: The Cost of Developing New Medicines*, The Guardian (Mar. 30, 2016), https://bit.ly/2kliNY5 (noting that "[d]rugs typically take 12 years from the initial discovery stage to reach the market").

[7] Schuhmacher et al., *supra* note 6 (the average time for clinical development increased from 6.4 years between 2005-2009 to 9.1 years between 2008-2012; research and development costs have increased 8.6% over the past sixty years); Rick Mullin, *Tufts Study Finds Big Rise in Cost of Drug Development*, Chem. & Eng'g News (Nov. 20, 2014), https://bit.ly/2LnuH0D (study found that "developing a prescription drug that gains market approval [costs] $2.6 billion, a 145% increase" from 2003).

[8] *Id.*

[9] MIT Sloan School of Management, *Measuring the Risks and Rewards of Drug Development* (Jan. 31, 2018), https://bit.ly/2mtmjTL.

[10] Jeffrey L. Cummings, et al., *The Price of Progress: Funding and Financing Alzheimer's Disease Drug Development*, 4 Alzheimer's & Dementia: Translational Research & Clinical Interventions 330, 331 (2018), https://bit.ly/2mtqy1C.

Page 8 -    COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

MB LAW GROUP, LLP
Attorneys at Law
117 SW Taylor Street, Suite 200
Portland, OR  97204
Telephone: 503-914-2015
Facsimile: 503-914-1725

in humans fail to be both effective and safe."[11]  Even for products that are approved and reach the market, manufacturers may not earn back the full costs of research and development.  The increased focus on novel medicines for small patient populations makes it even harder to recoup the investment in research and development as well as the costs associated with clinical trial failures.  Drug treatments are becoming increasingly personalized, taking into consideration a patient's "genetic, anatomical, and physiological characteristics."[12]  More than 40 percent of new drugs approved by FDA in 2018, for example, were personalized medicines with labeling that notes specific biological markers to help guide prescribers' decisions.[13]  Pharmaceutical researchers are now developing gene therapies that work by administering genetic material "to modify or manipulate the expression of a gene or to alter the biological properties of living cells for therapeutic use."[14]  These targeted drugs are often critical in treating rare illnesses.  But they cost more to develop and, in some cases, help only relatively few patients.

20.     As biopharmaceutical companies build on new technologies and advances in scientific knowledge, they continue to develop groundbreaking therapies to combat and potentially to cure devastating diseases.  Pharmaceutical researchers are currently developing almost 300 medicines and vaccines that use the immune system to combat cancer, homing in on "[a] novel treatment . . . for the potential to reverse brain damage suffered from a stroke," and

---

[11] Matthew Herper, *The Cost of Creating a New Drug Now $5 Billion, Pushing Big Pharma to Change*, Forbes (Aug. 11, 2013), https://bit.ly/2m6Y2m1.

[12] FDA, *Paving the Way for Personalized Medicine* 4 (Oct. 2013), https://bit.ly/2PdIjwq.

[13] Personalized Med. Coalition, *Personalized Medicine at FDA: A Progress and Outlook Report* 2, 4 (2018), https://bit.ly/2rPkjrx.

[14] FDA, *What is Gene Therapy?* (Jul. 25, 2018), https://bit.ly/2OL4MlC.

Page 9 -     COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

MB LAW GROUP, LLP
Attorneys at Law
117 SW Taylor Street, Suite 200
Portland, OR  97204
Telephone: 503-914-2015
Facsimile: 503-914-1725

"working on cutting-edge medicines for patients with mental illness."[15]  As of December 2018,

pharmaceutical companies were working on almost 300 novel cell and gene therapies, including

over 100 that treat cancer.[16]

### *The Nationwide WAC and the Pharmaceutical Supply Chain*

21.     The Disclosure Law and Advance Notification Law regulate the price of

pharmaceutical products.  Understanding the pharmaceutical supply chain and how prices are set

at different levels is critical to assessing the nationwide impact of the requirements and policies

set forth in these laws.  As the Oregon legislature has recognized, many entities besides

biopharmaceutical manufacturers are involved in determining the costs that consumers pay for

pharmaceutical products.[17]

22.     Biopharmaceutical manufacturers primarily sell their prescription drugs to

wholesalers.  Three wholesalers—AmerisourceBergen, Cardinal Health, and McKesson

Corporation—account for approximately 90 percent of all pharmaceuticals distributed in the

United States.

23.     The nationwide WAC is used as a benchmark price for contracts between

manufacturers and their customers, such as wholesalers and other direct customers.  Federal law

defines the WAC as "the manufacturer's list price" to wholesalers or direct purchasers, "not

---

[15] America's Biopharmaceutical Companies, *Medicines in Development 2018 Report: Cancer* 5–6; https://onphr.ma/2RdP0RN; America's Biopharmaceutical Companies, *Medicines in Development 2018 Report: Heart Disease & Stroke* 4, https://onphr.ma/2RqcgMq; America's Biopharmaceutical Companies, *Medicines in Development 2019: Mental Illness* 2, https://onphr.ma/2OLFhkj.

[16] America's Biopharmaceutical Companies, *Medicines in Development 2018 Report: Cell Therapy and Gene Therapy* 1, https://onphr.ma/33IN6LF.

[17] Joint Interim Task Force on the Fair Pricing of Prescription Drugs, *Report on Transparency Strategies for the Pharmaceutical Supply Chain* 1–6 (Nov. 2018), https://bit.ly/2sIu9vV.

Page 10 -   COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

MB LAW GROUP, LLP
Attorneys at Law
117 SW Taylor Street, Suite 200
Portland, OR  97204
Telephone: 503-914-2015
Facsimile: 503-914-1725

including prompt pay or other discounts, rebates or reductions in price." 42 U.S.C. § 1395w-3a(c)(6)(B); *see also* HHS, *Medicare and Medicaid Programs; Regulation To Require Drug Pricing Transparency*, 84 Fed. Reg. 20,732, 20,739 (May 10, 2019) (describing the WAC as "a *single*, manufacturer-published price that excludes rebates and discounts," and a "generalizable list price that applies to *all* patients prior to the application of insurance coverage" (emphasis added)). Manufacturers set the WAC for their drugs based on individualized, proprietary, and subjective pricing methodologies.

24. Consistent with federal law, a drug's WAC is uniform across the United States and is publicly available.

25. Wholesalers sell drugs to healthcare providers (such as hospitals and doctors) and retailers (such as pharmacies) at prices that are also based on the product's WAC. These prices, which are subject to competitive negotiation, are not public.

26. Most patients who receive drugs directly from a pharmacy or a healthcare provider pay insurance premiums, deductibles, and co-payment amounts. The amounts that a patient pays are set independently by the patient's insurance company, not by any biopharmaceutical manufacturer.

### *Overview of the Disclosure Law*

27. On February 28, 2018, the Oregon House of Representatives passed HB 4005, titled the "Prescription Drug Price Transparency Act." On March 2, the Oregon Senate passed the same bill. The Speaker of the House signed the bill on March 6. On March 12, the Senate President signed HB 4005 and then Governor Kate Brown signed it into law. The Disclosure

Page 11 - COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

MB LAW GROUP, LLP
Attorneys at Law
117 SW Taylor Street, Suite 200
Portland, OR 97204
Telephone: 503-914-2015
Facsimile: 503-914-1725

Law took effect immediately; its reporting requirements for new and existing drugs became operative on March 15 and July 1, 2019, respectively. 2018 Or. L. Ch. 7 §§ 13, 15.

28. The Disclosure Law imposes numerous disclosure requirements on manufacturers of "a prescription drug that is sold in [Oregon] state." *Id.* § 2(1)(e). The law authorizes DCBS to "adopt rules as necessary for carrying out" its mandate. *Id.* § 2(12).

29. The Disclosure Law's reporting requirements apply to all prescription drugs for which "[t]he price was $100 or more for a one-month supply or for a course of treatment lasting less than one month," whenever "[t]here was a net price increase of 10 percent or more in the price of the prescription drug . . . over the course of the previous calendar year." *Id.* § 2(2). The law defines "price" as "the wholesale acquisition cost as defined in 42 U.S.C. § 1395w-3a(c)(6)(B)"—*i.e.*, the federally defined, uniform, national WAC.

30. Beginning on July 1, 2019, manufacturers must submit to the Department annual reports regarding qualifying prescription drugs. Those reports must include the following information:

- the name and price of the prescription drug and the net increase, expressed as a percentage, in the price of the drug over the course of the previous calendar year;

- the length of time the prescription drug has been on the market;

- the factors that contributed to the price increase;

- the name of any generic version of the prescription drug available on the market;

- the research and development costs associated with the prescription drug that were paid using public funds;

- the direct costs incurred by the manufacturer to manufacture the prescription drug, to market the prescription drug, to distribute the prescription drug, and for ongoing safety and effectiveness research associated with the prescription drug;

- the total sales revenue for the prescription drug during the previous calendar year;

Page 12 -   COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

MB LAW GROUP, LLP
Attorneys at Law
117 SW Taylor Street, Suite 200
Portland, OR  97204
Telephone: 503-914-2015
Facsimile: 503-914-1725

- the manufacturer's profit attributable to the prescription drug during the previous calendar year;

- the introductory price of the prescription drug when it was approved for marketing by the FDA and the net yearly increase, by calendar year, in the price of the prescription drug during the previous five years;

- the 10 highest prices paid for the prescription drug during the previous calendar year in any country other than the United States;

- any other information that the manufacturer deems relevant to the price increase; and

- the documentation necessary to support the information reported.

2018 Or. L. Ch. 7 § 2(3).

31. DCBS regulations require manufacturers to include in their reports "a narrative description and explanation of all major financial and nonfinancial factors that influenced the decision to increase the wholesale acquisition cost of the drug product and to decide on the amount of the increase." Or. Admin. Code 836-200-0530(2)(h).

32. For drugs subject to these reporting requirements, manufacturers also must disclose detailed information annually regarding all patient assistance programs they offer to consumers residing in Oregon, including:

- the number of consumers who participated in the program;

- the total value of the coupons, discounts, copayment assistance, or other reduction in costs provided to consumers in Oregon who participated in the program;

- for each drug, the number of refills that qualify for the program;

- if the program expires after a specified period of time, the period of time that the program is available to each consumer; and

- the eligibility criteria for the program and how eligibility is verified for accuracy.

2018 Or. L. Ch. 7 § 2(5).

Page 13 - COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

MB LAW GROUP, LLP
Attorneys at Law
117 SW Taylor Street, Suite 200
Portland, OR 97204
Telephone: 503-914-2015
Facsimile: 503-914-1725

33.     The Disclosure Law imposes additional reporting obligations on any manufacturer that launches a new prescription drug for which the price "exceeds the threshold established by the Centers for Medicare and Medicaid Services for specialty drugs in the Medicare Part D program." *Id.* § 2(6).[18]  Manufacturers of such drugs must report the following additional information to DCBS within 30 days after introducing the drug for sale:

- a detailed description of the marketing used in the introduction of the new prescription drug;

- the methodology used to establish the price of the new prescription drug;

- whether the FDA granted the new prescription drug a breakthrough therapy designation or a priority review;

- if the new prescription drug was not developed by the manufacturer, the date of and the price paid for acquisition of the new prescription drug by the manufacturer;

- the manufacturer's estimate of the average number of patients who will be prescribed the new prescription drug each month; and

- the research and development costs associated with the new prescription drug that were paid using public funds.

*Id.*

34.     All disclosures must be made "in the form and manner prescribed by the department." *Id.* § 2(3), (6).

35.     DCBS may request that manufacturers substantiate their required reports with "supporting documentation or additional information concerning the report." *Id.* § 2(7).  And it "may use any prescription drug price information the Department deems appropriate to verify that manufacturers have properly reported price increases as required." *Id.* § 2(4).

---

[18] As of filing, the Medicare Part D specialty-drug threshold is $670 for a one-month supply of the drug. *See* Centers for Medicare & Medicaid Servs., *Announcement of Calendar Year (CY) 2019 Medicare Advantage Capitation Rates and Medicare Advantage and Part D Payment Policies and Final Call Letter* 232 (Apr. 2, 2018), https://go.cms.gov/343SSZk.

Page 14 -   COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

MB LAW GROUP, LLP
Attorneys at Law
117 SW Taylor Street, Suite 200
Portland, OR  97204
Telephone: 503-914-2015
Facsimile: 503-914-1725

36.     The statute directs DCBS to "post to its website" the information required to be reported under § 2(3) (the drug pricing disclosures), § 2(5) (the patient-assistance-program disclosures), and § 2(6) (the new-drug disclosures). *Id.* § 2(9)(b). The Department also must post on its website all of the prescription drugs that meet the law's reporting thresholds and the names of the drugs' manufacturers. *Id.* § 2(9)(a).

37.     The Disclosure Law contains an exception to the Internet-posting requirement if (1) the information is "conditionally exempt from disclosure under ORS 192.345 as a trade secret" *and* (2) "the public interest does not require disclosure of the information." *Id.* § 2(10)(a).[19] If the Department withholds any information from public disclosure pursuant to the trade-secret exception, then the Department must post to its website "a report describing the nature of the information and the [D]epartment's basis for withholding the information from disclosure." *Id.* § 2(10)(b). "A person may petition the Attorney General, as provided in ORS 192.411, to review a decision by the department to withhold information." *Id.* § 2(10)(c).

38.     DCBS has adopted regulations governing the evaluation and publication of trade-secret information. *See* Or. Admin. Code 836-200-0540. To request that any information be exempted from disclosure, the manufacturer must file with its report a written explanation demonstrating that: "(A) The information is not patented; (B) The information is known only to certain individuals within the manufacturer's organization and used in a business the organization conducts; (C) The information has actual or potential commercial value; (D) The

---

[19] ORS 192.345 conditionally exempts "trade secrets" from disclosure under Oregon's public-records law and defines "trade secret" as "any formula, plan, pattern, process, tool, mechanism, compound, procedure, production data, or compilation of information which is not patented, which is known only to certain individuals within an organization and which is used in a business it conducts, having actual or potential commercial value, and which gives its user an opportunity to obtain a business advantage over competitors who do not know or use it."

Page 15 -   COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

MB LAW GROUP, LLP
Attorneys at Law
117 SW Taylor Street, Suite 200
Portland, OR  97204
Telephone: 503-914-2015
Facsimile: 503-914-1725

information gives the manufacturer an opportunity to obtain a business advantage over competitors who do not know or use it; and (E) The public interest does not require disclosure of the information." *Id.* § (1)(b). Manufacturers bear the "burden of proof to establish that information in a filing is conditionally exempt from disclosure as a trade secret." *Id.* § (2). A manufacturer seeking to challenge DCBS's determination has only 15 days to request reconsideration from DCBS's director. *Id.* §§ (3), (4). The regulations do not clarify what information "the public interest" requires to be disclosed.

39.     Under a schedule of fines adopted by DCBS, manufacturers that fail to submit timely reports, provide required information, or respond in a timely manner to any request for supporting documentation or additional information may face fines of up to $10,000 per day, depending on the nature of the violation. 2018 Or. L. Ch. 7 § 3(2); *see* Or. Admin. Code 836-200-0560.

40.     The Disclosure Law requires DCBS to "conduct a public hearing annually on prescription drug prices" and on "information reported to the department" by manufacturers. 2018 Or. L. Ch. 7 § 5(2).

### *Overview of the Advance Notification Law*

41.     On April 18, 2019, the Oregon House of Representatives passed HB 2658, titled "an act [r]elating to prescription drug costs." The Oregon Senate passed the same bill on June 6. The House concurred with the Senate amendments and repassed the bill on June 11. On June 12, the Speaker of the House signed HB 2658, and the Senate President signed the bill the next day. On June 20, Governor Brown signed HB 2658 into law. *See* 2019 Or. L. Ch. 436. The Advance

Page 16 -   COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

MB LAW GROUP, LLP
Attorneys at Law
117 SW Taylor Street, Suite 200
Portland, OR  97204
Telephone: 503-914-2015
Facsimile: 503-914-1725

Notification Law takes effect January 1, 2020. *See* ORS 171.022 (providing that enrolled bills by default take effect "on January 1 of the year after passage of the Act").

42. The Advance Notification Law imposes notice and justification requirements on manufacturers of "a prescription drug that is sold in [Oregon] state." 2019 Or. L. Ch. 436 § 2(1)(c). The law does not cover health care practitioners or drug repackagers. *Id.* § 2(1)(b)(B).

43. Beginning January 1, 2020, the Advance Notification Law will require that covered manufacturers provide the State with written notice at least 60 days before increasing the WAC of prescription drugs beyond a certain threshold. *Id.* § 2(2). The thresholds depend on whether the drug is a brand-name product or a generic product. *Id.* § 2(3)

44. For a "brand-name prescription drug," the manufacturer must provide 60 days' notice before "[a]n increase in the price . . . for which there will be, on the date that the increase goes into effect, a cumulative increase of 10 percent or more or an increase of $10,000 or more in the price of the brand-name prescription drug within a 12-month period beginning on or after July 1, 2019." *Id.* § 2(3)(a).

45. The Advance Notification Law adopts a more lenient regimen for a "generic prescription drug." The advance-notice requirement is triggered at a higher threshold: "[a]n increase . . . for which there will be, on the date that the increase goes into effect, a cumulative increase of 25 percent or more *and* an increase of $300 or more in the price of the generic prescription drug within a 12-month period beginning on or after July 1, 2019." *Id.* § 2(3)(b) (emphasis added).

46. The Advance Notification Law exempts some generic drugs entirely. Manufacturers need not provide notice before increasing the price of a retail prescription drug

Page 17 -  COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

MB LAW GROUP, LLP
Attorneys at Law
117 SW Taylor Street, Suite 200
Portland, OR 97204
Telephone: 503-914-2015
Facsimile: 503-914-1725

Case 6:19-cv-01996-AA   Document 1   Filed 12/09/19   Page 209 of 261
Case 24-1996, 07/05/2024, DktEntry 16.1, Page 209 of 263

**E.R.-209**

that is both (1) "manufactured by four or more companies" and (2) either (i) is marketed and distributed pursuant to an abbreviated new drug application; (ii) is an "authorized generic drug as defined by 41 C.F.R. 447.502"; or (iii) "entered the market before the year 1962 and was not originally marketed under a new drug application." *Id.* § 2(4).

47.    When the Advance Notification Law's advance-notice requirement applies, the manufacturer must provide DCBS with information about the drug, including:  "(a) The date that the increase will become effective; (b) The current price of the prescription drug; (c) The dollar amount of the planned increase in the price of the prescription drug; (d) A statement of whether the price increase is necessitated by a change to or improvement in the prescription drug and, if so, a description of the change or improvement; and (e) The year the drug became available for sale in the United States." *Id.* § 2(2).

48.    While the text of the Advance Notification Law is vague as to whether DCBS will publicly disclose the information provided in the advance notice, there are reasons to expect that the State intends to make the information public.  A Fiscal Impact Statement accompanying the Advance Notification Law explains that DCBS "will implement this measure using the administrative framework developed as a result of [the Disclosure Law]."[20]  As discussed above, the Disclosure Law requires DCBS to post the reported information on its public website unless: (1) the information is "conditionally exempt from disclosure under [ORS] 192.345 as a trade secret" *and* (2) "the public interest does not require disclosure of the information."  2018 Or. L. Ch. 7 § 2(10)(a).  The Advance Notification Law thus threatens manufacturers with public

---

[20] *See* Legislative Fiscal Office, *Fiscal Impact of Proposed Legislation* (Mar. 28, 2019), https://olis.leg.state.or.us/liz/2019R1/Downloads/MeasureAnalysisDocument/46450.

Page 18 -   COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

MB LAW GROUP, LLP
Attorneys at Law
117 SW Taylor Street, Suite 200
Portland, OR  97204
Telephone: 503-914-2015
Facsimile: 503-914-1725

disclosure of even their most sensitive trade-secret information whenever DCBS unilaterally deems such disclosure to be in "the public interest." *Id.*

### CONSTITUTIONAL DEFECTS OF THE DISCLOSURE LAW AND THE ADVANCE NOTIFICATION LAW

#### *The Disclosure Law and the Advance Notification Law Violate the Dormant Commerce Clause*

49.     The Constitution grants Congress the power "[t]o regulate Commerce . . . among the several States." U.S. Const. art. I, § 8, cl. 3. The Commerce Clause "reflect[s] a central concern of the Framers that[,] . . . in order to succeed, the new Union would have to avoid the tendencies toward economic Balkanization that had plagued relations among the Colonies and later among the States under the Articles of Confederation." *Hughes v. Oklahoma*, 441 U.S. 322, 325 (1979).

50.     The Supreme Court has "long interpreted the Commerce Clause as an implicit restraint on state authority, even in the absence of a conflicting federal statute." *United Haulers Ass'n v. Oneida-Herkimer Solid Waste Mgmt. Auth.*, 550 U.S. 330, 338 (2007). This is the "so-called 'dormant' aspect of the Commerce Clause." *Id.*

51.     When a state "directly regulates" interstate commerce, the Supreme Court has "generally struck down the statute without further inquiry." *Brown-Forman Distillers Corp. v. N.Y. State Liquor Auth.*, 476 U.S. 573, 579 (1986); *see also Edgar v. MITE Corp.*, 457 U.S. 624, 640 (1982) (plurality op.) ("The Commerce Clause . . . permits only *incidental* regulation of interstate commerce by the States; direct regulation is prohibited."); *NCAA v. Miller*, 10 F.3d 633, 638 (9th Cir. 1993) (statute that "directly regulates interstate commerce . . . violates the Commerce Clause per se").

Page 19 -   COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

MB LAW GROUP, LLP
Attorneys at Law
117 SW Taylor Street, Suite 200
Portland, OR  97204
Telephone: 503-914-2015
Facsimile: 503-914-1725

52. In *Brown-Forman*, the Supreme Court invalidated a state law that required distillers to submit monthly price schedules to New York and certify that they would not charge wholesalers in other states less than the scheduled prices. 476 U.S. at 576. The Court held that this requirement violated the dormant Commerce Clause because "[o]nce a distiller has posted prices in New York, it is not free to change its prices elsewhere in the United States during the relevant month." *Id.* at 582. The Court found that New York was impermissibly "project[ing]" its legislation into other states. *Id.* at 584.

53. The Fourth Circuit last year followed *Brown-Forman* in striking down, under the dormant Commerce Clause, a Maryland statute that sought to reduce prescription drug prices by precluding manufacturers from making "excessive" and "[un]justified" price increases for certain "essential" generic drugs. *Ass'n for Accessible Medicines v. Frosh* ("*AAM*"), 887 F.3d 664, 666, 673 (4th Cir. 2018), *cert. denied*, 139 S. Ct. 1168 (2019). Even though the Maryland statute applied only to drugs "made available for sale" in Maryland, the Fourth Circuit held that the law impermissibly regulated commerce "wholly outside of the State's borders" because its "practical effect" was to regulate out-of-state wholesale transactions "upstream" from consumer retail sales. *Id.* at 672–73 (citing *Brown-Forman,* 476 U.S. at 580).

54. Just like the Maryland statute invalidated in *AAM* and the New York statute invalidated in *Brown-Forman,* Oregon's Disclosure and Advance Notification Laws directly regulate out-of-state prices. Indeed, the Oregon laws intrude more significantly than the law invalidated in *Brown-Forman*. The nationwide ban on price changes in *Brown-Forman* lasted one month. The Advance Notification Law's nationwide price freeze is twice as long, and the

Page 20 -   COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

MB LAW GROUP, LLP
Attorneys at Law
117 SW Taylor Street, Suite 200
Portland, OR 97204
Telephone: 503-914-2015
Facsimile: 503-914-1725

Disclosure Law's threatened abrogation of trade-secret protection upon price increases above a certain threshold discourages those increases indefinitely.

55. The reach of the Disclosure and Advance Notification Laws also extends further than the law struck down in *Brown-Forman*. In defending the law in that case, New York argued that it "addressed only . . . sales of liquor in New York." 476 U.S. at 583. By contrast, in tying the advance-notice obligation and mandated disclosures to increases in the WAC, the Disclosure and Advance Notification Laws regulate the federally defined *national* list price for pharmaceuticals. A manufacturer cannot increase the list price of its product in *any* state without triggering both (1) a mandatory 60-day national price freeze and (2) a compelled disclosure of information that includes trade secrets. The stated purpose of the legislation, moreover, was to control national drug prices: The legislature expressly designed the 60-day freeze and intrusive reporting requirements to discourage manufacturers from increasing prices to a level Oregon deems excessive. *See* 2019 Or. L. Ch. 436 § 1 (declaring a "legislative intent" of the law as "taking steps to address . . . spiraling health care costs").

56. The requirements under the Disclosure and Advance Notification Laws that manufacturers must explain their price increases constitute an additional burden on pricing nationwide. If a manufacturer of a qualifying drug wishes to increase the national WAC for the drug above the Oregon-imposed threshold, it must justify the increase. Any failure to provide DCBS with what it deems a sufficiently detailed explanation for increases in the national list price subjects the manufacturer to fines. The obvious purpose and effect of these requirements is to control prices, not just in Oregon, but nationally.

MB LAW GROUP, LLP
Attorneys at Law
117 SW Taylor Street, Suite 200
Portland, OR  97204
Telephone: 503-914-2015
Facsimile: 503-914-1725

57.     Manufacturers cannot avoid triggering the Disclosure Law or the Advance Notification Law even by refusing to sell drugs in-state.  Both laws apply to manufacturers of any drug "that is sold in" Oregon, 2018 Or. L. Ch. 7 § 2(1)(e); 2019 Or. L. Ch. 436 § 2(1)(c), whether or not the manufacturer itself directs sales toward the State.  This kind of attempt to "extend [a state's] police power beyond its jurisdictional bounds" violates the Commerce Clause. *C & A Carbone, Inc. v. Town of Clarkstown*, 511 U.S. 383, 393 (1994); *see also AAM*, 887 F.3d at 672.

### *The Disclosure Law and the Advance Notification Law Violate the First Amendment*

58.     The Disclosure and Advance Notification Laws violate the First Amendment by compelling pharmaceutical manufacturers to speak about their pricing decisions.  U.S. businesses generally have no obligation to explain their pricing decisions, and manufacturers would not do so in the manner required by these laws unless coerced.  This, in itself, causes harm.  "'Since *all* speech inherently involves choices of what to say and what to leave unsaid,'" it is fundamental to free speech "that one who chooses to speak may also decide 'what not to say.'"  *Hurley v. Irish-Am. Gay, Lesbian, & Bisexual Grp. of Boston*, 515 U.S. 557, 573 (1995) (quoting *Pac. Gas & Elec. Co. v. Pub. Utils. Comm'n of Cal.*, 475 U. S. 1, 11, 16 (1986) (plurality op.)).  "*All* speech" includes speech about prices.  As the Supreme Court has repeatedly held, laws regulating "how sellers may communicate their prices" are subject to First Amendment scrutiny.  *Expressions Hair Design v. Schneiderman*, 137 S. Ct. 1144, 1151 (2017).  In particular, the First Amendment protects the free "flow of prescription drug price information."  *Va. State Bd. of Pharmacy v. Va. Citizens Consumer Council, Inc.*, 425 U.S. 748, 770 (1976).  As the Disclosure and Advance Notification Laws "regulat[e] the communication of prices rather than prices themselves," the

Page 22 -   COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

MB LAW GROUP, LLP
Attorneys at Law
117 SW Taylor Street, Suite 200
Portland, OR  97204
Telephone: 503-914-2015
Facsimile: 503-914-1725

laws on their face implicate core First Amendment values. *Expressions Hair Design*, 137 S. Ct. at 1151; *see also Italian Colors Rest. v. Becerra*, 878 F.3d 1165, 1175-76 (9th Cir. 2018).

59. The Disclosure and Advance Notification Laws, however, do not merely require PhRMA's members to speak when they would prefer to remain silent. The laws require them implicitly to endorse the State's political message—namely, that manufacturers' WAC increases are primarily or even solely responsible for increases in the prices that patients and others pay for prescription drugs. Requiring manufacturers to justify price increases over the State's thresholds implies that such increases are inherently pernicious; lesser increases and price reductions require no explanation. And the Advance Notification Law expressly identifies "a change or improvement in the drug" as the only adequate justification for increasing the WAC, thereby subordinating alternative rationales for such increases. The new laws thus force private companies to "endorse ideas they find objectionable," a prospect that is "always demeaning." *Janus v. Am. Fed'n of State, Cty., & Mun. Emps., Council 31*, 138 S. Ct. 2448, 2464 (2018). "[F]or this reason . . . a law commanding involuntary affirmation of objected-to beliefs [requires] even more immediate and urgent grounds than a law demanding silence." *Id.* (internal quotation marks omitted).

60. Courts apply heightened judicial scrutiny to speech regulations that target particular speakers, discriminate based on the content of regulated communications, or favor particular viewpoints. *See Reed v. Town of Gilbert*, 135 S. Ct. 2218, 2227 (2015); *Sorrell v. IMS Health Inc.*, 564 U.S. 552, 564-66 (2011). The Disclosure and Advance Notification Laws discriminate on all three bases: speaker, content, *and* viewpoint.

Page 23 -   COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

MB LAW GROUP, LLP
Attorneys at Law
117 SW Taylor Street, Suite 200
Portland, OR  97204
Telephone: 503-914-2015
Facsimile: 503-914-1725

a)      **Speaker-Based Discrimination**.  Both of the new laws "on [their] face burden[] . . . disfavored speakers." *Sorrell*, 564 U.S. at 564 (overturning Vermont law that "disfavor[ed] specific speakers, namely pharmaceutical manufacturers," by imposing prohibitions only on them).  Participants all along the supply chain—wholesalers, pharmacy benefit managers, group purchasing organizations, pharmacies, hospitals, and clinics—play a role in setting a patient's out-of-pocket cost for prescription drugs.  Yet the Disclosure and Advance Notification Laws require only certain pharmaceutical manufacturers to "explain" their actions, with the obvious subtext that they have misbehaved, overcharged the public, or acted irresponsibly absent a "change or improvement" in the drug.  Indeed, the Advance Notification Law takes the speaker-based discrimination further by burdening manufacturers of brand-name drugs more than manufacturers of generics.

b)      **Content-Based Discrimination**.  The Advance Notification Law discriminates based on content by forcing manufacturers to speak at a particular time, to a particular audience, with a particular message—namely, the disapproving subtext previously described.  The Disclosure Law, by requiring manufacturers to report the reasons for price increases above the State's disapproval threshold, likewise requires communication, and implicit validation, of views that the manufacturers dispute and would not otherwise convey.  Laws that "[m]andat[e] speech that a speaker would not otherwise make" are content based, because forcing a speaker to convey a message "necessarily alters the content of the speech." *Riley*, 487 U.S. at 795.

c)      **Viewpoint-Based Discrimination**.  The Disclosure and Advance Notification Laws discriminate on the basis of viewpoint because they impose burdens based on

Page 24 -   COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

MB LAW GROUP, LLP
Attorneys at Law
117 SW Taylor Street, Suite 200
Portland, OR  97204
Telephone: 503-914-2015
Facsimile: 503-914-1725

E.R.-216

"the specific motivating ideology [and] the opinion or perspective of the speaker." *Reed*, 135 S. Ct. at 2230 (internal quotation marks omitted). A manufacturer may freely express its opinions—or remain silent—regarding *reductions* in drug prices, or even regarding increases in drug prices below the level the State deems excessive. But the manufacturer must speak when its price increases hit the prescribed threshold, and such compelled speech must take the form mandated by the State, which is designed to convey the State's message that the price increase is unjustified. The laws thus use speech regulation to advance the State's view that drug prices should be lower and that price increases exceeding 10 percent or $10,000 annually for brand-name drugs are improper.

61. Even if the Disclosure and Advance Notification Laws did not discriminate on their face against certain pharmaceutical manufacturers, they still would violate the First Amendment under the test set forth in *Central Hudson Gas & Electric Corp. v. Public Service Commission of New York*, 447 U.S. 557 (1980). Under *Central Hudson*, the State must demonstrate that the regulation of speech "directly advances a substantial governmental interest" and "is not more extensive than is necessary to serve that interest." 447 U.S. at 566; *see also Sorrell*, 564 U.S. at 572 (*Central Hudson* requires a "fit between the legislature's ends and the means chosen to accomplish those ends"). Oregon has no legitimate interest, let alone a substantial one, in regulating drug prices nationwide. Nor does Oregon have a substantial interest in compelling disclosure of changes to the WAC and explanations for those changes; the WAC is but one link in the chain of pharmaceutical pricing. *See, e.g.*, *Video Software Dealers Ass'n v. Schwarzenegger*, 556 F.3d 950, 965-67 (9th Cir. 2009), *aff'd*, 564 U.S. 786 (2011) (State has no legitimate reason to force retailers to affix misleading labels on their products).

Page 25 - COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

MB LAW GROUP, LLP
Attorneys at Law
117 SW Taylor Street, Suite 200
Portland, OR 97204
Telephone: 503-914-2015
Facsimile: 503-914-1725

62.     Indeed, the Disclosure Law flips the First Amendment on its head by forcing manufacturers who do not want their compelled justifications made public to prove that the "public interest"—a concept left vague and undefined—does "not require" dissemination. 2018 Or. L. Ch. 7 § 2(10)(a). Under the Constitution, it is *the State* that must prove that its speech restrictions are justified by a compelling governmental interest, *see Reed*, 135 S. Ct. at 2231-32, not the manufacturer that must prove the absence of any such interest.

63.     But even if regulating pharmaceutical prices nationwide were a legitimate state interest, Oregon does not and cannot advance that interest by mandating speech about prices and then regulating that speech as a backdoor means to achieve its regulatory objectives. Compelling speech about pricing is not a legitimate alternative to regulating pricing directly. The Supreme Court has made clear that "if the First Amendment means anything, it means that regulating speech must be a last—not first—resort." *Thompson v. W. States Med. Ctr.*, 535 U.S. 357, 373 (2002).

64.     Nor do Oregon's laws *directly* advance the State's interest in lowering healthcare costs. Instead, they purport to make prescription drug pricing more "transparent" in the hopes of shaming manufacturers who intend to increase the WAC of their products. Even assuming that transparency would lead to lower prices—a proposition the Federal Trade Commission has questioned[21]—the Disclosure and Advance Notification Laws cannot fulfill their stated mission,

---

[21] *See* Letter from James Cosgrove, Director of Health Care, Gov't Accountability Office, to Rep. Sander M. Levin, Ranking Member, House Comm. on Ways and Means 4 (Aug. 1, 2016), http://www.gao.gov/assets/680/678784.pdf; Cong. Budget Office, *Increasing Transparency in the Pricing of Health Care Services and Pharmaceuticals* 6 (June 5, 2008), https://bit.ly/2XFj4uf.

Page 26 -   COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

MB LAW GROUP, LLP
Attorneys at Law
117 SW Taylor Street, Suite 200
Portland, OR 97204
Telephone: 503-914-2015
Facsimile: 503-914-1725

as they do not require the same level of "transparency" from other participants in the pharmaceutical supply chain that have a substantial role in setting drug prices.

65. Indeed, even if these laws advanced a substantial state interest, they still would not survive scrutiny because the "fit between the legislature's ends and the means chosen to accomplish those ends" is no fit at all. *Sorrell*, 564 U.S. at 572 (internal quotation marks omitted). The laws impose burdens on a single actor in a complex distribution system, attempt to use transparency as a means of controlling nationwide list prices, and are unlikely to have the intended effect of lowering prescription drug prices.

66. Oregon cannot evade the *Central Hudson* test by invoking the more lenient standard set forth in *Zauderer v. Office of Disciplinary Counsel of Supreme Court of Ohio*, 471 U.S. 626, 651 (1985), which applies to certain compelled speech. Courts apply *Zauderer* only to the most basic, "purely factual and uncontroversial information" that is "orthodox in commercial advertising." The disclosures compelled here are not part of commercial advertising, and they are neither factual nor uncontroversial. *See Nat'l Inst. of Family & Life Advocates v. Becerra* ("*NIFLA*"), 138 S. Ct. 2361, 2368-72 (2018) (declining to apply *Zauderer* to California's requirement that pregnancy clinics give notice that the State provides free or low-cost access to family planning services and abortion). To the contrary, they misleadingly suggest that *only* the manufacturer determines the costs that consumers and others pay for pharmaceutical products, and also misleadingly suggest that price increases can be legitimate only if they are based on a "change or improvement in the prescription drug." 2019 Or. L. Ch. 7 § 2(2)(d).

Page 27 -   COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

MB LAW GROUP, LLP
Attorneys at Law
117 SW Taylor Street, Suite 200
Portland, OR  97204
Telephone: 503-914-2015
Facsimile: 503-914-1725

### The Disclosure Law and the Advance Notification Law Conflict with Federal Trade-Secret Law

67. Trade-secret laws play a key role in fueling the American economy. Legal protection for trade secrets "encourage[s] invention in areas where patent law does not reach, and . . . prompt[s] the independent innovator to proceed with the discovery and exploitation of his invention." *Kewanee Oil Co. v. Bicron Corp.*, 416 U.S. 470, 485 (1974).

68. Every state in the nation protects trade secrets. Forty-eight states, including Oregon, have adopted (with slight variations) the Uniform Trade Secrets Act ("UTSA"), which codified the common law elements of misappropriation of confidential information. The UTSA defines a "trade secret" as "information, including a formula, pattern, compilation, program, device, method, technique, or process, that: (i) derives independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable by proper means by, other persons who can obtain economic value from its disclosure or use, and (ii) is the subject of efforts that are reasonable under the circumstances to maintain its secrecy." UTSA, § 1(4); *see* ORS 646.461(4). Courts in UTSA jurisdictions, including Oregon, routinely hold that confidential information concerning advertising, cost, marketing, pricing, and production constitutes a trade secret. *See, e.g.*, *Pfizer Inc. v. Oregon Dep't of Justice ex rel. Kroger*, 254 Or. App. 144, 294 P.3d 496, 499, 507 (2012) (protecting from disclosure pharmaceutical manufacturers' litigation exhibits regarding "marketing of [two] medications"); *Citizens' Util. Bd. of Oregon v. Oregon Pub. Util. Comm'n*, 128 Or. App. 650, 877 P.2d 116, 122 (1994) (protecting from disclosure utility's cost-accounting method); *accord, e.g.*, *In re Dana Corp.*, 574 F.3d 129, 152 (2d Cir. 2009) ("Confidential proprietary data relating to pricing, costs, systems, and methods are protected by [New York] trade secret law").

Page 28 -   COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

MB LAW GROUP, LLP
Attorneys at Law
117 SW Taylor Street, Suite 200
Portland, OR 97204
Telephone: 503-914-2015
Facsimile: 503-914-1725

69.     In 2016, Congress enacted the Defend Trade Secrets Act, creating a federal private right of action for misappropriation of trade secrets "related to a product or service used in, or intended for use in, interstate or foreign commerce." Pub. L. No. 114-153, 130 Stat. 376 (2016) (codified at 18 U.S.C. § 1836(b)).

70.     Congress enacted the DTSA because "trade secrets are increasingly becoming the foundation of businesses across the country, with one estimate placing the value of trade secrets in the United States at $5 trillion. . . . With so much at stake, it is absolutely vital . . . [to] include strong protections against theft of trade secrets." 162 Cong. Rec. H2028-01, H2033 (Apr. 27, 2016) (comments of Rep. Nadler). "By improving trade secret protection," Congress intended the DTSA to "incentivize future innovation while protecting and encouraging the creation of American jobs." S. Rep. No. 114-220, at 3 (2016).

71.     Although every state protects trade secrets, Congress intended the DTSA to provide businesses engaged in interstate commerce with a uniform remedy for misappropriation. Congress expressed concern that "state laws vary in a number of ways and contain built-in limitations that make them not wholly effective in a national and global economy." H.R. Rep. No. 114-529, at 4 (Apr. 26, 2016) (Judiciary Committee). "[U]nlike patents, once this information is disclosed it instantly loses its value and the property right itself ceases to exist." 162 Cong. Rec. H2034 (comments of Rep. Jackson Lee). Thus, the DTSA allows businesses "to move quickly to Federal court . . . to stop trade secrets from winding up being disseminated and losing their value." H.R. Rep. No. 114-529, at 6; accord S. Rep. No. 114-220, at 3.

72.     The federal definition of "trade secret" under the DTSA was modeled on the UTSA. Oregon trade-secret law was too—until the Disclosure and Advance Notification Laws.

Page 29 -   COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

MB LAW GROUP, LLP
Attorneys at Law
117 SW Taylor Street, Suite 200
Portland, OR 97204
Telephone: 503-914-2015
Facsimile: 503-914-1725

The Disclosure Law compels manufacturers to disclose to DCBS confidential and proprietary advertising, cost, marketing, pricing, and production information. And the Advance Notification Law compels manufacturers to disclose confidential information about future price increases. All of this information derives independent value from not being generally known to third parties and competitors, and it constitutes trade secrets under the DTSA.

73.     Further, the Disclosure and Advance Notification Laws threaten to eliminate trade-secret protection for all disclosed information.  A manufacturer seeking to avoid public dissemination of any reported information bears the burden of showing not only that the information is subject to trade-secret protection under the DTSA or UTSA, but also that (among other things) the "information is known only to certain individuals within the manufacturer's organization and used in a business the organization conducts."  Or. Admin. Code 836-200-0540(1)(b). The DTSA's and UTSA's definitions of a trade secret contain no such categorical requirement.  *See* ORS 646.461(4); 18 U.S.C. § 1839(3).

74.     Even if the manufacturer convinces DCBS that the information meets those requirements—which go beyond those in the DTSA and UTSA—public dissemination is still required unless DCBS determines that "[t]he public interest does not require disclosure of the information."  2018 Or. L. Ch. 7 § 2(10)(a).  Neither the Disclosure Law nor its implementing regulations define "the public interest."  Indeed, the Oregon legislature in passing the Disclosure Law declared "a substantial public interest in the price and cost of prescription drugs," suggesting that DCBS may view the public interest as requiring publication of *all* compelled disclosures.

MB LAW GROUP, LLP
Attorneys at Law
117 SW Taylor Street, Suite 200
Portland, OR  97204
Telephone: 503-914-2015
Facsimile: 503-914-1725

75.     Once published on the Internet or otherwise publicly disseminated under the authority of the Disclosure or Advance Notification Laws, the information no longer constitutes a trade secret under either the UTSA or the DTSA.  *See, e.g.*, 18 U.S.C. § 1839.  The destruction of trade-secret protection in Oregon will thwart the ability of manufacturers subject to the State's disclosure requirements to sue for misappropriation in any jurisdiction, including in federal court under the DTSA.

76.     The threatened demise of trade secret protection for pricing information is itself an injury to PhRMA members.  Concerns about the ability of competitors to obtain commercially sensitive information also threatens to affect whether and how companies collect and store such information internally; to undermine the companies' position in commercial negotiations; and to impede the conduct of their business.  Oregon's laws make protection for trade secrets more uncertain, burdensome, and costly, undercutting the objective of the DTSA to protect the competitiveness of American industry.

77.     Thus, both laws "stand[] as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress," *Hines v. Davidowitz*, 312 U.S. 52, 67 (1941), and indeed jeopardize the trillion of dollars' worth of trade secrets that Congress enacted the DTSA to protect.

### *The Disclosure Law and the Advance Notification Law Violate the Takings Clause*

78.     The Fifth Amendment provides that "private property [shall not] be taken for public use, without just compensation."  U.S. Const. amend. V.  This proscription applies to the states through the Fourteenth Amendment.

Page 31 -   COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

MB LAW GROUP, LLP
Attorneys at Law
117 SW Taylor Street, Suite 200
Portland, OR  97204
Telephone: 503-914-2015
Facsimile: 503-914-1725

79.     Government regulation of private property can constitute a taking.  *See Lucas v. S.C. Coastal Council*, 505 U.S. 1003, 1015 (1992).  "Private property" includes not only tangible property, but also intangible property, such as trade secrets.  *Ruckelshaus v. Monsanto Co.*, 467 U.S. 986, 1002–04 (1984).  A state's "failure to provide adequate protection to assure [a trade secret's] confidentiality, when disclosure is compelled . . . , can amount to an unconstitutional taking of property by destroying [the trade secret], or by exposing it to the risk of destruction by public disclosure or by disclosure to competitors."  *St. Michael's Convalescent Hosp. v. California*, 643 F.2d 1369, 1374 (9th Cir. 1981) (alteration omitted) (quoting *Wearly v. FTC*, 462 F. Supp. 589, 598 (D.N.J. 1978)).

80.     Courts have recognized that regulatory takings may be categorical or noncategorical.  *See Lingle v. Chevron U.S.A. Inc.*, 544 U.S. 528, 538 (2005).  A categorical taking occurs where a statute or regulation "denies all economically beneficial or productive use" of property.  *Lucas*, 505 U.S. at 1015.  By contrast, a noncategorical taking may occur where a regulation "fall[s] short of eliminating all economically beneficial use," *Palazzolo v. Rhode Island*, 533 U.S. 606, 617 (2001), yet still goes "too far" for purposes of the Takings Clause, *Lucas*, 505 U.S. at 1014–15 (quoting *Pa. Coal Co. v. Mahon*, 260 U.S. 393, 415 (1922)).  To determine whether a noncategorical regulatory taking goes "too far," courts apply the three-part test articulated in *Penn Central Transportation Co. v. City of New York*, 438 U.S. 104 (1978).  That test assesses:  "[1] the character of the governmental action, [2] its economic impact, and [3] its interference with reasonable investment-backed expectations."  *Ruckelshaus*, 467 U.S. at 1005.

MB LAW GROUP, LLP
Attorneys at Law
117 SW Taylor Street, Suite 200
Portland, OR  97204
Telephone: 503-914-2015
Facsimile: 503-914-1725

Case 6:19-cv-01976-AA   07/05/2024,   Dkt Entry: 16.1, Page 224 of 261
Case 6:19-cv-01976-AA   Document 61   Filed 12/09/19   Page 33 of 42

**E.R.-224**

81.     The Disclosure and Advance Notification Laws categorically take property rights without compensation, in violation of the Takings Clause. "With respect to a trade secret, the right to exclude others is central to the very definition of the property interest." *Ruckelshaus*, 467 U.S. at 1011.  In the event that the state unilaterally deems the disclosed information as being in "the public interest," Oregon's laws strip trade-secret protection and mandate public disclosure of manufacturers' confidential advertising, cost, marketing, pricing, and production information on DCBS's website, irreversibly destroying any trade-secret protection for the information disclosed.  The operation of the laws thus ensures that manufacturers lose any claim of confidentiality, the *sine qua non* of what makes a trade secret valuable.  *See Ruckelshaus*, 467 U.S. at 1011–12; *see also* 162 Cong. Rec. H2034 ("[U]nlike patents, once this information is disclosed it instantly loses its value and the property right itself ceases to exist." (comments of Rep. Jackson Lee in support of DTSA)).

82.     Even if the laws did not work a categorical taking by threatening destruction of manufacturers' property interests in their trade secrets, the laws would still constitute impermissible regulatory takings under *Penn Central*'s three-part test.

83.     *First*, the "character" of Oregon's legislative actions weighs heavily against sustaining them.  The laws prevent pharmaceutical manufacturers from "exclud[ing] others from their trade secrets," causing the trade secrets to "lose all value." *Phillip Morris, Inc. v. Reilly*, 312 F.3d 24, 41 (1st Cir. 2002) (en banc).  "Therefore, if the [pharmaceutical manufacturers] comply with the requirements of [the Disclosure and Advance Notification Laws], their property right will be extinguished." *Id.* at 42.  "[T]his is precisely what the Takings Clause is designed to prevent." *Id.* at 32.

Page 33 -   COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

MB LAW GROUP, LLP
Attorneys at Law
117 SW Taylor Street, Suite 200
Portland, OR  97204
Telephone: 503-914-2015
Facsimile: 503-914-1725

Case 6:19-cv-01996-AA Document 161 Filed 12/09/19 Page 225 of 261
Case 24-1596, 07/05/2024, DktEntry 16.1, Page 234 of 42

**E.R.-225**

84.    *Second*, eliminating trade-secret protection for confidential advertising, cost, marketing, pricing, and production information relating to drugs will have a devastating "economic impact" not only on manufacturers subject to the disclosure requirements, but also on the market for drugs. *See Penn Central*, 438 U.S. at 124. A manufacturer forced to disclose such information will be at a severe competitive disadvantage against competitors not subject to the laws, who could use the published disclosures to learn how the manufacturer allocates its resources and sets its prices for each qualifying drug. Similarly, the Disclosure and Advance Notification Laws prejudice affected manufacturers in their dealings with third-party payers, who will be able to use the manufacturers' pricing information against them in negotiations. These adverse effects are not confined to Oregon: A trade secret published in Oregon is subject to use (and abuse) nationwide; losing trade-secret protection anywhere means losing it everywhere.

85.    *Third*, the laws interfere with manufacturers' reasonable "investment-backed expectation" that their confidential and proprietary information would remain secret. *See Penn Central*, 438 U.S. at 124. For many years Oregon has treated confidential advertising, cost, marketing, pricing, and production information as being entitled to trade-secret protection, without any exception for drug manufacturers. *See, e.g.*, ORS 192.345; *id.* 646.461(4); *Pfizer*, 294 P.3d at 507. Manufacturers thus had developed reasonable investment-backed expectations in the secrecy of this information, which no other state required them to disclose. The value of the lost trade secret protection is reflected in the erosion of the anticipated returns on their investments in researching, developing, and marketing their drugs.

86.    The requirement that disclosure of the reported information be deemed in "the public interest" is a vague, arbitrary, and insufficient safeguard. *See Reilly*, 312 F.3d at 31

Page 34 -   COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

MB LAW GROUP, LLP
Attorneys at Law
117 SW Taylor Street, Suite 200
Portland, OR  97204
Telephone: 503-914-2015
Facsimile: 503-914-1725

(striking down law allowing disclosure of trade secrets where doing so would "further public health"). Neither the Disclosure Law nor its implementing regulations clarify what sort of disclosures will or will not be deemed in "the public interest." The Disclosure Law's declaration that there is "a substantial public interest in the price and cost of prescription drugs" suggests that the State presumptively will find the reported information to be in the "public interest," even if it constitutes a trade secret. Indeed, the Disclosure Law requires manufacturers to prove that the information is subject to trade-secret protection as a threshold matter, even before the agency makes a public-interest determination. To avoid the destruction of their property, therefore, manufacturers bear the burden of proving the trade-secret status of their information *and* of convincing DCBS that disclosure is not in the public interest.

87. Thus, whether construed as a categorical or noncategorical taking, Oregon's disclosure and advance-notice requirements destroy valuable trade secrets without any compensation, much less "just compensation," in violation of the Takings Clause.

### *The Disclosure Law and the Advance Notification Law Harm PhRMA Members*

88. The Disclosure and Advance Notification Laws' reporting and advance-notice requirements have harmed and will continue to harm PhRMA's members.

89. In recent years, PhRMA members have taken price increases or have introduced new prescription drugs that have triggered the Disclosure Law's reporting requirements, and have taken price increases that will trigger the Advance Notification Law's 60-day advance notice requirement when it takes effect.

90. Indeed, several PhRMA members have already been forced to make the disclosures required under the Disclosure Law. PhRMA members market drugs with a WAC of

Page 35 - COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

MB LAW GROUP, LLP
Attorneys at Law
117 SW Taylor Street, Suite 200
Portland, OR 97204
Telephone: 503-914-2015
Facsimile: 503-914-1725

at least $100 for a month-long course of treatment and for which the WAC increased by 10 percent or more during the relevant time period. These PhRMA members timely submitted reports to DCBS containing the information required under section 2 of the Disclosure Law.

91. In addition, PhRMA members also market drugs that have triggered the Disclosure Law's reporting requirements for new prescription drugs. Each of these drugs was "introduced for sale in the United States" at a WAC "that exceeds the threshold established by the Centers for Medicare and Medicaid Services for specialty drugs in the Medicare Part D program." 2018 Or. L. Ch. 7 § 2(6). These PhRMA members timely submitted reports to DCBS containing the information required under section 2 of the Disclosure Law. They would not have made these statements, to which they object, had the Disclosure Law not required them to do so in violation of their First Amendment rights.

92. Moreover, in light of the absence of adequate protection for confidential and proprietary trade secrets in the Disclosure Law, these PhRMA members risk that DCBS will publicly disclose the confidential information that they have provided and will provide under the Disclosure Law. Such public disclosure of proprietary business information would subject these PhRMA members to competitive disadvantage.

93. The Advance Notification Law equally harms PhRMA's members. For example, California's Office of Statewide Health Planning and Development issued a report in September 2019 asserting that many pharmaceutical companies, including PhRMA members, have made price increases within the past five years that exceed the 10-percent threshold established by the

Page 36 -   COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

MB LAW GROUP, LLP
Attorneys at Law
117 SW Taylor Street, Suite 200
Portland, OR 97204
Telephone: 503-914-2015
Facsimile: 503-914-1725

Disclosure and Advance Notification Laws.[22]  Were the Advance Notification Law in force, those PhRMA members would have had to file advance notices in Oregon, which in turn would forbid them from raising the WAC of those products nationwide for at least 60 days.

94.     In the future, some PhRMA members will increase the prices for their products to a level that would subject them to the reporting requirements of the Disclosure Law and the advance notice and justification requirements of the Advance Notification Law.  In the absence of the Disclosure and Advance Notification Laws, PhRMA members who will trigger the reporting and justification requirements in the future would not make the required statements, to which the members object.  And, in the absence of the Advance Notification Law, PhRMA members would not wait 60 days to implement planned pricing increases.  In other instances, PhRMA members will be deterred from undertaking price increases at the levels that would trigger the advance notice and reporting and justification requirements.  Moreover, PhRMA members fear that the State will publish the advance notices to the public.  If this were to occur, such publication would destroy trade secret protection that applies to the timing of pricing decisions, which is highly confidential and competitively sensitive.

95.     PhRMA's challenges to both statutes are presently ripe for review.  The Disclosure Law is in effect, and PhRMA members have already filed required reports.  The Advance Notification Law's extraterritorial price regulation takes effect on January 1, 2020, but incorporates price increases made any time after July 1, 2019.  Thus, from the moment the

---

[22] *See* Cal. Health & Human Servs., *Prescription Drugs WAC Increases—5 Year History*, CHHS Open Data, https://data.chhs.ca.gov/dataset/0c693b50-6d23-46a0-a1ae-7c320fe23dff/ resource/b57d3435-a56c-4f74-83b3-d54775a005a2/download/prescription-drug-5year-history-data-q1.xlsx; *see also* Victoria Colliver, *California's Drug Transparency Law Yields Early Surprises*, Politico (Mar. 25, 2018), https://politi.co/2I6LctT.

Page 37 -   COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

MB LAW GROUP, LLP
Attorneys at Law
117 SW Taylor Street, Suite 200
Portland, OR  97204
Telephone: 503-914-2015
Facsimile: 503-914-1725

Case 6:19-cv-01976-AA Document 161 Filed 12/09/19 Page 229 of 261
Case 24-1976, 07/05/2024, DktEntry: 16.1, Page 229 of 288

**E.R.-229**

Advance Notification Law takes effect, it will restrict pricing decisions made outside the State in violation of the Commerce Clause, and it will compel manufacturers to report and justify their prices in violation of the First Amendment. Compliance with these unconstitutional laws thus will require "immediate and significant change in the plaintiffs' conduct of their affairs." *Abbott Labs. v. Gardner*, 387 U.S. 136, 153 (1967).

## CLAIMS FOR RELIEF

## FIRST CLAIM FOR RELIEF

**(Declaratory/Injunctive Relief – The Disclosure Law and Advance Notification Law Violate the Commerce Clause, Article I, section 8, clause 3 of the U.S. Constitution)**

96.     Plaintiff realleges and incorporates by reference all prior and subsequent paragraphs.

97.     The Constitution grants Congress the power "[t]o regulate Commerce . . . among the several States." U.S. Const. art. I, § 8, cl. 3. The Commerce Clause places an implicit restraint on state laws that improperly restrain national commerce.

98.     The Disclosure and Advance Notification Laws violate the Commerce Clause by regulating drug pricing beyond Oregon's jurisdiction. Because the WAC is a national list price, the Disclosure and Advance Notification Laws will affect the entire country. They will also curtail lawful pricing activities conducted entirely outside Oregon by burdening that conduct with notice and reporting requirements, by threating to strip trade-secret protection, and by imposing substantial fines in Oregon.

Page 38 -  COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

MB LAW GROUP, LLP
Attorneys at Law
117 SW Taylor Street, Suite 200
Portland, OR  97204
Telephone: 503-914-2015
Facsimile: 503-914-1725

## SECOND CLAIM FOR RELIEF

**(Declaratory/Injunctive Relief – The Disclosure Law and Advance Notification Law Violate the First Amendment to the U.S. Constitution)**

99.     Plaintiff realleges and incorporates by reference all prior and subsequent paragraphs.

100.     The Disclosure and Advance Notification Laws violate the First Amendment because they compel certain pharmaceutical manufacturers to communicate publicly the State's designated message about their drug pricing decisions even when the manufacturers prefer to remain silent.  The Disclosure and Advance Notification Laws force manufacturers to disseminate the State's messages that only changes or improvements in a drug can justify a price increase, and that manufacturers bear primary responsibility for increases in drug prices. PhRMA's members disagree with and would not otherwise endorse those messages, implicitly or explicitly.

101.     The Disclosure and Advance Notification Laws discriminate on the basis of speaker, content, and viewpoint.  They constitute impermissible efforts by Oregon to compel speech as a means of regulating nationwide drug prices that the State cannot regulate directly.

102.     The Disclosure and Advance Notification Laws fail strict scrutiny because they are not narrowly tailored to advance any compelling state interest.  They fail the *Central Hudson* test because they do not directly advance a substantial government interest and lack a sufficient fit.  And they fail even under *Zauderer* because their compelled disclosures are neither factual nor uncontroversial.

Page 39 -   COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

MB LAW GROUP, LLP
Attorneys at Law
117 SW Taylor Street, Suite 200
Portland, OR  97204
Telephone: 503-914-2015
Facsimile: 503-914-1725

## THIRD CLAIM FOR RELIEF

**(Declaratory/Injunctive Relief – The Disclosure Law and Advance Notification Law Are Preempted by the Federal Trade-Secret Law and the Supremacy Clause, Article VI, Clause 2 of the U.S. Constitution)**

103. Plaintiff realleges and incorporates by reference all prior and subsequent paragraphs.

104. The Disclosure Law compels manufacturers to disclose to DCBS confidential and proprietary advertising, cost, marketing, pricing, and production information that derives independent value from not being generally known to third-party payers and competitors. The Advance Notification Law compels manufacturers to disclose to DCBS information about future price increases that is confidential and that derives independent value from not being generally known to third-party payers and competitors. These categories of information are "trade secrets" under the federal Defend Trade Secrets Act of 2016.

105. The Disclosure and Advance Notification Laws violate the Supremacy Clause by nullifying federal trade-secret protection for information that manufacturers are forced to disclose. The laws thus stand as an obstacle to the accomplishment and execution of the full purposes and objectives of the DTSA, and are therefore preempted.

## FOURTH CLAIM FOR RELIEF

**(Declaratory/Injunctive Relief – The Disclosure Law and Advance Notification Law Work Takings Without Just Compensation in Violation of the Fifth and Fourteenth Amendments to the U.S. Constitution)**

106. Plaintiff realleges and incorporates by reference all prior and subsequent paragraphs.

Page 40 -   COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

MB LAW GROUP, LLP
Attorneys at Law
117 SW Taylor Street, Suite 200
Portland, OR  97204
Telephone: 503-914-2015
Facsimile: 503-914-1725

Case 6:19-cv-01976-AA   Document 1   Filed 12/09/19   Page 232 of 261
Case 24-1976, 07/05/2024, DktEntry 16.2, Page 232 of 261   Page 41 of 42

**E.R.-232**

107.     The Fifth Amendment to the United States Constitution, applicable to the states through the Fourteenth Amendment, provides that "private property [shall not] be taken for public use, without just compensation."

108.     The Disclosure and the Advance Notification Laws effect categorical takings of Plaintiff's members' intellectual property rights because they threaten public disclosure of their trade secrets, thereby negating the value of those trade secrets.

109.     Alternatively, the Disclosure and Advance Notification Laws work regulatory takings under the three-part test set out in *Penn Central*.  First, the laws have the "character" of a total interference with manufacturers' property rights in their trade secrets.  *Penn Central*, 438 U.S. at 124–25.  Second, eliminating trade-secret protection for drugs' confidential advertising, cost, marketing, pricing, and production information will have a devastating "economic impact" not only on manufacturers subject to the disclosure requirements, but also on the market for pharmaceuticals.  *Id.* at 124.  Third, manufacturers have invested in the research and development of pharmaceuticals with the reasonable "investment-backed expectation" that their confidential and proprietary information will remain a secret.  *Id.* at 124, 127.

110.     Thus, the laws' disclosure and advance-notice requirements destroy valuable trade secrets without any compensation, let alone just compensation, in violation of the Takings Clause.  U.S. Const. amends. V, XIV.

Page 41 -   COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

MB LAW GROUP, LLP
Attorneys at Law
117 SW Taylor Street, Suite 200
Portland, OR  97204
Telephone: 503-914-2015
Facsimile: 503-914-1725

## PRAYER FOR RELIEF

**NOW, THEREFORE,** Plaintiff requests a judgment in its favor against Defendant as follows:

1. A declaration that the Disclosure Law (2018 Or. L. Ch. 7) and the Advance Notification Law (2019 Or. L. Ch. 436) are unconstitutional and void;

2. A permanent injunction preventing Defendant from implementing or enforcing the Disclosure Law (2018 Or. L. Ch. 7) or the Advance Notification Law (2019 Or. L. Ch. 436);

3. An award of attorneys' fees and costs, plus interest accruing thereon, in Plaintiff's favor at the maximum rate allowed by law; and

4. An award of such other and further relief as the Court may deem appropriate.

DATED:  December 9, 2019.

MB LAW GROUP, LLP

 s/ Jonathan M. Hoffman
Jonathan M. Hoffman, OSB No. 754180
jhoffman@mblglaw.com
David W. Cramer, OSB No. 113621
dcramer@mblglaw.com
117 SW Taylor Street, Suite 200
Portland, OR 97204
Telephone: (503) 914-2015

*Attorneys for Plaintiff Pharmaceutical Research and Manufacturers of America*

MB LAW GROUP, LLP
Attorneys at Law
117 SW Taylor Street, Suite 200
Portland, OR  97204
Telephone: 503-914-2015
Facsimile: 503-914-1725

## CHAPTER 7

### AN ACT                                    HB 4005

Relating to the price of prescription drugs; creating new provisions; amending ORS 743.018 and 750.055; and declaring an emergency.

Whereas the state has a substantial public interest in the price and cost of prescription drugs; and

Whereas the state is a major purchaser of prescription drugs through the Public Employees' Benefit Board, the Oregon Health Authority, the Department of Human Services and the Department of Corrections; and

Whereas the state also provides major tax expenditures for health care through the tax exclusion of employer-sponsored health insurance coverage and the deductibility of the excess medical costs of individuals and families; and

Whereas the Legislative Assembly intends by sections 2, 3 and 5 of this 2018 Act to provide notice and disclosure of information relating to the cost and pricing of prescription drugs in order to provide accountability for prescription drug pricing; and

Whereas the Legislative Assembly intends by this 2018 Act to permit a manufacturer of a prescription drug to voluntarily make pricing decisions regarding a prescription drug, including decisions that result in price increases; and

Whereas the Legislative Assembly intends by this 2018 Act to permit purchasers, both public and private, as well as pharmacy benefit managers, to negotiate discounts and rebates for prescription drugs consistent with existing state and federal law; now, therefore,

**Be It Enacted by the People of the State of Oregon:**

**SECTION 1.** Sections 2 and 3 of this 2018 Act shall be known and may be cited as the Prescription Drug Price Transparency Act.

**SECTION 2.** (1) As used in this section:

(a) "Drug" has the meaning given that term in ORS 689.005.

(b) "Health care facility" has the meaning given that term in ORS 442.015.

(c) "Health care service contractor" has the meaning given that term in ORS 750.005.

(d)(A) "Manufacture" means:

(i) The production, preparation, propagation, compounding, conversion or processing of a drug, either directly or indirectly by extraction from substances of natural origin or independently by means of chemical synthesis, or by a combination of extraction and chemical synthesis; and

(ii) The packaging or repackaging of a drug or labeling or relabeling of a drug container.

(B) "Manufacture" does not include the preparation or compounding of a drug by an individual for the individual's own use or the preparation, compounding, packaging or labeling of a drug:

(i) By a health care practitioner incidental to administering or dispensing a drug in the course of professional practice;

(ii) By a health care practitioner or at the practitioner's authorization and supervision for the purpose of or incidental to research, teaching or chemical analysis activities and not for sale;

(iii) By a health care service contractor for dispensing to a subscriber or delivery to a health care facility or outpatient clinic owned or operated by the health care service contractor or an affiliate of the health care service contractor;

(iv) By a centralized repackaging operation for distribution to subscribers of health care service contractors or to pharmacies, health care facilities or outpatient clinics operated by or affiliated with a health care service contractor; or

(v) By a health care facility for dispensing to a patient or other person.

(e) "Manufacturer" means a person that manufactures a prescription drug that is sold in this state.

(f) "New prescription drug" has the meaning prescribed by the Department of Consumer and Business Services by rule.

(g) "Patient assistance program" means a program that a manufacturer offers to the general public in which a consumer may reduce the consumer's out-of-pocket costs for prescription drugs by using coupons or discount cards, receiving copayment assistance or by other means.

(h) "Prescription drug" means a drug that must:

(A) Under federal law, be labeled "Caution: Federal law prohibits dispensing without prescription" prior to being dispensed or delivered; or

(B) Under any applicable federal or state law or regulation, be dispensed only by prescription or restricted to use only by health care practitioners.

(i) "Price" means the wholesale acquisition cost as defined in 42 U.S.C. 1395w-3a(c)(6)(B).

(2) No later than July 1, 2019, a manufacturer shall report the information described in subsection (3) of this section to the department regarding each prescription drug for which:

(a) The price was $100 or more for a one-month supply or for a course of treatment lasting less than one month; and

(b) There was a net increase of 10 percent or more in the price of the prescription drug described in paragraph (a) of this subsection over the course of the previous calendar year.

(3) For each prescription drug described in subsection (2) of this section, a manufacturer

1

shall report to the department, in the form and manner prescribed by the department:

(a) The name and price of the prescription drug and the net increase, expressed as a percentage, in the price of the drug over the course of the previous calendar year;

(b) The length of time the prescription drug has been on the market;

(c) The factors that contributed to the price increase;

(d) The name of any generic version of the prescription drug available on the market;

(e) The research and development costs associated with the prescription drug that were paid using public funds;

(f) The direct costs incurred by the manufacturer:

(A) To manufacture the prescription drug;

(B) To market the prescription drug;

(C) To distribute the prescription drug; and

(D) For ongoing safety and effectiveness research associated with the prescription drug;

(g) The total sales revenue for the prescription drug during the previous calendar year;

(h) The manufacturer's profit attributable to the prescription drug during the previous calendar year;

(i) The introductory price of the prescription drug when it was approved for marketing by the United States Food and Drug Administration and the net yearly increase, by calendar year, in the price of the prescription drug during the previous five years;

(j) The 10 highest prices paid for the prescription drug during the previous calendar year in any country other than the United States;

(k) Any other information that the manufacturer deems relevant to the price increase described in subsection (2)(b) of this section; and

(L) The documentation necessary to support the information reported under this subsection.

(4) The department may use any prescription drug price information the department deems appropriate to verify that manufacturers have properly reported price increases as required by subsections (2) and (3) of this section.

(5) A manufacturer shall accompany the report provided under subsection (2) of this section with the following information about each patient assistance program offered by the manufacturer to consumers residing in this state for the prescription drugs described in subsection (2) of this section:

(a) The number of consumers who participated in the program;

(b) The total value of the coupons, discounts, copayment assistance or other reduction in costs provided to consumers in this state who participated in the program;

(c) For each drug, the number of refills that qualify for the program, if applicable;

(d) If the program expires after a specified period of time, the period of time that the program is available to each consumer; and

(e) The eligibility criteria for the program and how eligibility is verified for accuracy.

(6) Beginning March 15, 2019, 30 days or less after a manufacturer introduces a new prescription drug for sale in the United States at a price that exceeds the threshold established by the Centers for Medicare and Medicaid Services for specialty drugs in the Medicare Part D program, the manufacturer shall notify the department, in the form and manner prescribed by the department, of all the following information:

(a) A description of the marketing used in the introduction of the new prescription drug;

(b) The methodology used to establish the price of the new prescription drug;

(c) Whether the United States Food and Drug Administration granted the new prescription drug a breakthrough therapy designation or a priority review;

(d) If the new prescription drug was not developed by the manufacturer, the date of and the price paid for acquisition of the new prescription drug by the manufacturer;

(e) The manufacturer's estimate of the average number of patients who will be prescribed the new prescription drug each month; and

(f) The research and development costs associated with the new prescription drug that were paid using public funds.

(7)(a) After receiving the report or information described in subsections (2), (3), (5) or (6) of this section, the department may make a written request to the manufacturer for supporting documentation or additional information concerning the report. The department shall prescribe by rule the periods:

(A) Following the receipt of the report or information during which the department may request additional information; and

(B) Following a request by the department for additional information during which a manufacturer may respond to the request.

(b) The department may extend the period prescribed under paragraph (a)(B) of this subsection, as necessary, on a case-by-case basis.

(8) A manufacturer may be subject to a civil penalty, as provided in section 3 of this 2018 Act, for:

(a) Failing to submit timely reports or notices as required by this section;

(b) Failing to provide information required under this section;

(c) Failing to respond in a timely manner to a written request by the department for additional information under subsection (7) of this section; or

(d) Providing inaccurate or incomplete information under this section.

EXHIBIT A
Page 2 of 11

(9) Except as provided in subsection (10) of this section, the department shall post to its website all of the following information:

(a) A list of the prescription drugs reported under subsection (2) of this section and the manufacturers of those prescription drugs;

(b) Information reported to the department under subsections (3) and (5) to (7) of this section; and

(c) Written requests by the department for additional information under subsection (7) of this section.

(10)(a) The department may not post to its website any information described in subsection (9) of this section if:

(A) The information is conditionally exempt from disclosure under ORS 192.345 as a trade secret; and

(B) The public interest does not require disclosure of the information.

(b) If the department withholds any information from public disclosure pursuant to this subsection, the department shall post to its website a report describing the nature of the information and the department's basis for withholding the information from disclosure.

(c) A person may petition the Attorney General, as provided in ORS 192.411, to review a decision by the department to withhold information pursuant to paragraph (a) of this subsection.

(11) The department shall make available to consumers, online and by telephone, a process for consumers to notify the department about an increase in the price of a prescription drug.

(12) The department may adopt rules as necessary for carrying out the provisions of this section, including but not limited to rules establishing fees to be paid by manufacturers to be used solely to pay the costs of the department in carrying out the provisions of this section.

(13) No later than December 15 of each year, the department shall compile and report the information collected by the department under this section to the interim committees of the Legislative Assembly related to health. The report shall include recommendations for legislative changes, if any, to contain the cost of prescription drugs and reduce the impact of price increases on consumers, the Department of Corrections, the Public Employees' Benefit Board, the Oregon Health Authority, the Department of Human Services, the Oregon Educators Benefit Board and health insurance premiums in the commercial market.

**SECTION 3.** (1) A manufacturer that fails to report or provide information as required by section 2 of this 2018 Act may be subject to a civil penalty as provided in this section.

(2) The Department of Consumer and Business Services shall adopt a schedule of penalties, not to exceed $10,000 per day of violation, based on the severity of each violation.

(3) The department shall impose civil penalties under this section as provided in ORS 183.745.

(4) The department may remit or mitigate civil penalties under this section upon terms and conditions the department considers proper and consistent with the public health and safety.

(5) Civil penalties collected under this section shall be paid over to the State Treasurer and deposited in the General Fund to be made available for general governmental expenses.

**SECTION 4.** Section 5 of this 2018 Act is added to and made a part of the Insurance Code.

**SECTION 5.** (1) An insurer shall include with any filing under ORS 743.018 the following information regarding drugs reimbursed by the insurer under policies or certificates issued in this state:

(a) The 25 most frequently prescribed drugs;

(b) The 25 most costly drugs as a portion of total annual spending;

(c) The 25 drugs that have caused the greatest increase in total plan spending from one year to the next; and

(d) The impact of the costs of prescription drugs on premium rates.

(2) The Department of Consumer and Business Services shall conduct a public hearing annually on prescription drug prices, information reported to the department under section 2 of this 2018 Act and information described in subsection (1) of this section.

(3) The department shall regularly update the interim committees of the Legislative Assembly related to health on the information described in subsection (1) of this section.

(4) Subsection (1) of this section applies to an insurer that issues policies or certificates of health insurance for sale in this state that include a prescription drug benefit.

**SECTION 6.** Section 2 of this 2018 Act is amended to read:

Sec. 2. (1) As used in this section:

(a) "Drug" has the meaning given that term in ORS 689.005.

(b) "Health care facility" has the meaning given that term in ORS 442.015.

(c) "Health care service contractor" has the meaning given that term in ORS 750.005.

(d)(A) "Manufacture" means:

(i) The production, preparation, propagation, compounding, conversion or processing of a drug, either directly or indirectly by extraction from substances of natural origin or independently by means of chemical synthesis, or by a combination of extraction and chemical synthesis; and

(ii) The packaging or repackaging of a drug or labeling or relabeling of a drug container.

3

(B) "Manufacture" does not include the preparation or compounding of a drug by an individual for the individual's own use or the preparation, compounding, packaging or labeling of a drug:

(i) By a health care practitioner incidental to administering or dispensing a drug in the course of professional practice;

(ii) By a health care practitioner or at the practitioner's authorization and supervision for the purpose of or incidental to research, teaching or chemical analysis activities and not for sale;

(iii) By a health care service contractor for dispensing to a subscriber or delivery to a health care facility or outpatient clinic owned or operated by the health care service contractor or an affiliate of the health care service contractor;

(iv) By a centralized repackaging operation for distribution to subscribers of health care service contractors or to pharmacies, health care facilities or outpatient clinics operated by or affiliated with a health care service contractor; or

(v) By a health care facility for dispensing to a patient or other person.

(e) "Manufacturer" means a person that manufactures a prescription drug that is sold in this state.

(f) "New prescription drug" has the meaning prescribed by the Department of Consumer and Business Services by rule.

(g) "Patient assistance program" means a program that a manufacturer offers to the general public in which a consumer may reduce the consumer's out-of-pocket costs for prescription drugs by using coupons or discount cards, receiving copayment assistance or by other means.

(h) "Prescription drug" means a drug that must:

(A) Under federal law, be labeled "Caution: Federal law prohibits dispensing without prescription" prior to being dispensed or delivered; or

(B) Under any applicable federal or state law or regulation, be dispensed only by prescription or restricted to use only by health care practitioners.

(i) "Price" means the wholesale acquisition cost as defined in 42 U.S.C. 1395w-3a(c)(6)(B).

(2) No later than July 1, 2019, a manufacturer shall report the information described in subsection (3) of this section to the department regarding each prescription drug for which:

(a) The price was $100 or more for a one-month supply or for a course of treatment lasting less than one month; and

(b) There was a net increase of 10 percent or more in the price of the prescription drug described in paragraph (a) of this subsection over the course of the previous calendar year.

(3) For each prescription drug described in subsection (2) of this section, a manufacturer shall report to the department, in the form and manner prescribed by the department:

(a) The name and price of the prescription drug and the net increase, expressed as a percentage, in the price of the drug over the course of the previous calendar year;

(b) The length of time the prescription drug has been on the market;

(c) The factors that contributed to the price increase;

(d) The name of any generic version of the prescription drug available on the market;

(e) The research and development costs associated with the prescription drug that were paid using public funds;

(f) The direct costs incurred by the manufacturer:

(A) To manufacture the prescription drug;

(B) To market the prescription drug;

(C) To distribute the prescription drug; and

(D) For ongoing safety and effectiveness research associated with the prescription drug;

(g) The total sales revenue for the prescription drug during the previous calendar year;

(h) The manufacturer's profit attributable to the prescription drug during the previous calendar year;

(i) The introductory price of the prescription drug when it was approved for marketing by the United States Food and Drug Administration and the net yearly increase, by calendar year, in the price of the prescription drug during the previous five years;

(j) The 10 highest prices paid for the prescription drug during the previous calendar year in any country other than the United States;

(k) Any other information that the manufacturer deems relevant to the price increase described in subsection (2)(b) of this section; and

(L) The documentation necessary to support the information reported under this subsection.

(4) The department may use any prescription drug price information the department deems appropriate to verify that manufacturers have properly reported price increases as required by subsections (2) and (3) of this section.

(5) A manufacturer shall accompany the report provided under subsection (2) of this section with the following information about each patient assistance program offered by the manufacturer to consumers residing in this state for the prescription drugs described in subsection (2) of this section:

(a) The number of consumers who participated in the program;

(b) The total value of the coupons, discounts, copayment assistance or other reduction in costs provided to consumers in this state who participated in the program;

(c) For each drug, the number of refills that qualify for the program, if applicable;

(d) If the program expires after a specified period of time, the period of time that the program is available to each consumer; and

(e) The eligibility criteria for the program and how eligibility is verified for accuracy.

(6) [*Beginning March 15, 2019, 30 days or less*] **No later than 30 days** after a manufacturer introduces a new prescription drug for sale in the United States at a price that exceeds the threshold established by the Centers for Medicare and Medicaid

4

Case: 24-1570, 07/05/2024, DktEntry: 16.1, Page 238 of 261
Case 6:19-cv-01996-MO   Document 1-1   Filed 12/09/19   Page 5 of 11

**E.R.-238**

OREGON LAWS 2018                                                    Chap. 7

Services for specialty drugs in the Medicare Part D program, the manufacturer shall notify the department, in the form and manner prescribed by the department, of all the following information:

(a) A description of the marketing used in the introduction of the new prescription drug;

(b) The methodology used to establish the price of the new prescription drug;

(c) Whether the United States Food and Drug Administration granted the new prescription drug a breakthrough therapy designation or a priority review;

(d) If the new prescription drug was not developed by the manufacturer, the date of and the price paid for acquisition of the new prescription drug by the manufacturer;

(e) The manufacturer's estimate of the average number of patients who will be prescribed the new prescription drug each month; and

(f) The research and development costs associated with the new prescription drug that were paid using public funds.

(7)(a) After receiving the report or information described in subsections (2), (3), (5) or (6) of this section, the department may make a written request to the manufacturer for supporting documentation or additional information concerning the report. The department shall prescribe by rule the periods:

(A) Following the receipt of the report or information during which the department may request additional information; and

(B) Following a request by the department for additional information during which a manufacturer may respond to the request.

(b) The department may extend the period prescribed under paragraph (a)(B) of this subsection, as necessary, on a case-by-case basis.

(8) A manufacturer may be subject to a civil penalty, as provided in section 3 of this 2018 Act, for:

(a) Failing to submit timely reports or notices as required by this section;

(b) Failing to provide information required under this section;

(c) Failing to respond in a timely manner to a written request by the department for additional information under subsection (7) of this section; or

(d) Providing inaccurate or incomplete information under this section.

(9) Except as provided in subsection (10) of this section, the department shall post to its website all of the following information:

(a) A list of the prescription drugs reported under subsection (2) of this section and the manufacturers of those prescription drugs;

(b) Information reported to the department under subsections (3) and (5) to (7) of this section; and

(c) Written requests by the department for additional information under subsection (7) of this section.

(10)(a) The department may not post to its website any information described in subsection (9) of this section if:

(A) The information is conditionally exempt from disclosure under ORS 192.345 as a trade secret; and

(B) The public interest does not require disclosure of the information.

(b) If the department withholds any information from public disclosure pursuant to this subsection, the department shall post to its website a report describing the nature of the information and the department's basis for withholding the information from disclosure.

(c) A person may petition the Attorney General, as provided in ORS 192.411, to review a decision by the department to withhold information pursuant to paragraph (a) of this subsection.

(11) The department shall make available to consumers, online and by telephone, a process for consumers to notify the department about an increase in the price of a prescription drug.

(12) The department may adopt rules as necessary for carrying out the provisions of this section, including but not limited to rules establishing fees to be paid by manufacturers to be used solely to pay the costs of the department in carrying out the provisions of this section.

(13) No later than December 15 of each year, the department shall compile and report the information collected by the department under this section to the interim committees of the Legislative Assembly related to health. The report shall include recommendations for legislative changes, if any, to contain the cost of prescription drugs and reduce the impact of price increases on consumers, the Department of Corrections, the Public Employees' Benefit Board, the Oregon Health Authority, the Department of Human Services, the Oregon Educators Benefit Board and health insurance premiums in the commercial market.

**SECTION 7.** Section 2 of this 2018 Act, as amended by section 6 of this 2018 Act, is amended to read:

Sec. 2. (1) As used in this section:

(a) "Drug" has the meaning given that term in ORS 689.005.

(b) "Health care facility" has the meaning given that term in ORS 442.015.

(c) "Health care service contractor" has the meaning given that term in ORS 750.005.

(d)(A) "Manufacture" means:

(i) The production, preparation, propagation, compounding, conversion or processing of a drug, either directly or indirectly by extraction from substances of natural origin or independently by means of chemical synthesis, or by a combination of extraction and chemical synthesis; and

(ii) The packaging or repackaging of a drug or labeling or relabeling of a drug container.

(B) "Manufacture" does not include the preparation or compounding of a drug by an individual for the individual's own use or the preparation, compounding, packaging or labeling of a drug:

EXHIBIT A
Page 5 of 11

(i) By a health care practitioner incidental to administering or dispensing a drug in the course of professional practice;

(ii) By a health care practitioner or at the practitioner's authorization and supervision for the purpose of or incidental to research, teaching or chemical analysis activities and not for sale;

(iii) By a health care service contractor for dispensing to a subscriber or delivery to a health care facility or outpatient clinic owned or operated by the health care service contractor or an affiliate of the health care service contractor;

(iv) By a centralized repackaging operation for distribution to subscribers of health care service contractors or to pharmacies, health care facilities or outpatient clinics operated by or affiliated with a health care service contractor; or

(v) By a health care facility for dispensing to a patient or other person.

(e) "Manufacturer" means a person that manufactures a prescription drug that is sold in this state.

(f) "New prescription drug" has the meaning prescribed by the Department of Consumer and Business Services by rule.

(g) "Patient assistance program" means a program that a manufacturer offers to the general public in which a consumer may reduce the consumer's out-of-pocket costs for prescription drugs by using coupons or discount cards, receiving copayment assistance or by other means.

(h) "Prescription drug" means a drug that must:

(A) Under federal law, be labeled "Caution: Federal law prohibits dispensing without prescription" prior to being dispensed or delivered; or

(B) Under any applicable federal or state law or regulation, be dispensed only by prescription or restricted to use only by health care practitioners.

(i) "Price" means the wholesale acquisition cost as defined in 42 U.S.C. 1395w-3a(c)(6)(B).

(2) No later than [*July 1, 2019*] **March 15 of each year**, a manufacturer shall report the information described in subsection (3) of this section to the department regarding each prescription drug for which:

(a) The price was $100 or more for a one-month supply or for a course of treatment lasting less than one month; and

(b) There was a net increase of 10 percent or more in the price of the prescription drug described in paragraph (a) of this subsection over the course of the previous calendar year.

(3) For each prescription drug described in subsection (2) of this section, a manufacturer shall report to the department, in the form and manner prescribed by the department:

(a) The name and price of the prescription drug and the net increase, expressed as a percentage, in the price of the drug over the course of the previous calendar year;

(b) The length of time the prescription drug has been on the market;

(c) The factors that contributed to the price increase;

(d) The name of any generic version of the prescription drug available on the market;

(e) The research and development costs associated with the prescription drug that were paid using public funds;

(f) The direct costs incurred by the manufacturer:

(A) To manufacture the prescription drug;

(B) To market the prescription drug;

(C) To distribute the prescription drug; and

(D) For ongoing safety and effectiveness research associated with the prescription drug;

(g) The total sales revenue for the prescription drug during the previous calendar year;

(h) The manufacturer's profit attributable to the prescription drug during the previous calendar year;

(i) The introductory price of the prescription drug when it was approved for marketing by the United States Food and Drug Administration and the net yearly increase, by calendar year, in the price of the prescription drug during the previous five years;

(j) The 10 highest prices paid for the prescription drug during the previous calendar year in any country other than the United States;

(k) Any other information that the manufacturer deems relevant to the price increase described in subsection (2)(b) of this section; and

(L) The documentation necessary to support the information reported under this subsection.

(4) The department may use any prescription drug price information the department deems appropriate to verify that manufacturers have properly reported price increases as required by subsections (2) and (3) of this section.

(5) A manufacturer shall accompany the report provided under subsection (2) of this section with the following information about each patient assistance program offered by the manufacturer to consumers residing in this state for the prescription drugs described in subsection (2) of this section:

(a) The number of consumers who participated in the program;

(b) The total value of the coupons, discounts, copayment assistance or other reduction in costs provided to consumers in this state who participated in the program;

(c) For each drug, the number of refills that qualify for the program, if applicable;

(d) If the program expires after a specified period of time, the period of time that the program is available to each consumer; and

(e) The eligibility criteria for the program and how eligibility is verified for accuracy.

(6) No later than 30 days after a manufacturer introduces a new prescription drug for sale in the United States at a price that exceeds the threshold established by the Centers for Medicare and Medicaid Services for specialty drugs in the Medicare Part D program, the manufacturer shall notify the department, in the form and manner prescribed by the department, of all the following information:

EXHIBIT A
Page 6 of 11

(a) A description of the marketing used in the introduction of the new prescription drug;

(b) The methodology used to establish the price of the new prescription drug;

(c) Whether the United States Food and Drug Administration granted the new prescription drug a breakthrough therapy designation or a priority review;

(d) If the new prescription drug was not developed by the manufacturer, the date of and the price paid for acquisition of the new prescription drug by the manufacturer;

(e) The manufacturer's estimate of the average number of patients who will be prescribed the new prescription drug each month; and

(f) The research and development costs associated with the new prescription drug that were paid using public funds.

(7)(a) After receiving the report or information described in subsections (2), (3), (5) or (6) of this section, the department may make a written request to the manufacturer for supporting documentation or additional information concerning the report. The department shall prescribe by rule the periods:

(A) Following the receipt of the report or information during which the department may request additional information; and

(B) Following a request by the department for additional information during which a manufacturer may respond to the request.

(b) The department may extend the period prescribed under paragraph (a)(B) of this subsection, as necessary, on a case-by-case basis.

(8) A manufacturer may be subject to a civil penalty, as provided in section 3 of this 2018 Act, for:

(a) Failing to submit timely reports or notices as required by this section;

(b) Failing to provide information required under this section;

(c) Failing to respond in a timely manner to a written request by the department for additional information under subsection (7) of this section; or

(d) Providing inaccurate or incomplete information under this section.

(9) Except as provided in subsection (10) of this section, the department shall post to its website all of the following information:

(a) A list of the prescription drugs reported under subsection (2) of this section and the manufacturers of those prescription drugs;

(b) Information reported to the department under subsections (3) and (5) to (7) of this section; and

(c) Written requests by the department for additional information under subsection (7) of this section.

(10)(a) The department may not post to its website any information described in subsection (9) of this section if:

(A) The information is conditionally exempt from disclosure under ORS 192.345 as a trade secret; and

(B) The public interest does not require disclosure of the information.

(b) If the department withholds any information from public disclosure pursuant to this subsection, the department shall post to its website a report describing the nature of the information and the department's basis for withholding the information from disclosure.

(c) A person may petition the Attorney General, as provided in ORS 192.411, to review a decision by the department to withhold information pursuant to paragraph (a) of this subsection.

(11) The department shall make available to consumers, online and by telephone, a process for consumers to notify the department about an increase in the price of a prescription drug.

(12) The department may adopt rules as necessary for carrying out the provisions of this section, including but not limited to rules establishing fees to be paid by manufacturers to be used solely to pay the costs of the department in carrying out the provisions of this section.

(13) No later than December 15 of each year, the department shall compile and report the information collected by the department under this section to the interim committees of the Legislative Assembly related to health. The report shall include recommendations for legislative changes, if any, to contain the cost of prescription drugs and reduce the impact of price increases on consumers, the Department of Corrections, the Public Employees' Benefit Board, the Oregon Health Authority, the Department of Human Services, the Oregon Educators Benefit Board and health insurance premiums in the commercial market.

**SECTION 8.** ORS 743.018 is amended to read:

743.018. (1) Except for group life and health insurance, and except as provided in ORS 743.015, every insurer shall file with the Director of the Department of Consumer and Business Services all schedules and tables of premium rates for life and health insurance to be used on risks in this state, and shall file any amendments to or corrections of such schedules and tables. Premium rates are subject to approval, disapproval or withdrawal of approval by the director as provided in ORS 742.003, 742.005, 742.007 and 743.019.

(2) Except as provided in ORS 743B.013 and subsection (3) of this section, a rate filing by a carrier for any of the following health benefit plans subject to ORS 743.004, 743.022, 743.535 and 743B.003 to 743B.127 shall be available for public inspection immediately upon submission of the filing to the director:

(a) Health benefit plans for small employers.

(b) Individual health benefit plans.

(3) The director may by rule:

(a) Specify all information a carrier must submit as part of a rate filing under this section; and

(b) Identify the information submitted that will be exempt from disclosure under this section because the information constitutes a trade secret and would, if disclosed, harm competition.

Chap. 7 OREGON LAWS 2018

(4) The director, after conducting an actuarial review of the rate filing, may approve a proposed premium rate for a health benefit plan for small employers or for an individual health benefit plan if, in the director's discretion, the proposed rates are:

(a) Actuarially sound;

(b) Reasonable and not excessive, inadequate or unfairly discriminatory; and

(c) Based upon reasonable administrative expenses.

(5) In order to determine whether the proposed premium rates for a health benefit plan for small employers or for an individual health benefit plan are reasonable and not excessive, inadequate or unfairly discriminatory, the director may consider:

(a) The insurer's financial position, including but not limited to profitability, surplus, reserves and investment savings.

(b) Historical and projected administrative costs and medical and hospital expenses, **including expenses for drugs reported under section 5 of this 2018 Act**.

(c) Historical and projected loss ratio between the amounts spent on medical services and earned premiums.

(d) Any anticipated change in the number of enrollees if the proposed premium rate is approved.

(e) Changes to covered benefits or health benefit plan design.

(f) Changes in the insurer's health care cost containment and quality improvement efforts since the insurer's last rate filing for the same category of health benefit plan.

(g) Whether the proposed change in the premium rate is necessary to maintain the insurer's solvency or to maintain rate stability and prevent excessive rate increases in the future.

(h) Any public comments received under ORS 743.019 pertaining to the standards set forth in subsection (4) of this section and this subsection.

(6) The requirements of this section do not supersede other provisions of law that require insurers, health care service contractors or multiple employer welfare arrangements providing health insurance to file schedules or tables of premium rates or proposed premium rates with the director or to seek the director's approval of rates or changes to rates.

**SECTION 9.** ORS 750.055 is amended to read:

750.055. (1) The following provisions apply to health care service contractors to the extent not inconsistent with the express provisions of ORS 750.005 to 750.095:

(a) ORS 705.137, 705.138 and 705.139.

(b) ORS 731.004 to 731.150, 731.162, 731.216 to 731.362, 731.382, 731.385, 731.386, 731.390, 731.398 to 731.430, 731.428, 731.450, 731.454, 731.485, as provided in subsection (2) of this section, ORS 731.488, 731.504, 731.508, 731.509, 731.510, 731.511, 731.512, 731.574 to 731.620, 731.640 to 731.652, 731.730, 731.731, 731.735, 731.737, 731.750, 731.752, 731.804, 731.808 and 731.844 to 731.992.

(c) ORS 732.215, 732.220, 732.230, 732.245, 732.250, 732.320, 732.325 and 732.517 to 732.596, not including ORS 732.582.

(d) ORS 733.010 to 733.050, 733.080, 733.140 to 733.170, 733.210, 733.510 to 733.680 and 733.695 to 733.780.

(e) ORS 734.014 to 734.440.

(f) ORS 735.600 to 735.650.

(g) ORS 742.001 to 742.009, 742.013, 742.016, 742.061, 742.065, 742.150 to 742.162 and 742.518 to 742.542.

(h) ORS 743.004, 743.005, 743.007, 743.008, 743.010, 743.018, 743.019, 743.020, 743.022, 743.023, 743.028, 743.029, 743.038, 743.040, 743.044, 743.050, 743.100 to 743.109, 743.402, 743.405, 743.406, 743.417, 743.472, 743.492, 743.495, 743.498, 743.522, 743.523, 743.524, 743.526, 743.535, 743.550, 743.650 to 743.656, 743.680 to 743.689, 743.788 and 743.790.

(i) ORS 743A.010, 743A.012, 743A.014, 743A.020, 743A.034, 743A.036, 743A.040, 743A.044, 743A.048, 743A.051, 743A.052, 743A.058, 743A.060, 743A.062, 743A.063, 743A.064, 743A.065, 743A.066, 743A.068, 743A.070, 743A.080, 743A.082, 743A.084, 743A.088, 743A.090, 743A.100, 743A.104, 743A.105, 743A.108, 743A.110, 743A.124, 743A.140, 743A.141, 743A.148, 743A.150, 743A.160, 743A.168, 743A.170, 743A.175, 743A.185, 743A.188, 743A.190, 743A.192, 743A.250, 743A.252 and 743A.260 and section 2, chapter 771, Oregon Laws 2013.

(j) ORS 743B.001, 743B.003 to 743B.127, 743B.128, 743B.130, 743B.195 to 743B.204, 743B.220, 743B.222, 743B.225, 743B.227, 743B.250, 743B.252, 743B.253, 743B.254, 743B.255, 743B.256, 743B.257, 743B.258, 743B.280 to 743B.285, 743B.287, 743B.300, 743B.310, 743B.320, 743B.323, 743B.330, 743B.340, 743B.341, 743B.342, 743B.343 to 743B.347, 743B.400, 743B.403, 743B.407, 743B.420, 743B.423, 743B.450, 743B.451, 743B.452, 743B.453, 743B.470, 743B.475, 743B.505, 743B.550, 743B.555, 743B.601, 743B.602 and 743B.800 **and section 5 of this 2018 Act**.

(k) The following provisions of ORS chapter 744:

(A) ORS 744.001 to 744.009, 744.011, 744.013, 744.014, 744.018, 744.022 to 744.033, 744.037, 744.052 to 744.089, 744.091 and 744.093, relating to the regulation of insurance producers;

(B) ORS 744.605, 744.609, 744.619, 744.621, 744.626, 744.631, 744.635, 744.650, 744.655 and 744.665, relating to the regulation of insurance consultants; and

(C) ORS 744.700 to 744.740, relating to the regulation of third party administrators.

(L) ORS 746.005 to 746.140, 746.160, 746.220 to 746.370, 746.600, 746.605, 746.607, 746.608, 746.610, 746.615, 746.625, 746.635, 746.650, 746.655, 746.660, 746.668, 746.670, 746.675, 746.680 and 746.690.

(2) The following provisions of the Insurance Code apply to health care service contractors except in the case of group practice health maintenance organizations that are federally qualified pursuant to Title XIII of the Public Health Service Act:

(a) ORS 731.485, if the group practice health maintenance organization wholly owns and operates an in-house drug outlet.

8

(b) ORS 743A.024, unless the patient is referred by a physician, physician assistant or nurse practitioner associated with a group practice health maintenance organization.

(3) For the purposes of this section, health care service contractors are insurers.

(4) Any for-profit health care service contractor organized under the laws of any other state that is not governed by the insurance laws of the other state is subject to all requirements of ORS chapter 732.

(5)(a) A health care service contractor is a domestic insurance company for the purpose of determining whether the health care service contractor is a debtor, as defined in 11 U.S.C. 109.

(b) A health care service contractor's classification as a domestic insurance company under paragraph (a) of this subsection does not subject the health care service contractor to ORS 734.510 to 734.710.

(6) The Director of the Department of Consumer and Business Services may, after notice and hearing, adopt reasonable rules not inconsistent with this section and ORS 750.003, 750.005, 750.025 and 750.045 that are necessary for the proper administration of these provisions.

**SECTION 10.** ORS 750.055, as amended by section 21, chapter 771, Oregon Laws 2013, section 7, chapter 25, Oregon Laws 2014, section 82, chapter 45, Oregon Laws 2014, section 9, chapter 59, Oregon Laws 2015, section 7, chapter 100, Oregon Laws 2015, section 7, chapter 224, Oregon Laws 2015, section 11, chapter 362, Oregon Laws 2015, section 10, chapter 470, Oregon Laws 2015, section 30, chapter 515, Oregon laws 2015, section 10, chapter 206, Oregon Laws 2017, section 6, chapter 417, Oregon Laws 2017, and section 22, chapter 479, Oregon Laws 2017, is amended to read:

750.055. (1) The following provisions apply to health care service contractors to the extent not inconsistent with the express provisions of ORS 750.005 to 750.095:

(a) ORS 705.137, 705.138 and 705.139.

(b) ORS 731.004 to 731.150, 731.162, 731.216 to 731.362, 731.382, 731.385, 731.386, 731.390, 731.398 to 731.430, 731.428, 731.450, 731.454, 731.485, as provided in subsection (2) of this section, ORS 731.488, 731.504, 731.508, 731.509, 731.510, 731.511, 731.512, 731.574 to 731.620, 731.640 to 731.652, 731.730, 731.731, 731.735, 731.737, 731.750, 731.752, 731.804, 731.808 and 731.844 to 731.992.

(c) ORS 732.215, 732.220, 732.230, 732.245, 732.250, 732.320, 732.325 and 732.517 to 732.596, not including ORS 732.582.

(d) ORS 733.010 to 733.050, 733.080, 733.140 to 733.170, 733.210, 733.510 to 733.680 and 733.695 to 733.780.

(e) ORS 734.014 to 734.440.

(f) ORS 735.600 to 735.650.

(g) ORS 742.001 to 742.009, 742.013, 742.016, 742.061, 742.065, 742.150 to 742.162 and 742.518 to 742.542.

(h) ORS 743.004, 743.005, 743.007, 743.008, 743.010, 743.018, 743.019, 743.020, 743.022, 743.023, 743.028, 743.029, 743.038, 743.040, 743.044, 743.050, 743.100 to 743.109, 743.402, 743.405, 743.406, 743.417, 743.472, 743.492, 743.495, 743.498, 743.522, 743.523, 743.524, 743.526, 743.535, 743.550, 743.650 to 743.656, 743.680 to 743.689, 743.788 and 743.790.

(i) ORS 743A.010, 743A.012, 743A.014, 743A.020, 743A.034, 743A.036, 743A.040, 743A.044, 743A.048, 743A.051, 743A.052, 743A.058, 743A.060, 743A.062, 743A.063, 743A.064, 743A.065, 743A.066, 743A.068, 743A.070, 743A.080, 743A.082, 743A.084, 743A.088, 743A.090, 743A.100, 743A.104, 743A.105, 743A.108, 743A.110, 743A.124, 743A.140, 743A.141, 743A.148, 743A.150, 743A.160, 743A.168, 743A.170, 743A.175, 743A.185, 743A.188, 743A.190, 743A.192, 743A.250, 743A.252 and 743A.260.

(j) ORS 743B.001, 743B.003 to 743B.127, 743B.128, 743B.130, 743B.195 to 743B.204, 743B.220, 743B.222, 743B.225, 743B.227, 743B.250, 743B.252, 743B.253, 743B.254, 743B.255, 743B.256, 743B.257, 743B.258, 743B.280 to 743B.285, 743B.287, 743B.300, 743B.310, 743B.320, 743B.323, 743B.330, 743B.340, 743B.341, 743B.342, 743B.343 to 743B.347, 743B.400, 743B.403, 743B.407, 743B.420, 743B.423, 743B.450, 743B.451, 743B.452, 743B.453, 743B.470, 743B.475, 743B.505, 743B.550, 743B.555, 743B.601, 743B.602 and 743B.800 **and section 5 of this 2018 Act**.

(k) The following provisions of ORS chapter 744:

(A) ORS 744.001 to 744.009, 744.011, 744.013, 744.014, 744.018, 744.022 to 744.033, 744.037, 744.052 to 744.089, 744.091 and 744.093, relating to the regulation of insurance producers;

(B) ORS 744.605, 744.609, 744.619, 744.621, 744.626, 744.631, 744.635, 744.650, 744.655 and 744.665, relating to the regulation of insurance consultants; and

(C) ORS 744.700 to 744.740, relating to the regulation of third party administrators.

(L) ORS 746.005 to 746.140, 746.160, 746.220 to 746.370, 746.600, 746.605, 746.607, 746.608, 746.610, 746.615, 746.625, 746.635, 746.650, 746.655, 746.660, 746.668, 746.670, 746.675, 746.680 and 746.690.

(2) The following provisions of the Insurance Code apply to health care service contractors except in the case of group practice health maintenance organizations that are federally qualified pursuant to Title XIII of the Public Health Service Act:

(a) ORS 731.485, if the group practice health maintenance organization wholly owns and operates an in-house drug outlet.

(b) ORS 743A.024, unless the patient is referred by a physician, physician assistant or nurse practitioner associated with a group practice health maintenance organization.

(3) For the purposes of this section, health care service contractors are insurers.

(4) Any for-profit health care service contractor organized under the laws of any other state that is not governed by the insurance laws of the other state is subject to all requirements of ORS chapter 732.

9

(5)(a) A health care service contractor is a domestic insurance company for the purpose of determining whether the health care service contractor is a debtor, as defined in 11 U.S.C. 109.

(b) A health care service contractor's classification as a domestic insurance company under paragraph (a) of this subsection does not subject the health care service contractor to ORS 734.510 to 734.710.

(6) The Director of the Department of Consumer and Business Services may, after notice and hearing, adopt reasonable rules not inconsistent with this section and ORS 750.003, 750.005, 750.025 and 750.045 that are necessary for the proper administration of these provisions.

SECTION 11. (1) The Task Force on the Fair Pricing of Prescription Drugs is established.

(2) The task force consists of 18 members appointed as follows:

(a) The President of the Senate shall appoint:

(A) One member from the Senate who is a member of the majority party.

(B) One member from the Senate who is a member of the minority party.

(b) The Speaker of the House of Representatives shall appoint:

(A) One member from the House of Representatives who is a member of the majority party.

(B) One member from the House of Representatives who is a member of the minority party.

(c) The Governor shall appoint the following members:

(A) One representative from the Department of Consumer and Business Services;

(B) One representative from the Oregon Health Authority;

(C) One representative from the Oregon Health Policy Board; and

(D) Individuals representing:

(i) Pharmaceutical manufacturers;

(ii) Insurance companies offering health insurance in this state;

(iii) Pharmacy benefit managers;

(iv) Prescription drug wholesalers;

(v) Consumers;

(vi) Independent pharmacies;

(vii) Large retail pharmacy chains;

(viii) Hospitals;

(ix) Biopharmaceutical companies based in Oregon;

(x) Coordinated care organizations; and

(xi) Medical providers.

(3) The task force shall develop a strategy to create transparency for drug prices across the entire supply chain of pharmaceutical products, including but not limited to manufacturers, insurers, pharmacy benefit managers, distributors, wholesalers and retail pharmacies.

(4) A majority of the voting members of the task force constitutes a quorum for the transaction of business.

(5) Official action by the task force requires the approval of a majority of the voting members of the task force.

(6) The task force shall elect one of its members to serve as chairperson.

(7) If there is a vacancy for any cause, the appointing authority shall make an appointment to become immediately effective.

(8) The task force shall meet at times and places specified by the call of the chairperson or of a majority of the voting members of the task force.

(9) The task force may adopt rules necessary for the operation of the task force.

(10) The task force shall submit a report in the manner provided by ORS 192.245, and may include recommendations for legislation, to the interim committees of the Legislative Assembly related to health no later than November 1, 2018. The report must contain a cost-effective and enforceable solution that exposes the cost factors that negatively impact prices paid by Oregonians for pharmaceutical products.

(11) The Legislative Policy and Research Director shall provide staff support to the task force.

(12) Members of the Legislative Assembly appointed to the task force are nonvoting members of the task force and may act in an advisory capacity only.

(13) Members of the task force who are not members of the Legislative Assembly are not entitled to compensation or reimbursement for expenses and serve as volunteers on the task force.

(14) All agencies of state government, as defined in ORS 174.111, are directed to assist the task force in the performance of the task force's duties and, to the extent permitted by laws relating to confidentiality, to furnish information and advice the members of the task force consider necessary to perform their duties.

SECTION 12. Section 11 of this 2018 Act is repealed on December 31, 2020.

SECTION 13. (1) Sections 1 to 5 of this 2018 Act and the amendments to ORS 743.018 and 750.055 by sections 8 to 10 of this 2018 Act become operative on January 1, 2019.

(2) The Department of Consumer and Business Services shall take all steps necessary before January 1, 2019, to carry out the provisions of sections 1 to 5 of this 2018 Act and the amendments to ORS 743.018 and 750.055 by sections 8 to 10 of this 2018 Act on and after January 1, 2019.

(3) The amendments to section 2 of this 2018 Act by section 6 of this 2018 Act become operative on March 15, 2019.

(4) The amendments to section 2 of this 2018 Act by section 7 of this 2018 Act become operative on July 2, 2019.

**SECTION 14.** Notwithstanding any other law limiting expenditures, the limitation on expenditures established by section 1 (5), chapter 372, Oregon Laws 2017, for the biennium ending June 30, 2019, as the maximum limit for payment of expenses from fees, moneys or other revenues, including Miscellaneous Receipts, but excluding lottery funds and federal funds, collected or received by the Department of Consumer and Business Services, for the Division of Financial Regulation, is increased by $425,022 for carrying out sections 2, 3 and 5 of this 2018 Act.

**SECTION 15.** This 2018 Act being necessary for the immediate preservation of the public peace, health and safety, an emergency is declared to exist, and this 2018 Act takes effect on its passage.

Approved by the Governor March 12, 2018
Filed in the office of Secretary of State March 13, 2018
Effective date March 12, 2018

——————

ELLEN F. ROSENBLUM
Attorney General of Oregon
BENJAMIN GUTMAN
Solicitor General
DUSTIN BUEHLER
Attorney-in-Charge
Civil/Administrative Appeals
1162 Court St.
Salem, Oregon 97301
Telephone:  (503) 378-4402

Counsel for Defendant-Appellant

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF OREGON

|  |  |
|---|---|
| PHARMACEUTICAL RESEARCH AND MANUFACTURERS OF AMERICA,<br><br>    Plaintiff-Appellee,<br><br>       v.<br><br>ANDREW STOLFI, in his official capacity as Director of the Oregon Department of Consumer and Business Services,<br><br>    Defendant-Appellant. | USDC No. 6:19-cv-01996-MO<br><br><br>NOTICE OF APPEAL |

Notice is given that defendant-appellant Andrew Stolfi hereby appeals to

the United States Court of Appeals for the Ninth Circuit from the declaratory

judgment order entered on February 16, 2024 (Dkt. 77) by the

/ / /

/ / /

/ / /

Page 1 - NOTICE OF APPEAL
      DB4:kw5/957536832

Department of Justice
1162 Court Street NE
Salem, OR 97301-4096
(503) 378-4402 / Fax: (503) 378-3997

Honorable Michael W. Moseman of the United States District Court for the

District of Oregon.

Respectfully submitted,

ELLEN F. ROSENBLUM
Attorney General
BENJAMIN GUTMAN
Solicitor General

/s/  Dustin Buehler
_____
DUSTIN BUEHLER  #152024
Attorney-in-Charge
Civil/Administrative Appeals
dustin.buehler@doj.state.or.us

Attorneys for Defendant-Appellant
Andrew Stolfi

Page 2 - NOTICE OF APPEAL
     DB4:kw5/957536832

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

EUGENE DIVISION

| | |
|---|---|
| PHARMACEUTICAL RESEARCH AND MANUFACTURERS OF AMERICA, | Case No.  6:19-cv-01996-MO |
| Plaintiff, | DECLARATORY JUDGMENT |
| v. | |
| ANDREW STOLFI, in his official capacity as Director of the Oregon Department of Consumer and Business Services, | |
| Defendant. | |

**DECLARATORY JUDGMENT**

Pending before the Court are the Parties' Cross-Motions for Partial Summary Judgment

on Plaintiff's challenge to Oregon's House Bill 4005, 2018 Or. L. Ch. 7. Plaintiff alleges that

H.B. 4005 violates the Takings Clause of the Fifth Amendment of the United States Constitution;

is preempted by the Defend Trade Secrets Act and the Supremacy Clause of the United States

Page 1 -    DECLARATORY JUDGMENT

Constitution; violates the Commerce Clause of the United States Constitution; and violates the First Amendment of the United States Constitution.

The Court **GRANTS IN PART and DENIES IN PART** Plaintiff's Motion for Partial Summary Judgment, ECF No. 25, and **GRANTS IN PART and DENIES IN PART** Defendant's Motion for Partial Summary Judgment, ECF No. 29. Specifically, the Court **GRANTS** Plaintiff's Motion for Summary Judgment on its claim under the Takings Clause of the Fifth Amendment; **GRANTS** Defendant's Motion for Partial Summary Judgment on Plaintiff's preemption claim; **DENIES** the Parties' Cross-Motions for Summary Judgment on Plaintiff's Commerce Clause claim; and **GRANTS** Plaintiff's Motion for Summary Judgment on its First Amendment claim. ECF No. 71.

Per that ruling and the Declaratory Judgment Act, 28 U.S.C. § 2201(a), the Court hereby:

(1)     **DECLARES** that the publication of a manufacturer's trade secrets under the Public Interest Exception, House Bill No. 4005, 2018 Or. L. Ch. 7, § 2(10)(a), constitutes a taking of private property under the Fifth Amendment to the United States Constitution, and that any invocation of the Public Interest Exception by Defendant without simultaneously providing just compensation for that taking would accordingly violate the Fifth Amendment; and

(2)     **DISMISSES WITH PREJUDICE** Plaintiff's claim that House Bill 4005, 2018 Or. L. Ch. 7, §2(10)(a), is preempted by the Defend Trade Secrets Act and the Supremacy Clause; and

(3)     **DECLARES** that H.B. 4005's reporting requirement, House Bill 4005, 2018 Or. L. Ch. 7, § 2(3), violates the First Amendment to the United States Constitution and is, therefore, unenforceable.

This judgment completely resolves Plaintiff's Fifth Amendment, preemption, and First Amendment claims. The Court hereby certifies that "there is no just reason for delay" of entry of final judgment on these claims. Fed. R. Civ. P. 54(b). The Court's entry of judgment at this stage

Page 2 -   DECLARATORY JUDGMENT

will award Plaintiff with an enforceable declaratory judgment. The claims subject to this judgment involve no material facts intertwined with Plaintiff's remaining claim under the Commerce Clause, and allowing appellate review of this final judgment on fewer than all of Plaintiff's claims is likely to lead to the termination of this litigation. The Court therefore enters this judgment as its final judgment on the Second Claim (First Amendment), the Third Claim (Defend Trade Secrets Act and Supremacy Clause), and the Fourth Claim (Takings Clause of the Fifth Amendment) of Plaintiff's Complaint, ECF No. 1. Fed. R. Civ. P. 54(b). The Parties' Cross-Motions are **DENIED** in other respects consistent with the Court's oral ruling.

A full basis for these rulings, in addition to those stated on the record, will be set forth in a written opinion to follow.

DATED February 16, 2024.

/s/ Michael W. Mosman
Michael W. Mosman
United States District Court Judge

Page 3 -   DECLARATORY JUDGMENT

## CERTIFICATE OF SERVICE

I hereby certify that on March 13, 2024, I directed the Notice of Appeal to be electronically filed with the Clerk of the Court for the United States District Court for the District of Oregon by using the appellate CM/ECF system.

I certify that all participants in the case are registered CM/ECF users and that service will be accomplished by the appellate CM/ECF system.

I further certify that on March 13, 2024, a copy of the Notice of Appeal was sent via certified mail, return receipt requested, in an envelope with postage pre-paid to the following:

| | |
|---|---|
| Jonathan M. Hoffman<br>MB Law Group, LLP<br>117 SW Taylor St., Suite 200<br>Portland, OR 97204 | Allon S. Kedem<br>Arnold & Porter Kaye Scholer LLP<br>601 Massachusetts Ave. NW<br>Washington, DC 20001 |
| David W. Cramer<br>MB Law Group, LLP<br>117 SW Taylor St., Suite 200<br>Portland, OR 97204 | Elisabeth S. Theodore<br>Arnold & Porter Kaye Scholer LLP<br>601 Massachusetts Ave. NW<br>Washington, DC 20001 |
| Jeffrey L. Handwerker<br>Arnold & Porter Kaye Scholer LLP<br>601 Massachusetts Ave. NW<br>Washington, DC 20001 | R. Stanton Jones<br>Arnold & Porter Kaye Scholer LLP<br>601 Massachusetts Ave. NW<br>Washington, DC 20001 |

/s/  Dustin Buehler

DUSTIN BUEHLER  #152024
Attorney-in-Charge
Civil/Administrative Appeals
dustin.buehler@doj.state.or.us

Attorney for Defendant-Appellant
Andrew Stolfi

Page 3 - NOTICE OF APPEAL
DB4:kw5/957536832

**E.R.-251**

# U.S. District Court
## District of Oregon (Eugene (6))
## CIVIL DOCKET FOR CASE #: 6:19-cv-01996-MO

| | |
|---|---|
| Pharmaceutical Research and Manufacturers of America v. Stolfi | Date Filed: 12/09/2019 |
| Assigned to: Judge Michael W. Mosman | Jury Demand: None |
| Demand: $0 | Nature of Suit: 950 Constitutional - State Statute |
| Case in other court: Ninth Circuit, 24-01570 | Jurisdiction: Federal Question |
| Cause: 42:1983 Civil Rights Act | |

**Plaintiff**

| | | |
|---|---|---|
| **Pharmaceutical Research and Manufacturers of America** | represented by | **Jonathan M. Hoffman** <br> MB Law Group, LLP <br> 117 SW Taylor St. <br> Suite 200 <br> Portland, OR 97204 <br> 503-914-2015 <br> Fax: 503-914-1725 <br> Email: jhoffman@mblglaw.com <br> *LEAD ATTORNEY* <br> *ATTORNEY TO BE NOTICED* |

**Allon S. Kedem**
Arnold & Porter Kaye Scholer LLP
601 Massachusetts Ave. NW
Washington, DC 20001
202-942-6234
Fax: 202-942-5999
Email: allon.kedem@arnoldporter.com
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**David W. Cramer**
MB Law Group LLP
117 SW Taylor Street
#200
Portland, OR 97204
503-382-4211
Fax: 5039142015
Email: dcramer@mblglaw.com
*ATTORNEY TO BE NOTICED*

**Elisabeth S. Theodore**
Arnold & Porter Kaye Scholer LLP
601 Massachusetts Ave. NW
Washington, DC 20001
202-942-5891
Fax: 202-942-5999
Email:
elisabeth.theodore@arnoldporter.com

**E.R.-252**

*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Jeffrey L. Handwerker**
Arnold & Porter LLP
601 Massachusetts Ave. NW
Washington, DC 20001
202-942-6103
Fax: 202-942-5999
Email:
jeffrey.handwerker@arnoldporter.com
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**R. Stanton Jones**
Arnold & Porter Kaye Scholer LLP
601 Massachusetts Ave. NW
Washington, DC 20001
202-942-5563
Fax: 202-942-5999
Email: stanton.jones@arnoldporter.com
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Thomas W. Purcell**
MB Law Group LLP
117 SW Taylor Street
Suite 200
Portland, OR 97204
503-914-2015
Fax: 503-914-1725
Email: tpurcell@mblglaw.com
*TERMINATED: 05/23/2023*

V.

**<u>Defendant</u>**

**Lou Savage**
*in his official capacity as Acting Director of the Oregon Department of Consumer and Business Services*
*TERMINATED: 06/16/2020*

represented by **Carla Scott**
Oregon Department of Justice
100 SW Market Street
Portland, OR 97201
971-673-1880
Fax: 971-673-5000
Email: carla.a.scott@doj.state.or.us
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Sarah K. Weston**
Oregon Department of Justice
100 SW Market Street
Portland, OR 97201
971-673-1880
Fax: 971- 673-5000

Email: sarah.weston@doj.state.or.us
*TERMINATED: 04/15/2020*

**Shaunee Vanessa Morgan**
Oregon Department of Justice
Trial Division
100 SW Market Street
Portland, OR 97201
971-673-5022
Email: shaunee.morgan@doj.state.or.us
*ATTORNEY TO BE NOTICED*

**Defendant**

| | |
|---|---|
| **Andrew Stolfi** | represented by **Carla Scott** |
| *in his official capacity as Director of the* | (See above for address) |
| *Oregon Department of Consumer and* | *LEAD ATTORNEY* |
| *Business Services* | *ATTORNEY TO BE NOTICED* |

**Brian Simmonds Marshall**
Oregon Department of Justice
Trial Division, Special Litigation Unit
100 SW Market Street
Portland, OR 97201
971-673-1880
Email: brian.s.marshall@doj.state.or.us
*ATTORNEY TO BE NOTICED*

**Dustin Buehler**
Oregon Department of Justice
Appellate Division
1162 Court Street NE
Salem, OR 97301
503-378-4402
Email: dustin.buehler@doj.state.or.us
*ATTORNEY TO BE NOTICED*

**Shaunee Vanessa Morgan**
(See above for address)
*ATTORNEY TO BE NOTICED*

| Date Filed | # | Docket Text |
|---|---|---|
| 12/09/2019 | 1 | Complaint. Filing fee in the amount of $400 collected. Agency Tracking ID: 0979-6114577 Filer is subject to the requirements of Fed. R. Civ. P. 7.1. Jury Trial Requested: No. Filed by Pharmaceutical Research and Manufacturers of America against Lou Savage (Attachments: # 1 Exhibit A, # 2 Exhibit B, # 3 Civil Cover Sheet). (Hoffman, Jonathan) (Entered: 12/09/2019) |
| 12/09/2019 | 2 | Proposed Summons Filed by Pharmaceutical Research and Manufacturers of America. (Hoffman, Jonathan) (Entered: 12/09/2019) |
| 12/09/2019 | 3 | Corporate Disclosure Statement . Filed by Pharmaceutical Research and Manufacturers of America. (Hoffman, Jonathan) (Entered: 12/09/2019) |

**E.R.-254**

| 12/09/2019 | 4 | Notice of Case Assignment to Judge Ann L. Aiken and Discovery and Pretrial Scheduling Order. **NOTICE: Counsel shall print and serve the summonses and all documents issued by the Clerk at the time of filing upon all named parties in accordance with Local Rule 3-5**. Discovery is to be completed by 4/7/2020. Joint Alternate Dispute Resolution Report is due by 5/7/2020. Pretrial Order is due by 5/7/2020. Ordered by Judge Ann L. Aiken. (Attachments: # 1 Summons Issued) (kf) (Entered: 12/09/2019) |
|---|---|---|
| 12/09/2019 | 5 | CASE MANAGEMENT ORDER. Signed on 12/9/2019 by Judge Ann L. Aiken. (ck) (Entered: 12/09/2019) |
| 12/10/2019 | 6 | Motion for Leave to Appear Pro Hac Vice *for Attorney Jeffrey L. Handwerker* . Filing fee in the amount of $300 collected; Agency Tracking ID: 0979-6115898. Filed by Pharmaceutical Research and Manufacturers of America. (Hoffman, Jonathan) (Entered: 12/10/2019) |
| 12/10/2019 | 7 | Motion for Leave to Appear Pro Hac Vice *for Attorney Robert S. Jones* . Filing fee in the amount of $300 collected; Agency Tracking ID: 0979-6115912. Filed by Pharmaceutical Research and Manufacturers of America. (Hoffman, Jonathan) (Entered: 12/10/2019) |
| 12/10/2019 | 8 | Motion for Leave to Appear Pro Hac Vice *for Attorney Elisabeth S. Theodore* . Filing fee in the amount of $300 collected; Agency Tracking ID: 0979-6115916. Filed by Pharmaceutical Research and Manufacturers of America. (Hoffman, Jonathan) (Entered: 12/10/2019) |
| 12/10/2019 | 9 | Motion for Leave to Appear Pro Hac Vice *for Attorney Allon S. Kedem* . Filing fee in the amount of $300 collected; Agency Tracking ID: 0979-6115920. Filed by Pharmaceutical Research and Manufacturers of America. (Hoffman, Jonathan) (Entered: 12/10/2019) |
| 12/10/2019 | 10 | **ORDER:** Granting Application for Special Admission *Pro Hac Vice* of Jeffrey L. Handwerker for Pharmaceutical Research and Manufacturers of America. Application Fee in amount of $300 collected. Receipt No. 0979-6115898 issued. Signed on 12/10/2019 by Judge Ann L. Aiken. (ck) (Entered: 12/10/2019) |
| 12/10/2019 | 11 | Notification of CM/ECF Account for Jeffrey L. Handwerker (*Pro Hac Vice* admission). Your login is: **jlhandwerker**. Go to the CM/ECF login page to set your password. (ck) (Entered: 12/10/2019) |
| 12/10/2019 | 12 | **ORDER:** Granting Application for Special Admission *Pro Hac Vice* of R. Stanton Jones for Pharmaceutical Research and Manufacturers of America. Application Fee in amount of $300 collected. Receipt No. 0979-6115912 issued. Signed on 12/10/2019 by Judge Ann L. Aiken. (ck) (Entered: 12/10/2019) |
| 12/10/2019 | 13 | Notification of CM/ECF Account for R. Stanton Jones (*Pro Hac Vice* admission). Your login is: **rsjones**. Go to the CM/ECF login page to set your password. (ck) (Entered: 12/10/2019) |
| 12/10/2019 | 14 | **ORDER:** Granting Application for Special Admission *Pro Hac Vice* of Elisabeth S. Theodore for Pharmaceutical Research and Manufacturers of America. Application Fee in amount of $300 collected. Receipt No. 0979-6115916 issued. Signed on 12/10/2019 by Judge Ann L. Aiken. (ck) (Entered: 12/10/2019) |
| 12/10/2019 | 15 | Notification of CM/ECF Account for Elisabeth S. Theodore (*Pro Hac Vice* admission). Your login is: **estheodore**. Go to the CM/ECF login page to set your password. (ck) (Entered: 12/10/2019) |
| 12/10/2019 | 16 | **ORDER:** Granting Application for Special Admission *Pro Hac Vice* of Allon S. Kedem for Pharmaceutical Research and Manufacturers of America. Application Fee in amount of |

**E.R.-255**

| | | |
|---|---|---|
| | | $300 collected. Receipt No. 0979-6115920 issued. Signed on 12/10/2019 by Judge Ann L. Aiken. (ck) (Entered: 12/10/2019) |
| 12/10/2019 | 17 | Notification of CM/ECF Account for Allon S. Kedem (*Pro Hac Vice* admission). Your login is: **askedem**. Go to the CM/ECF login page to set your password. (ck) (Entered: 12/10/2019) |
| 12/23/2019 | 18 | Motion for Extension of Time *to Respond to the Complaint*. Filed by Lou Savage. (Weston, Sarah) (Entered: 12/23/2019) |
| 12/24/2019 | 19 | **ORDER:** Granting Motion for Extension of Time 18 . Answer is due by 2/14/2020. Ordered by Judge Ann L. Aiken. (ck) (Entered: 12/24/2019) |
| 01/14/2020 | 20 | Affidavit of Service upon Lou Savage served on 12/20/2019 Filed by Pharmaceutical Research and Manufacturers of America. (Cramer, David) (Entered: 01/14/2020) |
| 02/14/2020 | 21 | Answer to 1 Complaint, *and Affirmative Defenses*. Filed by Lou Savage. (Weston, Sarah) (Entered: 02/14/2020) |
| 03/09/2020 | 22 | Joint Stipulation *to Set Briefing Schedule* by Pharmaceutical Research and Manufacturers of America. Filed by Pharmaceutical Research and Manufacturers of America. (Hoffman, Jonathan) (Entered: 03/09/2020) |
| 03/09/2020 | 23 | Proposed Form of Order Submitted *Order Granting Joint Stipulation to Set Briefing Schedule*. Filed by Pharmaceutical Research and Manufacturers of America. (Hoffman, Jonathan) (Entered: 03/09/2020) |
| 03/09/2020 | 24 | Scheduling Order by Judge Ann L. Aiken. The Court is in receipt of the parties' Joint Stipulation to Set Briefing Schedule 22 and adopts the proposed deadlines as follows: PhRMA's Motion for Summary Judgment is due by 3/24/2020. DCBS's combined Response and Cross-Motion for Summary Judgment is due by 4/23/2020. PhRMA's combined Response to DCBS's Cross-Motion for Summary Judgment and Reply in Support of its Motion for Summary Judgment is due by 5/20/2020. DCBS's Reply in Support of its Cross-Motion for Summary Judgment is due by 6/10/2020. Ordered by Judge Ann L. Aiken. (ck) (Entered: 03/09/2020) |
| 03/24/2020 | 25 | Motion for Partial Summary Judgment . Oral Argument requested. Filed by Pharmaceutical Research and Manufacturers of America. (Hoffman, Jonathan) (Entered: 03/24/2020) |
| 04/02/2020 | 26 | Motion for Extension of Time *to File Combined Motion for Partial Summary Judgment and Response to Plaintiff's Motion for Partial Summary Judgment and Corresponding Deadlines for the Parties' Reply Briefs*. Filed by Lou Savage. (Scott, Carla) (Entered: 04/02/2020) |
| 04/15/2020 | 27 | Notice of Attorney Substitution:Attorney Shaunee Morgan is substituted as counsel of record in place of Attorney Sarah K. Weston Filed by Lou Savage. (Weston, Sarah) (Entered: 04/15/2020) |
| 04/22/2020 | 28 | **ORDER:** Granting Motion for Extension of Time 26 . Defendant's combined opposition to Plaintiff's motion for partial summary judgment and Defendant's motion for partial summary judgment is due 5/26/2020. Plaintiff's combined opposition and reply is due 6/26/2020. Defendant's reply is due by 7/27/2020. Motion is taken under advisement as of 8/3/2020. Ordered by Judge Ann L. Aiken. (ck) (Entered: 04/22/2020) |
| 05/26/2020 | 29 | Motion for Partial Summary Judgment *and Opposition to Plaintiff's Motion for Partial Summary Judgment* 25 . Filed by Andrew Stolfi. (Scott, Carla) Modified on 5/27/2020 to add link to #25 (jw). (Entered: 05/26/2020) |

**E.R.-256**

| 05/26/2020 | 30 | Declaration of Cassandra Soucy *In Support of Defendant's Combined Motion For Partial Summary Judgment And Opposition To Plaintiff's Motion For Partial Summary Judgment*. Filed by Andrew Stolfi. (Related document(s): Motion for Partial Summary Judgment 29 .) (Scott, Carla) (Entered: 05/26/2020) |
|---|---|---|
| 05/26/2020 | 31 | Declaration of Shaunee Morgan *In Support of Defendant's Combined Motion For Partial Summary Judgment And Opposition To Plaintiff's Motion For Partial Summary Judgment*. Filed by Andrew Stolfi. (Related document(s): Declaration, 30 , Motion for Partial Summary Judgment 29 .) (Scott, Carla) (Entered: 05/26/2020) |
| 06/16/2020 | 32 | Unopposed Motion to Amend/Correct *Caption*. Filed by Andrew Stolfi. (Scott, Carla) (Entered: 06/16/2020) |
| 06/16/2020 | 33 | **ORDER:** Granting Unopposed Motion to Amend/Correct Caption 32 . Andrew Stolfi shall replace Lou Savage in his official capacity as Director of the Oregon Department of Consumer and Business Services. Ordered by Judge Ann L. Aiken. (ck) (Entered: 06/16/2020) |
| 06/26/2020 | 34 | Reply *in Support of Plaintiff's Motion for Partial Summary Judgment* 25 *and Opposition* to Motion for Partial Summary Judgment *and Opposition to Plaintiff's Motion for Partial Summary Judgment* 29 , Motion for Partial Summary Judgment 25 . Filed by Pharmaceutical Research and Manufacturers of America. (Cramer, David) (Entered: 06/26/2020) |
| 06/26/2020 | 35 | Declaration of David W. Cramer *in Support of Combined Reply and Opposition*. Filed by Pharmaceutical Research and Manufacturers of America. (Related document(s): Reply to Motion, 34 .) (Attachments: # 1 Exhibit 1, # 2 Exhibit 2) (Cramer, David) (Entered: 06/26/2020) |
| 07/21/2020 | 36 | Unopposed Motion for Extension of Time to File a Response/Reply to Motion for Partial Summary Judgment *and Opposition to Plaintiff's Motion for Partial Summary Judgment* 29 . Filed by Andrew Stolfi. (Morgan, Shaunee) (Entered: 07/21/2020) |
| 07/21/2020 | 37 | **ORDER:** Granting 36 Unopposed Motion for Extension of Time to File Response/Reply to Motion for Partial Summary Judgment 29 . Reply is due by 8/3/2020. Motion is taken under advisement as of 8/10/2020. Ordered by Judge Ann L. Aiken. (ck) (Entered: 07/21/2020) |
| 08/03/2020 | 38 | Reply *In Support of Defendant's Motion for Partial Summary Judgment* to Motion for Partial Summary Judgment *and Opposition to Plaintiff's Motion for Partial Summary Judgment* 29 . Filed by Andrew Stolfi. (Scott, Carla) (Entered: 08/03/2020) |
| 08/03/2020 | 39 | Supplemental Declaration of Cassandra Soucy *In Support of Defendant's Motion for Partial Summary Judgment*. Filed by Andrew Stolfi. (Related document(s): Reply to Motion 38 , Motion for Partial Summary Judgment 29 .) (Scott, Carla) (Entered: 08/03/2020) |
| 10/08/2020 | 40 | Scheduling Order by Judge Ann L. Aiken regarding Motion for Partial Summary Judgment 25 and Motion for Partial Summary Judgment 29 . Oral Argument is set for 11/30/2020 at 02:00PM in Eugene by telephone before Judge Ann L. Aiken. Motions are taken under advisement as of 11/30/2020. Ordered by Judge Ann L. Aiken. (ck) (Entered: 10/08/2020) |
| 10/16/2020 | 41 | Notice of Appearance of Brian Simmonds Marshall appearing on behalf of Andrew Stolfi Filed by on behalf of Andrew Stolfi. (Marshall, Brian) (Entered: 10/16/2020) |
| 11/10/2020 | 42 | Scheduling Order by Judge Ann L. Aiken regarding Motion for Partial Summary Judgment 25 and Motion for Partial Summary Judgment *and Opposition to Plaintiff's Motion for Partial Summary Judgment* 29 . Oral Argument is reset from 11/30/2020 to 1/14/2021 at |

**E.R.-257**

| | | |
|---|---|---|
| | | 03:00PM in Eugene by telephone before Judge Ann L. Aiken. Motions are taken under advisement as of 1/14/2021. Ordered by Judge Ann L. Aiken. (ck) (Entered: 11/10/2020) |
| 01/07/2021 | 43 | Notice - *Defendant's Notice of Supplemental Authority.* Filed by Andrew Stolfi. (Attachments: # 1 Exhibit 1, # 2 Exhibit 2) (Morgan, Shaunee) (Entered: 01/07/2021) |
| 01/11/2021 | 44 | Response *to Notice of Supplemental Authority*. Filed by Pharmaceutical Research and Manufacturers of America. (Related document(s): Notice 43 .) (Cramer, David) (Entered: 01/11/2021) |
| 01/14/2021 | 45 | **MINUTES of Proceedings:** Telephonic Motion Hearing held before Judge Ann L. Aiken regarding Motion for Partial Summary Judgment 29 and Motion for Partial Summary Judgment 25 . The Court hears argument as stated on the record and takes the matter under advisement. Formal Written Opinion to follow. Allon Kedem, Jeffrey Handwerker, David Cramer present as counsel for plaintiff. Carla Scott, Brian Marshall, Shaunee Morgan present as counsel for defendant. Court Reporter: Kelly Polvi. (ck) (Entered: 01/14/2021) |
| 03/31/2021 | 46 | Second Notice re Motion for Partial Summary Judgment 29 - *Defendant's Second Notice of Supplemental Authority.* Filed by Andrew Stolfi. (Related document(s): Motion for Partial Summary Judgment 29 .) (Attachments: # 1 Exhibit 1) (Scott, Carla) (Entered: 03/31/2021) |
| 04/05/2021 | 47 | Response *to Second Notice of Supplemental Authority*. Filed by Pharmaceutical Research and Manufacturers of America. (Related document(s): Notice, 46 .) (Attachments: # 1 Exhibit 1) (Cramer, David) (Entered: 04/05/2021) |
| 07/01/2021 | 48 | Notice re Motion for Partial Summary Judgment 25 *of Supplemental Authority* Filed by Pharmaceutical Research and Manufacturers of America. (Related document(s): Motion for Partial Summary Judgment 25 .) (Cramer, David) (Entered: 07/01/2021) |
| 07/16/2021 | 49 | Response *(Titled "Defendant's Notice of Supplemental Authority and Response to Plaintiff's Notice of Supplemental Authority")*. Filed by Andrew Stolfi. (Related document(s): Notice 48 .) (Marshall, Brian) (Entered: 07/16/2021) |
| 07/22/2021 | 50 | Response *to Notice of Supplemental Authority*. Filed by Pharmaceutical Research and Manufacturers of America. (Cramer, David) (Entered: 07/22/2021) |
| 03/29/2022 | 51 | Notice re Motion for Partial Summary Judgment 25 *of Supplemental Authority* Filed by Pharmaceutical Research and Manufacturers of America. (Related document(s): Motion for Partial Summary Judgment 25 .) (Attachments: # 1 Exhibit 1) (Cramer, David) (Entered: 03/29/2022) |
| 10/03/2022 | 52 | Joint Notice Filed by Pharmaceutical Research and Manufacturers of America. (Cramer, David) (Entered: 10/03/2022) |
| 11/11/2022 | 53 | Joint Notice *re Briefing Schdule* Filed by Pharmaceutical Research and Manufacturers of America. (Attachments: # 1 Attachment Letter) (Cramer, David) (Entered: 11/11/2022) |
| 01/20/2023 | 54 | Scheduling Order: Status Conference is set for 2/8/2023 at 01:00PM in Eugene by telephone before Judge Ann L. Aiken. Ordered by Judge Ann L. Aiken. (ck) (Entered: 01/20/2023) |
| 02/08/2023 | 55 | **MINUTES of Proceedings:** Telephonic Status Conference held before Judge Ann L. Aiken. The Court reopens Discovery and directs the parties to schedule their Rule 26 conference. If the parties cannot agree on a schedule, they shall contact the Court to schedule a further status conference. Allon Kedem, Jonathan Hoffman, David Cramer present as counsel for plaintiff. Brian Marshall, Carla Scott present as counsel for defendant. Court Reporter: Kendra Steppler. (ck) (Entered: 02/08/2023) |

| | | |
|---|---|---|
| 04/11/2023 | 56 | Notice of Supplemental Authority re Motion for Partial Summary Judgment 25 Filed by Pharmaceutical Research and Manufacturers of America. (Related document(s): Motion for Partial Summary Judgment 25 .) (Attachments: # 1 Exhibit 1) (Cramer, David) (Entered: 04/11/2023) |
| 05/16/2023 | 57 | Notice of Supplemental Authority re Motion for Partial Summary Judgment 29 , Motion for Partial Summary Judgment 25 Filed by Andrew Stolfi. (Related document(s): Motion for Partial Summary Judgment 29 , Motion for Partial Summary Judgment 25 .) (Attachments: # 1 Attachment 21-468. National Pork Producers Council, et al. v. Ross, et al.) (Marshall, Brian) (Entered: 05/16/2023) |
| 05/18/2023 | 58 | Counter Notice of Supplemental Authority re Notice of Supplemental Authority, 57 Filed by Pharmaceutical Research and Manufacturers of America. (Related document(s): Notice of Supplemental Authority, 57 .) (Purcell, Thomas) (Entered: 05/18/2023) |
| 05/23/2023 | 59 | Notice of Attorney Withdrawal: Filed by Pharmaceutical Research and Manufacturers of America. (Cramer, David) (Entered: 05/23/2023) |
| 06/16/2023 | 60 | Stipulation re Complaint, 1 *Stipulated Amendment to Complaint Removing Certain Claims Without Prejudice* by Pharmaceutical Research and Manufacturers of America. Filed by Pharmaceutical Research and Manufacturers of America. (Cramer, David) (Entered: 06/16/2023) |
| 06/21/2023 | 61 | Notice of Case Reassignment: This case has been reassigned from Judge Ann L. Aiken to Judge Karin J. Immergut. (eo) (Entered: 06/21/2023) |
| 07/05/2023 | 62 | Joint Status Report . Filed by Pharmaceutical Research and Manufacturers of America. (Cramer, David) (Entered: 07/05/2023) |
| 08/25/2023 | 63 | Scheduling Order. Telephonic Status Conference is set for 9/15/2023 at 11:00AM in Portland by telephone before Judge Karin J. Immergut. Ordered by Judge Karin J. Immergut. (jy) (Entered: 08/25/2023) |
| 09/05/2023 | 64 | Scheduling Order. The telephonic Status Conference scheduled for 9/15/2023 is VACATED. Ordered by Judge Karin J. Immergut. (jy) (Entered: 09/05/2023) |
| 10/17/2023 | 65 | Scheduling Order regarding Motion for Partial Summary Judgment 25 and Motion for Partial Summary Judgment *and Opposition to Plaintiff's Motion for Partial Summary Judgment* 29 . Oral Argument is set for 12/19/2023 at 1:00PM in Portland Courtroom 13A before Judge Karin J. Immergut. Ordered by Judge Karin J. Immergut. (jy) (Entered: 10/17/2023) |
| 11/27/2023 | 66 | OFFICIAL COURT TRANSCRIPT OF PROCEEDINGS FILED Telephonic Motion Hearing held on January 14, 2021 before Judge Ann L. Aiken, Court Reporter Kelly Polvi, telephone number 503-779-7406 or kpolvi@comcast.net. Transcript may be viewed at Court's public terminal or purchased from the Court Reporter before the deadline for Release of Transcript Restriction. Afterwards it may be obtained from the Court Reporter or through PACER. See Policy at ord.uscourts.gov. Notice of Intent to Redact Transcript is due by 12/4/2023. Redaction Request due 12/18/2023. Redacted Transcript Deadline set for 12/28/2023. Release of Transcript Restriction set for 2/26/2024. (Steppler, Kendra) Modified hearing date on 12/14/2023 (ck). (Entered: 11/27/2023) |
| 12/18/2023 | 67 | Scheduling Order. Due to a calendar conflict, Oral Argument on the motions for summary judgment is reset for 1/11/2024 at 01:00PM in Portland Courtroom 13A before Judge Karin J. Immergut. The previous date of 12/19/2023 is VACATED. Ordered by Judge Karin J. Immergut. (jy) (Entered: 12/18/2023) |

| 01/08/2024 | 68 | Scheduling Order. Telephonic Status Conference is set for 1/8/2024 at 03:30PM in Portland by telephone before Judge Karin J. Immergut. Ordered by Judge Karin J. Immergut. (jy) (Entered: 01/08/2024) |
|---|---|---|
| 01/08/2024 | 69 | **MINUTES of Proceedings:** Telephonic Status Conference held. For the reasons stated on the record, this case will be reassigned. Allon S. Kedem and David W. Cramer present as counsel for plaintiff(s). Carla Scott, Brian Simmonds Marshall, and Shaunee Vanessa Morgan present as counsel for defendant(s). Court Reporter: Jill Jessup. Judge Karin J. Immergut presiding. (jy) (Entered: 01/08/2024) |
| 01/08/2024 | 70 | Notice of Case Reassignment: This case has been reassigned from Judge Karin J. Immergut to Judge Michael W. Mosman. (eo) (Entered: 01/08/2024) |
| 01/11/2024 | 71 | **MINUTES of Proceedings:** Oral Argument held on 1/11/2024 before Judge Michael W. Mosman. For the reasons stated on the record at oral argument, Plaintiff's Motion for Partial Summary Judgment [ECF 25] is GRANTED in part and DENIED in part and Defendant's Motion for Summary Judgment [ECF 29] is DENIED. As to the Takings Clause claim, summary judgment is GRANTED in favor of Plaintiff. Given the Court's ruling on the Takings Clause claim, summary judgment as to the preemption claim is DENIED as moot to both parties. As to the Commerce Clause claim, summary judgment is DENIED to both parties. As to the First Amendment claim, summary judgment is GRANTED in favor of Plaintiff. Plaintiff is ORDERED to file a proposed declaratory judgment within 10 days. Formal opinion to follow. Allon S. Kedem and David W. Cramer present as counsel for plaintiff(s). Brian Simmonds Marshall and Shaunee Vanessa Morgan present as counsel for defendant(s). Court Reporter: Jill Jessup. Judge Michael W. Mosman presiding. (jy) (Entered: 01/12/2024) |
| 01/19/2024 | 72 | **ORDER:** This Court is in receipt of an email from the parties proposing deadlines for the proposed judgment this Court ordered Plaintiff to file, [ECF 71]. This Court ADOPTS the parties' proposed schedule. If the parties are unable to agree on the proposed judgment, then Defendant's objections will be due 14 days after Plaintiff files its proposed judgment. Plaintiff's response to any objections will be due 14 days after the Defendant's objections. Ordered on 1/19/2024 by Judge Michael W. Mosman. (jy) (Entered: 01/19/2024) |
| 01/22/2024 | 73 | Proposed Form of Order Submitted */Plaintiff's Proposed Declaratory Judgment*. Filed by Pharmaceutical Research and Manufacturers of America. (Cramer, David) (Entered: 01/22/2024) |
| 02/01/2024 | 74 | OFFICIAL COURT TRANSCRIPT OF PROCEEDINGS FILED Oral Argument held on January 11, 2024, before Judge Michael W. Mosman, Court Reporter Jill L. Jessup, telephone number (503)326-8191 or jill_jessup@ord.uscourts.gov. <span style="color:red">Transcript may be viewed at Court's public terminal or purchased from the Court Reporter before the deadline for Release of Transcript Restriction. Afterwards it may be obtained through the Court Reporter at (503)326-8191 or jill_jessup@ord.uscourts.gov or PACER. See Policy at ord.uscourts.gov.</span> Notice of Intent to Redact Transcript is due by 2/8/2024. Redaction Request due 2/22/2024. Redacted Transcript Deadline set for 3/4/2024. Release of Transcript Restriction set for 5/1/2024. (jjcr) (Entered: 02/01/2024) |
| 02/05/2024 | 75 | Counter Proposed Form of Order Submitted *Defendant's Objections to Plaintiff's Proposed Declaratory Judgment*. Filed by Andrew Stolfi. (Attachments: # 1 Attachment Proposed Judgment, # 2 Attachment Proposed Judgment - Comparison) (Marshall, Brian) (Entered: 02/05/2024) |
| 02/14/2024 | 76 | Counter Proposed Form of Order Submitted *Plaintiff's Response to Defendant's Objections to Plaintiff's Proposed Declaratory Judgment*. Filed by Pharmaceutical Research and Manufacturers of America. (Cramer, David) (Entered: 02/14/2024) |

**E.R.-260**

| 02/16/2024 | 77 | **JUDGMENT ON FIFTH AMENDMENT, PREEMPTION, AND FIRST AMENDMENT CLAIMS:** This Court is in receipt of Plaintiff's Proposed Declaratory Judgment, ECF 73 , as well as the parties' briefing regarding that proposal, ECFs 75 , 76 . The Court GRANTS IN PART and DENIES IN PART Plaintiff's Motion for Partial Summary Judgment, ECF 25 , and GRANTS IN PART and DENIES IN PART Defendant's Motion for Partial Summary Judgment, ECF 29 . Specifically, the Court GRANTS Plaintiff's Motion for Summary Judgment on its claim under the Takings Clause of the Fifth Amendment; GRANTS Defendant's Motion for Partial Summary Judgment on Plaintiff's preemption claim; DENIES the Parties' Cross-Motions for Summary Judgment on Plaintiff's Commerce Clause claim; and GRANTS Plaintiff's Motion for Summary Judgment on its First Amendment claim. ECF 71 . This judgment completely resolves Plaintiff's Fifth Amendment, preemption, and First Amendment claims. The Court hereby certifies that "there is no just reason for delay" of entry of final judgment on these claims. Fed. R. Civ. P. 54(b). The Court's entry of judgment at this stage will award Plaintiff with an enforceable declaratory judgment. See attached Declaratory Judgment for details. Signed on 2/16/2024 by Judge Michael W. Mosman. (jy) (Entered: 02/16/2024) |
| --- | --- | --- |
| 03/13/2024 | 78 | Notice of Appeal to the 9th Circuit from Judgment,,,,, 77 Filing fee $605 collected; Agency Tracking ID AORDC-9320503: . Filed by Andrew Stolfi. (Buehler, Dustin) (Entered: 03/13/2024) |
| 03/13/2024 | 79 | Representation Statement re Notice of Appeal 78 . Filed by Andrew Stolfi. (Buehler, Dustin) (Entered: 03/13/2024) |
| 03/13/2024 | 80 | Transcript Designation and Order Form *Notice of No Transcript*. Filed by Andrew Stolfi. (Buehler, Dustin) (Entered: 03/13/2024) |
| 03/15/2024 | | USCA Case Number and Notice confirming Docketing Record on Appeal regarding Notice of Appeal 78 . **Case Appealed to Ninth Circuit, Case Number 24-1570** assigned. (bd) (Entered: 03/15/2024) |
| 03/19/2024 | 81 | **OPINION:** As this Court ruled at oral argument, ECF 71 , 74 , and for the reasons elaborated in the attached Opinion, PhRMA is entitled to summary judgment on its Takings Clause and First Amendment claims, and neither party is entitled to summary judgment on PhRMA's Commerce Clause claim. As clarified upon the entry of declaratory judgment, ECF 77 , and in this Opinion, Oregon is entitled to summary judgment on PhRMA's Supremacy Clause claim. Signed on 3/19/2024 by Judge Michael W. Mosman. (jy) (Entered: 03/19/2024) |
| 03/22/2024 | 82 | Scheduling Order. Telephone Status Conference is set for 4/10/2024 at 10:00AM in Portland before Judge Michael W. Mosman. Ordered by Judge Michael W. Mosman. (kms) (Entered: 03/22/2024) |

| PACER Service Center | | | |
| --- | --- | --- | --- |
| **Transaction Receipt** | | | |
| 04/09/2024 09:04:45 | | | |
| **PACER Login:** | peeneshshah | **Client Code:** | 107130AL168113-01Phrma |
| **Description:** | Docket Report | **Search Criteria:** | 6:19-cv-01996-MO Start date: 1/1/1980 End date: 4/9/2024 |
| **Billable Pages:** | 9 | **Cost:** | 0.90 |

## CERTIFICATE OF SERVICE

I hereby certify that on July 5, 2024, I directed the Appellant's Excerpts of Record to be electronically filed with the Clerk of the Court for the United States Court of Appeals for the Ninth Circuit by using the appellate CM/ECF system.

I certify that all participants in the case are registered CM/ECF users and that service will be accomplished by the appellate CM/ECF system.

/s/ Peenesh Shah
_____
PEENESH SHAH
Assistant Attorney General
peenesh.h.shah@doj.oregon.gov

Attorney for Defendant-Appellant
Andrew Stolfi, Director, Oregon Department of Consumer and
Business Services