No. 24-1570

# IN THE UNITED STATES COURT OF APPEALS FOR THE NINTH CIRCUIT

PHARMACEUTICAL RESEARCH AND MANUFACTURERS OF AMERICA,
*Plaintiff-Appellee,*

v.

ANDREW STOLFI, in his official capacity as Director
of the Oregon Department of Consumer and Business Services,
*Defendant-Appellant.*

On Appeal from the United States District Court
for the District of Oregon
No. 6:19-cv-01996-MO
(Hon. Michael W. Mosman, District Judge)

## PETITION FOR REHEARING EN BANC OR PANEL REHEARING

James C. Stansel
Melissa B. Kimmel
Joanne H. Chan
PHARMACEUTICAL RESEARCH AND
MANUFACTURERS OF AMERICA
670 Maine Ave., SW, Ste. 1000
Washington, DC 20024
jstansel@phrma.org

Allon Kedem
Jeffrey L. Handwerker
Samuel F. Callahan
ARNOLD & PORTER
 KAYE SCHOLER LLP
601 Massachusetts Ave., NW
Washington, DC 20001
(202) 942-5000
allon.kedem@arnoldporter.com

*Counsel for Plaintiff-Appellee Pharmaceutical Research and
Manufacturers of America*

# TABLE OF CONTENTS

Introduction and Rule 40(b) Statement ................................................... 1

Background ............................................................................................... 4

     A.     House Bill 4005 ................................................................. 4

     B.     Proceedings Below ........................................................... 6

     C.     The Panel Decision .......................................................... 6

Reasons for Granting the Petition ......................................................... 9

I.     The Panel's First Amendment Holding Merits Review ................. 9

     A.     Precedent requires applying strict scrutiny to
compelled disclosures ...................................................... 9

     B.     The Panel's approach to intermediate scrutiny
contravenes precedent and creates a circuit split ............... 17

II.     The Panel's Takings Holding Merits Review .............................. 19

     A.     The Panel's highly-regulated-industry test conflicts
with Supreme Court precedent ......................................... 20

     B.     The Panel's decision splits with other Circuits ................... 23

Conclusion .............................................................................................. 24

Certificate of Compliance ...................................................................... 26

Certificate of Service ............................................................................. 27

Addendum:
    *Pharmaceutical Research & Mfrs. of Am. v. Stolfi*,
    No. 24-1570, slip op. (9th Cir. Aug. 26, 2025)

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Bolger v. Youngs Drug Prods. Corp.*,
  463 U.S. 60 (1983)......................................................................... 6, 17

*CTIA—The Wireless Ass'n v. City of Berkeley*,
  928 F.3d 832 (9th Cir. 2019)................................................................ 14

*Horne v. Dep't of Agriculture*,
  576 U.S. 350 (2015)....................................................................... 4, 22

*Nat'l Ass'n of Mfrs. v. SEC*,
  800 F.3d 518 (D.C. Circ. 2015) ....................................................... 2, 18, 19

*NetChoice, LLC v. Bonta*,
  113 F.4th 1101 (9th Cir. 2024) ......................................................... 2, 7, 8

*Philip Morris, Inc. v. Reilly*,
  312 F.3d 24 (1st Cir. 2002) .......................................................... 4, 23, 24

*Ruckelshaus v. Monsanto Co.*,
  467 U.S. 986 (1984)...................................................................... 20, 21

*S.F. Apartment Ass'n v. City and County of San Francisco*,
  881 F.3d 1169 (9th Cir. 2018).............................................................. 14

*X Corp. v. Bonta*,
  116 F.4th 888 (9th Cir. 2024) ........................................................ *passim*

**Statutes and Regulations**

ORS § 646A.689 ........................................................................ 4, 5, 21

ORS § 646A.692 ............................................................................... 5

OAC 836-200-0530 ........................................................................ 5, 16

## INTRODUCTION AND RULE 40(B) STATEMENT

This case involves a constitutional challenge to a sweeping state law that undermines free speech and private property rights.

Oregon's House Bill (HB) 4005 requires pharmaceutical manufacturers (and *only* them) to disclose confidential and proprietary information about their products, including trade secrets. A state agency then must publish the information on its website—destroying the value of the secrets—if the agency deems publication to be in "[t]he public interest." ORS § 646A.689(2), (10)(a)(B). HB 4005 also requires manufacturers to create narrative justifications to defend the sale prices they have chosen for their products.

Over a vigorous dissent from Judge Bea, a Panel of this Court upheld the law against First Amendment and Takings Clause challenges. The Panel created a new First Amendment framework for what it called "government reporting requirements." Op. 16-17.* Under this framework, such requirements receive only intermediate scrutiny—not strict scrutiny—so long as the State demands information that is "product-specific." Op. 40-42.

---

\* "Op." refers to the majority opinion unless otherwise indicated.

As Judge Bea recognized, this "newly minted test" for product-related disclosures not only "discards the well-established legal tests articulated by the Supreme Court," but also "disregards [this] Circuit's binding precedents." Diss. Op. 79. Just last year, the Court applied strict scrutiny to indistinguishable state "transparency measures." *X Corp. v. Bonta*, 116 F.4th 888, 902 (9th Cir. 2024); *see NetChoice, LLC v. Bonta*, 113 F.4th 1101 (9th Cir. 2024). The Panel's decision, if allowed to stand, would "effectively overrule" Circuit precedent. Diss. Op. 96.

Perhaps worse was the Panel's tautological application of intermediate scrutiny. The Panel acknowledged a complete lack of evidence regarding the effects of disclosures compelled by HB 4005. It nevertheless upheld the disclosures as serving an interest in reducing "information asymmetries." Op. 51. That reasoning, of course, makes intermediate scrutiny meaningless—since countering informational asymmetry is the goal of *all* mandated disclosures—and splits with other circuits, which have recognized that intermediate scrutiny requires actual proof. *See Nat'l Ass'n of Mfrs. v. SEC*, 800 F.3d 518 (D.C. Circ. 2015) (*NAM*).

2

The Panel's First Amendment ruling imperils core constitutional values. Oregon's law stands among other recent efforts by "state and national governments" to use "transparency" measures as a means of shaping business behavior. Op. 66. The Panel's new approach gives regulators a playbook "to circumvent strict First Amendment scrutiny" by simply recasting forced speech as a "government reporting requirement" to reduce informational asymmetries. Diss. Op. 113.

The Panel's takings holding similarly calls out for review. The Panel acknowledged that trade secrets are private property, and that forced public disclosure of trade secrets extinguishes the property right. The Panel nevertheless held that a company cannot have "reasonable investment-backed expectations" in the secrecy of its information—and thus cannot claim Takings Clause protection at all—if it "choose[s]" to "do business in [a] highly regulated … industry." Op. 70.

This "highly-regulated-industry" exception to property rights is radical. It defies the Supreme Court's holding that merely "[s]elling" a product is *not* a "special governmental benefit that the Government may hold hostage, to be ransomed by the waiver of a constitutional protec-

3

tion." *Horne v. Dep't of Agriculture*, 576 U.S. 350, 366 (2015). It also creates a conflict with courts of appeals that have rejected indistinguishable arguments from States in cases involving similarly "regulated" industries. *See Philip Morris, Inc. v. Reilly*, 312 F.3d 24 (1st Cir. 2002).

The exception also has no logical limit, threatening the end of takings protections for all kinds of businesses (not just drug companies) and for all kinds of property (not just trade secrets). The exception allows a State to regulate beyond its borders, moreover, so long as the regulated company's product "is sold in th[e] state." ORS § 646A.689(1)(e). Review is necessary to prevent the Panel's decision from nullifying property rights nationwide.

## BACKGROUND

### A.    House Bill 4005

HB 4005 requires pharmaceutical manufacturers to report information when introducing a new drug or when the price of an existing drug increases above a certain threshold. ORS § 646A.689(2)-(3). For each covered drug, manufacturers must file reports with Oregon's Department

4

of Consumer and Business Services (DCBS) containing a range of information about prices and revenues for their products, and the costs of developing and distributing them. §646A.689(3).

As relevant here, the law also requires manufacturers to disclose "[t]he factors that contributed to the price increase" of each drug. §646A.689(3)(c). In particular, price-increase reports must include "a *narrative description and explanation* of all major financial and nonfinancial factors that influenced the decision to increase the wholesale acquisition cost of the drug product and to decide on the amount of the increase." OAC 836-200-0530(2)(h) (emphasis added). Violations trigger fines of up to $10,000 per day. ORS §646A.692(2).

DCBS must "post to its website" all the information that manufacturers are required to report. ORS §646A.689(9)(b). The internet-posting requirement applies even to information that qualifies as a trade secret under Oregon law, unless DCBS determines that "the public interest does not require disclosure of the information." §646A.689(10)(a). HB 4005 thus creates a categorical exception to existing state-law protections for manufacturers' trade secrets, under which DCBS *must* publish them whenever the agency deems publication in "the public interest." ER-138.

5

## B. Proceedings Below

Plaintiff-Appellee Pharmaceutical Research and Manufacturers of America (PhRMA) is a trade association whose members develop cutting-edge medicines used by patients nationwide. In December 2019, PhRMA challenged HB 4005 in the District of Oregon. ER-192-233.

The district court granted partial summary judgment for PhRMA, holding that HB 4005's reporting requirement fails First Amendment scrutiny and its public-interest exception works an unlawful taking.

## C. The Panel Decision

A divided Panel upheld HB 4005 against both claims, with Judge Bea dissenting as to the First Amendment.

**1.** On PhRMA's First Amendment claim, the Panel applied intermediate scrutiny on the ground that HB 4005 merely compels commercial speech. The Panel acknowledged case law under which "the 'core notion of commercial speech' is 'speech which does no more than propose a commercial transaction.'" Op. 36-37 (quoting *Bolger v. Youngs Drug Prods. Corp.*, 463 U.S. 60, 66 (1983)) (cleaned up). The Panel nevertheless determined that "policy considerations" warranted extending the commercial speech doctrine to other government-compelled disclosures—so long

6

as they "communicate product-specific economic information." Op. 39-40 (citation omitted).

The Panel held that, unlike the state disclosure laws subject to strict scrutiny in *X Corp.* and *NetChoice*, HB 4005 only requires a "manufacturer to disclose, as a matter of historical fact, the factors the company considered in setting its drug price." Op. 44. That information, said the Panel, "has no independent expressive meaning" outside the context of commercial transactions. Op. 41, 42 n.18.

Applying intermediate scrutiny, the Panel acknowledged that "the State failed to cite any empirical evidence linking drug pricing transparency laws to lower drug prices." Op. 51. But the Panel deemed that failure irrelevant because it believed HB 4005 advanced Oregon's interest in "reduc[ing] information asymmetries in the pharmaceutical market and provid[ing] drug purchasers with leverage in negotiations with manufacturers." Op. 51.

**2.** On PhRMA's takings claim, the Panel rejected the argument that HB 4005's public-interest exception "interfere[s] with" a manufacturer's "reasonable investment-based expectations" in its trade secrets. Op. 65.

7

In the Panel's view, manufacturers "choose to run the risk of public disclosure of their trade secrets to do business in the highly regulated pharmaceutical industry." Op. 70. To protect their property rights, the Panel held, manufacturers "can decide to forego pharmaceutical sales in the state." Op. 70-71.

**3.** Judge Bea dissented on the First Amendment. The "starting point" for determining the appropriate level of scrutiny for government-compelled speech, he explained, is whether it does "no more than propose a commercial transaction." Diss. Op. 83 (quoting *X Corp.*, 116 F.4th at 900). A manufacturer's internal pricing strategy, which HB 4005 requires it to disclose, is "a far cry from a proposal for commercial transactions." Diss. Op. 83. Even if the question were "close," precedent requires applying *Bolger*'s "guideposts" to determine "whether [the law] compels noncommercial speech." Diss. Op. 85 (quoting *X Corp.*, 116 F.4th at 900). Under *Bolger*, HB 4005 should be subject to strict scrutiny: The compelled disclosures "are not akin to advertisements, and no drug manufacturer has economic motivations to volunteer such disclosures." Diss. Op. 85.

In Judge Bea's view, "the majority's new framework conflicts with the Ninth Circuit's binding precedents" in *X Corp.* and *NetChoice.*

8

Diss. Op. 105; *see* Diss. Op. 87-105. Under "the majority's test," he explained, the speech compelled by the California laws at issue there "would have amounted to commercial speech." Diss. Op. 96-97, 104-05. Nor could the majority distinguish HB 4005 on the ground that it merely calls for disclosure of "historical fact," since the California law in *X Corp.* did too. Diss. Op. 99. The Panel's decision is thus the first time this Court has "applied anything other than strict scrutiny to the kind of speech that HB 4005's Pricing Strategy Disclosure Requirement compels." Diss. Op. 113.

## REASONS FOR GRANTING THE PETITION

The Panel's First and Fifth Amendment rulings contravene Supreme Court precedent, create multiple circuit conflicts—both internal and external—and provide States with a roadmap for circumventing important constitutional protections. Rehearing is warranted.

### I.   THE PANEL'S FIRST AMENDMENT HOLDING MERITS REVIEW

#### A.   Precedent requires applying strict scrutiny to compelled disclosures

Laws that "compel non-commercial speech" are "subject to strict scrutiny." *X Corp.*, 116 F.4th at 898. The Panel's decision applying only

9

intermediate scrutiny "conflicts with [this Court's] binding precedents." Diss. Op. 105.

**1.** In *X Corp.*, this Court applied strict scrutiny to a California law requiring social media companies to "post their terms of service" and to submit "reports to the Attorney General of California" about "their terms of service and content-moderation policies and practices." *Id.* at 894. *X Corp.* recognized that the appropriate level of scrutiny turned on whether the challenged law "regulat[ed] commercial speech." *Id.* at 900. Concluding that it did not, the Court reaffirmed that "[c]ommercial speech is usually defined as speech that does no more than propose a commercial transaction." *Id.* (cleaned up).

The Court further emphasized that the reports "fail[ed] to satisfy at least two of the three *Bolger* factors." *Id.* First, "[t]he compelled disclosures are not advertisements." *Id.* at 901. Second, they do not "merely disclose existing commercial speech, so a social media company has no economic motivation in their content." *Id.* The Court also emphasized that although "a social media platform's existing [terms of service] and content moderation policies may be commercial speech," platforms' "opinions and reasons for those policies" are not. *Id.*

10

California nevertheless argued the reporting requirement should receive "lower scrutiny because 'it is *only* a transparency measure' about the product," since the company's positions on the reported issues were already "memorialized in the company's content moderation policy." *Id.* at 902. But this Court found that rationale "untenable," since "[i]t would mean that basically any compelled disclosure by any business about its activities would be commercial and subject to a lower tier of scrutiny." *Id.*

In *NetChoice*, this Court applied the same level-of-scrutiny analysis to a California law requiring online businesses to identify, in reports submitted to the State (but *not* publicly), the risks of "material detriment to children" and to create a plan for mitigating these risks. 113 F.4th at 1109-10. Assessing the appropriate standard of scrutiny, the Court again applied the ordinary definition of commercial speech and the *Bolger* factors. *Id.* at 1119-20. To comply with the law, the Court noted, businesses "must do far more than propose a commercial transaction." *Id.* at 1119 (cleaned up). Nor did the reports satisfy the *Bolger* factors. *Id.* at 1120. The Court accordingly applied strict scrutiny. *Id.* at 1121.

**2.** In this case, the Panel's level-of-scrutiny "test and reasoning effectively overrule *X Corp.*" and "contradict[]" *NetChoice*. Diss. Op. 96, 102.

11

Had the Panel applied the framework from those cases, it would have evaluated whether the speech compelled by HB 4005 "does no more than propose a commercial transaction"; and, if "the facts present[ed] a close question," it would have applied the *Bolger* factors. *X Corp.*, 116 F.4th at 900 (cleaned up).

The Panel itself admitted that "applying these tests strictly" would have required treating the speech compelled by HB 4005 as non-commercial. Op. 29. The mandatory reports "do[] not propose a commercial transaction." Op. 29 (cleaned up). Nor do they "fit two of the factors identified in *Bolger*: A report to the government is not an 'advertisement,' and regulated entities and individuals typically produce these reports out of legal obligation, not economic motivation." Op. 29.

The Panel simply deemed the established test "inapt for determining what level of scrutiny to apply to … mandatory reports from [a] regulated entity to the government." Op. 29. In the Panel's view, such "government reporting requirements" must receive a lower level of scrutiny to avoid "counterintuitive results." Op. 29. So the Panel jettisoned "the traditional definitions of commercial speech" altogether. Op. 30.

12

Instead, the Panel announced a new rule: "product-specific government reporting requirements" are now to be "[t]reat[ed] … as commercial speech." Op. 41. The Panel did not explain what it meant for reports to be "product-specific," other than that a business is required to speak about a particular product. Op. 41. And here, the Panel held that "the explicit purpose of HB 4005 is to provide market participants with information to facilitate future commercial transactions," so the speech it compels "is properly categorized as commercial speech." Op. 41-42.

That analysis cannot be squared with *X Corp.* or *NetChoice*. Both decisions applied the ordinary definition of commercial speech and the *Bolger* factors to reporting requirements that were product-specific under the Panel's definition: They required information about particular products offered to consumers, and their explicit purpose was to give consumers the information necessary to "make informed decisions about where they consume" those products. *X Corp.*, 116 F.4th at 896 (citation omitted).

Nor did the Panel identify any authority supporting its new test. The Panel cited prior Circuit decisions that addressed laws "requir[ing] landlords to provide contact information for tenants' rights organizations

13

before initiating buyout negotiations for condominium conversions," and "requiring retailers to provide warnings about federal radio-frequency radiation exposure guidelines for cell phone users." Op. 38-39 (citing *S.F. Apartment Ass'n v. City and County of San Francisco*, 881 F.3d 1169, 1174, 1176-77 (9th Cir. 2018); *CTIA—The Wireless Ass'n v. City of Berkeley*, 928 F.3d 832, 841-42 (9th Cir. 2019)). But *X Corp.* distinguished those very cases under the *existing* commercial-speech framework: "all of this speech communicates *the terms* of an actual or potential transaction." 116 F.4th at 901 (emphasis added).

The reports required by HB 4005 "go further." *Id.* They do not communicate "the terms" of any transaction: Rather than require manufacturers to communicate prices, the law forces them to disclose their *internal* reasons for their pricing decisions. The law thus forces drug manufacturers to "recast [their] pricing strategies in language prescribed by Oregon and … to voice their views as to how drugs are and should be priced." Diss. Op. 91.

**3.** The Panel sought to distinguish *X Corp.* on the ground that the information demanded by HB 4005 has "no independent expressive meaning." Op. 41. That argument is both unconnected to the commercial

14

speech doctrine and incorrect: "[P]ricing strategies can be influenced by many factors, including drug manufacturers' views on issues of public concern such as how drugs should be priced and who should be held responsible for the allegedly inflated drug prices." Diss. Op. 96. Indeed, the Panel itself acknowledged that "drug pricing decisions may implicate controversial public policy issues." Op. 45. The speech compelled here thus has "independent expressive meaning outside the drug sale context"—surely no less than statements about "how social media companies chose to define and moderate different content on their platforms." Diss. Op. 96 (citing *X Corp.*).

Indeed, any connection between the compelled speech and the relevant product is even *more* tenuous here. The reports in *X Corp.* (regarding companies' terms of service and their procedures for handling problematic speech) were directly tied to the product being marketed (social media services governed by those very terms and procedures). Here, manufacturers are required to explain their *internal* decision-making, which tells consumers little about the intrinsic features of the product being offered to them.

15

Nor could *X Corp.* be distinguished on the ground that factors contributing to a price change are "historical fact[s]" for which "no opinion is required." Op. 44. California made the same argument in *X Corp.*, claiming that its law did not force companies to disclose their "beliefs" on "intensely debated and politically fraught topics" in the abstract—only as "memorialized in the company's content moderation policy." 116 F.4th at 902. But this Court found it "untenable" to conclude that this fact, "by itself, convert[s] expression about those beliefs into commercial speech." *Id.* at 902.

Just as the law in *X Corp.* required social media platforms to disclose their "opinions about and reasons for" handling certain content, 116 F.4th at 901, HB 4005 requires a manufacturer to "expla[in]" its views on the "major financial and nonfinancial factors that influenced" its pricing decisions. OAC 836-200-0530(2)(h). The Panel's refusal to apply strict scrutiny to this requirement thus "conflicts with the Ninth Circuit's binding precedents." Diss. Op. 105.

16

**B.** **The Panel's approach to intermediate scrutiny contravenes precedent and creates a circuit split**

Compounding its error, the Panel applied intermediate scrutiny in a manner that would impose no meaningful restraint on government reporting requirements.

The Panel acknowledged that Oregon "failed to cite any empirical evidence linking drug pricing transparency laws to lower drug prices." Op.51. That is an understatement. As the district court found, "the record [the State] created does nothing to advance [a] connection" to *any* "legislative goals." ER-37. Instead, the State offered "little more than speculation." ER-37. Under intermediate scrutiny, that falls far short of satisfying the State's burden to show that its law "directly advances" a "substantial" governmental interest. *Bolger,* 463 U.S. at 69.

The Panel excused Oregon's failure to introduce any evidence because the State has "never claimed that HB 4005's reporting itself will directly lower drug prices." Op.51. Instead, the Panel held that the law's requirements were necessarily justified—as a matter of "common sense"—because they advanced a goal of reducing "information asymmetries in the pharmaceutical market and provid[ing] drug purchasers with leverage in negotiations with manufacturers." Op.51.

17

That argument is self-refuting. *Of course* HB 4005 is aimed at reducing drug prices; "provid[ing] drug purchasers with leverage" could serve no other purpose. Moreover, the State *did* claim the law will lower prices: It argued the law will help save "significant funds that the state of Oregon expends both directly and indirectly on the purchase of prescription drugs." AOB38.

Setting those issues aside, the Panel's reasoning is tautological: "[R]educ[ing] information asymmetry," to give more "leverage" to the person receiving the information, is the purpose of *every* reporting requirement. Such requirements, by their nature, create "symmetry" by forcing the dissemination of information to others who do not already have it. If that rationale sufficed to satisfy intermediate scrutiny, such scrutiny would become meaningless for government-compelled disclosures.

The Panel's approach also opens a circuit split. In *NAM*, the D.C. Circuit held that a federal law requiring diamond producers to publicly report if their products have "not been found to be 'DRC conflict free'" failed the "intermediate standard" for commercial speech. 800 F.3d at 524, 530. Invoking "common sense," the government argued that the re-

18

quirement would help consumers make informed decisions. *Id.* at 525 (citation omitted). But the Court insisted that "in commercial speech cases the government cannot rest on 'speculation or conjecture.'" *Id.* at 526 (citation omitted). Citing "evidentiary gaps" in the government's proof, the Court found the government's burden unsatisfied. *Id.* at 525.

That is how intermediate scrutiny is supposed to work. But the Panel here deemed the lack of evidence regarding HB 4005's real-world effects to be irrelevant, instead treating the State's desire to correct "information asymmetries" as *per se* sufficient to compel disclosure of such information. That approach effectively nullifies First Amendment scrutiny for government-reporting requirements—even where, as here, the information concerns the disclosing entity's *internal* business decision-making. The implications of such a rule, especially when paired with the Panel's level-of-scrutiny approach, are deeply problematic.

## II. THE PANEL'S TAKINGS HOLDING MERITS REVIEW

In upholding HB 4005's public-interest exception under the Takings Clause, the Panel held that "manufacturers choose to run the risk of public disclosure of their trade secrets to do business in the highly regulated pharmaceutical industry." Op. 70. The Panel's creation of a "highly-

regulated-industry" exception to private-property rights is wrong, dangerous, and inconsistent with precedent of the Supreme Court and other courts of appeals.

### A. The Panel's highly-regulated-industry test conflicts with Supreme Court precedent

To justify its new test, the Panel invoked *Ruckelshaus v. Monsanto Co.*, 467 U.S. 986 (1984), where Monsanto was required to disclose confidential information to EPA as a condition of its federal pesticide registrations, subject to subsequent public disclosure by EPA. *Id.* at 991-97. Given that condition, the Supreme Court held that "Monsanto had no reasonable, investment-backed expectation that its information would remain inviolate in the hands of EPA." *Id.* at 1008. The Panel here deemed "HB 4005's public-interest exception [to be] materially indistinguishable from" the disclosure requirement in *Monsanto*. Op. 70.

But crucially, Monsanto "ha[d] not challenged the ability of the Federal Government to regulate the marketing and use of pesticides." 467 U.S. at 1007. Nor could it. Federal law had "long" treated "the ability to market pesticides in this country" as a "valuable Government benefit" that the United States could withhold. *Id.* Manufacturers thus had a gen-

uine choice: If they wanted to seek federal permission to sell their products, they had to "voluntar[ily]" submit their trade secrets "in exchange for the economic advantages of a registration." *Id.*

Here, Oregon offers no comparable "exchange." The ability to sell pharmaceutical products in Oregon is not a "benefit" that the State confers on manufacturers. Nor does Oregon have authority to forbid the sale of drugs in the State comparable to the federal government's authority to withhold pesticide registrations.

Indeed, HB 4005's disclosure requirements are not even limited to businesses that *choose* to sell their products in the State. Most PhRMA members *do not* sell their products directly within Oregon; they sell to out-of-state wholesalers, who resell the drugs in the State. Yet the law applies to anyone who "manufactures a prescription drug that *is sold* in th[e] state." ORS § 646A.689(1)(e) (emphasis added). To avoid HB 4005's forced trade-secret disclosure, a manufacturer would have to refrain from doing business with wholesalers *nationwide*, because manufacturers otherwise cannot prevent national wholesalers from selling drugs to Oregon-based end-purchasers.

The Supreme Court has reaffirmed that *Monsanto*'s holding applies only to genuine government benefits, not the right to sell in a market generally. In *Horne*, the federal government forced raisin producers to hold a portion of their crop in reserve, to be acquired by the government. They "voluntarily choose to participate in the raisin market," the government argued, and could avoid the reserve requirement by "plant[ing] different crops" or selling grapes for "juice or wine." 576 U.S. at 365.

The Supreme Court disagreed, rejecting "the idea that *Monsanto* may be extended by regarding basic and familiar uses of property as a 'Government benefit' on the same order as a permit to sell hazardous chemicals." *Id.* at 366. The government could not avoid the Takings Clause by "characteriz[ing]" the taking "as part of a similar voluntary exchange." *Id.* The same reasoning applies here: Selling pharmaceutical products "in interstate commerce, although certainly subject to reasonable government regulation, is similarly not a special governmental benefit that [a State] may hold hostage, to be ransomed by the waiver of constitutional protection." *Id.*

22

The Panel's ruling creates a takings loophole with no limiting principle. If companies in "highly regulated" markets have no reasonable investment-backed expectations in their property rights, then the government can take their property with impunity—merely by describing any taking as a "risk" the company runs by doing business in the industry. The Panel's logic also is not limited to "intangible" property like trade secrets. Op. 62-63. It applies equally to personal property (goods and machinery) and even real property (land). Nor is the reasoning limited to the pharmaceutical industry; it applies to any market that a court decides is sufficiently "regulated."

## B. The Panel's decision splits with other Circuits

Other Circuits have applied *Monsanto*'s voluntary-exchange rule correctly, even in heavily regulated industries. In *Philip Morris*, the First Circuit held that a Massachusetts statute requiring tobacco companies to disclose their trade secrets, in the form of ingredient lists, facially violated the Taking Clause. 312 F.3d at 26. Like HB 4005's public-interest exception, the Massachusetts law "allow[ed] the public disclosure of these ingredient lists whenever such disclosure 'could reduce risks to public health.'" *Id.* at 26 (citation omitted).

The First Circuit acknowledged that "tobacco is subject to heavy regulation," including by "state governments." *Id.* Yet it rejected Massachusetts's argument that "tobacco companies have no reasonable investment-backed expectation that their ingredient lists will remain secret." *Id.* at 41; *see id.* at 48-50 (Selya, J., concurring). Though tobacco companies voluntarily sell tobacco, they "have not voluntarily provided their ingredient lists." *Id.* at 38.

The First Circuit accordingly rejected the argument that the State could condition manufacturers' participation in the market on "the forfeiture of any constitutional protections [that manufacturers] have to their trade secrets." *Id.* at 47. That reasoning applies with at least as much force to pharmaceuticals.

## CONCLUSION

The Court should grant rehearing.

Dated: September 30, 2025      Respectfully submitted,

/*s*/Allon Kedem

James C. Stansel             Allon Kedem
Melissa B. Kimmel            Jeffrey L. Handwerker
Joanne H. Chan               Samuel F. Callahan
PHARMACEUTICAL RESEARCH      ARNOLD & PORTER
AND MANUFACTURERS OF          KAYE SCHOLER LLP
AMERICA                      601 Massachusetts Ave., NW
670 Maine Ave., SW, Ste. 1000  Washington, DC 20001
Washington, DC 20024         (202) 942-5000
jstansel@phrma.org           (202) 942-5999 (fax)
                             allon.kedem@arnoldporter.com

25

## CERTIFICATE OF COMPLIANCE

I hereby certify that this brief complies with the word length requirements of Circuit Rule 40-1(a) because it contains 4,189 words, excluding the portions excluded by Federal Rule of Appellate Procedure 32(f). I further certify that this brief complies with the typeface requirements of Rule 32(a)(5) and the type-style requirements of Rule 32(a)(6) because it has been prepared in proportionally spaced typeface using Microsoft Word in 14-point Century Schoolbook font.


Dated: September 30, 2025          /s/ Allon Kedem
                                        Allon Kedem

## CERTIFICATE OF SERVICE

I hereby certify that on September 30, 2025, I electronically filed the foregoing document with the Clerk of the Court of the United States Court of Appeals for the Ninth Circuit by using the appellate ECF system. I certify that all participants in the case are registered ECF users and that service will be accomplished by the appellate ECF system.

Dated: September 30, 2025        /s/ Allon Kedem
                                        Allon Kedem

## UNITED STATES COURT OF APPEALS
## FOR THE NINTH CIRCUIT

## Form 11. Certificate of Compliance for Petitions for Rehearing/Responses

*Instructions for this form:* *https://www.ca9.uscourts.gov/forms/form11instructions.pdf*

**9th Cir. Case Number(s)** 24-1570

I am the attorney or self-represented party.

I certify that pursuant to Circuit Rule 40-1, the attached petition for panel

rehearing/petition for rehearing en banc/response to petition is *(select one)*:

◉ Prepared in a format, typeface, and type style that complies with Fed. R. App. P. 32(a)(4)-(6) and **contains the following number of words:** 4189 .
*(Petitions and responses must not exceed 4,200 words)*

**OR**

○ In compliance with Fed. R. App. P. 32(a)(4)-(6) and does not exceed 15 pages.

**Signature** s/Allon Kedem **Date** September 30, 2025
*(use "s/[typed name]" to sign electronically-filed documents)*

*Feedback or questions about this form? Email us at* *forms@ca9.uscourts.gov*

**Form 11** *Rev. 12/01/24*

**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS FOR THE NINTH CIRCUIT

| | |
|---|---|
| PHARMACEUTICAL RESEARCH AND MANUFACTURERS OF AMERICA, | No. 24-1570 |
| | D.C. No. 6:19-cv-01996-MO |
| *Plaintiff - Appellee*, | |
| v. | |
| ANDREW R. STOLFI, in his official capacity as Director of the Oregon Department of Consumer and Business Services, | OPINION |
| *Defendant - Appellant*. | |

Appeal from the United States District Court
for the District of Oregon
Michael W. Mosman, District Judge, Presiding

Argued and Submitted February 5, 2025
Portland, Oregon

Filed August 26, 2025

Before: Carlos T. Bea, Lucy H. Koh, and Jennifer Sung,
Circuit Judges.

Opinion by Judge Koh;
Partial Concurrence and Partial Dissent by Judge Bea

# SUMMARY[*]

## First Amendment/Takings

The panel reversed the district court's summary judgment in favor of Plaintiff Pharmaceutical Researchers and Manufacturers of America ("PhRMA"), in PhRMA's action challenging Oregon House Bill No. 4005 ("HB 4005").

HB 4005 requires prescription drug manufacturers to report information related to certain prescription drugs to the Oregon Department of Consumer and Business Services ("DCBS"). In most circumstances, HB 4005 requires DCBS to post disclosed information on its website. However, HB 4005 expressly provides that DCBS may not publicly post any information designated as a "trade secret" unless disclosure is in the public interest. PhRMA brought facial claims against HB 4005, alleging in relevant part, that: (1) the reporting requirement violates the First Amendment and (2) any invocation of the public-interest exception constitutes an unconstitutional taking under the Fifth Amendment.

The panel reversed the district court's grant of summary judgment in favor of PhRMA on its First Amendment claim. The disclosures required by HB 4005, which involve product-specific economic information about prescription drugs that are available for purchase on the market, are properly categorized as commercial speech. The panel declined to reach the issue of whether the statute is subject

---

[*] This summary constitutes no part of the opinion of the court. It has been prepared by court staff for the convenience of the reader.

to intermediate scrutiny under *Central Hudson Gas & Electric Corp. v. Public Service Commission of New York*, 447 U.S. 557 (1980), or a lower level of scrutiny under *Zauderer v. Office of Disciplinary Counsel of the Supreme Court of Ohio*, 471 U.S. 626 (1985), concluding that the statute survives the more stringent standard of intermediate scrutiny.

The panel reversed the district court's grant of summary judgment in favor of PhRMA on its Fifth Amendment takings claim. Although DCBS has never invoked the public-interest exception, PhRMA has standing and the takings claim is ripe for review. The panel then determined that it is appropriate to treat the claim as an alleged regulatory taking, rather than as a categorical, per se taking. Even assuming *arguendo* that a facial challenge can be made under the test for regulatory takings set forth in *Penn Central Transportation Co. v. New York City*, 438 12 U.S. 104 (1978), none of the *Penn Central* factors support PhRMA's facial takings claim.

Concurring in part and dissenting in part, Judge Bea concurred that PhRMA's facial takings challenge on the Fifth Amendment ground failed because Oregon's long-standing public interest exception in its state trade secret laws undermined the reasonableness of any expectation of absolute protection of trade secrets in Oregon. Judge Bea dissented because in his view, HB 4005's Pricing Strategy Disclosure Requirement compels non-commercial speech and cannot survive strict scrutiny under the First Amendment.

## COUNSEL

Allon Kedem (argued), Elisabeth S. Theodore, Jeffrey L. Handwerker, Matthew L. Farley, and Robert S. Jones, Arnold & Porter Kaye Scholer LLP, Washington, D.C.; Jonathan M. Hoffman and David Cramer, MB Law Group LLP, Portland, Oregon; James C. Stansel, Melissa B. Kimmel, and Joanne H. Chan, Pharmaceutical Research and Manufacturers of America, Washington, D.C.; for Plaintiff-Appellee.

Peenesh Shah (argued) and Denise G. Fjordbeck, Assistant Attorneys General; Benjamin Gutman, Solicitor General; Ellen F. Rosenblum, Attorney General; Oregon Department of Justice, Salem, Oregon; for Defendant-Appellant.

Bryan Kao and Katelyn Wallace, Deputy Attorneys General; Karli Eisenberg, Supervising Deputy Attorney General; David Jones, Acting Senior Assistant Attorney General; Rob Bonta, California Attorney General; Office of the California Attorney General, Oakland, California; Kris Mayes, Arizona Attorney General, Office of the Arizona Attorney General, Phoenix, Arizona; Philip J. Weiser, Colorado Attorney General, Office of the Colorado Attorney General, Denver, Colorado; William Tong, Connecticut Attorney General, Office of the Connecticut Attorney General, Hartford, Connecticut; Kathleen Jennings, Delaware Attorney General, Office of the Delaware Attorney General, Wilmington, Delaware; Brian L. Schwalb, District of Columbia Attorney General, Office of the District of Columbia Attorney General, Washington, D.C.; Anne E. Lopez, Hawai'i Attorney General, Office of the Hawai'i Attorney General, Honolulu, Hawai'i; Kwame Raoul, Illinois Attorney General, Office of the Illinois Attorney General, Chicago, Illinois; Aaron M. Frey, Maine Attorney

General, Office of the Maine Attorney General, Augusta, Maine; Anthony G. Brown, Maryland Attorney General, Office of the Maryland Attorney General, Baltimore, Maryland; Andrea J. Campbell, Commonwealth of Massachusetts Attorney General, Office of the Commonwealth of Massachusetts Attorney General, Boston, Massachusetts; Dana Nessel, Michigan Attorney General, Office of the Michigan Attorney General, Lansing, Michigan; Keith Ellison, Minnesota Attorney General, Office of the Minnesota Attorney General, St. Paul, Minnesota; Aaron D. Ford, Nevada Attorney General, Office of the Nevada Attorney General, Carson City, Nevada; Matthew J. Platkin, New Jersey Attorney General, Office of the New Jersey Attorney General, Trenton, New Jersey; Raul Torrez, New Mexico Attorney General, Office of the New Mexico Attorney General, Santa Fe, New Mexico; Letitia James, New York Attorney General, Office of the New York Attorney General, New York, New York; Joshua H. Stein, North Carolina Attorney General, Office of the North Carolina Attorney General, Raleigh, North Carolina; Michelle A. Henry, Commonwealth of Pennsylvania Attorney General, Office of the Pennsylvania Attorney General, Harrisburg, Pennsylvania; Charity R. Clark, Vermont Attorney General, Office of the Vermont Attorney General, Montpelier, Vermont; Robert W. Ferguson, Washington Attorney General, Office of the Washington Attorney General, Olympia, Washington; for Amici Curiae States of California, Arizona, Colorado, Connecticut, Delaware, Hawai'i, Illinois, Maine, Maryland, Massachusetts, Michigan, Minnesota, Nevada, New Jersey, New Mexico, New York, North Carolina, Pennsylvania, Vermont, Washington, and The District of Columbia.

Margaret S. Olney, Bennett Hartman LLP, Portland, Oregon, for Amicus Curiae Oregon Coalition for Affordable Prescriptions.

Andrew R. Varcoe and Mariel A. Brookins, U.S. Chamber Litigation Center, Washington, D.C.; Jeffrey S. Bucholtz, King & Spalding LLP, Washington, D.C.; Matthew V.H. Noller, King & Spalding LLP, San Francisco, California; for Amicus Curiae The Chamber of Commerce of the United States of America.

## OPINION

KOH, Circuit Judge:

In 2018, the Oregon Legislative Assembly passed the Prescription Drug Price Transparency Act, 2018 Or. Laws Ch. 7, also referred to as House Bill No. 4005 ("HB 4005"), codified at Or. Rev. Stat. §§ 646A.680-692. The law requires prescription drug manufacturers to, *inter alia*, report to the Oregon Department of Consumer and Business Services ("DCBS") information related to certain prescription drugs including, for example, current and past list prices, generic alternatives, and the length of time the drugs have been on the market. Or. Rev. Stat. § 646A.689(3). In most circumstances, HB 4005 requires DCBS to post disclosed information on its website. *Id.* § 646A.689(9). However, HB 4005 expressly provides that DCBS may not publicly post any information designated as a "trade secret" unless disclosure is in the public interest. *Id.* § 646A.689(10)(a).

This appeal concerns two facial challenges against HB 4005 brought by Plaintiff-Appellee Pharmaceutical

Research and Manufacturers of America ("PhRMA"). First, PhRMA alleges that HB 4005's reporting requirement, Or. Rev. Stat. § 646A.689(3), compels speech in violation of the First Amendment. Second, PhRMA alleges that HB 4005's "public-interest exception," Or. Rev. Stat. § 646A.689(10)(a), constitutes an uncompensated taking in violation of the Fifth Amendment. The district court entered summary judgment in favor of PhRMA on both claims and entered final declaratory judgment. For the reasons below, we reverse and remand to the district court for further proceedings consistent with this opinion.

## I.  BACKGROUND AND PROCEDURAL HISTORY

### A.  Statutory Background

In February 2018, the Oregon Legislative Assembly enacted HB 4005, commonly known as the Prescription Drug Price Transparency Act. In a preface to the bill, the legislature explained that "the state has a substantial public interest in the price and cost of prescription drugs," especially because the state acts as a "major purchaser of prescription drugs" and "provides major tax expenditures for health care through the tax exclusion of employer-sponsored health insurance coverage and the deductibility of the excess medical costs of individuals and families." HB 4005, ch. 7. In a statement of purpose, the legislature explained that HB 4005 is intended to "provide notice and disclosure of information relating to the cost and pricing of prescription drugs in order to provide accountability for prescription drug pricing" and "permit purchasers, both public and private, as well as pharmacy benefit managers, to negotiate discounts and rebates for prescription drugs consistent with existing state and federal law." HB 4005, ch. 7.

### i.  The Reporting Requirement

The first provision at issue in this appeal, which the parties refer to as the "reporting requirement," requires pharmaceutical manufacturers to disclose to DCBS information related to the costs, revenues, and prices of certain prescription drugs. [1] The challenged reporting requirement applies only to drugs for which: (a) "[t]he price was $100 or more for a one-month supply or for a course of treatment lasting less than one month," and (b) "[t]here was a net increase of 10 percent or more in the price of the prescription drug ... over the course of the previous calendar year." Or. Rev. Stat. § 646A.689(2). For these drugs, HB 4005 requires manufacturers to "report to [DCBS], in the form and manner prescribed by [DCBS]" the following information:

> (a) The name and price of the prescription drug and the net increase, expressed as a percentage, in the price of the drug over the course of the previous calendar year;
> (b) The length of time the prescription drug has been on the market;
> (c) The factors that contributed to the price increase;
> (d) The name of any generic version of the prescription drug available on the market;

---

[1] For the purposes of HB 4005, a "manufacturer" is defined as "a person that manufactures a prescription drug that is sold in [Oregon]." Or. Rev. Stat. § 646A.689(1)(e). "Price" is defined as the drug's wholesale acquisition cost, *i.e.*, the drug's federally defined, national list price. *Id.* § 646A.689(1)(i); 42 U.S.C. § 1395w-3a(c)(6)(B).

(e) The research and development costs associated with the prescription drug that were paid using public funds;

(f) The direct costs incurred by the manufacturer:

    (A) To manufacture the prescription drug;

    (B) To market the prescription drug;

    (C) To distribute the prescription drug; and

    (D) For ongoing safety and effectiveness research associated with the prescription drug;

(g) The total sales revenue for the prescription drug during the previous calendar year;

(h) The manufacturer's profit attributable to the prescription drug during the previous calendar year;

(i) The introductory price of the prescription drug when it was approved for marketing by the United States Food and Drug Administration and the net yearly increase, by calendar year, in the price of the prescription drug during the previous five years;

(j) The 10 highest prices paid for the prescription drug during the previous calendar year in any country other than the United States;

(k) Any other information that the manufacturer deems relevant to the price increase . . . ; and

> (l) The documentation necessary to support the information reported under this subsection.

*Id.* § 646A.689(3) (hereinafter, "HB 4005's reporting requirement").[2]

Following HB 4005's enactment, DCBS promulgated implementing regulations requiring manufacturers to include, among other disclosures, "[t]he factors that contributed to the price increase, including a narrative description and explanation of all major financial and nonfinancial factors that influenced the decision to increase the wholesale acquisition cost of the drug product and to decide on the amount of the increase." Or. Admin. R. 836-200-0530(2)(h).[3]

### ii. The Public-Interest Exception

The second provision at issue in this appeal, which the parties refer to as the "public-interest exception," relates to the public disclosure of certain information reported to DCBS by manufacturers. As a default, HB 4005 requires DCBS to post information disclosed by manufacturers publicly on the DCBS website. Or. Rev. Stat.

---

[2] Similar reporting requirements also apply to certain new prescription drugs introduced above a certain price threshold. Or. Rev. Stat. § 646A.689(6). However, PhRMA's motion for summary judgment discussed only the reporting requirement for existing drugs, and the district court's declaratory judgment was limited to the reporting requirement for existing drugs, Or. Rev. Stat. § 646A.689(3).

[3] Although the partial dissent would find several subsections of HB 4005's reporting requirement unconstitutional, the partial dissent agrees that multiple other subsections, specifically § 646A.689(3)(a), (b), (g), (i), and (j), do not violate the First Amendment. Partial Dissent at 80-81.

§ 646A.689(9). However, HB 4005 provides that DCBS may not post to its website information disclosed by manufacturers if: (1) "[t]he information is conditionally exempt from disclosure under [Or. Rev. Stat. § 192.345] as a trade secret; and (2) "[t]he public interest does not require disclosure of the information." *Id.* § 646A.689(10)(a). For purposes of HB 4005, a trade secret is defined to include "any formula, plan, pattern, process, tool, mechanism, compound, procedure, production data, or compilation of information which is not patented, which is known only to certain individuals within an organization and which is used in a business it conducts, having actual or potential commercial value, and which gives its user an opportunity to obtain a business advantage over competitors who do not know or use it." *Id.* § 192.345; *see id.* § 646A.689(10)(a).

As of May 2020, manufacturers had asserted 4,865 trade secret claims in the 1,112 reports submitted to DCBS. PhRMA represents that, according to an annual report published by DCBS, the number of trade secrets claimed by manufacturers had risen to more than 10,500 as of December 2023. Since HB 4005 was enacted in 2018, DCBS has not disclosed any information claimed as a trade secret.

## B. Procedural History

Plaintiff PhRMA is a trade association whose members include pharmaceutical and biotechnology manufacturers. On December 9, 2019, PhRMA sued in federal court under 42 U.S.C. § 1983, naming as defendant the director of DCBS, acting in his official capacity (hereinafter, the "State"). PhRMA brought four facial claims against HB 4005, alleging that: (1) HB 4005 violates the dormant Commerce Clause, (2) HB 4005 is preempted by the federal Defend Trade Secrets Act, 18 U.S.C. §§ 1832-1839, (3) HB

4005's reporting requirement violates the First Amendment, and (4) any invocation of HB 4005's public-interest exception constitutes an unconstitutional taking under the Fifth Amendment.[4] PhRMA initially sought both injunctive relief and declaratory relief, but later abandoned any claim for injunctive relief.

PhRMA and the State filed cross-motions for partial summary judgment. In PhRMA's summary judgment motion, PhRMA's First Amendment arguments addressed only Or. Rev. Stat. § 646A.689(3)(c), which requires manufacturers to provide the "factors that contributed to the price increase," and its implementing regulation, Or. Admin. R. 836-200-0530(2)(h).

At a hearing in January 2024, the district court made an oral preliminary ruling on the parties' cross-motions. The court granted summary judgment to PhRMA on its First Amendment and Fifth Amendment takings claims, granted summary judgment to the State on PhRMA's preemption claim, and denied summary judgment to both sides on the dormant Commerce Clause claim. In its preliminary oral ruling on the First Amendment claim, the district court concluded that HB 4005's reporting requirement was unconstitutional without referencing any specific subsection of HB 4005. However, the court had before it only the

---

[4] In its complaint, PhRMA also challenged Oregon's Advance Notification Law, House Bill No. 2658, 2019 Or. Laws Ch. 436, which requires manufacturers to provide 60 days' notice before increasing the price of certain medications. PhRMA voluntarily dismissed its challenges to the Advance Notification Law, following the resolution of a challenge to a similar California law. *See generally Pharm. Rsch. & Manufacturers of Am. v. David*, No. 2:17-cv-02573 (E.D. Cal.).

parties' argument as to one subsection: Or. Rev. Stat. § 646A.689(3)(c).

Following the district court's oral preliminary ruling, the parties submitted briefing on the proper scope of the judgment. Although PhRMA had only made summary judgment arguments as to Or. Rev. Stat. § 646A.689(3)(c), PhRMA requested a judgment declaring the entirety of HB 4005's reporting requirement facially unconstitutional. In response, the State argued in its declaratory judgment briefing that subsection 646A.689(3)(c) should be severed from the remainder of the statute.

In February 2024, the district court entered a declaratory judgment. *Pharm. Rsch. & Manufacturers of Am. v. Stolfi*, No. 6:19-CV-01996, 2024 WL 1144401 (D. Or. Feb. 16, 2024) ("*Declaratory Judgment*"). In relevant part, the court declared that HB 4005's reporting requirement violates the First Amendment and is therefore unenforceable. *Id.* Although the district court had previously provided no analysis of any subsection of HB 4005's reporting requirement other than § 646A.689(3)(c) and provided no analysis of any subsection of HB 4005 in the declaratory judgment, it declared the entirety of § 646A.689(3) unconstitutional. As the district court later explained in its written opinion, although the district court acknowledged the State's argument that PhRMA's First Amendment summary judgment briefing addressed only § 646A.689(3)(c), the court declined to sever this subsection from the statute because it concluded that the State had waived any severability argument by failing to address severability in its opposition to PhRMA's summary judgment motion, which only challenged § 646A.689(3)(c). The court further declared that the publication of trade secrets under the public-interest exception,

§ 646A.689(10)(a), constitutes a taking under the Fifth Amendment, and that any invocation of the exception without simultaneously providing just compensation for that taking would accordingly violate the Fifth Amendment. *Id.*

In March 2024, the district court issued a written opinion supporting its declaratory judgment. *Pharm. Rsch. & Manufacturers of Am. v. Stolfi*, 724 F. Supp. 3d 1174 (D. Or. 2024) ("*Summary Judgment Opinion*"). As to PhRMA's First Amendment claim, the court first concluded that, "[v]iewing the context of the disclosures as a whole, the speech at issue here is best categorized as commercial speech." *Id.* at 1197-99. The district court next considered which of the two levels of scrutiny governing commercial speech—intermediate scrutiny under *Central Hudson Gas & Electric Corp. v. Public Service Commission of New York*, 447 U.S. 557 (1980), or the more permissive standard set forth in *Zauderer v. Office of Disciplinary Counsel of the Supreme Court of Ohio*, 471 U.S. 626 (1985)—should be applied to PhRMA's claim. *Id.* at 1199-200. The court explained that, for *Zauderer* to apply, the speech at issue "must disclose 'purely factual and uncontroversial information.'" *Id.* at 1199 (quoting *Nat'l Ass'n of Wheat Growers v. Bonta*, 85 F.4th 1263, 1275 (9th Cir. 2023)). The court determined that "the only non-factual information HB 4005 asks for is the pharmaceutical companies' narrative explanations justifying certain increases in price," but explained that "this is not the kind of non-factual information courts consider problematic under *Zauderer*." *Id.* Nonetheless, the court determined that because HB 4005 required manufacturers to "speak on a controversial topic and, in particular, justify why they fall on one side . . . of that controversy," *Zauderer* review was inappropriate. *Id.* at 1200. Applying *Central Hudson*, the district court held that

HB 4005's reporting requirement failed intermediate scrutiny, concluding both that the State had failed to show how HB 4005 would directly advance its legislative goals, and that the State had failed to establish that HB 4005 was narrowly tailored to advance these goals. *Id.* at 1200-02. Again, the district court's analysis did not address any subsections of HB 4005's reporting requirement except § 646A.689(3)(c).

As to PhRMA's Fifth Amendment takings claim, the district court first concluded that PhRMA has standing to bring the claim, *id.* at 1186, and that the claim was ripe for review, *id.* at 1187-88. Turning to the merits, the court then determined that it was appropriate to treat PhRMA's claim as a regulatory taking, rather than a per se physical taking, and apply the regulatory takings test set forth in *Penn Central Transportation Co. v. New York City*, 438 U.S. 104 (1978). *Id.* at 1188-89. Applying the three factors articulated in *Penn Central*, the court determined that "all the factors support finding a regulatory taking" and thus concluded that any invocation of the public-interest exception constitutes an unconstitutional taking. *Id.* at 1189-90. Finally, the court held that declaratory relief was an appropriate remedy, explaining that "[u]nless just compensation is provided, a taking of private property for public use occurs with each mandated public disclosure." *Id.* at 1190-91.

In its declaratory judgment, the district court declared the entirety of HB 4005's reporting requirement unconstitutional under the First Amendment and declared any invocation of the public-interest exception unconstitutional under the Fifth Amendment. Finding "no just reason for delay," the court entered partial final judgment on these claims under Federal Rule of Civil

Procedure 54(b). *Declaratory Judgment*, 2024 WL 1144401 at *1. The State timely appealed.

## II. JURISDICTION AND STANDARD OF REVIEW

We have jurisdiction to review the district court's partial final judgment under 28 U.S.C. § 1291. We review the district court's summary judgment rulings de novo. *Branch Banking & Tr. Co. v. D.M.S.I., LLC*, 871 F.3d 751, 759 (9th Cir. 2017). Under Federal Rule of Civil Procedure 56, a court "shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).

## III. DISCUSSION

### A. First Amendment Claim

We first address PhRMA's facial First Amendment challenge. For the reasons below, we hold that HB 4005's reporting requirement is best categorized as commercial speech and survives applicable First Amendment scrutiny.

### i. Determining the Applicable Level of Scrutiny

#### a. Government Reporting Requirements

The State argues that HB 4005 merely requires manufacturers to report specific information to a government agency, which then makes that information available to the public unless it is a confidential trade secret. *See* Or. Rev. Stat. § 646A.689(3). And, as the State points out, statutes and regulations that require regulated entities and individuals to report information to a government agency are a common feature of modern government. *See, e.g.*, 26 U.S.C. § 6033 (requiring tax-exempt organizations

to report internal financial information to the Internal Revenue Service ("IRS")); 17 C.F.R. § 229.402(b) (requiring corporations to submit information regarding executive compensation to the Securities and Exchange Commission ("SEC")); 40 C.F.R. §§ 705.10, 705.15 (requiring manufacturers of certain chemical substances to report information regarding chemical use and processing to the Environmental Protection Agency ("EPA")); 21 C.F.R. §§ 803.1, 803.20 (requiring medical device manufacturers to report adverse medical events related to their products to the Food and Drug Administration ("FDA")); *see also Pharm. Care Mgmt. Ass'n v. Rowe*, 429 F.3d 294, 316 (1st Cir. 2005) (controlling concurrence) (referring to the "thousands" of commonplace reporting requirements "on the books"). For ease, we refer to such laws as "government reporting requirements." Notably, it is also commonplace for statutes and regulations to authorize or require agencies to make the information that must be disclosed under such reporting requirements available to the public. *See, e.g.*, 26 U.S.C. § 6104(a) (requiring the IRS to make certain information in reports from tax-exempt organizations available to the public); 40 C.F.R. § 705.30(h) (authorizing the EPA to publicize chemical processing information); 21 C.F.R. § 803.9 (authorizing the FDA to publicly disclose information in medical device reports).

Government reporting requirements are distinguishable from laws that require a private individual or entity to communicate information directly to another private individual or entity or the general public. *See, e.g.*, *Am. Beverage Ass'n v. City & County of San Francisco*, 916 F.3d 749, 753-54 (9th Cir. 2019) (en banc) (ordinance requiring health warning on advertisements for sugar-sweetened beverages); *Nat'l Ass'n of Wheat Growers*, 85 F.4th 1263,

1266 (9th Cir. 2023) (law requiring businesses to provide carcinogen warnings if products expose consumers to glyphosate); *CTIA—The Wireless Ass'n v. City of Berkeley*, 928 F.3d 832, 837-38 (9th Cir. 2019) (ordinance requiring retailers to provide warnings to customers about federal radio-frequency radiation exposure guidelines for cell phone users). For ease, we refer to laws that compel certain information to be communicated directly from one private entity to another as "direct disclosure requirements."

Laws that require disclosures of information, including both government reporting requirements and direct disclosure requirements, are subject to First Amendment scrutiny. *See NetChoice, LLC v. Bonta*, 113 F.4th 1101, 1117 (9th Cir. 2024) ("[T]he forced disclosure of information . . . triggers First Amendment scrutiny."). However, such laws may be subject to different levels of scrutiny: rational basis review, intermediate scrutiny, or strict scrutiny.

For direct disclosure requirements, the analytical path for determining the applicable level of scrutiny is fairly well-settled. A direct disclosure requirement that "compel[s] individuals to speak a particular message" or "alter[s] the content" of protected speech is generally viewed as a content-based "compelled speech" requirement subject to strict scrutiny, unless the content of the direct disclosure requirement qualifies as "commercial speech," which is entitled to less constitutional protection. *Compare Nat'l Inst. of Fam. & Life Advocs. v. Becerra*, 585 U.S. 755, 766 (2018); *Riley v. Nat'l Fed'n of the Blind of N.C., Inc.*, 487 U.S. 781, 795 (1988), *with Cent. Hudson*, 447 U.S. at 562-63, *and Zauderer*, 471 U.S. at 651; *cf. Env't Def. Ctr., Inc. v. EPA*, 344 F.3d 832, 849 (9th Cir. 2003) (recognizing that government "may not constitutionally require an individual to disseminate an ideological message" but concluding that

an EPA rule "requiring a provider of storm sewers . . . to educate the public about the impacts of stormwater discharge on water bodies and . . . the hazards of improper waste disposal falls short of compelling such speech"). If the direct disclosure requirement regulates "commercial speech," then courts apply either intermediate scrutiny, *see Cent. Hudson*, 447 U.S. at 564-66, or a lower level of scrutiny akin to rational basis review, *see Zauderer*, 471 U.S. at 651. *Nat'l Ass'n of Wheat Growers*, 85 F.4th at 1266, 1275.

For government reporting requirements, however, the correct analytical path is less clear. The parties advocate for two different approaches for determining the applicable level of scrutiny. Under PhRMA's preferred approach, all government reporting requirements are, for First Amendment purposes, the legal equivalent of direct disclosure requirements and should be analyzed the same way. That is, government reporting requirements are categorically viewed as content-based "compelled speech" requirements that are presumptively subject to strict scrutiny. It is important to recognize that, under this approach, government reporting requirements as a general rule are subject to strict scrutiny—and the *only* exception is for reports that qualify as "commercial speech" entitled to less constitutional protection.[5] For ease, we refer to this approach as the "presumptively strict approach."

---

[5] It is also important to recognize, in evaluating the merits of PhRMA's preferred analytical approach, that a content-based, compelled speech requirement that does not qualify as a commercial speech regulation is "presumptively unconstitutional" and must be struck down unless it withstands strict scrutiny. *See Nat'l Inst. of Fam. & Life Advocs.*, 585 U.S. at 766.

The State argues for a different approach for determining the applicable level of scrutiny. The State's alternative does not categorically equate government reporting requirements with direct disclosure requirements; nor does it categorically equate government reporting requirements with "compelled speech" requirements presumptively subject to strict scrutiny. However, if a government reporting requirement mandated that a covered entity or individual make a political or ideological statement, then it would be viewed as compelled speech that is presumptively subject to strict scrutiny.[6] *See United States v. Sindel*, 53 F.3d 874, 878 (8th Cir. 1995) ("A First Amendment protection against compelled speech . . . has been found only in the context of governmental compulsion to disseminate a particular political or ideological message."); *cf. Full Value Advisors, LLC v. SEC*, 633 F.3d 1101, 1108 (D.C. Cir. 2011) ("First Amendment concerns are paramount when the Government compels a speaker to endorse a position contrary to his beliefs, or to 'affirm[] a belief and an attitude of mind' he opposes." (alteration in original) (quoting *W. Va. Bd. of Educ. v. Barnette*, 319 U.S. 624, 633 (1943))). Thus, under the State's alternative approach, a government reporting requirement *may* be subject to strict scrutiny, but that is not presumptively the correct standard of review. For ease, we refer to this alternative as the "potentially strict approach."

---

[6] Of course, government reporting requirements are also potentially subject to heightened or strict scrutiny under various other constitutional doctrines. *See, e.g.*, *Cal. Bankers Ass'n v. Shultz*, 416 U.S. 21, 57-76 (1974) (considering First, Fourth, and Fifth Amendment challenges to a government reporting requirement); *Ams. for Prosperity Found. v. Bonta*, 594 U.S. 595, 602, 611-19 (2021) (considering a freedom of association challenge to a government reporting requirement).

In our view, there are several compelling reasons to follow the State's potentially strict approach. For one, as the State notes, two of our sister circuits have taken this approach in cases addressing First Amendment challenges to government reporting requirements. In doing so, they have explicitly rejected the argument that government reporting requirements necessarily compel speech—and therefore are presumptively subject to strict scrutiny—simply because they mandate the disclosure of specific information.

In *United States v. Sindel*, 53 F.3d 874 (8th Cir. 1995), the Eighth Circuit considered a First Amendment challenge to IRS Form 8300, which requires taxpayers to report information related to cash transactions, including "the name, address, tax identification number, and other information about each payor and each person on whose behalf payment is made." *Id.* at 875. The court rejected the argument that Form 8300 "compel[s] speech," holding that although the "protection against compelled speech" applies "in the context of governmental compulsion to disseminate a particular political or ideological message," Form 8300 "requires [the plaintiff] only to provide the government with information which his clients have given him voluntarily, not to disseminate publicly a message with which he disagrees." *Id.* at 878.

In *Full Value Advisors, LLC v. SEC*, 633 F.3d 1101 (D.C. Cir. 2011), the D.C. Circuit considered a First Amendment challenge to an SEC regulation requiring institutional investment managers to report quarterly to the SEC "the names, shares, and fair market value of the securities" over which the managers exercise control. *Id.* at 1104. This information was made publicly available unless managers sought and received an individual exemption from the SEC. *Id.* at 1104-05. Because exemption requests might require

managers to, for example, "provide a description of their investment strategy and explain why disclosure would be detrimental," the plaintiff argued that the regulation compelled it to speak in violation of the First Amendment. *Id.* at 1105-06. However, the court applied a level of scrutiny "akin to the general rational basis test," and concluded that the regulation satisfied this standard. *Id.* at 1109 (citation omitted).[7] Like the Eighth Circuit in *Sindel*, the D.C. Circuit rejected the plaintiff's argument that the required reports to the SEC were "a form of compelled speech," holding that the regulation was not "a veiled attempt to 'suppress unpopular ideas or information or manipulate the public debate through coercion rather than persuasion.'" *Id.* at 1108-09 (quoting *Turner Broad. Sys., Inc. v. FCC*, 512 U.S. 622, 641 (1994)).

A First Circuit case, *Pharmaceutical Care Management Association v. Rowe*, 429 F.3d 294 (1st Cir. 2005), is also instructive. *Rowe* involved a direct disclosure requirement, not a government reporting requirement: the challenged state law required pharmacy benefit managers to disclose conflicts of interest and certain financial information to third parties with which they entered into contracts. *Id.* at 299. Nonetheless, the First Circuit's reasons for rejecting the plaintiff's argument that the challenged disclosure requirement should be viewed as "compelled speech" suggest that it, too, would use the potentially strict approach

---

[7] Although the plaintiff in *Full Value Advisors* challenged subsections of the SEC regulation at issue that required public disclosures of its investment positions, the D.C. Circuit determined that this issue was not ripe for review and cabined its analysis to disclosures made only to the SEC. 633 F.3d at 1106-07, 1110.

to analyze a government reporting requirement. As the First Circuit explained:

> [The plaintiff's] First Amendment claim is completely without merit. So-called "compelled speech" may under modern Supreme Court jurisprudence raise a serious First Amendment concern where it effects a forced association between the speaker and a particular viewpoint. *See, e.g.*, *Wooley v. Maynard*, 430 U.S. 705 (1977) (requiring all New Hampshire drivers to display "Live Free or Die" on their license plates); *Miami Herald Publ'g Co. v. Tornillo*, 418 U.S. 241 (1974) (requiring newspapers to afford political candidates a right to reply to editorial critiques). What is at stake here, by contrast, is simply routine disclosure of economically significant information designed to forward ordinary regulatory purposes—in this case, protecting covered entities from questionable [pharmacy benefit manager] business practices. There are literally thousands of similar regulations on the books—such as product labeling laws, environmental spill reporting, accident reports by common carriers, SEC reporting as to corporate losses and (most obviously) the requirement to file tax returns to government units who use the information to the obvious disadvantage of the taxpayer. The idea that these thousands of routine regulations require an extensive First Amendment analysis is mistaken. *Zauderer*, 471 U.S. 626, makes

> clear "that an advertiser's rights are adequately protected as long as disclosure requirements are reasonably related to the State's interest in preventing deception of consumers." *Id.* at 651. This is a test akin to the general rational basis test governing all government regulations under the Due Process Clause. The test is so obviously met in this case as to make elaboration pointless.

*Id.* at 316 (controlling concurrence).

Although *Sindel* and *Full Value Advisors* did not address laws that specifically required the government to make reported information available to the public,[8] the Supreme Court's reasoning in *Village of Schaumburg v. Citizens for a Better Environment*, 444 U.S. 620 (1980), and *Riley v. National Federation of the Blind of North Carolina, Inc.*, 487 U.S. 781 (1988), suggests that public dissemination of regulatory information collected by the government should not necessarily change the analytical framework. *Cf. NetChoice*, 113 F.4th at 1117-19 (rejecting the state's argument that a confidential government reporting requirement cannot unconstitutionally compel speech and subjecting the requirement to strict scrutiny).

In *Village of Schaumburg*, the Supreme Court struck down a local ordinance that required charitable organizations—in order to be eligible for a permit to engage in solicitation—to use a certain amount of their solicitation

---

[8] Even where a statute or regulation does not specifically provide for the public disclosure of reported information, that information may be made available to the public through federal or state public records laws. *See, e.g.*, 5 U.S.C. § 552 (Freedom of Information Act).

proceeds towards their charitable missions. 444 U.S. at 623-24. The Court held that this requirement did not withstand strict scrutiny and was not sufficiently tailored to the Village's asserted interest in fraud prevention. *Id.* at 636-37. It explained that "[t]he Village's legitimate interest in preventing fraud can be better served by measures less intrusive than a direct prohibition on solicitation," including through Illinois's existing financial disclosure requirements for charitable organizations. *Id.* at 637-38. Those state reporting requirements required charitable organizations to submit to the state a registration statement detailing "a variety of information about the organization and its fundraising activities," and these reports were "open to public inspection." *Id.* at 830 n.5 & 837 n.12.

In *Riley*, the Supreme Court considered the constitutionality of a direct disclosure requirement: the challenged North Carolina statute required fundraisers to disclose to potential donors the percentage of funds they had turned over to charities in the previous year when soliciting charitable donations. 487 U.S. at 786. The Court concluded that the direct disclosure requirement "alter[ed] the content" of fundraisers' speech during charitable solicitations, and it therefore applied strict scrutiny. *Id.* at 795, 798. [9] In

---

[9] In *Riley*, the state argued that, even if charitable solicitations generally are fully protected speech, the challenged statute "regulate[d] only commercial speech" because the information the fundraiser was compelled to disclose to potential donors "relate[d] only to the professional fundraiser's profit from the solicited contribution." *Id.* at 795. The Supreme Court assumed without deciding that speech related to the fundraiser's "financial motivation for speaking . . . in the abstract is indeed merely 'commercial,'" but held that it lost "its commercial character when it [wa]s inextricably intertwined with" fully protected charitable solicitations—and such "intertwining" is what the challenged direct disclosure law effectively required. *Id.* at 795-96.

concluding that the statute was not adequately tailored, the Court explained that "more benign and narrowly tailored options [were] available." *Id.* at 800. Most relevant here, the Court explained that "as a general rule, the State may itself publish the detailed financial disclosure forms it requires professional fundraisers to file. This procedure would communicate the desired information to the public without burdening a speaker with unwanted speech during the course of a solicitation." *Id.* In other words, at the same time that the Court held that a direct disclosure requirement—a law mandating disclosure of controversial financial information in the context of solicitation—was a "compelled speech" requirement subject to strict scrutiny, the Court strongly implied that a government reporting requirement was not— even if it would require fundraisers to report the same controversial financial information and disseminate it to the public.[10] *See also id.* at 795 ("[W]e do not suggest that States

---

[10] In *American Target Advertising, Inc. v. Giani*, 199 F.3d 1241 (10th Cir. 2000), the Tenth Circuit applied *Riley*'s reasoning to evaluate a First Amendment challenge to a Utah statute that, in relevant part, required professional fundraising consultants to meet certain registration and disclosure requirements. *Id.* at 1248. The statute required fundraisers to provide the state's consumer protection agency with, among other things, "a satisfactory statement of the factual basis for the projected percentage [of contributions] and projected anticipated revenues provided to the charitable organization, and if a flat fee is charged, documentation to support the reasonableness of such flat fee." Utah Code § 13-22-9(1)(b)(vii)(D). Similar to the regulatory regime created by HB 4005, the state made these fundraiser reports available to the public. *See Am. Target Advert., Inc. v. Giani*, 23 F. Supp. 2d 1303, 1307 (D. Utah 1998). The Tenth Circuit recognized that charitable solicitations are protected speech but determined that the statute was a content-neutral regulation of that speech, and was therefore subject to only intermediate scrutiny. *Am. Target Advert.*, 199 F.3d at 1247. Citing *Riley*, the court concluded

must sit idly by and allow their citizens to be defrauded. . . . North Carolina may constitutionally require fundraisers to disclose certain financial information to the State, as it has since 1981." (citing *Sec'y of State of Md. v. Joseph H. Munson Co.*, 467 U.S. 947, 967 n.16 (1984))).

To be clear, a law requiring a regulated entity to express or endorse a political or ideological message would still be subject to strict scrutiny under the State's potentially strict approach. But the potentially strict approach would provide an analytical framework that would distinguish between government reporting requirements that "effect[] a forced association between the speaker and a particular viewpoint" and those involving only "routine disclosure of economically significant information designed to forward ordinary regulatory purposes" which typically will not "require an extensive First Amendment analysis." *Rowe*, 429 F.3d at 316 (controlling concurrence); *see also id.* ("The idea that these thousands of routine [government reporting] regulations require an extensive First Amendment analysis is mistaken.").

Another advantage of using the potentially strict approach to determine the applicable level of scrutiny is that it does not require us to evaluate, as a threshold question, whether the government reporting requirement should be categorized as a regulation of "commercial speech" by applying tests that were developed in a very different factual

that the registration and disclosure requirements were narrowly tailored to the state's substantial interest in fighting fraud. *Id.* at 1248. Notably, the court did not treat the registration and disclosure requirements as "compelled speech" subject to strict scrutiny, instead applying intermediate scrutiny, even though the requirements impacted fully protected charitable solicitations, not lesser-protected commercial speech.

context. The commercial speech doctrine has primarily evolved in the context of regulations of commercial entities' advertising, including laws that restricted advertising, *see Bolger v. Youngs Drug Prods. Corp.*, 463 U.S. 60, 62-63, 66-68 (1983); *Cent. Hudson*, 447 U.S. at 558-60, 561-63; and laws that required advertisements to contain specific disclosures (*i.e.*, direct disclosure requirements), *see Zauderer*, 471 U.S. at 633, 637-38.

Because the commercial speech doctrine originated in this advertising context, the traditional legal tests for determining whether speech is "commercial" reflect this paradigm. The Court set forth these tests in *Bolger v. Youngs Drug Products Corp.*, 463 U.S. 60 (1983). There, the Court considered a federal law that restricted the mailing of unsolicited advertisements for contraceptive devices. *Id.* at 61-62. The plaintiff, a manufacturer of contraceptives, sought to mail unsolicited advertisements, including informational pamphlets promoting its products but also discussing venereal disease and family planning. *Id.* at 67-68. It challenged the application of the federal statute to its proposed mailings on First Amendment grounds. *Id.* at 63. The plaintiff argued that the restricted speech was not commercial (and therefore fully protected) because the proposed mailings included non-commercial, educational information. *Id.* at 65-66.

In determining that the plaintiff's proposed mailings were "properly characterized as commercial speech," the Court explained that the "core notion of commercial speech [is] 'speech which does no more than propose a commercial transaction.'" *Id.* at 66-67 (quoting *Va. State Bd. of Pharmacy v. Va. Citizens Consumer Council, Inc.*, 425 U.S. 748, 762 (1976)) (cleaned up). The Court also identified three, non-dispositive factors that reflected the commercial

nature of the informational pamphlets in particular: (1) the pamphlets were "conceded to be advertisements," (2) they referred to particular products, and (3) the plaintiff had an "economic motivation" for mailing the pamphlets. *Id.* at 66-67.

The tests articulated in *Bolger* were designed to determine the appropriate level of scrutiny to apply to laws that regulate voluntary speech from a regulated commercial entity to a public audience. They are therefore inapt for determining what level of scrutiny to apply to speech in an entirely different context—mandatory reports from the regulated entity to the government, which the government may then make available to the public. The submission of information to the government pursuant to a government reporting requirement typically does not "*propose* a commercial transaction," even if it involves the disclosure of information directly related to commercial transactions. *Id.* at 66 (emphasis added). It also does not neatly fit two of the factors identified in *Bolger*: A report to the government is not an "advertisement," and regulated entities and individuals typically produce these reports out of legal obligation, not economic motivation. *Id.* at 66-67.

Because of this conceptual mismatch, applying these tests strictly in the context of government reporting requirements produces counterintuitive results. *Cf. Nat'l Ass'n of Mfrs. v. SEC*, 800 F.3d 518, 535 (D.C. Cir. 2015) (Srinivasan, J., dissenting) (explaining why "confining *Zauderer* to advertisement or product labels gives rise to highly curious results"). It would be odd to subject speech in a consumer-facing advertisement to *less* scrutiny than speech in an annual report filed with a state regulatory body simply because it better fits the doctrinal tests for defining commercial speech. Consider, for example, if HB 4005

required manufacturers to prominently display information about price increases in direct-to-consumer television advertisements, rather than in annual reports filed with DCBS. In that circumstance, the traditional "definitions" of commercial speech would likely be satisfied, and yet, disclosure of this information by the State in DCBS reports, rather than by a manufacturer in an advertisement, is a less burdensome disclosure obligation. *See Riley*, 487 U.S. at 800-01. That is, "[i]t would be strange . . . if the same compelled . . . disclosure—providing the same information about the same product—commanded more demanding First Amendment scrutiny if it appeared in a single yearly report" instead of in every television advertisement. *Nat'l Ass'n of Mfrs.*, 800 F.3d at 535 (Srinivasan, J., dissenting). This counterintuitive result underscores that, as a general matter, it makes little sense to determine the appropriate level of scrutiny to apply to government reporting requirements using the traditional definitions of commercial speech.[11]

---

[11] The combination of the presumptively strict approach with the partial dissent's view of *Bolger*'s commercial speech standard would also produce results that are inconsistent with the Supreme Court's reasoning in *Riley*. Recall that in *Riley*, the Court concluded that the challenged direct disclosure requirement failed strict scrutiny in part because there was a less restrictive alternative: the state could "constitutionally" serve its governmental interests by requiring professional fundraisers to file "detailed financial disclosure forms" specifying the percentage of charitable donations retained by the fundraiser and then "publish[ing]" those forms. 487 U.S. at 795, 800. Under the presumptively strict approach, that government reporting requirement would be subject to strict scrutiny unless the reported information qualified as commercial speech under *Bolger*. But mandatory reports to the government about how professional fundraisers profit from charitable donations do not "propose a commercial transaction," they are not "advertisements," and

In two recent cases, our court has applied strict scrutiny to evaluate government reporting requirements. However, as explained below, neither of those cases require us to adopt PhRMA's presumptively strict approach. In *NetChoice, LLC v. Bonta*, 113 F.4th 1101 (9th Cir. 2024), we considered a challenge to a California law that required "online businesses" to prepare reports "identifying, for each offered online service, product, or feature likely to be accessed by children, any risk of 'material detriment to children that arise from the data management practices of the business.'" *Id.* at 1109, 1116 (quoting Cal. Civ. Code § 1798.99.31). Every covered business was also required to assess "factors related to 'harm' prior to offering a new online service, product, or feature that is likely to be accessed by children." *Id.* at 1116.

Consistent with the potentially strict approach, we first addressed the question whether the challenged "DPIA report requirement" compelled speech, and we concluded that it "clearly compels speech by requiring covered businesses to opine on potential harm to children." *Id.* at 1117. We further explained that the reporting requirement "invites First Amendment scrutiny because it deputizes covered businesses into serving as censors for the State" by requiring business to make subjective decisions on whether or not material is "potentially harmful to children." *Id.* at 1118. That is, because the government reporting requirement mandated the covered entity to make a subjective opinion

---

they are not produced out of an "economic motivation." *Bolger*, 463 U.S. at 66-67. Further, the Court in *Riley* described the financial disclosures at issue as "unfavorable" to the fundraisers. 487 U.S. at 800. Therefore, under the presumptively strict approach and the partial dissent's view of *Bolger*, the less restrictive and "constitutional" alternative identified by the *Riley* Court would be unconstitutional unless it withstood strict scrutiny.

statement on a political issue, we concluded it was properly analyzed as a compelled speech requirement.[12] Next, we determined the appropriate level of scrutiny to apply. *Id.* at 1119. Because we had determined that the DPIA reporting requirement was a compelled speech requirement, it would be subject to strict scrutiny unless it regulated only "commercial speech . . . subject to a lesser standard than strict scrutiny." *Id.* at 1119-20. In resolving that issue, we again noted that the challenged requirement compelled covered entities to "opine on potential speech-based harms to children . . . disconnected from any economic transaction," and we concluded that "the subjective opinions compelled by [the law] are best classified as non-commercial speech" and therefore applied strict scrutiny. *Id.* at 1119-21.

*NetChoice* very briefly considered the fact that the challenged law was a government reporting requirement, and it did so only in rejecting the state's argument that the First Amendment is "wholly inapplicable" to government reporting requirements.[13] *Id.* at 1117-18. In other words,

_____

[12] The partial dissent suggests that the *NetChoice* panel did not view the DPIA report requirements as compelling any political or ideological messages, seemingly because the panel never used the words "political" or "ideological." Partial Dissent at 104-05. But the *NetChoice* panel made quite clear that it viewed the DPIA reporting requirement as "requir[ing] businesses to go beyond opining about their products or services to opine on highly controversial issues of public concern." 113 F.3d at 1120.

[13] *NetChoice* relied on *Americans for Prosperity Foundation v. Bonta*, 594 U.S. 595 (2021), for this proposition. We note that *Americans for Prosperity Foundation* considered the First Amendment right to association, not the compelled speech doctrine. That case concerned a challenge to a California law that required charitable organizations to submit Schedule B of IRS Form 990 to the state. *Id.* at 602. (Schedule B

*NetChoice* neither considered whether, nor conclusively held that, government reporting requirements are categorically compelled speech requirements presumptively subject to strict scrutiny.

Next, in *X Corp. v. Bonta*, 116 F.4th 888 (9th Cir. 2024), we considered a challenge to a different California law, California's Assembly Bill 587 ("AB 587"), that required large social media companies to report to the state, among other things, whether and how they define several categories of content for purposes of their terms of service, including: hate speech or racism, extremism or radicalization, disinformation or misinformation, harassment, and foreign political interference. *Id.* at 894. But in *X Corp.*, unlike in *NetChoice*, we did not begin by expressly considering whether the challenged government reporting requirement compelled speech, and we did not answer that question by determining whether it required the covered entity to make subjective, political or ideological opinion statements. *Compare NetChoice*, 113 F.4th at 1116-18, *with X Corp.*, 116 F.4th at 899-900. Instead, we skipped over that question and started our analysis by asking whether the required "Content Category Reports" were commercial speech. *Id.* at 901. Then, we concluded that AB 587 did not regulate commercial speech because it required companies "to recast [their] content-moderation practices into language prescribed by the State, implicitly opining on whether and how certain controversial categories of content should be

___

requires organizations to disclosure the names and addresses of significant donors. *Id.*) The Supreme Court concluded that the law violated First Amendment associational rights. *Id.* at 611-19. There is no indication, however, that the Court viewed any aspect of the reporting requirement as a content-based compelled speech requirement subject to strict scrutiny.

moderated." *Id.* at 901. And we therefore applied strict scrutiny. *Id.* at 903.

In both *NetChoice* and *X Corp.*, our application of strict scrutiny ultimately turned on the subjective and political or ideological nature of the information that the regulations required. Specifically, in both cases, we concluded that the government reporting requirement at issue forced regulated entities to opine on fraught political issues, such as what online content is "harmful to children" or what content constitutes "hate speech or racism." *See NetChoice*, 113 F.4th at 1117-18; *X Corp.*, 116 F.4th at 901-02. We therefore applied the rule that laws that regulate speech based on its expressive content, by "compel[ling] speakers to utter or distribute speech bearing a particular message," are subject to strict scrutiny. *Turner Broad.*, 512 U.S. at 642.

Using the potentially strict approach would have led to the same conclusion in both cases. That is, using the potentially strict approach, we would still conclude that the government reporting requirements at issue in *NetChoice* and *X Corp.* must be subject to strict scrutiny because they compelled private entities to make subjective, ideological opinion statements to the government by identifying what online content is "harmful to children" or what content constitutes "hate speech or racism." *See* 113 F.4th at 1117-18; 116 F.4th at 901-02. Because laws that require speakers to disseminate ideological messages are subject to strict scrutiny—whether in a government report or an advertisement—we would apply that standard. *See Turner Broad.*, 512 U.S. at 642. However, we would reach this conclusion without applying the inapt commercial speech standards along the way. Rather, we would cut to the chase: because the government reporting requirements at issue in those cases mandate the "report" of political or ideological

statements, they are subject to strict scrutiny—regardless of whether they otherwise look like commercial speech regulations under *Bolger*.

PhRMA reads *X Corp.* as effectively adopting the presumptively strict approach. That is, it reads *X Corp.* as supporting the broad proposition that, because government reporting requirements mandate the disclosure of specific information, they are categorically content-based, compelled speech regulations subject to strict scrutiny unless they qualify as regulations of "commercial speech." We are not persuaded by this reading of *X Corp.* for several reasons.

First, as explained above, our application of strict scrutiny in *X Corp.* turned on the fact that AB 587 required social media companies to "speak a particular message" by "opining on whether and how certain controversial categories of content should be moderated." *Id.* 899-901 (citation omitted). *X Corp.* did not expressly hold that *all* government reporting requirements are compelled speech requirements subject to strict scrutiny unless they regulate commercial speech. Indeed, reading *X Corp.* in this way would create considerable tension with the decisions of our sister circuits and with the Supreme Court's reasoning in *Riley* and *Village of Schaumburg*, which suggests that many government reporting requirements are not subject to strict scrutiny, regardless of whether they can be categorized as regulations of commercial speech. Second, and relatedly, *X Corp.* also did not reach the question of what level of scrutiny should apply if a government reporting requirement does not qualify as a "commercial speech" regulation but does not compel the regulated entity to make subjective political or ideological statements. *See, e.g.*, *United States v. Kirilyuk*, 29 F.4th 1128, 1134 (9th Cir. 2022) ("[C]ases are not precedential for propositions not considered." (internal

quotation marks and citation omitted)). Third, *X Corp.* did not consider the potential consequences of presumptively treating all government reporting requirements as compelled speech requirements subject to strict scrutiny.

Although, in our view, using the potentially strict approach followed by our sister circuits would be more doctrinally sound and avoid unintended consequences, we do not need to fully resolve whether *X Corp.* requires us to use the presumptively strict approach in this case, because both approaches lead us to the same conclusion. As explained further below, using the presumptively strict approach, we conclude that HB 4005's reporting requirement qualifies as a commercial speech regulation subject to either intermediate scrutiny or lower scrutiny under *Zauderer*, and that it withstands intermediate scrutiny. HB 4005 is distinguishable from the laws challenged in *X Corp.* and *NetChoice* because it does not compel the covered entities to make subjective political or ideological statements. For that same reason, HB 4005 would not be subject to strict scrutiny under the potentially strict approach discussed above.[14]

### b. Commercial Speech

Under the presumptively strict approach, to determine the level of scrutiny applicable to HB 4005's reporting requirement, we must first consider whether HB 4005's reporting requirement is properly categorized as commercial speech. As discussed, the "core notion of commercial speech [is] 'speech which does no more than propose a commercial

---

[14] PhRMA's First Amendment challenge focuses on its argument that HB 4005's reporting requirement unconstitutionally compels speech. It does not argue HB 4005's reporting requirement should be subject to strict scrutiny for any other reason.

transaction.'" *Bolger*, 463 U.S. at 66 (quoting *Va. State Bd. of Pharmacy*, 425 U.S. at 762) (cleaned up); *accord United States v. United Foods, Inc.*, 533 U.S. 405, 409 (2001). Courts also consider the three so-called "*Bolger* factors": (1) whether the speech is an advertisement, (2) whether the speech refers to a particular product, and (3) whether the speaker has an economic motivation. *Ariix, LLC v. NutriSearch Corp.*, 985 F.3d 1107, 1116 (9th Cir. 2021) (citing *Hunt v. City of Los Angeles*, 638 F.3d 703, 715 (9th Cir. 2011)).[15]

---

[15] The partial dissent suggests that these tests limit commercial speech to content "akin to something people would otherwise disclose in proposing commercial transactions." Partial Dissent at 86. However, "in the commercial context . . . [the government] often requires affirmative disclosures that the speaker might not make voluntarily." *Rubin v. Coors Brewing Co.*, 514 U.S. 476, 492 & n.1 (1995) (Stevens, J., concurring) (categorizing "Surgeon General's Warning' labels on cigarettes" as commercial speech). Indeed, it is entirely common for courts to conclude that regulatory disclosures related to a specific product are commercial speech, even where the specific information disclosed is directly *contrary* to the speaker's economic interest and therefore would not be disclosed absent regulation. *See, e.g.*, *Am. Beverage Ass'n*, 916 F.3d at 755-56 (health warning on advertisements for sugar sweetened beverages); *Nat'l Ass'n of Wheat Growers*, 85 F.4th at 1275 (carcinogen warnings for business whose products expose consumers to glyphosate); *CTIA*, 928 F.3d at 841-42 (warnings about radio-frequency radiation exposure guidelines for cell phone users); *Am. Meat Inst. v. U.S. Dep't of Agri.*, 760 F.3d 18, 21 (D.C. Cir. 2014) (en banc) (country of origin labeling on the packaging of meat products). And in any case, the partial dissent's assumption that the "pricing strategies" that manufacturers must disclose under HB 4005—*i.e.*, the "factors that contributed to the price increase[s]" of pharmaceutical drugs, Or. Rev. Stat. § 646A.689(3)(c)— are "not akin to anything people would otherwise disclose in proposing commercial transactions" is unfounded. Partial Dissent at 86. Companies routinely provide explanations for price

Courts treat these legal tests "as just a starting point, however, and instead try to give effect to a 'common-sense distinction' between commercial speech and other varieties of speech." *X Corp.*, 116 F.4th at 900 (quoting *Ariix*, 985 F.3d at 1115); *see also Ariix*, 985 F.3d at 1116 (explaining that the *Bolger* factors "are important guideposts, but they are not dispositive").[16] The "commercial speech analysis is fact-driven, due to the inherent difficulty of drawing bright lines that will clearly cabin commercial speech in a distinct category." *X Corp.*, 116 F.4th at 900 (quoting *First Resort, Inc. v. Herrera*, 860 F.3d 1263, 1272 (9th Cir. 2017)).

Our Circuit has characterized speech as commercial "even if not a clear fit" with these legal tests where the speech nonetheless "communicates the terms of an actual or potential [commercial] transaction." *Id.* at 901. We have, for example, applied the commercial speech doctrine to regulations requiring landlords to provide contact information for tenants' rights organizations before initiating buyout negotiations for condominium conversions, *see S.F. Apartment Ass'n v. City and County of San*

---

increases in proposing commercial transactions. *See, e.g.*, Daniella Genovese, *Egg Surcharge Hits Diners' Wallets*, Fox Bus. (Feb. 7, 2025 13:32 ET), https://www.foxbusiness.com/lifestyle/egg-surcharge-hits-diners-wallets-experts-say-consumers-should-fear-menu-price-hikes-more (featuring a photo of a menu with a disclaimer explaining a temporary surcharge "due to the nationwide rise in cost of eggs"); Utpal M. Dholakia, *If You're Going to Raise Prices, Tell Customers Why*, Harv. Bus. Rev. (June 29, 2021) (describing a United Airlines message to customers explaining its decision to raise the price of its United Club membership).

[16] Indeed, in *Bolger* itself the Supreme Court emphasized that it did not "mean to suggest that each of the characteristics present in this case must necessarily be present in order for speech to be commercial." 463 U.S. at 67 n.14.

*Francisco*, 881 F.3d 1169, 1174, 1176-77 (9th Cir. 2018); and to regulations requiring retailers to provide warnings about federal radio-frequency radiation exposure guidelines for cell phone users, *see CTIA*, 928 F.3d at 841-42. Similarly, in *Environmental Defense Center, Inc. v. EPA*, we applied the Supreme Court's reasoning in *Zauderer* in rejecting a compelled speech challenge to an EPA regulation that required municipal storm sewer providers to educate the public about the dangers of improper waste disposal. 344 F.3d at 849-51. We explicitly concluded that the "policy considerations" underlying the commercial speech doctrine applied in that context because the regulation required "market-participant" storm sewer providers to "inform the public how to dispose safely of toxins." *Id.* at 851 n.27.

Although the compelled disclosures in these cases did not "propose a commercial transaction," we applied the commercial speech doctrine because they nonetheless provided parties to "actual or potential" commercial transactions with information about those transactions.[17] *X Corp.*, 116 F.4th at 901; *see also NetChoice, LLC v. Paxton*, 49 F.4th 439, 446, 485-86 (5th Cir. 2022), *rev'd on other grounds sub nom. Moody v. NetChoice, LLC*, 603 U.S. 707 (2024) (applying the commercial speech doctrine to evaluate a state law requiring social media platforms to publish information related to their content-moderation policies); *NetChoice, LLC v. Att'y Gen., Fla.*, 34 F.4th 1196, 1206-07, 1223 (11th Cir. 2022), *rev'd on other grounds sub nom. Moody*, 603 U.S. 707 (same).

---

[17] Notably, none of these decisions applied the factors identified in *Bolger*. 463 U.S. at 66-68; *see generally S.F. Apartment Ass'n*, 881 F.3d at 1176-80; *CTIA*, 928 F.3d at 841-49; *Env't Def. Ctr.*, 344 F.3d at 849-51.

The reports required by HB 4005 likewise communicate the terms of potential commercial transactions. Specifically, the reports communicate product-specific economic information about prescription drugs that are available for purchase on the market. *See* Or. Rev. Stat. § 646A.689(2), (3). Much of the information required by HB 4005's reporting requirement is basic marketing information that manufacturers already disclose to the federal government and/or the public. *See, e.g.*, *id.* § 646A.689(3)(a), (i) (current and past list prices); *id.* § 646A.689(3)(b) (time drug has been on the market); *id.* § 646A.689(3)(d) (generic alternatives); *id.* § 646A.689(3)(g) (sales revenue); *id.* § 646A.689(3)(j) (prices in other countries); *see also* U.S. Food & Drug Admin., *Orange Book Preface* (Mar. 27, 2025), https://www.fda.gov/drugs/development-approval-process-drugs/orange-book-preface (providing background on the FDA's "Orange Book" report, which publicizes therapeutic equivalence evaluations of generic drugs to "serve as public information . . . in the area of drug product selection"); Or. Rev. Stat. § 689.515 (permitting generic substitution based on therapeutic equivalence evaluations made by the FDA). Indeed, the partial dissent agrees that much of this "general marketing information" "compels factual and uncontroversial information and probably does not violate the First Amendment." Partial Dissent at 80-81. The remaining information required by HB 4005's reporting requirement is economic information that is no less tethered to commercial transactions. *See* Or. Rev. Stat. § 646A.689(3)(e), (f) (costs incurred by manufacturers); *id.* § 646A.689(3)(c), (k) (factors contributing to price increases); *id.* § 646A.689(3)(h) (profit information).

HB 4005's reporting requirement thus improves the "free flow of commercial information" for all drug

purchasers—both public and private. *Va. State Bd. of Pharmacy*, 425 U.S. at 765. Not only does HB 4005's reporting requirement provide drug pricing information to the State (itself a major drug purchaser in Oregon), but it also ensures private consumers have access to this information via public reports prepared by DCBS. *See* Or. Rev. Stat. § 646A.689(9). Indeed, the explicit purpose of HB 4005 is to provide market participants with information to facilitate future commercial transactions between drug manufacturers and market participants. *See* HB 4005, ch. 7 ("[T]he Legislative Assembly intends by this [Act] to permit purchasers, both public and private, as well as pharmacy benefit managers, to negotiate discounts and rebates for prescription drugs.").

Treating product-specific government reporting requirements as commercial speech makes sense in this case. Part of the reason that the First Amendment protects commercial speech is that such speech furthers the "consumer's interest in the free flow of commercial information." *Va. State Bd. of Pharmacy*, 425 U.S. at 764; *see also Milavetz, Gallop & Milavetz, P.A. v. United States*, 559 U.S. 229, 249-50 (2010) ("First Amendment protection for commercial speech is justified in large part by the information's value to consumers . . . ."); *Cent. Hudson*, 447 U.S. at 561-62 ("Commercial expression not only serves the economic interest of the speaker, but also assists consumers and furthers the societal interest in the fullest possible dissemination of information."). Notably, outside the context of commercial transactions, the information required by HB 4005 has no independent expressive meaning. *Cf. Zauderer*, 471 U.S. at 651 (noting that the "interests at stake" in regulating commercial transactions "are not of the same order" as those where a speech regulation "prescribe[s] what

shall be orthodox in politics, nationalism, religion, or other matters of opinion" (quoting *Barnette*, 319 U.S. at 642)). Where, as here, a government reporting requirement is closely tethered to the sale of a product and "assists consumers and furthers the societal interest in the fullest possible dissemination of information," it is properly categorized as commercial speech. *Cent. Hudson*, 447 U.S. at 561-62.[18]

The partial dissent argues that certain subsections of HB 4005's reporting requirement—namely, those that it views as related to "pricing strategy"[19]— require manufacturers to disclose information that "go[es] further" than communicating the terms of a potential transaction because the reports require manufacturers to express "opinions about and reasons for" their drug prices. Partial Dissent at 81-82,

---

[18] Contrary to the partial dissent's assertions, we have not "articulate[d] a new legal test" for government reporting requirements. Partial Dissent at 95. Nor have we "discard[ed]" the *Bolger* factors. Partial Dissent at 79, 85. Rather, we have simply recognized that some aspects of the commercial speech doctrine are more instructive in this context than others. Our fact-cabined analysis reflects the reality that the "commercial speech analysis is fact-driven, due to the inherent difficulty of drawing bright lines that will clearly cabin commercial speech in a distinct category." *X Corp.*, 116 F.4th at 900 (quoting *First Resort*, 860 F.3d at 1272). Additionally, although the partial dissent characterizes our analysis as lacking a "limiting principle," Partial Dissent at 113, we highlight the close tether between the speech compelled by HB 4005 and commercial pharmaceutical transactions. Speech, such as this, that is incidental to a commercial transaction is not far removed from the "core" of commercial speech, *i.e.*, speech that "propose[s] a commercial transaction." *United Foods*, 533 U.S. at 409.

[19] The partial dissent agrees that other basic marketing information required by HB 4005 is "factual and uncontroversial commercial information." Partial Dissent at 80-81.

91-95 (quoting *X Corp.*, 116 F.4th at 901).[20] We disagree. The economic-focused reports at issue here are a far cry from the "politically fraught" definitions at issue in *X Corp.* 116 F.4th at 902. The law under review in *X Corp.*, AB 587, required social media companies to identify what they believed to be "Hate speech or racism," "Extremism or radicalization," "Disinformation or misinformation" and "Foreign political interference," which is an intensely political exercise. *Id.* at 896. HB 4005's reporting requirement simply does not compel manufacturers to express any analogous normative view about their drug pricing,[21] nor does it require manufacturers to define their drug pricing in value-laden, state-prescribed language.[22]

---

[20] Indeed, the partial dissent seems to imagine that HB 4005 requires manufacturers to report a detailed, play-by-play recount of internal discussions about pricing. Partial Dissent at 91-94, 98-100. However, the State represented at oral argument that DCBS would consider the following straightforward list of factors to be a satisfactory response to Or. Rev. Stat. § 646A.689(3)(c): "supply cost increases, research costs, and investor return."

[21] Unlike the information required by HB 4005, the speech compelled by AB 587 had independent expressive meaning outside the context of any commercial transaction. What constitutes "hate speech," for example, is a matter of public debate and concern outside the context of a social media company's terms of service (or, indeed, any commercial transaction). By contrast, it would make little sense to divorce the speech compelled by HB 4005, such as a pharmaceutical manufacturer's distribution costs, Or. Rev. Stat. § 646A.689(3)(f)(3), from specific product sales.

[22] The partial dissent asserts that reports required under HB 4005 "recast drug manufactures' pricing strategies into language prescribed by Oregon" because requiring manufacturers to report on various costs "impl[ies] that any increase in drug prices can be fairly justified only by increases in costs." Partial Dissent at 91. But under this view, laws

Rather, HB 4005 requires manufacturers to report product-specific, economic information about their products such as current and past list prices, generic alternatives, and the length of time the drugs have been on the market. *Compare* Or. Rev. Stat. § 646A.689(3), *with X Corp.*, 116 F.4th at 894, *and NetChoice*, 113 F.4th at 1109, 1119-20.

PhRMA similarly argues that HB 4005's reporting requirement calls for "opinion[s] . . . about the reasons for high prescription prices." But no opinion is required for a manufacturer to disclose, as a matter of historical fact, the factors the company considered in setting its drug price. Contrary to PhRMA's arguments, HB 4005's reporting requirement does not "reinforce the State's message that manufacturers are the ones responsible for drug prices." Indeed, manufacturers are free to explicitly *reject* any such message and explain (to DCBS, market participants, and the public at large) the full range of factors that drive their pricing decisions. If, for example, a manufacturer raises the

requiring nutrition labels on food products would also be subjected to strict scrutiny simply because they require reporting based on categories prescribed by the state. *Contra Am. Beverage Ass'n*, 916 F.3d at 756. Moreover, even setting aside that the "factors that contributed to [a] price increase" are reported separately from these costs here, *see* Or. Rev. Stat. § 646A.689(3)(c), (e), (f), if consumers were to find an "implicit" message in the State's decision to request cost information from manufacturers, any such message would be attributable to the State. Just as consumers understand that the categories of information disclosed on nutrition labels (*e.g.*, added sugars, trans fats, protein) are selected by the government, it is clear here that the categories of information disclosed under HB 4005 are selected by the State. Of course, the "State can express [its] view[s] through its own speech," *Sorrell v. IMS Health Inc.*, 564 U.S. 552, 578 (2011), and nothing about HB 4005 prevents a manufacturer from defining and disseminating its own message about drug pricing.

price of a drug to mitigate rising manufacturing costs, fund future research and development, offset a tax hike, or comply with new regulatory requirements, it remains entirely free to explain the impact of these economic pressures on the drug's price. *See* Or. Rev. Stat. § 646A.689(3)(k) (requesting "[a]ny other information that the manufacturer deems relevant to the price increase"); Or. Admin. R. 836-200-0530(2)(h) (requiring manufacturers include "a narrative description and explanation of all major financial and nonfinancial factors" contributing to a price increase).

And although drug pricing decisions may implicate controversial public policy issues, this fact is insufficient to transform the required reports into noncommercial speech. *See Bolger*, 469 U.S. at 68 ("We have made clear that advertising which 'links a product to a current public debate' is not thereby entitled to the constitutional protection afforded noncommercial speech." (quoting *Cent. Hudson*, 447 U.S. at 563 n.5)); *Bd. of Trs. v. Fox*, 492 U.S. 469, 475 (1989) ("[C]ommunications can constitute commercial speech notwithstanding the fact that they contain discussions of important public issues." (internal quotation marks and citation omitted)); *Valle Del Sol Inc. v. Whiting*, 709 F.3d 808, 819 (9th Cir. 2013) (concluding that restrictions on solicitation speech of day laborers implicated commercial speech because, although "[t]he act of soliciting work as a day laborer may communicate a political message, . . . the primary purpose of the communication is to advertise a laborer's availability for work and to negotiate the terms of such work"). In this way, HB 4005's reporting requirement is similar to the hypothetical government reporting requirement that the Court tacitly approved of in *Riley*. There, the Court suggested that North Carolina could require

professional fundraisers to submit financial reports that disclosed the percentage of solicitation funds actually turned over to charities within the last 12 months—and then disseminate those financial reports to the public. *Riley*, 487 U.S. at 800. As here, exposing how much money professional fundraisers take from charitable donations could be considered "controversial" to the extent that it reflects fundraisers' profit-motivated decisionmaking, and publication of this information arguably went against the fundraisers' economic interests.[23]

That HB 4005 calls for the reporting of some information that may reflect internal decisionmaking also does not dissuade us from categorizing the reporting requirement as commercial speech.[24] Many routine financial regulations

___

[23] The partial dissent attempts to reconcile its reasoning with *Riley* by reframing the required disclosure in *Riley* as communicating the "price of [a professional fundraiser's] services." Partial Dissent at 111-12. But there is no difference in kind between requiring a professional fundraiser to publicly disclose "the average percentage of gross receipts actually turned over to charities by the fundraiser for all charitable solicitations conducted in North Carolina within the previous 12 months," *Riley*, 487 U.S. at 786, and requiring a pharmaceutical manufacturer to disclose the factors that contributed to a price increase. Both regulations essentially require the covered entity to (indirectly) explain to customers what it is they are paying for, even if the covered entity would prefer not to provide such clarity.

[24] PhRMA's focus on the disclosure of "internal decisionmaking" attempts to inject concerns about confidentiality into the First Amendment analysis. But PhRMA cites no authority for the proposition that confidentiality has a role to play in our First Amendment analysis. In any event, HB 4005 does not broadly compel the public disclosure of confidential information. A manufacturer may designate the information as a trade secret in its report to DCBS, and the State may only disclose protected trade secret information under the public-interest exception.

require the reporting of similar internal economic analysis. *See, e.g.*, 17 C.F.R. § 229.402(b) (requiring corporations to describe the "objectives of the [corporation's executive] compensation programs" including "[w]hat the compensation program is designed to reward" and "[w]hether and . . . how the [corporation] has considered the results of the most recent shareholder advisory vote on executive compensation" in publicly disclosed SEC filings); *Rowe*, 429 F.3d at 299, 307, 310, 316 (controlling concurrence) (analyzing a regulation requiring pharmacy benefit managers to identify and disclose "conflicts of interest" and "financial and utilization information" to health benefit providers as commercial speech). The mere fact that a reporting requirement compels regulated entities to disclose information reflecting the company's internal decisionmaking does not strip that speech of its fundamentally commercial character.[25]

Having concluded that HB 4005's reporting requirement is properly categorized as commercial speech, our next step would normally be to determine whether the statute is subject to intermediate scrutiny under *Central Hudson*, or qualifies for a lower level of scrutiny under *Zauderer*.[26] *See*

---

Or. Rev. Stat. § 646A.689(10)(a). The State has not done so since the law was enacted in 2018.

[25] Although the degree to which a compelled disclosure reflects a company's internal strategies might bear on whether speech is "purely factual" for purposes of determining if *Zauderer* review is appropriate, 471 U.S. at 651, it does not bear on whether a reporting requirement regulates commercial speech.

[26] For HB 4005, application of the commercial speech doctrine to determine the appropriate level of scrutiny does not produce a doctrinally

48          PHARM. RESEARCH & MFRS. OF AM. V. STOLFI

*Nat'l Ass'n of Wheat Growers*, 85 F.4th at 1275. We need not decide this issue, however, because we conclude that HB 4005's reporting requirement survives even the more stringent standard, intermediate scrutiny under *Central Hudson*. *See INS v. Bagamasbad*, 429 U.S. 24, 25 (1976) ("As a general rule courts . . . are not required to make findings on issues the decision of which is unnecessary to the results they reach.").

### ii. Application of Intermediate Scrutiny

For HB 4005's reporting requirement to survive intermediate scrutiny under *Central Hudson*, the State must establish that the law "'directly advance[s]' a 'substantial' governmental interest, and [that] the means chosen [are] not . . . 'more extensive than necessary.'" *Nat'l Ass'n of Wheat*

---

indefensible result. However, there are other longstanding government reporting requirements that would be subject to strict scrutiny under the presumptively strict approach—even if we treated the *Bolger* factors as a "just a starting point" (as *Bolger* instructs) and focused on whether the report "communicates the terms of an actual or potential [commercial] transaction." *X Corp.*, 116 F.4th at 900-01. Consider, for example, IRS Form 990, which requires *noncommercial* entities, including non-profit charitable organizations, to disclose information about their missions and "program service accomplishments," as well as detailed financial information (such as their revenues, sources of revenues, spending, and most highly compensated employees). *See Form 990*, Internal Rev. Serv., https://www.irs.gov/pub/irs-pdf/f990.pdf; *see also Form 990*, Library of Cong. Rsch. Guide, https://guides.loc.gov/nonprofit-sector/form-990. Further, the 990 is a public document that can be accessed in a variety of ways, including on government websites. *See, e.g.*, *Tax Exempt Organization Search Tool*, Internal Rev. Serv., https://www.irs.gov/charities-non-profits/search-for-tax-exempt-organizations. Under the presumptively strict approach, this longstanding reporting requirement would likely be subject to strict scrutiny simply because it "compels" noncommercial entities to disclose noncommercial information.

*Growers*, 85 F.4th at 1275 (quoting *Cent. Hudson*, 447 U.S. at 564-66).

*First*, we conclude that the State's asserted interests in HB 4005's reporting requirement are "substantial." *Cent. Hudson*, 447 U.S. at 566. When the Oregon Legislative Assembly passed HB 4005, it highlighted the State's "substantial public interest in the price and cost of prescription drugs," and explained that HB 4005 is specifically designed to: (1) "provide notice and disclosure of information relating to the cost and pricing of prescription drugs in order to provide accountability for prescription drug pricing," and (2) "permit purchasers, both public and private, as well as pharmacy benefit managers, to negotiate discounts and rebates for prescription drugs consistent with existing state and federal law." HB 4005, ch. 7.

Although "consumer curiosity" alone is generally insufficient as a substantial state interest, *see Nat'l Elec. Mfrs. Ass'n v. Sorrell*, 272 F.3d 104, 115 n.6 (2d Cir. 2001), the State's asserted interests here are not limited to transparency for its own sake. Rather, the State's transparency goals are intended to ensure the "preservation of a fair bargaining process" in negotiations related to drug purchasing. *44 Liquormart, Inc. v. Rhode Island*, 517 U.S. 484, 501 (1996); *see also id.* at 502 ("It is the State's interest in protecting consumers from 'commercial harms' that provides 'the typical reason why commercial speech can be subject to greater governmental regulation than noncommercial speech.'" (quoting *Cincinnati v. Discovery Network, Inc.*, 507 U.S. 410, 426 (1993))); *Bolger*, 463 U.S. at 69 (highlighting the "substantial individual and societal interests in the free flow of commercial information" (internal quotation marks and citation omitted)).

The pharmaceutical drug market is characterized by significant informational asymmetries. *See* Robin Feldman & Charles Tait Graves, *Naked Price and Pharmaceutical Trade Secret Overreach*, 22 Yale J.L. & Tech. 61, 70-77 (2020) (explaining that in the pharmaceutical market, "perverse incentives, along with externalities and information asymmetries, operate to blunt the natural competitive forces society might otherwise enjoy"). The State has a substantial interest in reducing those asymmetries, facilitating informed commercial transactions, and improving the efficiency of the pharmaceutical market. *See S.F. Apartment Ass'n*, 881 F.3d at 1177 (recognizing San Francisco's asserted interests in the "fairness of buyout negotiations" between landlords and tenants and the "reduct[ion] [in] the likelihood that tenants will accept 'unfair' buyout agreements" as substantial); *cf. Edenfield v. Fane*, 507 U.S. 761, 769 (1993) ("For purposes of [the *Central Hudson*] test, there is no question that [the State's] interest in ensuring the accuracy of commercial information in the marketplace is substantial."). This is particularly true given the State's role as a direct purchaser of pharmaceutical drugs and a major payer in the health care system, and given the magnitude of the State's expenditures on prescription drugs. *See* Brief for the State of Cal., et al. as Amici Curiae, at 15 (noting the Oregon Health Authority spent more than $1.3 billion in 2022 on prescription drugs for those enrolled in Oregon's Medicaid and children's health program).

*Second*, we conclude that HB 4005's reporting requirement "directly advances" these substantial interests. *Cent. Hudson*, 447 U.S. at 566. To meet the "direct advancement" requirement, the State must demonstrate that "the harms it recites are real and that its restriction will in fact alleviate them to a material degree." *Edenfield*, 507 U.S.

at 771. However, even "in a case applying strict scrutiny," the State may "justify speech restrictions by reference to studies and anecdotes pertaining to different locales altogether"—or even "based solely on history, consensus, and simple common sense." *Lorillard Tobacco Co. v. Reilly*, 533 U.S. 525, 555 (2001) (internal quotation marks and citation omitted).

The district court concluded that the State had not established how HB 4005 would directly advance its asserted interests because the State had failed to point to data showing that HB 4005 would "actually reduce the cost of prescription drugs in Oregon." *Summary Judgment Opinion*, 724 F. Supp. 3d at 1202. It is true that, in its summary judgment briefing, the State failed to cite any empirical evidence linking drug pricing transparency laws to lower drug prices. But the State has never claimed that HB 4005's reporting requirement itself will directly lower drug prices.[27] Rather, the State's stated goal in enacting HB 4005 was to reduce information asymmetries in the pharmaceutical market and provide drug purchasers with leverage in negotiations with manufacturers. It is common sense that collecting and publishing information about drug pricing,

---

[27] Although HB 4005's stated legislative goal is not to lower drug prices, amici curiae have provided evidence showing a correlation between drug pricing transparency laws and reductions in drug price increases. For example, the Oregon Coalition for Affordable Prescriptions cites data from Vermont showing that in the four years after the State passed a drug price transparency law in 2016, there was a 79% decline in the number of drugs reaching the per-year price increase threshold that triggered the law's reporting requirements. Brief for the Or. Coalition for Affordable Prescriptions as Amici Curiae, at 12 (citing Johanna Butler, *Drug Price Transparency Laws Position States to Impact Drug Prices*, Nat'l Acad. for State Health Pol'y (Jan. 10, 2022), https://nashp.org/drug-price-transparency-laws-position-states-to-impact-drug-prices).

costs, and pharmaceutical market conditions "directly advances" this goal. *Cf. Spirit Airlines, Inc. v. U.S. Dep't of Transp.*, 687 F.3d 403, 415 (D.C. Cir. 2012) ("The government interest—ensuring the accuracy of commercial information in the marketplace—is clearly and directly advanced by a regulation requiring that the total, final price [of commercial airfare] be the most prominent."); Medicare and Medicaid Programs; Regulation To Require Drug Pricing Transparency, 84 Fed. Reg. 20732, 20744 (May 10, 2019) ("Price transparency helps improve market efficiencies by helping consumers make informed choices and the disclosure of price information clearly and directly advances this interest.").

*Third*, we conclude that the State's chosen means of speech regulation here are not "more extensive than necessary to further the State's interest[s]." *Cent. Hudson*, 447 U.S. at 569-70. In its briefing before this court, PhRMA does not argue that a more limited disclosure would suffice or identify any specific subsection of HB 4005's reporting requirement that it asserts is unnecessary to advance the State's interests. Rather PhRMA's sole argument is that HB 4005's reporting requirement is impermissibly underinclusive because it applies only to pharmaceutical manufacturers, and does not require other supply chain participants to provide any drug pricing information. However, "[a]s a general matter, governments are entitled to attack problems piecemeal, save where their policies implicate rights so fundamental that strict scrutiny must be applied." *Zauderer*, 471 U.S. at 651 n.14; *see also Destination Ventures, Ltd. v. FCC*, 46 F.3d 54, 56 (9th Cir. 1995) ("The First Amendment does not require Congress to forgo addressing the problem at all unless it completely eliminates [the problem]."). Moreover, PhRMA's

"argument holds even less water here because the narrow tailoring requirement guards against over-regulation rather than under-regulation." *Metro Lights, LLC v. City of Los Angeles*, 551 F.3d 898, 911 (9th Cir. 2009).

Additionally, courts have repeatedly characterized the mechanism of disclosure here—wherein the State rather than a regulated entity makes disclosed information available to the public—as narrowly tailored. For example, in *Riley*, the Court concluded that the North Carolina statute at issue, which required fundraisers to directly disclose the percentage of funds they had turned over to charities, was not narrowly tailored because there were "more benign and narrowly tailored options." *Id.* at 800. Again, the Court explained that "as a general rule, the State may itself publish the detailed financial disclosure forms it requires professional fundraisers to file. This procedure would communicate the desired information to the public without burdening a speaker with unwanted speech during the course of a solicitation." *Id.*; *see also Buckley v. Valeo*, 424 U.S. 1, 68 (1976) (explaining that, in the context of campaign finance, "disclosure requirements certainly in most applications appear to be the least restrictive means of curbing the evils of campaign ignorance"); *Nat'l Ass'n of Wheat Growers*, 85 F.4th at 1283 (explaining that a more narrowly tailored alternative for a product warning would be for the state to "post information about glyphosate on its own website"); *Nat'l Fed'n of the Blind of Tex., Inc. v. Abbott*, 647 F.3d 202, 214 (5th Cir. 2011) ("[T]here is nothing stopping Texas from requiring [a regulated entity] to file financial disclosure forms, which Texas could publish without burdening the [entity] with unwanted speech."). Under the State's chosen means of regulation here, manufacturers remain free to disseminate their own

messages directly to consumers and to the public at large. *See Va. State Bd. of Pharmacy*, 425 U.S. at 770 ("[P]eople will perceive their own best interests if only they are well enough informed, and that the best means to that end is to open the channels of communication rather than to close them.").

Ultimately, *Central Hudson* review requires only "a reasonable fit between the means and ends of the regulatory scheme." *Lorillard*, 533 U.S. at 561. We conclude that HB 4005's reporting requirement is appropriately tailored and survives intermediate scrutiny.

### iii. Severability

In this appeal, the State again argues that, even if PhRMA were to prevail, it is entitled only to a judgment severing and invalidating Or. Rev. Stat. § 646A.689(3)(c), which requires manufacturers to report the "factors that contributed to the price increase." Because we conclude that all subsections of HB 4005's reporting requirement are constitutional under the First Amendment, we do not reach this argument. We note, however, that when striking down a state statute as unconstitutional, "'the normal rule' is that 'partial, rather than facial, invalidation is the required course.'" *Project Veritas v. Schmidt*, 125 F.4th 929, 960 n.29 (9th Cir. 2025) (en banc) (quoting *Brockett v. Spokane Arcades, Inc.*, 472 U.S. 491, 504 (1985)).

Here, PhRMA only addressed § 646A.689(3)(c) in its summary judgment briefing. As a result, the State's opposition to PhRMA's summary judgment motion only addressed § 646A.689(3)(c). Similarly, the district court only analyzed § 646A.689(3)(c) in its preliminary oral ruling. Nevertheless, PhRMA subsequently proposed a declaratory judgment invalidating the entirety of

§ 646A.689(3). Although the State then raised severability in its brief objecting to PhRMA's proposed declaratory judgment, the district court invalidated the entire reporting requirement because it considered the State's severability argument waived. *Summary Judgment Opinion*, 724 F. Supp. 3d at 1197 n.6. At no point did the district court ever provide substantive analysis on any subsection except § 646A.689(3)(c). Moreover, because PhRMA's motion for summary judgment only addressed § 646A.689(3)(c), the State had no reason to raise severability in its opposition to PhRMA's summary judgment motion. Thus, the State could not have waived the severability issue in its opposition to PhRMA's motion for summary judgment.

But even if the State had waived the argument, our en banc court recently expressed "doubt" that declining to consider severability based on waiver "would be the proper course," explaining that "the Supreme Court has previously faulted our court for failing to consider severability before invalidating an entire state statute." *Project Veritas*, 125 F.4th at 960 n.29 (citing *Brockett*, 472 U.S. at 507; *Ayotte v. Planned Parenthood of N. New England*, 546 U.S. 320, 328-31 (2006); *New York v. United States*, 505 U.S. 144, 186 (1992)). So even if some subsections of Or. Rev. Stat. § 646A.689(3) did not survive the applicable level of scrutiny, the appropriate next step would be to sever them.

\*          \*          \*

In sum, assuming *arguendo* that HB 4005's reporting requirement is subject to intermediate scrutiny, we conclude that it is a permissible regulation of commercial speech. We thus hold that the State, not PhRMA, is entitled to summary judgment on PhRMA's First Amendment claim.

### B.  Fifth Amendment Takings Claim

We next turn to whether HB 4005's public-interest exception constitutes an unconstitutional taking of private property under the Fifth Amendment. For the reasons below, we hold that PhRMA is not entitled to summary judgment in this facial challenge.

"The Takings Clause of the Fifth Amendment states that 'private property [shall not] be taken for public use, without just compensation.'" *Knick v. Twp. of Scott, Pennsylvania*, 588 U.S. 180, 184 (2019) (alteration in original) (quoting U.S. Const. amend. V). [28] Here, PhRMA argues that the public-interest exception is a facial violation of the Takings Clause because, each and every time the exception is invoked, the State takes manufacturers' property—specifically, their trade secrets—without providing just compensation. The State advances two primary arguments: (1) that PhRMA's claim is nonjusticiable, and (2) that PhRMA cannot prevail on the merits of its facial claim.

### i.  Justiciability

Both parties acknowledge that, to date, DCBS has never invoked the public-interest exception and never publicly disclosed any of the thousands of purported trade secrets filed with DCBS under HB 4005. The State argues that, because DCBS has yet to invoke the exception, PhRMA's claim is nonjusticiable. The pre-enforcement posture of this facial challenge raises two issues: Article III standing and ripeness. We discuss each in turn.

---

[28] The Takings Clause applies against the States through the Fourteenth Amendment. *Webb's Fabulous Pharmacies, Inc. v. Beckwith*, 449 U.S. 155, 160 (1980).

### a.  Article III Standing

Here, PhRMA asserts associational standing on behalf of its member pharmaceutical and biotechnology manufacturers. "To satisfy associational standing requirements, an organization must demonstrate that (1) at least one of its members has suffered an injury in fact that is (a) concrete and particularized and (b) actual or imminent, rather than conjectural or hypothetical; (2) the injury is fairly traceable to the challenged action; and (3) it is likely, not merely speculative, that the injury will be redressed by a favorable decision." *California Rest. Ass'n v. City of Berkeley*, 89 F.4th 1094, 1099 (9th Cir. 2024).[29] The State argues that PhRMA cannot establish this first prong, *i.e.*, that any of its members has suffered an injury in fact. We disagree.

The State argues that PhRMA cannot establish an injury in fact in its facial challenge because the law's enactment had no immediate effect on private property. This argument is unavailing. To establish injury in fact, "[a]n allegation of future injury may suffice if the threatened injury is 'certainly impending,' or there is a 'substantial risk' that the harm will occur." *Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 158 (2014) (quoting *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 411, 414 n.5 (2013)); *see also In re Zappos.com, Inc.*, 888 F.3d 1020, 1026 (9th Cir. 2018). Standing alone, the fact

---

[29] Associational standing also requires that "the interests [the organization] seeks to protect are germane to the organization's purpose" and that "neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit." *Associated Gen. Contractors of Am., San Diego Chapter, Inc. v. Cal. Dep't of Transp.*, 713 F.3d 1187, 1194 (9th Cir. 2013). The State does not dispute that PhRMA has established these elements of associational standing, and we agree.

that the public-interest exception has never been invoked does not persuade us that the alleged harm here is, as the State argues, "purely speculative." Indeed, in a hearing before the district court, when the State was asked whether DCBS's decisions not to invoke the public-interest exception have been "influenced by the pendency of this litigation," counsel stated that this was "possible." Where, as here, "the State has not disavowed any intention of invoking the [challenged] provision," manufacturers face a "credible threat" of public disclosure of their trade secrets. *Babbitt v. United Farm Workers Nat'l Union*, 442 U.S. 289, 298, 302 (1979). Importantly, PhRMA's theory of standing does not rest on a "speculative multi-link chain of inferences" about possible future events, *In re Zappos.com*, 888 F.3d at 1026, nor does it depend on the independent actions of third parties, *see Washington v. U.S. Food & Drug Admin.*, 108 F.4th 1163, 1175 (9th Cir. 2024). Rather, PhRMA's theory rests on a single determination by DCBS that disclosure of a claimed trade secret is in the "public interest." *See* Or. Rev. Stat. § 646A.689(10)(a). Once that determination is made, disclosure under HB 4005 is mandatory. *See id.* § 646A.689(9) (explaining that unless the public-interest exception applies, DCBS "*shall* post to its website" information disclosed by manufacturers (emphasis added)). We thus conclude that the risk of future injury is sufficiently nonspeculative to establish injury in fact.

The remaining Article III standing requirements are also satisfied. The risk of future harm faced by PhRMA's members is self evidently "fairly traceable" to the conduct being challenged—the invocation of the public-interest exception.

Redressability is also satisfied here. In considering Article III redressability, the focus is primarily on "the

connection between the alleged injury and requested judicial relief." *Wash. Env't Council v. Bellon*, 732 F.3d 1131, 1146 (9th Cir. 2013). PhRMA's requested relief here is a declaratory judgment recognizing that any invocation of the public-interest exception without simultaneously providing just compensation would violate the Fifth Amendment. A declaratory judgment in PhRMA's favor would redress manufacturers' injuries by making a "definitive determination of the legal rights of the parties." *Aetna Life Ins. Co. v. Haworth*, 300 U.S. 227, 241 (1937); *see also MedImmune, Inc. v. Genentech, Inc.*, 549 U.S. 118, 126-27 (2007); *Seattle Pac. Univ. v. Ferguson*, 104 F.4th 50, 62 (9th Cir. 2024). In other words, even though a declaratory judgment itself would not provide immediate relief to PhRMA's members, the preclusive effect of the judgment would provide manufacturers relief by binding the State in any subsequent lawsuits seeking compensation for unconstitutional takings under the challenged provision. *Cf. Larson v. Valente*, 456 U.S. 228, 243 n.15 (1982) ("[A] plaintiff satisfies the redressability requirement when he shows that a favorable decision will relieve a discrete injury to himself. He need not show that a favorable decision will relieve his *every* injury.").

To be sure, in this context there is significant overlap between constitutional standing and ripeness issues. But, for Article III standing purposes, it suffices to conclude that the preclusive effect of a declaratory judgment in PhRMA's favor would redress manufacturers' alleged injuries.

### b.  Ripeness

We also conclude that PhRMA's takings claim is ripe for review. "[T]he ripeness inquiry contains both a constitutional and a prudential component." *Thomas v.*

*Anchorage Equal Rts. Comm'n*, 220 F.3d 1134, 1138 (9th Cir. 2000) (quoting *Portman v. County of Santa Clara*, 995 F.2d 898, 902 (9th Cir. 1993)). The constitutional component of the ripeness inquiry focuses on whether the issues presented are "definite and concrete, not hypothetical or abstract." *Id.* (quoting *Ry. Mail Ass'n v. Corsi*, 326 U.S. 88, 93 (1945)). Here, this inquiry "coincides squarely with standing's injury in fact prong," *id.*, and for the reasons discussed above, *see supra* Section III.B.i.a, we conclude that PhRMA's claim meets constitutional ripeness requirements.

Turning to prudential ripeness, in the context of a takings claim, the key question is whether the plaintiff has "received a 'final decision regarding the application of the [challenged] regulations to the property at issue' from 'the government entity charged with implementing the regulations.'" *Suitum v. Tahoe Reg'l Plan. Agency*, 520 U.S. 725, 734 (1997) (quoting *Williamson Cnty. Reg'l Plan. Comm'n v. Hamilton Bank of Johnson City*, 473 U.S. 172, 186 (1985)). "[O]ur analysis is guided by two overarching considerations: 'the fitness of the issues for judicial decision and the hardship to the parties of withholding court consideration.'" *Thomas*, 220 F.3d at 1141 (quoting *Abbott Laby's v. Gardner*, 387 U.S. 136, 148 (1967)).

Generally, in the takings context, "[o]nce the government is committed to a position . . . the dispute is ripe for judicial resolution." *Pakdel v. City & County of San Francisco*, 594 U.S. 474, 479 (2021). It is true that the State has yet to define the circumstances under which "[t]he public interest . . . require[s] disclosure." Or. Rev. Stat. § 646A.689(10)(a). However, PhRMA has chosen to litigate this case as a facial challenge and seeks a declaration stating that every disclosure under the public-interest exception—

regardless of why that disclosure was made—constitutes an unconstitutional taking. Resolving this facial claim does not involve probing fact-specific DCBS public-interest determinations, and thus there is no finality issue that renders this claim unripe. *Guggenheim v. City of Goleta*, 638 F.3d 1111, 1117 (9th Cir. 2010) (en banc) ("Facial challenges are exempt from [prudential finality requirements] because a facial challenge by its nature does not involve a decision applying the statute or regulation."); *see also Suitum*, 520 U.S. at 736 n.10 ("[F]acial challenges to regulation are generally ripe the moment the challenged regulation or ordinance is passed, but face an uphill battle since it is difficult to demonstrate that mere enactment of a piece of legislation deprived the owner of economically viable use of his property." (cleaned up)).

To be sure, whether any individual invocation of the public-interest exception constitutes an unconstitutional taking is a fact-specific, individualized inquiry. *See infra* Section III.B.ii. But we conclude that this issue is properly addressed as part of the merits of PhRMA's facial claim. No additional factual development is necessary for this court to decide whether every invocation of the exception constitutes a taking. Because the "issue presented is fit for judicial resolution," *Abbott Laby's*, 387 U.S. at 153, we see no reason to withhold a decision on the merits.

## ii.  Merits of the Takings Clause Claim

Because we conclude that PhRMA's facial takings claim is justiciable, we next turn to the merits.

As a threshold matter, we note that manufacturers have a protectable property interest in their claimed trade secret information to the extent that the information is "cognizable as a trade-secret property right under [state] law."

*Ruckelshaus v. Monsanto Co.*, 467 U.S. 986, 1003-04 (1984); *see also Carpenter v. United States*, 484 U.S. 19, 26 (1987) ("Confidential business information has long been recognized as property."); *St. Michael's Convalescent Hosp. v. California,* 643 F.2d 1369, 1374 (9th Cir. 1981); *CDK Glob. LLC v. Brnovich*, 16 F.4th 1266, 1282 (9th Cir. 2021). Here, Oregon law recognizes a property interest in trade secrets, *see* Or. Rev. Stat. § 307.020(1)(a)(I) (defining trade secrets as intangible personal property for property tax purposes); *State ex rel. Sports Mgmt. News v. Nachtigal*, 921 P.2d 1304, 1309 (Or. 1996) (recognizing that Oregon's Uniform Trade Secrets Act "protect[s] the property interests of the holder of [a] trade secret"), and thus trade secrets submitted to DCBS constitute protectable property under the Fifth Amendment.[30]

### a.   Legal Standard

We next turn to the proper legal standard for evaluating PhRMA's takings claim. The Supreme Court has articulated two categories of takings under the Fifth Amendment. *See Cedar Point Nursery v. Hassid*, 594 U.S. 139, 147-49 (2021). Where the government "physically acquires private property for a public use," a "per se" taking has occurred. *Id.* at 147-48. But where the government "instead imposes regulations that restrict an owner's ability to use his own

---

[30] We note that the definition of a "trade secret" incorporated by reference in HB 4005 is not identical to the definition in Oregon's Uniform Trade Secrets Act. *Compare* Or. Rev. Stat. § 192.345(2) (HB 4005 definition), *with id.* § 646.461(4) (Oregon Uniform Trade Secrets Act definition). However, the parties have not suggested that there is any material difference in these definitions, and the State does not dispute that trade secrets submitted under HB 4005 are property protected by the Fifth Amendment.

property," courts "appl[y] the flexible test developed in *Penn Central*." *Id.* at 148.

PhRMA does not assert that HB 4005 involves a "physical" taking but nonetheless argues that the public-interest exception should be considered a per se, "categorical" taking because it "denies [manufacturers] all economically beneficial or productive use" of their property. *Lucas v. S.C. Coastal Council*, 505 U.S. 1003, 1015 (1992). This argument is unpersuasive for three reasons.

First, in the only Supreme Court case addressing an alleged taking of trade secrets, *Ruckelshaus v. Monsanto Co.*, 467 U.S. 986 (1984), the Court categorized the alleged taking as a regulatory taking and looked to the *Penn Central* factors. *Id.* at 1005-06. Second, it is far from clear that *Lucas*'s categorical approach extends beyond real property to intangible personal property. *Lucas* involved a land-use regulation and the Supreme Court framed the inquiry as whether the governmental action "denies an owner economically viable use *of his land*." 505 U.S. at 1016 (emphasis added). Indeed, *Lucas* explicitly distinguished land from personal property, explaining that "in the case of personal property, by reason of the State's traditionally high degree of control over commercial dealings, [a plaintiff] ought to be aware of the possibility that new regulation might even render his property economically worthless." *Id.* at 1027-28. Third, even if *Lucas*'s categorical approach were applicable to intangible personal property, it is far from clear that every disclosure made under the public-interest exception will "den[y] *all* economically beneficial . . . use" of a manufacturer's trade secret in all cases. 505 U.S. at 1015 (emphasis added); *see also Tahoe-Sierra Pres. Council, Inc. v. Tahoe Reg'l Plan. Agency*, 535 U.S. 302, 330 (2002) ("Anything less than a 'complete elimination of value,' or a

'total loss,' . . . require[s] the kind of analysis applied in *Penn Central*." (quoting *Lucas*, 505 U.S. at 1019 n.8)). As discussed below, the economic impact of a disclosure will likely vary case by case, depending on the trade secret at issue and the extent of the information actually disclosed by DCBS. *See infra* Section III.B.ii.b.2.

We therefore categorize PhRMA's claim as a potential regulatory taking governed by the standards articulated in *Penn Central*.

### b. Application of *Penn Central*

We begin by highlighting again that PhRMA has chosen to litigate this case as a facial challenge. Because "'[c]laims of facial invalidity often rest on speculation' about the law's coverage and its future enforcement" and "'threaten to short circuit the democratic process' by preventing duly enacted laws from being implemented in constitutional ways," the Supreme Court has "made facial challenges hard to win." *Moody v. NetChoice, LLC*, 603 U.S. 707, 723 (2024) (quoting *Wash. State Grange v. Wash. State Republican Party*, 552 U.S. 442, 450-51 (2008)); *see also Pennell v. City of San Jose*, 485 U.S. 1, 10 (1988); *Suitum*, 520 U.S. at 736 n.10; *Willis v. City of Seattle*, 943 F.3d 882, 886 (9th Cir. 2019).

Indeed, given the fact-intensive nature of the *Penn Central* framework, this court has repeatedly noted that "[i]t is not clear that a facial challenge can be made under *Penn Central*." *Laurel Park Cmty., LLC v. City of Tumwater*, 698 F.3d 1180, 1188 (9th Cir. 2012); *see also Guggenheim*, 638 F.3d at 1118 & n.32; *MHC Fin. Ltd. P'ship v. City of San Rafael*, 714 F.3d 1118, 1126 n.3 (9th Cir. 2013). As in these previous cases, we "assume, without deciding, that a facial challenge can be made under *Penn Central*." *Guggenheim,*

638 F.3d at 1118. However, we stress that PhRMA faces an "uphill battle," *Suitum*, 520 U.S. at 736 n.10, and "cannot succeed on [its] facial challenge unless [it] 'establishes that no set of circumstances exists under which the law would be valid,' or [it] shows that the law lacks a 'plainly legitimate sweep,'" *Moody*, 603 U.S. at 723 (quoting *United States v. Salerno*, 481 U.S. 739, 745 (1987)) (cleaned up).

When considering whether a regulation constitutes a taking under *Penn Central*, courts generally consider three factors: (1) the regulation's interference with reasonable investment-backed expectations, (2) the economic impact of the regulation, and (3) the character of the government action. 438 U.S. at 124. We conclude that, under this "ad hoc," fact-specific framework, PhRMA is not entitled to summary judgment on this facial challenge. *Id.* at 124.

### 1. Reasonable Investment-Backed Expectations

"A 'reasonable investment-backed expectation' must be more than a 'unilateral expectation or an abstract need.'" *Monsanto*, 467 U.S. at 1005 (quoting *Webb's Fabulous Pharmacies, Inc. v. Beckwith*, 449 U.S. 155, 161 (1980)). Moreover, "[a]s a general matter, 'in the case of personal property, by reason of the State's traditionally high degree of control over commercial dealings, [a property owner] ought to be aware of the possibility that new regulation might even render his property economically worthless.'" *CDK Glob.*, 16 F.4th at 1282 (quoting *Lucas*, 505 U.S. at 1027-28). Here, we conclude that the disclosure of trade secrets under the public-interest exception will not, in every instance, upset reasonable investment-backed expectations.

*First*, reasonable expectations are necessarily tempered in areas "that ha[ve] long been the source of public concern

and the subject of government regulation." *Monsanto*, 467 U.S. at 1007; *see also Maine Educ. Ass'n Benefits Tr. v. Cioppa*, 695 F.3d 145, 154 (1st Cir. 2012) ("As a baseline proposition, [plaintiff's] expectations are substantially diminished by the highly regulated nature of the industry in which it operates."); *Rowe*, 429 F.3d at 316 (controlling concurrence) (concluding that pharmacy benefit managers "should . . . have expected the possibility" of disclosure of trade secrets given the "heavily regulated nature of the healthcare industry"). The pharmaceutical industry is unquestionably an industry with a long history of government regulation. *See, e.g.*, Pure Food and Drugs Act of 1906, Pub. L. No. 59-384, 34 Stat. 768, 770-71 (prohibiting drug labels from being false or misleading and requiring labels to list presence and amount of certain ingredients). Importantly, regulation has not been limited to health and safety concerns. Increasingly, state and national governments have enacted regulations that directly address transparency in the pharmaceutical market. *See, e.g.*, 29 C.F.R. § 2590.715-2715A3(b); Vt. Stat. Ann. tit. 18, §§ 4633-4637; Cal. Health & Safety Code §§ 127675-12785; Minn. Stat. Ann. § 62J.84; N.J. Stat. Ann. §§ 45:14-82.1-82.11; N.Y. Ins. Law § 111-a. As a starting point, then, manufacturers ought to be aware of the heightened possibility that regulations may be enacted requiring disclosure of the exact type of information that may be commonly claimed as a trade secret under HB 4005.

*Second*, "the regulatory regime in place at the time the claimant acquires the property at issue helps to shape the reasonableness of . . . expectations." *Palazzolo v. Rhode Island*, 533 U.S. 606, 633 (2001) (O'Connor, J., concurring); *see also Ark. Game & Fish Comm'n v. United States*, 568 U.S. 23, 38 (2012) (explaining that "the property owner's

distinct investment-backed expectations" are "often informed by the law in force in the State in which the property is located"). Oregon law has precluded trade secret misappropriation claims based on the public disclosure of trade secrets where "the public interest requires disclosure" since the State first adopted the Uniform Trade Secrets Act in 1987. *See* 1987 Or. Laws Ch. 537 § 8(3) (Oregon Uniform Trade Secrets Act, now codified at Or. Rev. Stat. § 646.473(3)); 1973 Or. Laws Ch. 794 § 11 (Oregon's Public Records Law, now codified at Or. Rev. Stat. § 192.345(2)). The State's general practice of disclosing trade secrets in furtherance of the public interest further diminishes manufacturers' reasonable expectations of strict confidentiality in all cases.

*Third*, concluding that manufacturers have reasonable expectations of strict confidentiality of trade secrets submitted to the State under HB 4005 would be in significant tension with *Monsanto*, 467 U.S. 986. In *Monsanto*, the Supreme Court considered whether the EPA's disclosure of trade secret data submitted by Monsanto, a pesticide manufacturer, under the Federal Insecticide, Fungicide, and Rodenticide Act ("FIFRA") constituted an unconstitutional taking. *Id.* at 990. The Court analyzed Monsanto's takings claim during three different time periods defined by two amendments to the statutory scheme.

Under FIFRA, which was first adopted in 1947, all pesticides must be registered with the federal government before their sale in interstate commerce. *Id.* at 990-91. Registration applications include various confidential information, including the formula for the pesticide and various health, safety, and environmental data. *See id.* at 991-93. As originally enacted, the statutory scheme was "silent with respect to EPA's authorized use and disclosure

of data submitted to it in connection with an application for registration." *Id.* at 1008. In 1972, Congress undertook comprehensive amendments to FIFRA and added a new provision related to the public disclosure of data submitted to EPA by pesticide manufacturers in support of a registration application. Under the new provision, pesticide manufacturers could designate disclosed information as a trade secret. *Id.* at 992. If so designated, EPA was prohibited from publicly disclosing this information. *Id.* In 1978, in part to clarify ambiguities in this regulatory scheme, Congress enacted additional amendments. *Id.* at 993. The 1978 amendments permitted the public disclosure of all health, safety, and environmental data—even if data was claimed as a trade secret. *Id.* at 995-96.[31]

The Court determined that EPA's disclosure of data between the 1972 and 1978 amendments could constitute a taking as "disclosure conflicts with the explicit assurance of confidentiality . . . contained in the statute during that period." *Id.* at 1013. However, the Court held that Monsanto could have had no reasonable expectation of strict confidentiality for information disclosed to EPA either before 1972 or after 1978, and thus the disclosure of data submitted by Monsanto during this time could not constitute an unconstitutional taking. Before 1972, when the statutory scheme was silent as to the disclosure of trade secret information, the Court explained that:

> [T]he [federal] Trade Secrets Act is not a
> guarantee of confidentiality to submitters of

---

[31] Other types of trade secret information (*e.g.*, manufacturing and quality control processes) were exempted from the disclosure requirement. *Id.* at 996 & n.5.

data, and, absent an express promise, Monsanto had no reasonable, investment-backed expectation that its information would remain inviolate in the hands of EPA. In an industry that long has been the focus of great public concern and significant government regulation, the possibility was substantial that the Federal Government, which had thus far taken no position on disclosure of health, safety, and environmental data concerning pesticides, upon focusing on the issue, would find disclosure to be in the public interest.

*Id.* at 1008-09. As to data submitted after 1978, the Court concluded that:

If, despite the . . . data-disclosure provisions in the statute, Monsanto chose to submit the requisite data in order to receive a registration, it can hardly argue that its reasonable investment-backed expectations are disturbed when EPA acts to use or disclose the data in a manner that was authorized by law at the time of the submission. . . . [A]s long as Monsanto is aware of the conditions under which the data are submitted, and the conditions are rationally related to a legitimate Government interest, a voluntary submission of data by an applicant in exchange for the economic

advantages of a registration can hardly be
called a taking.

*Id.* at 1006-07.

HB 4005's public-interest exception is materially
indistinguishable from the third time period at issue in
*Monsanto*, *i.e.*, post-1978 amendments. HB 4005 explicitly
authorizes the disclosure of trade secrets submitted to the
State if disclosure is in the public interest. If manufacturers
choose to run the risk of public disclosure of their trade
secrets to do business in the highly regulated pharmaceutical
industry, they "can hardly argue that [their] reasonable
investment-backed expectations are disturbed when [the
State] acts to . . . disclose the data in a manner that was
authorized by law at the time of the submission." *Monsanto*,
467 U.S. at 1006-07.

The district court concluded that *Monsanto* was
inapposite because there, pesticide manufacturers
"voluntarily provided the trade secrets at issue," whereas
here there is "no quid pro quo." *Summary Judgment
Opinion*, 724 F. Supp. 3d at 1190. However, just as in
*Monsanto*, the benefit provided to manufacturers is the
ability to sell a highly regulated product in a government-
regulated market. In *Monsanto*, the Supreme Court
explained that in "those situations where [Monsanto] deems
the [trade secret] data to be protected from disclosure more
valuable than the right to sell in the United States," it can
"decide to forgo registration in the United States and sell a
pesticide only in foreign markets." 467 U.S. at 1007 n.11.
Here, manufacturers have a similar choice. If they decide the
value of protecting their trade secrets from potential
disclosure to be more valuable than the right to sell in
Oregon, they can decide to forego pharmaceutical sales in

the state and limit their product sales to other states and foreign markets.

PhRMA argues that such a choice is illusory and allowing a manufacturer to sell a legal product is not a valuable government benefit comparable to the regulatory permit at issue in *Monsanto*. This argument is not entirely without support. In *Horne v. Department of Agriculture*, the Supreme Court concluded that a regulation requiring "the [plaintiffs] to turn over 47 percent of their raisin crop[] in exchange for the 'benefit' of being allowed to sell the remaining 53 percent" was not a "similar voluntary exchange" to the exchange in *Monsanto*. 576 U.S. 350, 366 (2015); *see also Nollan v. California Coastal Comm'n*, 483 U.S. 825, 833 n.2 (1987) (distinguishing *Monsanto* on the basis that "the right to build on one's own property—even though its exercise can be subjected to legitimate permitting requirements—cannot remotely be described as a 'governmental benefit'").

However, we conclude that this case is much closer to *Monsanto* than to *Horne*. Access to highly regulated markets has not historically been conceived as a constitutional right. *See, e.g.*, *Corn Prods. Ref. Co. v. Eddy*, 249 U.S. 427, 431 (1919) ("[A] manufacturer or vendor has no constitutional right to sell goods without giving to the purchaser fair information of what it is that is being sold."); *Nat'l Fertilizer Ass'n v. Bradley*, 301 U.S. 178, 182 (1937). The "valuable government benefit" of permitting a manufacturer to sell products in the highly regulated pesticide market is no different in kind than the "valuable government benefit" of permitting a manufacturer to sell products in a highly regulated pharmaceutical market. *Monsanto*, 467 U.S. at 1007. The claim at issue in *Horne*, where plaintiffs challenged the *physical* taking of a raisin crop, involved a

materially different market and a materially different government action. Indeed, in *Horne*, the Court explicitly noted that a law requiring raisin growers to physically turn over a portion of their crop was factually distinct from "[a] case about conditioning the sale of hazardous substances on disclosure of health, safety, and environmental information related to those hazards." 576 U.S. at 366.

*Finally*, manufacturers' reasonable expectations may differ significantly depending on the specific trade secret information and the public interest at issue in a given disclosure. A wide variety of information can be protected as a trade secret under Oregon law. *See* Or. Rev. Stat. § 192.345(2) (defining a trade secret to include, but not be limited to a "formula, plan, pattern, process, tool, mechanism, compound, procedure, production data, or compilation of information"). Manufacturers' reasonable confidentiality expectations will vary depending on how similar information has been historically regulated under preexisting state and federal law. Especially where a claimed trade secret is related to a drug's health and safety information, confidentiality expectations may be particularly diminished given the long history of government disclosure requirements for this type of information. *See, e.g.*, *Corn Prods.*, 249 U.S. at 431-32 ("The right of a manufacturer to maintain secrecy as to his compounds and processes must be held subject to the right of the State, in the exercise of its police power and in promotion of fair dealing, to require that the nature of the product be fairly set forth."); 15 U.S.C. § 2613(d)(3) (providing for the disclosure of data submitted under the Toxic Substances Control Act where "necessary to protect health or the environment against an unreasonable risk of injury to health or the environment").

Ultimately, given the facial nature of PhRMA's claim and the broad sweep of trade secret protection, we cannot say that every disclosure of a trade secret under HB 4005 will upset reasonable investment-backed expectations. We thus conclude that this factor does not support PhRMA's facial takings claim. We note that in *Monsanto*, the Supreme Court concluded that "the force of this factor is so overwhelming . . . that it disposes of the taking question." 467 U.S. at 1005. However, given the inherently fact-specific nature of the regulatory takings inquiry, we also address the additional *Penn Central* factors.

## 2. Economic Impact of the Regulation

In evaluating the economic impact of a challenged regulation under *Penn Central*, courts assess the extent to which the regulation "will unreasonably impair the value or use of [the plaintiff's] property." *PruneYard Shopping Ctr. v. Robins*, 447 U.S. 74, 83 (1980). In other words, "[w]e 'compare the value that has been taken from the property with the value that remains in the property.'" *Bridge Aina Le'a, LLC v. Land Use Comm'n*, 950 F.3d 610, 630-31 (9th Cir. 2020) (quoting *Colony Cove Props., LLC v. City of Carson*, 888 F.3d 445, 450 (9th Cir. 2018)). Here, because the economic impact of the public-interest exception may vary based on the extent of the disclosure, we conclude that this factor also does not support PhRMA's facial takings claim.

PhRMA argues that each time that DCBS publicly discloses a trade secret under the public-interest exception, the trade secret is rendered entirely worthless because the value of a trade secret lies in its confidentiality. This argument is not entirely without merit. HB 4005 incorporates the definition of a trade secret as information

with commercial value "known only to certain individuals within an organization . . . which gives its user an opportunity to obtain a business advantage over competitors who do not know or use it." Or. Rev. Stat. § 192.345; *see id.* § 646A.689(10)(a). As explained by the Supreme Court in *Monsanto*, "[i]f an individual discloses his trade secret to others who are under no obligation to protect the confidentiality of the information, or otherwise publicly discloses the secret, his property right is extinguished." 467 U.S. at 1002; *see also Hartley Pen Co. v. U.S. Dist. Ct.*, 287 F.2d 324, 328 (9th Cir. 1961) ("[T]he property in a trade secret is the power to make use of it to the exclusion of the world. If the world knows the [trade secret] then the property disappears." (citation omitted)).

However, it is far from clear that *every* invocation of the public-interest exception will necessarily disclose the information that provides the trade secret owner with its "competitive edge." *See Monsanto*, 467 U.S. at 1012. As defined in HB 4005, trade secret protection extends to *any* information that is valuable and secret enough to afford an economic advantage over competitors, including "compilation[s] of information." Or. Rev. Stat. § 192.345. If, in the context of a compilation trade secret, the State were to disclose only a portion of the data making up the claimed trade secret, it is plausible that the trade secret could retain much, if not all, of its economic value. *See Imperial Chem. Indus. Ltd. v. Nat'l Distillers & Chem. Corp.*, 342 F.2d 737, 742 (2d Cir. 1965) (collecting cases for the proposition that "a trade secret can exist in a combination of characteristics and components, each of which, by itself, is in the public domain, but the unified process, design and operation of which, in unique combination, affords a competitive advantage and is a protectable secret"). In other words, to

hold the public-interest exception unconstitutional on its face, we would have to conclude that HB 4005 mandates broad disclosure of *all* the data making up a claimed trade secret in every case. However, in this pre-enforcement challenge, it is entirely plausible that DCBS could make a determination that a more limited disclosure is all that the public interest requires.

To be sure, many trade secrets implicated by HB 4005 may constitute a single piece of data, and disclosure of that data may entirely extinguish the value of the trade secret. But in this facial challenge, PhRMA cannot "establish[] that *no* set of circumstances exists under which the law would be valid." *Moody*, 603 U.S. at 723 (emphasis added) (quoting *Salerno*, 481 U.S. at 745). "[PhRMA] chose to litigate th[is] case[] as [a] facial challenge[], and that decision comes at a cost." *Id.* Therefore, this factor does not support PhRMA's takings claim.

### 3.   Character of the Government Action

Finally, "the 'character of the governmental action'—for instance whether it amounts to a physical invasion or instead merely affects property interests through 'some public program adjusting the benefits and burdens of economic life to promote the common good'—may be relevant in discerning whether a taking has occurred." *Lingle v. Chevron U.S.A. Inc.*, 544 U.S. 528, 539 (2005) (quoting *Penn Cent.*, 438 U.S. at 124). This case clearly falls into the latter category. *See CDK Glob.*, 16 F.4th at 1282 ("Regulations commonly require regulated entities to disclose certain information. . . . [N]o one conceives of such requirements as physical takings."); *see also MHC Fin.*, 714 F.3d at 1128 (concluding that a rent control ordinance was "much more an 'adjust[ment of] the benefits and burdens of

economic life to promote the common good' than it is a physical invasion of property" (quoting *Penn Cent.*, 438 U.S. at 124)).

Moreover, because the "determination that governmental action constitutes a taking, is, in essence, a determination that the public at large, rather than a single owner, must bear the burden of an exercise of state power in the public interest," the Supreme Court has "recognized that this question 'necessarily requires a weighing of private and public interests.'" *Keystone Bituminous Coal Ass'n v. DeBenedictis*, 480 U.S. 470, 492 (1987) (quoting *Agnis v. Tiburon*, 447 U.S. 255, 260-61 (1980)). Here, the public-interest exception does not permit disclosure of trade secret information unless and until DCBS makes an affirmative determination that disclosure is in the public interest. To be sure, the balance of private and public interests will differ depending on the nature of the public interest claimed by DCBS and the trade secret information at issue. But assessed facially, we cannot conclude that "no set of circumstances exist" where a significant public interest would clearly outweigh a manufacturer's private interest in a trade secret. *See Keystone*, 480 U.S. at 485 (concluding that "the character of the governmental action involved here leans heavily against finding a taking" where the government had "acted to arrest what it perceives to be a significant threat to the common welfare"); *see also CDK Glob.*, 16 F.4th at 1283 (concluding this factor did not support finding a regulatory taking where the state legislature determined "the statute promotes the common good through the advancement of consumer privacy and competition"). Thus, this factor also fails to support PhRMA's takings claim.

*          *          *

The proper weighing of the *Penn Central* factors varies from case to case, and courts have sometimes found individual factors to be dispositive. *Compare Hodel v. Irving*, 481 U.S. 704, 716 (1987) (concluding the "extraordinary" character of the regulation to be dispositive), *with Monsanto*, 467 U.S. at 1005 (concluding the lack of reasonable investment-backed expectations to be dispositive). Here, however, a weighing of the factors does not affect our analysis because none of the *Penn Central* factors support PhRMA's facial taking claim. We thus conclude that the State, not PhRMA, is entitled to summary judgment on the Fifth Amendment takings claim.

## IV.   CONCLUSION

For the foregoing reasons, the district court erred in granting summary judgment in favor of PhRMA on its First Amendment and Fifth Amendment claims and in entering final declaratory judgment. Accordingly, we reverse the district court's entry of final judgment and remand with instructions to enter summary judgment for the State on PhRMA's First Amendment and Fifth Amendment claims.

**REVERSED AND REMANDED**.

BEA, Circuit Judge, concurring in part and dissenting in part:

The First Amendment to our Constitution, applicable to the States through the Fourteenth Amendment, protects people's "right to refrain from speaking at all." *Wooley v. Maynard*, 430 U.S. 705, 714 (1977). The question in this case is whether the government can, without passing strict scrutiny,[1] force an unwilling speaker to opine on an intensely debated and politically fraught subject because some potential listeners, including the government itself, can take advantage of that opinion for their own economic or political interests.[2]

My colleagues answer this question in the affirmative. They hold that an Oregon statute and its implementing regulation need not pass strict scrutiny when compelling drug manufacturers to disclose their internal pricing strategies because the purchasers of their drug products,

---

[1] Under strict scrutiny, a government regulation is "presumptively unconstitutional and may be justified only if the government proves that [the regulation is] narrowly tailored to serve compelling state interests." *Nat'l Inst. of Fam. & Life Advocs. v. Becerra*, 585 U.S. 755, 766 (2018).

[2] Where there is a willing speaker, the First Amendment protects both the speaker's right to speak and the listeners' right to listen. *Va. State Bd. of Pharmacy v. Va. Citizens Consumer Council, Inc.*, 425 U.S. 748, 756–57 (1976). Accordingly, courts have struck down regulations that abridge willing speakers' right to speak in the interest of their audiences' right to hear, as the Supreme Court did in *Virginia State Board of Pharmacy*. *See id.* at 763–65. In the same vein, courts have also upheld regulations that tackle inaccurate or misleading commercial speech by willing speakers to, for example, protect their audiences from possible deception. *See, e.g.*, *Zauderer v. Off. of Disciplinary Couns. of the Sup. Ct. of Ohio*, 471 U.S. 626, 650–53 (1985). This case does not involve such a willing speaker's speech.

including the State of Oregon itself, can take advantage of such information when negotiating prices against these drug manufacturers. Maj. Op. at 40–42.

In so holding, my colleagues discard the well-established legal tests articulated by the Supreme Court in *Bolger v. Youngs Drug Prods. Corp.*, 463 U.S. 60 (1983); disregard our Circuit's binding precedents in *X Corp. v. Bonta*, 116 F.4th 888 (9th Cir. 2024), and *NetChoice, LLC v. Bonta*, 113 F.4th 1101 (9th Cir. 2024); and deliver extensive dicta on how installing a novel analytical framework could help usher in a "modern government" that requires individuals and entities to turn in much private information. *See* Maj. Op. at 16–54.

My colleagues might be right that an attempt to impose wide-ranging reporting requirements is "a common feature of modern government," *id.* at 16, but it is the hallmark of our *lawful* government to demand such disclosures only within the confines of our Constitution. As the majority blurs and breaches these well-settled Constitutional boundaries, I respectfully dissent.[3]

## I.

Pharmaceutical Research and Manufacturers of America ("PhRMA") challenged certain reporting requirements imposed by Oregon's Prescription Drug Price Transparency Act ("HB 4005") as violative of the First Amendment. Maj.

---

[3] I concur that the plaintiff-appellee's facial challenge on the Fifth Amendment ground fails because Oregon's long-standing public interest exception in its state trade secret laws undermines the reasonableness of any expectation of absolute protection of trade secrets in Oregon. Maj. Op. at 67. The plaintiff-appellee chose to litigate its Fifth Amendment claim as a facial challenge; "that decision comes at a cost." *Id.* at 75 (citation omitted).

Op. at 6–7.  HB 4005 requires drug manufacturers to report, *inter alia*, detailed information about their pricing strategies for some prescription drugs to the Oregon Department of Consumer and Business Services ("DCBS") and instructs the DCBS to publish such information unless an exception applies.  *Id.* (citing Or. Rev. Stat. § 646A.689(3), (9), (10)(a)).  On appeal is the district court's declaratory judgment that invalidated Section 646A.689(3) of HB 4005 as offending the First Amendment.[4]  *Id.* at 13 (citing *Pharm. Rsch. & Manufacturers of Am. v. Stolfi*, No. 6:19-CV-01996, 2024 WL 1144401 (D. Or. Feb. 16, 2024)).

## A.

Section 646A.689(3) requires drug manufacturers to disclose two types of information.  First, it demands disclosure of certain general marketing information for each prescription drug covered by HB 4005 ("General Marketing Information Disclosure Requirement"), including the length of time that the drug has been marketed, its introductory price, its price increases over time, its sales revenue, and its prices in other countries.  Or. Rev. Stat. § 646A.689(3)(a), (b), (g), (i), (j).  In my view, HB 4005's General Marketing Information Disclosure Requirement compels factual and uncontroversial commercial information and probably does not violate the First Amendment.  *See Zauderer v. Off. of*

---

[4] Our review is not limited to Section 646A.689(3)(c) of HB 4005.  *See* Maj. Op. at 12–15 (noting that PhRMA advanced arguments only against this one of many provisions under Section 646A.689(3)).  It is the district court's judgment—not the statements in its opinion or the parties' arguments below—that we review on appeal.  *See California v. Rooney*, 483 U.S. 307, 311 (1987).  The district court's judgment declared the entire Section 646A.689(3) of HB 4005 unenforceable as violative of the First Amendment, so our review extends to the entire Section 646A.689(3).

*Disciplinary Couns. of the Sup. Ct. of Ohio*, 471 U.S. 626 (1985). So far, so good.

But Section 646A.689(3) demands much more. One should not be misled when the majority portrays HB 4005 as if it contained only this General Marketing Information Disclosure Requirement. *See* Maj. Op. at 7, 40, 43. This requirement is not the point of contention here.

What is really in dispute is Section 646A.689(3)'s additional requirement that drug manufacturers disclose their pricing strategies ("Pricing Strategy Disclosure Requirement"). Section 646A.689(3) obligates drug manufacturers to disclose, "in the form and manner prescribed by" the DCBS, all the "factors that contributed to the price increase[s]" of the drugs covered by HB 4005. Or. Rev. Stat. § 646A.689(3)(c). The state's implementing regulations clarify the statute's onerous requirements: drug manufacturers "must" include "narrative description[s] and explanation[s] of all major financial and nonfinancial factors that influenced the[ir] decision[s] to increase the [prices] of the [relevant] drug product[s] and to decide on the amount[s] of the increase[s]." [5] Or. Admin. R. 836-200-0530(2)(h) (2019). And Section 646A.689(3) further lists several factors that Oregon deems potentially relevant to drug prices and forces drug manufacturers to disclose information pursuant to these prescribed factors: research and development costs, manufacturing costs, marketing costs, distribution costs,

---

[5] While this appeal is pending, the DCBS amended its regulation, which now asks drug manufacturers to furnish this pricing strategy information "voluntarily." Or. Admin. R. 836-200-0530(2) (2025). As the mandatory language in Section 646A.689(3) of HB 4005 remains unchanged, this amendment of the DCBS's regulation affects neither the majority's analysis nor mine. *See, e.g.*, Maj. Op. at 44–45.

costs of safety and effectiveness research, the availability of generic substitutes, attributable profits, and so forth.  Or. Rev. Stat. § 646A.689(3)(d), (e), (f), (h), (k); *see also id.* § 646A.689(l) (requiring drug manufacturers to produce documents to support the disclosed information).

In my view, HB 4005's Pricing Strategy Disclosure Requirement compels non-commercial speech and cannot survive strict scrutiny under the First Amendment.[6]  My dissent thus focuses on HB 4005's Pricing Strategy Disclosure Requirement and the DCBS implementing regulation thereunder.[7]

### B.

"It is well-established that the First Amendment protects 'the right to refrain from speaking at all'" and, accordingly, any "forced disclosure of information" "triggers First Amendment scrutiny."  *NetChoice*, 113 F.4th at 1117 (quoting *Wooley*, 430 U.S. at 714).  "When a state 'compels individuals to speak a particular message,' the state 'alters the content of their speech'" and engages in a content-based regulation.  *X Corp.*, 116 F.4th at 900 (quoting *Nat'l Inst. of Fam. & Life Advocs. v. Becerra*, 585 U.S. 755, 766 (2018))

---

[6] Although the district court did not apply strict scrutiny when it invalidated Section 646A.689(3) of HB 4005 as violative of the First Amendment, we can affirm the judgment below on any ground supported by the record.  *See Sec. Life Ins. Co. of Am. v. Meyling*, 146 F.3d 1184, 1190 (9th Cir. 1998).  Oregon does not claim Section 646A.689(3) can survive strict scrutiny, so the only question is whether strict scrutiny applies in the first place.

[7] I would remand this case so that the district court could decide in the first instance whether HB 4005's Pricing Strategy Disclosure Requirement is severable from the remainder of Section 646A.689(3).  *See* Maj. Op. at 54–55.

(cleaned up). Such a content-based regulation must withstand strict scrutiny unless it compels only commercial speech. *Id.* at 899–900. Hence, the First Amendment analysis in this case turns on whether the speech compelled by HB 4005's Pricing Strategy Disclosure Requirement ("Pricing Strategy Disclosures") constitutes commercial speech.

The "starting point" for this commercial speech inquiry is a "common-sense" one: Courts ask whether HB 4005's Pricing Strategy Disclosures do "no more than propose a commercial transaction." *Id.* at 900 (quoting *Ariix, LLC v. NutriSearch Corp.*, 985 F.3d 1107, 1115 (9th Cir. 2021), and *United States v. United Foods, Inc.*, 533 U.S. 405, 409 (2001)). My colleagues perform essentially no analysis under this test; they recite it and move on. *See* Maj. Op. at 36–38. In my view, HB 4005's Pricing Strategy Disclosures are a far cry from a proposal for commercial transactions. After all, rational sellers do not propose commercial transactions by disclosing detailed rationales underlying their pricing decisions to potential buyers.

As a corollary of this "commercial transaction proposal" test, our Circuit has held that a compelled disclosure constitutes commercial speech if it "communicates the terms of an actual or potential transaction." *X Corp.*, 116 F.4th at 901. While the General Marketing Information Disclosures under HB 4005 may communicate transaction terms,[8] the

---

[8] The majority asserts that HB 4005 may lawfully compel drug manufacturers to identify the generic competitors of their drug products because this type of information constitutes common terms of commercial transactions. This is not the kind of commercial transactions with which I am familiar; to my knowledge, sellers usually do not inform

Pricing Strategy Disclosures convey far more than mere commercial terms. One need only ask oneself if a buyer of a Ford pickup truck would expect the dealer to tell him—as the terms of the potential transaction between them—*all the major* financial and nonfinancial factors that influenced the pickup's price, including, for example, the Ford Dearborn management's internal estimates of how competitors may price comparable pickups, its internal evaluation of competitors' business strengths, or its internal forecasts of tax credits and tariffs. Probably not.

Not denying this, the majority shifts the focus by stating in passing that HB 4005's Pricing Strategy Disclosures concern "economic information that is no less tethered to commercial transactions" than are actual terms of these transactions. Maj. Op. at 40; *see also id.* at 42 n.18 ("Speech, such as [the one compelled by HB 4005] . . . is not far removed from the 'core' of commercial speech, *i.e.*, speech that 'propose[s] a commercial transaction.'" (citation omitted)). But this vague standard of what is *closely* tethered to or what is not *far* removed from true commercial speech is not the "commercial transaction proposal" test that the Supreme Court and our Circuit have long applied.

Our inquiry should have ended here: Strict scrutiny should apply because HB 4005's Pricing Strategy Disclosure

---

potential buyers of cheaper alternatives competitive to the sellers' own products. The majority has reached this counterintuitive conclusion seemingly because the U.S. Food and Drug Administration and pharmacies have made such information publicly available. *See* Maj. Op. at 40. This reasoning misconceives our compelled speech doctrine. Just because a message is otherwise publicly available does not mean the government can freely force a person to be a carrier of that message.

Requirement compels non-commercial speech that does much more than just propose a commercial transaction.

If, however, one were to believe that HB 4005's Pricing Strategy Disclosure Requirement somehow presents "a close question" as to whether it compels non-commercial speech, the Supreme Court in *Bolger*, 463 U.S. at 66–67, has set forth some "important guideposts" to help us decide such a close case. *X Corp.*, 116 F.4th at 900 (discussing the "so-called *Bolger* factors"). *Bolger* teaches that "strong support" for finding speech to be commercial exists where the following factors are satisfied: (1) "the speech is an advertisement"; (2) "the speech refers to a particular product"; and (3) "the speaker has an economic motivation." *X Corp.*, 116 F.4th at 900 (quoting *Hunt v. City of L.A.*, 638 F.3d 703, 715 (9th Cir. 2011), which cited *Bolger*, 463 U.S. at 66–67). The first and third *Bolger* factors counsel against finding commercial speech here: HB 4005's Pricing Strategy Disclosures are not akin to advertisements, and no drug manufacturer has economic motivations to volunteer such disclosures, else PhRMA would not have brought this case.

This, again, should have ended our inquiry, even were ours a close case. But the majority simply recounts the *Bolger* factors and fails to apply them meaningfully.

Worse, the majority declares that the "commercial transaction proposal" test and the *Bolger* factors are not a "neat[] fit" and thus "inapt" for determining the proper level of First Amendment scrutiny where, as here, a law mandates companies to report information to the government and directs the government to publish the reported information. Maj. Op. at 29. According to the majority, a "submission of information to the government" "typically does not '*propose* a commercial transaction,'" even if the submission contains

only commercial speech. *Id.* (emphasis in original) (citation omitted). And it "would be odd" to apply less First Amendment scrutiny to a mandated display of a price increase in a consumer-facing advertisement than to a compelled disclosure of the same information in a government-facing report. *Id.* at 29.

That, if true, would indeed be odd. But the majority misunderstands the relevant doctrinal tests. Our precedents instruct us to consider whether the content of the speech compelled in a government submission is akin to something people would otherwise disclose in proposing commercial transactions. The inquiry focuses on the content, not the format, of the compelled speech.[9] Under our precedents, HB 4005's Pricing Strategy Disclosure Requirement compels non-commercial speech not because drug manufacturers' submissions to the DCBS serve no function of proposing commercial transactions, but because detailed pricing strategies are not akin to anything people would otherwise disclose in proposing commercial transactions, as discussed above. By the same logic, speech that communicates such quintessential transaction terms as a price increase—the type of information that HB 4005's General Marketing Information Disclosure Requirement compels—would constitute commercial speech wherever it appears, be it a consumer-facing advertisement or a government-facing report. Commercial speech does not lose its commercial

---

[9] Of course, the fact that certain speech already appears in the format of a product advertisement is evidence that the speech is something people would disclose in proposing commercial transactions. Hence the first *Bolger* factor. And if certain speech refers to a specific product, that factor is evidence that the speech might be something people would deliver in proposing commercial transactions. Hence the second and third *Bolger* factors.

nature because it is made in a government submission rather than in the process of proposing a transaction.

Therefore, our doctrinal tests, if understood correctly, are not inapt here.

## II.

In fact, our doctrinal tests are very much apt in this case, as they were in *X Corp.  See* 116 F.4th at 899–903.  Like this case, *X Corp.* involved a law that required companies to report information to the government and directed the government to publish the reported information.  Reviewing that law under the First Amendment, the *X Corp.* panel did not find it necessary to abandon the "commercial transaction proposal" test or the *Bolger* factors.  *See* 116 F.4th at 902 (reprimanding the district court for its deviation from the doctrinal tests for discerning commercial speech).  Rather, the *X Corp.* panel, unlike the majority here, deemed these well-established legal tests a proper fit and applied them faithfully.

## A.

In *X Corp.*, X Corp., the owner of the social media platform X (formerly known as Twitter), sought a preliminary injunction against the enforcement of California State Assembly Bill 587 ("AB 587").  *Id.* at 894.  Broadly speaking, AB 587 required large social media companies, including X Corp., to submit reports to the California Attorney General, (1) disclosing social media companies' terms of services and any existing content moderation policies ("TOS"), and (2) identifying from those TOSs specific terms, policies, and practices, if any, that address several content categories prescribed by the State of California, including hate speech, racism, misinformation,

radicalization, and so forth ("TOS Category Report"). *See id.* at 895–97 (quoting Cal. Bus. & Prof. Code § 22677). AB 587 then directed the Attorney General to publish these reports. Cal. Bus. & Prof. Code § 22677(c).

Regarding the TOS Category Reports in particular, Section 22677(a)(3) of AB 587 required social media companies to report whether and, if so, how they defined the content categories listed by California. *Id.* at 896. Section 22677(a)(4)(A) also required social media companies to report their content moderation policies, if any, that addressed these content categories pursuant to the social media companies' own definitions. *Id.* And Section 22677(a)(5) further required social media companies to report the high-level statistics as to how they had been moderating these content categories, if they had moderated them at all (e.g., the total number of flagged items of content in each category). *Id.* at 896–97. Under this disclosure regime, as the *X Corp.* panel observed, "[n]o matter how a social media company chooses to moderate [the content on its platform], the company will face backlash from its users and the public." *Id.* at 899 n.8. "That is true even if the company decides not to define the enumerated [content] categories, because [it] will draw criticism for under-moderating [its] [social media platform]." *Id.*

The district court denied X Corp. a preliminary injunction, holding that X Corp. was unlikely to prevail because both the TOSs and the TOS Category Reports constituted commercial speech and, accordingly, their compelled disclosure likely did not violate the First Amendment. *X Corp. v. Bonta*, No. 2:23-CV-01939, 2023 WL 8948286, at *1–2 (E.D. Cal. Dec. 28, 2023). With respect to the TOSs, the district court found that they were "part of a commercial transaction and appear[ed] to satisfy

the *Bolger* factors." *Id.* at *1. As to the TOS Category Reports, the district court found that they did "not so easily fit the traditional definition of commercial speech." *Id.* at *2. Sound familiar? Much like the majority here, the district court in *X Corp.* nonetheless held that the TOS Category Reports constituted commercial speech, without conducting any meaningful analysis under the doctrinal commercial speech tests. *See id.*; *see also X Corp.*, 116 F.4th at 902.

We reversed the district court's ruling on the TOS Category Reports. *X Corp.*, 116 F.4th at 904. We held that, while social media platforms' TOSs "m[ight] be commercial speech," the TOS Category Reports were "different in character and kind" because they would reveal social media companies' "opinions about and reasons for" their TOSs. *Id.* at 901.

Specifically, the *X Corp.* panel first found that the TOS Category Reports did "not satisfy the usual definition of commercial speech—i.e., speech that does no more than propose a commercial transaction." *Id.* (cleaned up) (citations omitted). The panel further reasoned that the TOS Category Reports "fail[ed] to satisfy at least two of the three *Bolger* factors": The compelled disclosures were not advertisements, and social media companies did not have any economic motivation in disclosing the TOS Category Reports. *Id.* (citations omitted). Therefore, after faithfully applying these doctrinal tests, the *X Corp.* panel concluded that the TOS Category Reports compelled non-commercial speech.

Additionally, the *X Corp.* panel distinguished social media companies' TOS Category Reports from their TOSs:

> [T]he [TOS] Category Reports are not commercial speech. They require a company to recast its content-moderation practices in language prescribed by the State, implicitly opining on whether and how certain controversial categories of content should be moderated. As a result, few indicia of commercial speech are present in the Content Category Reports.
>
> . . .
>
> . . . [T]he [TOS] Category Reports go further [than merely communicating the terms of actual or potential transactions]: they express a view *about* those terms by conveying whether a company believes certain categories should be defined and proscribed.
>
> . . .
>
>  . . . The [TOS] Category Report provisions would require a social media company to convey the company's policy views on intensely debated and politically fraught topics, including hate speech, racism, misinformation, and radicalization, and also convey how the company has applied its policies. . . .

*Id.* at 901–02 (emphasis in original). For all these reasons, the *X Corp.* panel held that the TOS Category Reports

amounted to non-commercial speech and, accordingly, AB 587 likely failed strict scrutiny. *Id.* at 903.

## B.

So too is the case here.  While drug prices—like social media platforms' TOSs—are terms of commercial transactions, the detailed breakdown of and the internal rationales for these prices—like the TOS Category Reports—do much more than just propose a commercial transaction, and they do not resemble advertisements or anything that drug manufacturers would have an economic motivation to disclose.

Additionally, HB 4005's Pricing Strategy Disclosures go further than merely communicating the pricing terms for actual or potential transactions: They recast drug manufacturers' pricing strategies in language prescribed by Oregon and force drug manufacturers to voice their views as to how drugs are and should be priced.

"Our lodestars in deciding what level of scrutiny to apply to a compelled statement must be the nature of the speech taken as a whole and the effect of the compelled statement thereon." *Riley v. Nat'l Fed'n of the Blind of N.C., Inc.*, 487 U.S. 781, 796 (1988).  Here, HB 4005's Pricing Strategy Disclosure Requirement prescribes language that focuses primarily on costs, implying that any increase in drug prices can be fairly justified only by increases in costs, rather than other factors such as drug manufacturers' insights and

foresights regarding the relevant market demands and competitive dynamics.[10]  *See* Or. Rev. Stat. § 646A.689(3).

Of course, drug manufacturers can offer explanations other than costs for their pricing decisions.  *See* Or. Rev. Stat. § 646A.689(3)(c), (k); Or. Admin. R. 836-200-0530(2)(h) (2019).    In doing so, however, drug manufacturers would have to divulge their overall pricing strategies, which are driven by not only cold numbers but also a host of qualitative judgments.  Thomas T. Nagle & Georg Müller, THE STRATEGY AND TACTICS OF PRICING: A GUIDE TO GROWING MORE PROFITABLY 21, 172 (7th ed. 2024) ("There is no substitution for managerial experience and judgment when setting prices. . . . [P]rice setting usually . . . balances costs, customer value, strategic goals, and potential competitive responses.").    A pharmaceutical company's pricing strategy may reveal its subjective assessment of customer demands, *id.* at 26–55, its marketing and communication strategies,[11] *see id.*, at 56–76, 158–63,

---

[10] The majority argues that this implied message would be attributed only to Oregon because the public knows drug manufacturers are forced by HB 4005.  *See* Maj. Op. at 43–44 n.22.  This argument, if it were to carry the day, would uproot our compelled speech doctrine under the First Amendment, as any message compelled by the government would henceforth be deemed attributable only to the government.

[11] Granted, companies may sometimes find it advantageous to communicate publicly certain rationales behind their pricing decisions. *See* Nagle & Müller, *supra*, at 170–72; *see also* Maj. Op. at 36–37 n.15. That some companies have elected or have been encouraged to engage in such a communication strategy every now and then does not license Oregon to compel similar speech in all circumstances.    More importantly, HB 4005's Pricing Strategy Disclosures are different in character from disclosures typically involved in such a voluntary communication strategy.    HB 4005's Pricing Strategy Disclosure

and even its opinion on issues of public concern. In fact, failure to consider public concern is a textbook mistake:

> Take the example of a pharmaceutical company that purchased an old prescription drug and hiked the price many-fold. The price change may have been considered economically rational—after all, the drug had few substitutes and consequently demand was very inelastic. Yet what the company failed to consider was the power of community-held norms of fairness in the decision and the resulting backlash against it and the entire pharmaceutical industry in general by an outraged public.

*Id.* at 154.

A drug manufacturer might consider at what level a price spike would spark public outcry and thereby cap any price increase below that level. In the relevant internal discussions, employees might opine on a myriad of controversial topics: whether a free market should allow drug manufacturers to set prices as they see fit; to what extent public sentiments against drug manufacturers are justified; and whether the government has adequate political

---

Requirement requires drug manufacturers to disclose *all the major* financial and nonfinancial factors that influenced their pricing decisions, thereby denying drug manufacturers the freedom to tailor what to disclose and what to withhold about their pricing decisions. *See, e.g.*, Maj. Op. at 36–37 n.15 (citing Utpal M. Dholakia, *If You're Going to Raise Prices, Tell Customers Why*, HARV. BUS. REV. (June 29, 2021), which advised companies to consider crafting "vivid and compelling stor[ies] for why the price[s] [are] being increased that focus[] on customer value").

will and power to quell a given price increase. HB 4005's Pricing Strategy Disclosure Requirement would compel disclosure of all these nuanced views regarding how drugs are and should be priced. As such, HB 4005's Pricing Strategy Disclosure Requirement does not simply compel "product-specific, economic information." Maj. Op. at 44.

Moreover, HB 4005's Pricing Strategy Disclosures would prompt drug manufacturers to express their broader views on the intensely debated and politically fraught topic of allegedly inflated prescription drug prices. PhRMA argues that HB 4005 seeks to reinforce Oregon's message that drug manufacturers are responsible for the allegedly inflated drug prices in our country, as HB 4005 did not require other participants in the pharmaceutical industry— pharmacy benefit managers, for instance—to make similar disclosures. In rejecting this argument, the majority envisions that drug manufacturers are free to refute Oregon's political message by opining that other market participants may have contributed to drug price increases. *See id.* at 44– 45. In other words, the majority acknowledges that HB 4005's Pricing Strategy Disclosure Requirement will probably drag drug manufacturers into a public debate as to who is to blame for the allegedly inflated drug prices.

Therefore, HB 4005's Pricing Strategy Disclosures convey drug manufacturers' "opinions about and reasons for" their drug prices.[12] *X Corp.*, 116 F.4th at 901. To

---

[12] Relying on Oregon's purported representations at oral argument, the majority maintains that the "DCBS would consider the following straightforward list of factors to be a satisfactory response to Or. Rev. Stat. § 646A.689(3)(c): 'supply cost increases, research costs, and investor return.'" *Id.* at 43 n.20. To begin with, we review the

follow *X Corp.*, we must treat HB 4005's Pricing Strategy Disclosure Requirement as compelling non-commercial speech and subject it to strict scrutiny.

### C.

Departing from *X Corp.*'s teaching, the majority articulates a new legal test. To decide whether a regulatory disclosure constitutes commercial speech, my colleagues ask two questions: (1) whether the disclosure would improve the "free flow of commercial information"; and (2) whether the disclosure is "incidental to a commercial transaction." Maj. Op. at 40, 42 n.18.

Given that any disclosure, almost by definition, would improve the free flow of information, the majority's new test depends on just its second question. To answer that question, the majority determines whether a forced

---

constitutionality of HB 4005 as legislated, not as how counsel hypothesized it should be read. More importantly, Oregon conceded only that a straightforward list of factors such as supply cost increases, research costs, and investor return would suffice "if [it in fact] explains the price increase." Oral Arg. at 2:41-3:33. What if it does not explain the price increase? Suppose a drug manufacturer decides to raise the price for its domestically manufactured drugs because, in its opinion, its competitors are likely to suffer significant tariffs for their foreign-manufactured generic substitutes. Does HB 4005 compel the drug manufacturer to disclose this rationale and the underlying opinions and analyses by demanding the disclosure of "all major financial and nonfinancial factors" that influenced drug manufacturers' pricing decisions? Or. Admin. R. 836-200-0530(2)(h) (2019); *see also* Or. Rev. Stat. § 646A.689(3)(c), (k); *id.* § 646A.689(l) (requiring drug manufacturers to produce supporting documents). Of course, it does. In fact, Section 646A.689(3)(c)'s very function is to capture nuanced financial and nonfinancial considerations other than, for example, research costs, of which other HB 4005 sections including Sections 646A.689(3)(e) and 646A.689(3)(f)(D) already demand disclosure.

disclosure "has no independent expressive meaning" outside the context of commercial transactions. *Id.* at 41; *see also id.* at 42 n.18.

But even under the majority's newly minted test, HB 4005's Pricing Strategy Disclosures constitute non-commercial speech. As detailed above, drug manufacturers' pricing strategies can be influenced by many factors, including drug manufacturers' views on issues of public concern such as how drugs should be priced and who should be held responsible for the allegedly inflated drug prices. The majority does not explain why such views have no independent expressive meaning outside the drug sale context.

Not only that, but the majority's test and reasoning effectively overrule *X Corp.*, 116 F.4th 888, which is impermissible in our Circuit, *see Miller v. Gammie*, 335 F.3d 889, 899 (9th Cir. 2003). To illustrate this point, let's apply the majority's test and reasoning to *X Corp.* 116 F.4th 888. In *X Corp.*, how social media companies chose to define and moderate different content on their platforms had little independent expressive meaning outside of their social media services. The number of items of content concerning hate speech that X Corp. had flagged—one part of a typical TOS Category Report under AB 587, *id.* at 896–97—carried little standalone expressive meaning other than describing X Corp.'s content moderation practices in its social media services.

The majority argues that, the speech compelled by HB 4005 in this case would not exist absent commercial transactions, whereas in *X Corp.*, "[w]hat constitute[d] 'hate speech,' for example, [was] a matter of public debate and concern outside the context of a social media company's

terms of service (or, indeed, any commercial transaction)." Maj. Op. at 43 n.21. The majority misreads AB 587. AB 587 compelled social media companies to disclose how they had defined and moderated such content categories as hate speech for purposes of running their social media platforms, not what *should* constitute hate speech in the abstract or in the public forum. *See X Corp.*, 116 F.4th at 896–97. In fact, the TOS Category Reports compelled by AB 587 were derived from social media companies' TOSs, which were largely "directed to [their] potential consumers" and might "presumably play a role in [these consumers'] decision of whether to use the platform." *Id.* at 902 n.10. As such, the TOS Category Reports would not come into existence absent social media companies' provision of their services.

Therefore, the TOS Category Reports would have amounted to commercial speech under my colleagues' novel test and myopic reasoning, contrary to what the *X Corp.* panel concluded less than a year ago. As this panel lacks the authority to overrule such published opinions of this Court as *X Corp.*, I cannot join my colleagues. *See Miller*, 335 F.3d at 899.

### D.

To distinguish *X Corp.*, the majority advances three arguments. *First*, the majority argues that, while issues such as hate speech are "intensely political," prescription drug prices are not. Maj. Op. at 43. Why? As far as I can tell, the majority cites nothing but its own common sense. *See id.* at 38.

But it is unclear whether the majority's common sense aligns with our country's when it comes to what is or is not politically charged. *See, e.g., Fact Sheet: President Donald J. Trump Announces Actions to Get Americans the Best*

*Prices in the World for Prescription Drugs*, THE WHITE HOUSE (July 31, 2025), https://www.whitehouse.gov/fact-sheets/2025/07/fact-sheet-president-donald-j-trump-announces-actions-to-get-americans-the-best-prices-in-the-world-for-prescription-drugs/ (announcing that the executive branch sent "letters to leading pharmaceutical manufacturers outlining the steps they must take to bring down the prices of prescription drugs in the United States. . . ."); Sarah Fioroni, *Five Things to Know: Healthcare and the U.S. Election*, GALLUP (Sept. 30, 2024), https://news.gallup.com/poll/651386/five-things-know-healthcare-election.aspx (reporting that 47% of the respondents in a September 2024 preelection healthcare subject survey ranked "reducing drug costs" as "the single most or among the most important issues determining their votes" in the 2024 presidential election). First Amendment protections cannot depend on a judge's self-determined and unelaborated common sense regarding what is "intensely political" and what is not.[13]

*Second*, the majority asserts that, while AB 587 called for social media companies' opinions, HB 4005 simply

---

[13] That prices and costs are economic concepts does not automatically mean that HB 4005's Pricing Strategy Disclosures are nonpolitical. Suppose Congress passes a law requiring companies to disclose whether and, if so, how tariffs have contributed to the prices they charge. Does this hypothetical law necessarily compel only commercial speech simply because prices and tariffs are economic concepts? I am not so sure. *See* Wyatte Grantham-Philips & Josh Boak, *Amazon Is Not Planning to Break Out Tariff Costs Online as White House Attacks Potential Move*, THE ASSOCIATED PRESS (Apr. 29, 2025), https://apnews.com/article/amazon-tariff-prices-trump-white-house-8598569632263872a6c04f7ef330c0fd. In my view, a person's speech is not automatically subject to a lower level of scrutiny simply because it involves economic concepts.

requires drug manufacturers to disclose, "as a matter of historical fact," their considerations in setting drug prices. Maj. Op. at 44.  This assertion is incorrect as to both AB 587 and HB 4005.  AB 587 directed social media companies to disclose, as a matter of historical fact, whether their TOSs defined and moderated such content categories as hate speech, what their definitions of those content categories encompassed, and how their moderation practices addressed those content categories.  *X Corp.*, 116 F.4th at 896–97.  To be clear, AB 587 did not require social media companies to express any "normative" view in "value-laden" language. Maj. Op. at 43.  If a social media company's TOSs did not address any of the content categories prescribed by AB 587, an answer of "not applicable" under that category would suffice, and no additional narratives or explanations were necessary.  *X Corp.*, 116 F.4th at 901 n.9.  Notwithstanding this ostensible call for only factual disclosures, the *X Corp.* panel struck down AB 587 because it forced social media companies to opine "implicitly" on whether and how certain content categories should be defined and proscribed.  *Id.* at 901.

The same reasoning applies here.  Even assuming HB 4005's Pricing Strategy Disclosure Requirement covers only what factors, as a matter of historical fact, drug manufacturers considered in setting their prices, that requirement still compels drug manufacturers to opine *implicitly* on how their drugs should be priced, as discussed above.  What's more, HB 4005's Pricing Strategy Disclosure Requirement demands not only a recount of historical facts, but also "narrative[s]" and "explanation[s]" of what drug manufacturers "deem[]" to have "contributed to the price increase[s]" of the relevant drugs.  Or. Rev. Stat. § 646A.689(3)(c), (k); Or. Admin. R. 836-200-0530(2)(h)

(2019); *see also Narrative*, BLACK'S LAW DICTIONARY (12th ed. 2024) (defining a "narrative" to mean "[a]n account or description of a *selected* set of events, facts, experiences, or the like; a story" (emphasis added)); *Explanation*, BLACK'S LAW DICTIONARY (12th ed. 2024) (defining an "explanation" to mean a statement made in the "activity or process of expounding, *interpreting*, or making something intelligible" and/or the "*interpretation or meaning given* to something by someone who expounds it" (emphases added)).  This means drug manufacturers must voice the reasons which, in their judgment and interpretation, caused the relevant drug price increases.  As such, the majority cannot distinguish *X Corp.* by portraying HB 4005's Pricing Strategy Disclosure Requirement as more factual than AB 587's TOS Category Report provisions—if anything, Oregon calls for more opinions and judgments than did California.

Finally, the majority asserts that treating HB 4005's Pricing Strategy Disclosures as commercial speech is at odds with our case laws regarding retail product warnings.  Maj. Op. at 37–38 n.15, 43–44 n.22.  Like the *X Corp.* panel, I disagree.  116 F.4th at 901.  Granted, our Circuit has treated certain retail product warnings as commercial speech, even though the traditional legal tests for finding commercial speech could sometimes suggest otherwise.  *Id.*  But retail product warnings constitute a "limited" exception inapplicable here.  *Id.*  Retail product warnings describe the products being sold to the public or communicate the terms of the relevant transactions, whereas HB 4005's Pricing Strategy Disclosures—much like AB 587's TOS Category Reports—"go further" by at least "implicitly" conveying drug manufacturers' "opinions about and reasons for" their

drug prices. *Id.* Therefore, cases regarding retail product warnings are inapposite.

III.

The majority has much more to say beyond disposing of the case before us. In dicta, the majority formulates a novel framework for future speech compulsion cases under the First Amendment. I address these dicta lest they become precedential in our Circuit. *United States v. Johnson*, 256 F.3d 895, 914 (9th Cir. 2001) (en banc) (Kozinski, J., concurring).

The majority first distinguishes "government reporting requirements" (i.e., laws that require entities and individuals to report information to the government and direct the government to publish such reported information) from "direct disclosure requirements" (i.e., laws that compel communication of certain information directly from one individual or private entity to another). Maj. Op. at 17–18. The majority then argues that, while "direct disclosure requirements" are presumptively subject to strict scrutiny unless the commercial speech exception applies, "government reporting requirements" need to pass strict scrutiny only when they compel political or ideological statements. *Id.* at 18–21. My colleagues call this new framework a "potentially strict" approach, as opposed to the "presumptively strict" approach that I have discussed so far. *Id.* at 19–20. With this new framework, my colleagues would like to skirt the commercial speech inquiry where, as here, a government reporting requirement is at issue. *Id.* at 27–28.

Perhaps unsure about this fresh framework, my colleagues elaborate it only in dicta.[14]   Though rather lengthy—almost twice the length of the majority's discussion of strict scrutiny's inapplicability in this case, *compare id.* at 16–36, *with id.* at 36–48—these dicta are not well-reasoned, a requirement for dicta to become precedential in our Circuit.  *See Johnson*, 256 F.3d at 914. In my view, these dicta contravene the binding precedents of our Circuit and lack support in the other cases that the majority discusses.[15]

## A.

Of course, most conspicuous is the absence of the majority's novel framework in *X Corp.  See* 116 F.4th 888. My colleagues admit that absence.  Maj. Op. at 33–34.  But they argue that their framework would nevertheless lead to the same conclusion as came the *X Corp.* panel.  *Id.* at 34. This argument does not change the fact that our *X Corp.* panel never endorsed the majority's framework, explicitly or implicitly.

Moreover, the majority's new framework contradicts another binding precedent in our Circuit: *NetChoice*, 113

---

[14] *See* Maj. Op. at 36 ("Although, in our view, using the potentially strict approach followed by our sister circuits would be more doctrinally sound and avoid unintended consequences, we do not need to fully resolve whether *X Corp.* requires us to use the presumptively strict approach in this case, because both approaches lead us to the same conclusion.").

[15] I also note that HB 4005's Pricing Strategy Disclosure Requirement, as discussed above, compels drug manufacturers to opine on an "intensely debated and politically fraught" subject, *X Corp.*, 116 F.4th at 902, so it should be subject to strict scrutiny even under the majority's "potentially strict" approach.

F.4th 1101.[16]  In *NetChoice*, a trade association of online businesses sued the California Attorney General, seeking to invalidate as violative of the First Amendment the California Age-Appropriate Design Code Act ("CAADCA"), a statute aimed at protecting children's privacy and influencing online products' designs to this end.  *Id.* at 1108.  At issue was CAADCA's reporting requirement (i.e., Data Protection Impact Assessment Report, or "DPIA report"), which compelled online businesses to identify risks of "material detriment to children" and to create a timed plan mitigating these risks.  *Id.* at 1109–10 (quoting Cal. Civ. Code § 1798.99.31(a)(1), (a)(2)).  Although the CAADCA, like HB 4005, imposed a government reporting requirement, the *NetChoice* panel analyzed the DPIA report requirement using the traditional "commercial transaction proposal" test and the *Bolger* factors.  *Id.* at 1119–20.  After concluding that the DPIA report requirement forced online businesses to "do far 'more than propose a commercial transaction'" and that the requirement satisfied none of the *Bolger* factors, *id.* (citations omitted), the *NetChoice* panel applied strict scrutiny and held that the DPIA report requirement fell "well short of satisfying strict First Amendment scrutiny," *id.* at 1121, 1122.

Despite this reasoning and holding, my colleagues believe *NetChoice* supports their framework because the *NetChoice* panel engaged in a threshold inquiry before determining whether the DPIA reports constituted

---

[16] *NetChoice* and *X Corp.* were argued on the same day before the same panel, and both opinions were authored by Judge Milan D. Smith. *Compare X Corp.*, 116 F.4th 888, *with NetChoice*, 113 F.4th 1101.  The *NetChoice* opinion preceded the *X Corp.* opinion by about half a month; there is no reason to believe *X Corp.* departed from *NetChoice* in any meaningful way.

commercial speech. That threshold inquiry, in the majority's view, was whether the DPIA report requirement mandated the covered online businesses to make an opinion statement "on a political issue." Maj. Op. at 32.

But the majority is mistaken. The *NetChoice* panel simply inquired, as a threshold matter, whether the DPIA report requirement compelled speech *or conduct*, a traditional threshold inquiry for any case concerning the Free Speech Clause of the First Amendment. *See, e.g.*, 113 F.4th at 1117 ("Nor can we, as the State suggests, ignore that the DPIA [report] requirement compels speech simply because other parts of the CAADCA may primarily or exclusively regulate non-expressive conduct. The primary effect of the DPIA [report] provision is to compel speech, distinguishing it from statutes where the compelled speech was 'plainly incidental to the [law's] regulation of conduct.'"); *id.* at 1118 (reasoning that, even if the DPIA report requirement compelled the conduct of mitigating risks to children, the DPIA report requirement still triggered strict First Amendment scrutiny because it "deputize[d] covered businesses into serving as censors for the State," thereby interfering with these businesses' "editorial choices" and forcing them to determine "what material is potentially harmful to children"). Nowhere did the *NetChoice* panel apply or approve the majority's new framework. *See id.* at 1116–18.

What's more, had the majority's framework controlled the *NetChoice* panel, it would have concluded that the DPIA report requirement did not compel any political or ideological messages and thus need not pass strict scrutiny, opposite to what *NetChoice* held. The *NetChoice* panel never described the DPIA reports as "political" or "ideological." *See generally* 113 F.4th 1101. My colleagues

appear to admit as much, Maj. Op. at 32 n.12, and they fail to explain why they believe opinions about what harms children, which the DPIA report requirement compelled, amounted to political or ideological messages, whereas opinions about drug pricing in this case do not.[17] *See id.* at 34.

Therefore, the majority's new framework conflicts with the Ninth Circuit's binding precedents.

### B.

The majority instead resorts to two cases from other Circuits, both predating our decisions in *X Corp.* and *NetChoice*: *Full Value Advisors, LLC v. S.E.C.*, 633 F.3d 1101 (D.C. Cir. 2011), and *United States v. Sindel*, 53 F.3d 874 (8th Cir. 1995). *See* Maj. Op. at 21–22. Neither of these cases is binding upon us; nor are they persuasive. I discuss them in turn.

In *Full Value Advisors*, Full Value Advisors, LLC, an institutional investment manager, challenged one of the Securities Exchange Act's disclosure requirements because it allegedly compelled speech in violation of the First

---

[17] My colleagues note that "the *NetChoice* panel made quite clear that it viewed the DPIA reporting requirement as 'requir[ing] businesses to go beyond opining about their products or services to opine on highly controversial issues of public concern.'" Maj. Op. at 32 n.12 (quoting *NetChoice*, 113 F.3d at 1120). Obviously, a controversial issue of public concern is not necessarily a political or ideological issue, so this quote from *NetChoice* does not support the majority's new legal framework. More importantly, the *NetChoice* panel made the relevant statement when it explained why the DPIA report requirement did not simply refer to a particular product under the second *Bolger* factor. *NetChoice*, 113 F.3d at 1120. Thus, this quote highlights the fact that *NetChoice* did not apply or approve my colleagues' novel framework. Quite the opposite, the *NetChoice* panel performed the traditional *Bolger* analysis.

Amendment.   633 F.3d at 1104.   Specifically, Section 13(f)(1) of the Act required institutional investment managers to file quarterly reports with the SEC, disclosing the names, shares, and fair market values of the securities that the managers controlled ("Quarterly Reporting Requirement").   *Id.* (citing 15 U.S.C. § 78m(f)(1) and 17 C.F.R. § 240.13f-1(a)(1)).   The SEC was required to publish this reported information unless an exemption applied.   *Id.* 1104–05 (citing 15 U.S.C. § 78m(f)(2), (f)(3)).   To request an exemption, an investment manager had to "submit enough information" to the SEC for it to "make an informed judgment as to the merits of the request" ("Exemption Application Requirement").   *Id.* at 1105.

The D.C. Circuit held that the Exemption Application Requirement did not violate the First Amendment.[18]   *Id.* at 1109.   Observing that the SEC, "not the public," was the "only audience" of investment managers' exemption applications, the court reasoned that "[c]ompelling disclosure to the [SEC] alone so the [SEC] may determine whether [an exemption is] warranted is a rational means of achieving" the goal of protecting institutional investors' confidential information.   *Id.* at 1108.

*Full Value Advisors* stands for the unremarkable proposition that a party seeking relief before an adjudicator must offer—if needed, on a confidential basis—sufficient evidence to convince the adjudicator, "as in the case of compulsion to give evidence in court."   *W. Virginia State Bd. of Educ. v. Barnette*, 319 U.S. 624, 645 (1943) (Murphy, J., concurring).   This proposition has little relevance to this

---

[18] The D.C. Circuit did not opine as to whether the Quarterly Reporting Requirement violated the First Amendment, since Full Value Advisors's First Amendment claim in that regard was unripe.   *Id.* at 1106–07.

case, which does not involve the compelled production of evidence in an adjudicatory setting.

In any event, the D.C. Circuit cabined its holding in *Full Value Advisors* to the context of confidential submissions for securities regulation. *See* 633 F.3d at 1109. As Justice Breyer once opined, securities regulation "involves 'a different balance of concerns' and 'calls for different applications of First Amendment principles.'" *Id.* (quoting *Nike, Inc. v. Kasky*, 539 U.S. 654, 678 (2003) (Breyer, J., dissenting from the dismissal of certiorari as improvidently granted)). This call for different applications of First Amendment principles undergirded the D.C. Circuit's opinion in *Full Value Advisors* but is inapplicable in this case. Therefore, *Full Value Advisors* cannot lend support to the majority's new framework.

Let's then turn to *Sindel*, another case on which the majority relies. In *Sindel*, the government sued attorney Richard Sindel to enforce an IRS summons that requested missing information from the IRS Form 8300 that Sindel filed to report certain cash transactions relating to his legal services. 53 F.3d at 875–76. The government argued that Sindel, pursuant to the instructions in IRS Form 8300, should have provided identifying information regarding the payors of the underlying cash transactions. *Id.* The Eighth Circuit held that "the First Amendment protection against compelled speech d[id] not prevent [the] enforcement of the summons." *Id.* at 878. The court reasoned that "[t]here is no right to refrain from speaking when 'essential operations of government may require it for the preservation of an orderly society[]—as in the case of compulsion to give evidence in court.'" *Id.* (quoting *Barnette*, 319 U.S. at 645 (Murphy, J., concurring)). Because the IRS summons in that case required "Sindel only to provide the government with

information which his clients ha[d] given him voluntarily, not to disseminate publicly a message with which he disagree[d]," the Eighth Circuit held that the summons compelled neither Sindel's nor his client's speech. *Id.* at 877–78.

Assuming *Sindel* was correctly decided, it is distinguishable. Compelling drug manufacturers to disclose their internal pricing strategies is in no way analogous to requiring citizens to provide the government with certain basic transaction information to facilitate the essential governmental operations of tax collection and illegality detection. The majority does not attempt to (and could not reasonably) argue that learning and publishing drug manufacturers' detailed pricing strategies constitute the "essential operations" of the Oregon government "for the preservation of an orderly society." *Id.* at 878.

To the extent *Sindel* seems to suggest that a speech compulsion claim under the First Amendment may arise only where the government forces a person to "disseminate publicly a message with which he disagrees," this suggestion conflicts with the law in our Circuit. *Id.* In *X Corp.*, AB 587 asked what constituted hate speech, in social media companies' views, but AB 587 did not impose any hate speech definition of its own. 116 F.4th at 896–97. In *NetChoice*, the DPIA report requirement urged online businesses to ascertain whether their operations could harm children, but the DPIA report requirement itself did not define what should be deemed harmful to children. 113 F.4th at 1109–10. Both AB 587 and the DPIA report requirement were transparency measures. In neither case did the challenged law ask any person to disseminate any views with which he disagreed. And yet, in both cases, strict

scrutiny applied.  Thus, *Sindel* is not persuasive in our Circuit.

Therefore, neither *Full Value Advisors* nor *Sindel* is applicable here.  Nor did they espouse the analytical framework that the majority now advocates.[19]

### C.

The majority also posits that two Supreme Court cases are, if not in direct support, at least not inconsistent with its new framework: *Village of Schaumburg v. Citizens for a Better Environment*, 444 U.S. 620 (1980), and *Riley*, 487 U.S. 781.  *See* Maj. Op. at 24–27.  As both cases are distinguishable for the same reason, I discuss them together.

In *Schaumburg*, Citizens for a Better Environment ("CBE"), a nonprofit organization, "requested permission to solicit contributions in the Village" of Schaumburg.  444

---

[19] The majority also relies on *Pharmaceutical Care Management Association v. Rowe*, 429 F.3d 294 (1st Cir. 2005), a case involving a direct disclosure requirement, not a government reporting requirement. Maj. Op. at 22–24.  At issue in *Rowe* was Maine's Unfair Prescription Drug Practices Act ("UPDPA") that regulated pharmacy benefit managers ("PBM").  429 F.3d at 298.  The UPDPA required the PBMs to act as fiduciaries for their health benefit provider clients in Maine and, accordingly, adhere to certain fiduciary duties including disclosing to the clients their conflicts of interest, self-dealing, and financial arrangements with third parties.  *Id.* at 299.  "None of the disclosures [were] available to the public."  *Id.*  Pharmaceutical Care Management Association ("PCMA") alleged that the UPDPA's disclosure requirement violated the First Amendment, but the First Circuit disagreed.  *Id.* at 316 (controlling concurrence).  Contrary to the majority's new framework, *Rowe* did not distinguish government reporting requirements from direct disclosure requirements.  *Id.*  And unlike HB 4005 here, the UPDPA simply imposed a fiduciary duty upon the PBMs in certain contractual setup, and the resulting factual disclosure requirement was just a derivative to such a fiduciary duty.  *See id.* at 299.

U.S. at 624–25.  The Village denied CBE's request because CBE could not demonstrate it would use 75% of received contributions for charitable purposes as required by the Schaumburg Village Code.  *Id.* at 625.  CBE thus sued the Village, claiming that the 75% requirement violated the First Amendment.  *Id.*  The Supreme Court agreed, holding that this 75% requirement did not withstand strict scrutiny.  *Id.* at 636.

My colleagues recognize that *Schaumburg* concerned the curtailment of charitable solicitation speech—a type of speech that is fully protected by strict First Amendment scrutiny—not any compelled disclosures of charitable usage percentages.  *See* Maj. Op. at 24.  To find support for their framework, however, my colleagues seize on the following language from the Supreme Court's discussion of why the 75% requirement was not narrowly tailored under strict scrutiny:

> The Village's legitimate interest in preventing fraud can be better served by measures less intrusive than a direct prohibition on solicitation. . . . Efforts to promote disclosure of the finances of charitable organizations [] may assist in preventing fraud by informing the public of the ways in which their contributions will be employed.

444 U.S. at 637–38.

*Riley* was also about percentages of charitable usage.  487 U.S. at 795.  At issue there was the North Carolina Charitable Solicitations Act's requirement that "professional fundraisers disclose to potential donors, before an appeal for

funds, the percentage of charitable contributions collected during the previous 12 months that were actually turned over to charity." *Id.* Assuming, without deciding, that the charitable usage disclosure compelled by the Act constituted commercial speech, the Supreme Court held that the timing of this disclosure, which had to be made before a fundraiser's solicitation for funds, rendered it "inextricably intertwined with otherwise fully protected speech," i.e., charitable solicitation. *Id.* at 796. Strict scrutiny thus applied. *Id.* at 798.

Reading *Riley*, my colleagues again focus on the Supreme Court's discussion as to why this charitable usage disclosure requirement was not narrowly tailored:

> [M]ore benign and narrowly tailored options are available. For example, as a general rule, the State may itself publish the detailed financial disclosure forms it requires professional fundraisers to file. This procedure would communicate the desired information to the public without burdening a speaker with unwanted speech during the course of a solicitation.

*Id.* at 800.

According to my colleagues, *Schaumburg* and *Riley* suggest that the Supreme Court would agree with their new framework, which treats government reporting requirements and direct disclosure requirements differently and abandons the commercial speech doctrine in cases involving government reporting requirements. Maj. Op. at 24–27. In my view, this interpretation of *Schaumburg* and *Riley* is unconvincing because it depends on the false premise that

the charitable usage disclosures hypothesized in *Schaumburg* and *Riley* constituted non-commercial speech that would warrant strict scrutiny if compelled by direct reporting requirements.

But the information regarding the percentages of donations that are used for charity constitutes commercial speech, for it communicates the prices—a quintessential transaction term—that nonprofit organizations charge for their services managing and dispensing donations. Disclosing how much of the received donations that a nonprofit organization passes on to intended charities tells the public the amount of donations that the nonprofit organization retains for itself; that is, the price of its services. It is analogous to the commission fees that people pay for brokerage services in the securities transaction context. Those commissions fees are distinct from the value of the securities that brokers help people transact, and disclosing those commission fees simply communicates the prices of the brokerage services. Understood as such, the Supreme Court in *Schaumburg* and *Riley* suggested only that the government could require charitable organizations to display the price tags of their services more prominently. By contrast, HB 4005's Pricing Strategy Disclosure Requirement does not merely require drug manufacturers to broadcast their price increases. Rather, it forces a full disclosure of drug manufacturers' pricing strategies, i.e., the "opinions about and reasons for" their drug prices. *X Corp.*, 116 F.4th at 901. *Schaumburg* and *Riley* cannot rescue HB 4005's Pricing Strategy Disclosure Requirement from strict scrutiny.

IV.

We have never applied anything other than strict scrutiny to the kind of speech that HB 4005's Pricing Strategy Disclosure Requirement compels. As the Supreme Court has cautioned, we must be "reluctant to mark off new categories of speech for diminished constitutional protection." *Nat'l Inst. of Fam. & Life Advocs.*, 585 U.S. at 767 (citation omitted).

In this case, my colleagues break new ground because society has an "interest in the fullest possible dissemination of information." Maj. Op. at 41 (citation omitted). The governmental power countenanced by this reasoning "has no clear limiting principle." *United States v. Alvarez*, 567 U.S. 709, 723 (2012) (Kennedy, J.) (plurality opinion) ("Our constitutional tradition stands against the idea that we need Oceania's Ministry of Truth." (citing G. Orwell, Nineteen Eighty-Four (1949) (Centennial ed. 2003))). I am not prepared to countenance a government that can compel an unwilling speaker to speak simply because the government and some others, for their own economic or political interests, would like to hear.

My colleagues also suggest that we subject government reporting requirements to a more lenient level of First Amendment scrutiny than we do for direct disclosure requirements. *See* Maj. Op. at 16–20. I fear this suggestion would encourage the government to circumvent strict First Amendment scrutiny by converting various kinds of existing and prospective direct disclosure requirements to government reporting requirements. I am not prepared to condone such a loophole either.

Following *X Corp.* and *NetChoice*, we must subject HB 4005's Pricing Strategy Disclosure Requirement to strict

scrutiny because it compels drug manufacturers to engage in non-commercial speech on an intensely debated and politically fraught topic: prescription drug prices. Oregon does not claim HB 4005's Pricing Strategy Disclosure Requirement survives strict scrutiny. Therefore, I dissent from the majority's disposition of PhRMA's First Amendment claim.